UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHIVA STEIN, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>  vs.<br><br>EAGLE BANCORP, INC., SUSAN G. RIEL, RONALD D. PAUL, CHARLES D. LEVINGSTON, and JAMES H. LANGMEAD,<br><br>     Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff Shiva Stein ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Eagle Bancorp, Inc. ("Eagle Bancorp" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Eagle Bancorp securities between March 2, 2015 and July 17, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Eagle Bancorp was founded in 1997 and is headquartered in Bethesda, Maryland. Eagle Bancorp operates as the bank holding company for EagleBank, Inc. ("EagleBank"), which provides commercial and consumer banking services primarily in the United States.

3.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Eagle Bancorp's internal controls and procedures and compliance policies were inadequate; (ii) the foregoing shortcoming created a foreseeable risk of heightened regulatory scrutiny and the need for the Company undertake its own internal investigations; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

4.      On July 17, 2019, Eagle Bancorp disclosed rising legal costs stemming from ongoing internal and government investigations of "the Company's identification, classification and disclosure of related party transactions; the retirement of certain former officers and directors; and the relationship of the Company and certain of its former officers and directors with a local public official."

5.     On this news, Eagle Bancorp's stock price fell $14.30 per share, or 26.75%, to close at $39.15 per share on July 18, 2019.

6.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

9.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Eagle Bancorp's common stock trades on the Nasdaq Stock Market ("NASDAQ"), located within this Judicial District.

10.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

11.     Plaintiff, as set forth in the attached Certification, acquired Eagle Bancorp securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

12.     Defendant Eagle Bancorp is incorporated in Maryland with its principal executive offices located at 7830 Old Georgetown Road, Third Floor, Bethesda, Maryland 20814.  Eagle Bancorp's securities trade in an efficient market on the NASDAQ under the symbol "EGBN."

13.     Defendant Susan G. Riel ("Riel") has served as Eagle Bancorp's President and Chief Executive Officer ("CEO") since May 6, 2019.  Defendant Riel served as the Company's Interim President and CEO from March 21, 2019 until her permanent appointment as President and CEO on May 6, 2019.

14.     Defendant Ronald D. Paul ("Paul") served as Eagle Bancorp's Chairman, President and CEO at all relevant times until he retired on March 21, 2019, citing serious health developments.  Defendant Paul co-founded Eagle Bancorp with Defendant Riel and two others.

15.     Defendant Charles D. Levingston ("Levingston") has served as Eagle Bancorp's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") since April 7, 2017.

16.     Defendant James H. Langmead ("Langmead") served as Eagle Bancorp's EVP and CFO from January 2007 until April 2017.

17.     Defendants Riel, Paul, Levingston, and Langmead are sometimes referred to herein as the "Individual Defendants."

18.     The Individual Defendants possessed the power and authority to control the contents of Eagle Bancorp's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Eagle Bancorp's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Eagle Bancorp, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been

disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Eagle Bancorp was founded in 1997 and is headquartered in Bethesda, Maryland. Eagle Bancorp operates as the bank holding company for EagleBank that provides commercial and consumer banking services primarily in the United States.

20.     Eagle Bancorp accepts business and personal checking, NOW, tiered savings, and money market accounts, as well as individual retirement, certificate of deposit, and investment sweep accounts, and time deposits.  The Company also offers various commercial and consumer lending products.  In addition, it provides online and mobile banking services and other services. The Company serves sole proprietors, small and medium-sized businesses, partnerships, corporations, non-profit organizations and associations, and individuals, as well as investors.  As of December 31, 2018, it operated twenty banking offices comprising six in Suburban Maryland, five in the District of Columbia, and nine in Northern Virginia.

### Materially False and Misleading Statements Issued During the Class Period

21.     The Class Period begins on March 2, 2015, when Eagle Bancorp filed its Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2014 (the "2014 10-K").  For 2014, Defendants reported net income of $54.26 million, or $1.95 per diluted share, on net revenue of $196.82 million, compared to net income of $47.01 million, or $1.76 per diluted share, on net revenue of $169.51 million for 2013.

22.     With regard to Eagle Bancorp's related party loans and transactions, the 2014 10-K

stated, in relevant part:

> Certain directors and executive officers have had loan transactions with the
> Company. Such loans were made in the ordinary course of business on substantially
> the same terms, including interest rates and collateral, as those prevailing at the
> time for comparable transactions with outsiders.
>
> * * *
>
> During 2014, approximately $801 thousand in interest was paid to the current or
> former directors of the Company or accounts for the benefit of such persons in
> respect of subordinated notes, which were amended in 2013. [. . . .]
>
> The Bank leases office space, at a current monthly base rental of $132,938,
> excluding certain pass through expenses, from limited liability companies in which
> a trust for the benefit of an executive officer's children has an 85% interest in one
> instance and a 51% interest in another.
>
> A director is a partner in the law firm Shulman, Rogers, Gandal, Pordy & Ecker,
> P.A. which has provided, and continues to provide, legal services to the Company
> and its subsidiaries. During 2014, the Company and its subsidiaries paid aggregate
> fees of $907,603 to that firm. Under the director's arrangement with his firm, he
> does not participate in the profits or revenues resulting from the provision of legal
> services to the Company and its subsidiaries, and he receives no other compensation
> or benefits in lieu of such participation.

23.     Additionally, according to the 2014 10-K, Eagle Bancorp and its management had

concluded that the Company's controls and procedures were effective as of the last day of the

period covered by the 2014 10-K, stating, in relevant part:

> The Company's management, under the supervision and with the participation of
> the Chief Executive Officer and Chief Financial Officer, evaluated, as of the last
> day of the period covered by this report, the effectiveness of the design and
> operation of the Company's disclosure controls and procedures, as defined in
> Rule 13a-15(e) under the Securities Exchange Act of 1934. Based on that
> evaluation, the Chief Executive Officer and Chief Financial Officer concluded that
> the Company's disclosure controls and procedures were effective.

24.     In its "Management Report on Internal Control Over Financial Reporting" section,

the 2014 10-K touted Eagle Bancorp's compliance mechanisms and procedures, noting that

6

management had concluded that the Company maintained effective internal control over financial reporting as of December 31, 2014, and that there were no material weaknesses within the Company's internal control structure.  Specifically, the 2014 10-K stated, in relevant part:

> The Company's internal control over financial reporting includes those policies and procedures that pertain to the Company's ability to record, process, summarize and report reliable financial data. ***The internal control system contains monitoring mechanisms, and appropriate actions taken to correct identified deficiencies.*** Management believes that internal controls over financial reporting, which are subject to scrutiny by management and the Company's internal auditors, support the integrity and reliability of the financial statements . . . . The Audit Committee of the Board of Directors (the "Committee"), is comprised entirely of outside directors who are independent of management. The Committee is responsible for the appointment and compensation of the independent auditors and makes decisions regarding the appointment or removal of members of the internal audit function. The Committee meets periodically with management, the independent auditors, and the internal auditors to ensure that they are carrying out their responsibilities. The Committee is also responsible for performing an oversight role by reviewing and monitoring the financial, accounting, and auditing procedures of the Company in addition to reviewing the Company's financial reports. The independent auditors and the internal auditors have full and unlimited access to the Audit Committee, with or without the presence of management, to discuss the adequacy of internal control over financial reporting, and any other matters which they believe should be brought to the attention of the Audit Committee.

> ***Management assessed the Company's system of internal control over financial reporting as of December 31, 2014.*** This assessment was conducted based on the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission "Internal Control—Integrated Framework (2013)." ***Based on this assessment, management believes that the Company maintained effective internal control over financial reporting as of December 31, 2014. Management's assessment concluded that there were no material weaknesses within the Company's internal control structure.***

> There were no changes in the Company's internal control over financial reporting (as defined in Rule 13a-15 under the Securities Act of 1934) during the quarter ended December 31, 2014 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

(Emphasis added.)

25.     Coupled with these assurances, the 2014 10-K contained merely generic, boilerplate representations, merely noting an unspecified potential risk that Eagle Bancorp's internal controls could prove deficient, stating, in relevant part:

> Management recognizes that there are inherent limitations in the effectiveness of any internal control system, including the possibility of human error and the circumvention or overriding of internal controls. Accordingly, even effective internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation. In addition, because of changes in conditions and circumstances, the effectiveness of internal control over financial reporting may vary over time.

26.     Appended as exhibits to the 2014 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") wherein Defendants Paul and Langmead certified that "such [2014 10-K] fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "the information contained in such [2014 10-K] fairly presents, in all material respects, the financial condition and results of operations of Eagle Bancorp, Inc."

27.     On February 29, 2016, Eagle Bancorp filed its Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2015 (the "2015 10-K").  For 2015, Defendants reported net income of $84.17 million, or $2.50 per diluted share, on net revenue of $260.57 million, compared to net income of $54.26 million, or $1.95 per diluted share, on net revenue of $196.82 million for 2014.

28.     With regard to Eagle Bancorp's related party loans and transactions, the 2015 10-K stated, in relevant part:

> Certain directors and executive officers have had loan transactions with the Company. Such loans were made in the ordinary course of business on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with outsiders.

* * *

Related Party Deposits totaled $57 million, $71 million, and $71 million at December 31, 2015, 2014, and 2013, respectively.

* * *

During 2015, approximately $427 thousand in interest was paid to the current or former directors of the Company or accounts for the benefit of such persons in respect of the Company's subordinated notes, due 2021. [. . . .]

The Bank leases office space from limited liability companies in which a trust for the benefit of an executive officer's children has an 85% interest in one instance and a 51% interest in another. During the fourth quarter of 2015, the Company entered into an agreement to lease office space for a second location with limited liability companies in which an executive officer indirectly owns a majority interest. The Company paid $1.6 million, $1.3 million, and $822 thousand excluding certain pass-through expenses for the years ended December 31, 2015, 2014 and 2013, respectively.

A director is a partner in the law firm which has provided, and continues to provide, legal services to the Company and its subsidiaries. During 2015, the Company and its subsidiaries paid aggregate fees of $1.1 million to that firm. Under Mr. Roger's arrangement with his firm, he does not participate significantly in the profits or revenues resulting from the provision of legal services to the Company and its subsidiaries.

29.    Additionally, the 2015 10-K contained substantively the same statements as those quoted in ¶¶ 23-25 above concerning Eagle Bancorp's controls and procedures and internal control over financial reporting—*i.e.*, touting those controls, affirming they remained effective, and noting unspecified potential risks of speculative deficiencies in those controls.

30.    Appended as exhibits to the 2015 10-K were signed SOX certifications wherein Defendants Paul and Paul and Langmead certified that "such [2015 10-K] fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "the information contained in such [2015 10-K] fairly presents, in all material respects, the financial condition and results of operations of Eagle Bancorp, Inc."

31.    On March 1, 2017, Eagle Bancorp filed its Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended

December 31, 2016 (the "2016 10-K").  For 2016, Defendants reported net income of $97.71 million, or $2.86 per diluted share, on net revenue of $285.45 million, compared to net income of $84.17 million, or $2.50 per diluted share, on net revenue of $260.57 million for 2015.

32.     With regard to Eagle Bancorp's related party loans and transactions, the 2016 10-K stated, in relevant part:

> Certain directors and executive officers have had loan transactions with the Company. Such loans were made in the ordinary course of business on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with outsiders.
>
> * * *
>
> Related Party Deposits totaled $57.5 million and $57.3 million at December 31, 2016 and 2015, respectively.
>
> * * *
>
> The Bank leases office space from a limited liability company in which a trust for the benefit of an executive officer's children has a 51% interest. During the fourth quarter of 2015, the Company entered into an agreement to lease office space for a second location with limited liability companies in which an executive officer indirectly owns a majority interest. The Company paid $1.9 million, $1.6 million, and $1.3 million excluding certain pass-through expenses for the years ended December 31, 2016, 2015 and 2014, respectively.
>
> A director is a partner in the law firm which has provided, and continues to provide, legal services to the Company and its subsidiaries. During 2016, the Company and its subsidiaries paid aggregate fees of $1.0 million to that firm. Under the Director's arrangement with his firm, he does not participate significantly in the profits or revenues resulting from the provision of legal services to the Company and its subsidiaries.

33.     Additionally, the 2016 10-K acknowledged deficiencies in Eagle Bancorp's controls and procedures and internal control over financial reporting, but cabined these deficiencies to issues relating to income tax accounting.  Specifically, the 2016 10-K disclosed that management "concluded that the Company did not maintain effective disclosure controls and procedures" and also "did not maintain effective internal control over financial reporting as of

December 31, 2016" both as a result of a "material weakness in the Company's internal control relating to income tax accounting[.]" The 2016 10-K described these material weaknesses in more detail, stating, in relevant part:

> The Company did not maintain effective controls over its income tax accounting. Specifically, the Company did not maintain effective controls related to: state income tax apportionment; an error in federal tax rates; financial statement to tax return reconciliation errors; and matters related to accounting for share based compensation. While these errors were determined not to be material to the consolidated financial statements, and no adjustments were made as a result of these errors, this control deficiency could result in a misstatement of the tax accruals or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected on a timely basis.

34.     In acknowledging these material weaknesses, purportedly limited to income tax accounting issues, Eagle Bancorp also touted its ostensible remediation plan, stating, in relevant part:

> *Remediation Plan.*   Management, with oversight from our Audit Committee and in consultation with our tax advisors, has begun development of a remediation plan to address the control deficiency that led to the material weakness. Upon full implementation, the remediation plan will include the following:
>
> - Specific review procedures, including the enhanced involvement of outside independent tax consulting services in the review of tax accounting, designed to enhance our income tax accruals and deferrals; and
>
> - Stronger quarterly income tax controls with improved documentation standards, technical oversight and training.
>
> We currently plan to have our enhanced review procedures and documentation standards in place and operating beginning in the first quarter of 2017. These new controls and procedures will be tested as we apply our controls related to tax accounting during 2017. Our goal is to remediate this material weakness by the end of 2017, subject to there being sufficient opportunities to conclude, through testing, that the enhanced control is operating effectively.

35.     Appended as exhibits to the 2016 10-K were signed SOX certifications wherein Defendants Paul and Langmead certified that "such [2016 10-K] fully complies with the

requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "the information contained in such [2016 10-K] fairly presents, in all material respects, the financial condition and results of operations of Eagle Bancorp, Inc."

36.     On December 1, 2017, anonymous short-selling organization *Aurelius Value* issued a report alleging that EagleBank executives, including Defendant Paul, had offered bank loans in exchange for cheap valuations for other personal investments, as well as a series of regulatory infractions regarding the company's disclosure of related-party transactions by Paul and other EagleBank members (the "*Aurelius* Report"). In the *Aurelius* Report's opinion, "insiders treat Eagle as their own private piggy bank." The *Aurelius* Report's allegations concerned, among other things, improper conduct stretching back as far as 2014, which included:

- Large Insider loans that finance the CEO's companies but haven't been disclosed.

- Fraud accusations that favorable loans are used to enrich the CEO and certain Board Members.

- Undisclosed financial entanglements between largest borrowers and the CEO

- Indications that loans to companies owned by insiders are distressed.

- Compromised and conflicted Board oversight.

- Large recent Insider stock sales.

37.     Much of the *Aurelius* Report also examined how Defendant Paul, while simultaneously acting as President of the Ronald D. Paul Companies ("RDP"), which owns a portfolio of real estate properties and operating businesses, allegedly financed RDP's real estate ventures and other transactions by having Eagle Bancorp issue loans to limited liability organizations controlled by RDP. For example, the *Aurelius* Report stated that "[a]ccording to public documents [*Aurelius Value*] obtained, Eagle has made loans financing at least 10 different

RDP properties with amounts totaling over $180 million or over **21%** of the company's Tier 1

capital of $827 million" (emphasis in original).

38.     That same day, Eagle Bancorp issued a press release "categorically reject[ing] the

assertions and implications" in the Aurelius Report, stating, in relevant part:

> Early this morning, Aurelius Value—an anonymous online firm that supports short-sellers—published a deceptive and materially misleading piece about Eagle Bancorp ("Eagle"). Eagle categorically rejects the assertions and implications in the piece.
>
> Based on a 36 percent increase in short positions month over month leading up to the release of the article, it appears that the goal of this piece was to manipulate and depress Eagle's stock price. The piece, which was issued without contacting Eagle for comment, is filled with demonstrable falsehoods and material omissions. For example:
>
> - **Selective Quoting of Baseless Allegations from Meritless Lawsuits.** The internet piece relies on unsubstantiated claims in two pending lawsuits. Aurelius fails to disclose that Eagle is not even a party to one of them and thus has had no reason to address the allegations. Eagle has moved to dismiss the other lawsuit in its entirety. It is utterly frivolous. While it may further Aurelius' financial purpose to selectively quote from these lawsuits and omit material information that investors would surely consider important, such behavior is both disturbing and misleading.
>
> - **All Loans Referenced in the Piece Fully Meet Legal Requirements.** The only credit issued by Eagle to the identified executive was a line of credit in case of an overdraft; the line never was used and has not been funded. Eagle takes seriously its obligation to comply with all applicable laws and regulations, including Regulation O. Its compliance is regularly examined internally, and is also examined by agency regulators. Contrary to the misrepresentations by Aurelius, the loans identified in the piece were not made to the identified executive, and, in any event, were approved and disclosed (where required) in compliance with Regulation O.
>
> - **Mischaracterization of Stock Transactions.** Contrary to the incorrect assertions in the piece, the referenced stock sales by an Eagle executive constituted only a small fraction of his holdings. The majority of the proceeds of those sales was used to further charitable purposes. There have been no non-routine stock sales by Eagle executive management.

- **Falsehoods About "Distressed" Loans.** The piece's claim that two alleged related party loans are distressed is false. Those loans are current and performing.

These are but a few examples of the blatant mischaracterizations, falsehoods, and misleading statements in the Aurelius Value report. Eagle categorically rejects the assertions and implications in the piece.

Eagle was founded on, and remains strongly committed to, abiding by the law and the highest professional and ethical standards.

39.     Following the release of the *Aurelius* Report, Eagle Bancorp's stock price fell $16.20 per share, or 24.49%, to close at $49.95 per share on December 1, 2017.  However, padded by Defendants' continued positive statements and rebuke of any allegations of wrongdoing against the Company, Eagle Bancorp's stock price quickly recovered and continued to trade at inflated prices.

40.     On March 1, 2018, Eagle Bancorp filed its Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2017 (the "2017 10-K").  For 2017, Defendants reported net income of $100.23 million, or $2.92 per diluted share, on net revenue of $313.26 million, compared to net income of $97.71 million, or $2.86 per diluted share, on net revenue of $285.45 million for 2016.

41.     With regard to Eagle Bancorp's related party loans and transactions, the 2017 10-K stated, in relevant part:

Certain directors and executive officers have had loan transactions with the Company. Such loans were made in the ordinary course of business on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with outsiders.

* * *

The Bank has made an aggregate of $4.0 million of loans to a trust with an independent third party trustee, established by an executive officer and director, of which the children of such executive officer and director are discretionary beneficiaries, and over which such individuals have no investment or operational

14

authority, and an aggregate of $65.6 million of loans to entities in which the trust has an ownership interest in excess of 10%, which the Company does not consider to be related party transactions. All of such loans were made in the ordinary course of the Company's lending business, were made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable loans with third parties; and did not involve more than the normal risk of collectability or present other unfavorable features. All of such loans are performing and none of such loans are disclosed as nonaccrual, past due, restructured or potential problem loans.

* * *

Related Party Deposits totaled $84.3 million and $57.5 million at December 31, 2017 and 2016, respectively.

* * *

The Bank leases office space from a limited liability company in which a trust for the benefit of an executive officer's children has a 51% interest. During the fourth quarter of 2015, the Company entered into an agreement to lease office space for a second location with limited liability companies in which an executive officer indirectly owns a majority interest. The Company leased additional space at this location starting with the third quarter of 2017. The Company paid $2.1 million, $1.9 million, and $1.6 million excluding certain pass-through expenses for the years ended December 31, 2017, 2016 and 2015, respectively.

A director is a partner in the law firm which has provided, and continues to provide, legal services to the Company and its subsidiaries. During 2017, the Company and its subsidiaries paid aggregate fees of $871 thousand to that firm. Under the Director's arrangement with his firm, he does not participate significantly in the profits or revenues resulting from the provision of legal services to the Company and its subsidiaries.

42.     Additionally, the 2017 10-K contained substantively the same statements as those quoted in ¶¶ 23-25 above concerning Eagle Bancorp's controls and procedures and internal control over financial reporting—*i.e.*, touting those controls, affirming they remained effective, and merely noting unspecified risks of speculative deficiencies in those controls.  The 2017 10-K additionally touted the successful implementation of the remedial measures outlined in the 2016 10-K, as discussed above, as well as the purportedly successful cure of the material weaknesses that existed in the Company's controls and procedures and internal control over financial reporting.

43.     Appended as exhibits to the 2017 10-K were signed SOX certifications wherein
Defendants Paul and Levingston certified that "such [2017 10-K] fully complies with the
requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "the
information contained in such [2017 10-K] fairly presents, in all material respects, the financial
condition and results of operations of Eagle Bancorp, Inc."

44.     On March 1, 2019, Eagle Bancorp filed its Annual Report on Form 10-K with the
SEC, reporting the Company's financial and operating results for the fiscal year ended December
31, 2018 (the "2018 10-K").  For 2018, Defendants reported net income of $152.28 million, or
$4.42 per diluted share, on net revenue of $339.58 million, compared to net income of $100.23
million, or $2.92 per diluted share, on net revenue of $313.26 million for 2017.

45.     With regard to Eagle Bancorp's related party loans and transactions, the 2018 10-
K stated, in relevant part:

> Certain directors and executive officers have had loan transactions with the
> Company. Such loans were made in the ordinary course of the Company's lending
> business, were made on substantially the same terms, including interest rates and
> collateral, as those prevailing at the time for comparable loans with third parties;
> and did not involve more than the normal risk of collectability or present other
> unfavorable features. All of such loans are performing and none of such loans are
> disclosed as nonaccrual, past due, restructured or potential problem loans.
>
> * * *
>
> Related Party Deposits totaled $141.4 million and $179.1 million at December 31,
> 2018 and 2017, respectively.
>
> * * *
>
> The Bank leases office space from a limited liability company in which a trust for
> the benefit of an executive officer's children has a 51% interest. During the fourth
> quarter of 2015, the Company entered into an agreement to lease office space for a
> second location with limited liability companies in which an executive officer
> indirectly owns a majority interest. The Company leased additional space at this
> location starting with the third quarter of 2017. The Company paid $2.2 million,

$2.1 million, and $1.9 million excluding certain pass-through expenses for the years ended December 31, 2018, 2017 and 2016, respectively.

A director is a shareholder in the law firm which has provided, and continues to provide, legal services to the Company and its subsidiaries. During 2018, the Company and its subsidiaries paid aggregate fees of $750 thousand to that firm. Under the Director's arrangement with his firm, he does not participate significantly in the profits or revenues resulting from the provision of legal services to the Company and its subsidiaries.

The EagleBank Foundation, a 501(c)3 non-profit, seeks to improve the well being of our community by providing financial support to local charitable organizations that help foster and strengthen vibrant, healthy, cultural and sustainable communities. The Company paid $150 thousand, $145 thousand, and $139 thousand to the EagleBank Foundation for the years ended December 31, 2018, 2017 and 2016, respectively.

46.     Notably, the 2018 10-K acknowledged that Eagle Bancorp was modifying its analysis with respect to insider related parties and, consequently, restated the amounts Eagle Bancorp had previously reported in the 2017 10-K for related party loans and related party deposits.  Specifically, the 2018 10-K stated, in relevant part:

During 2018, we modified our analysis with respect to insider related parties and as a result included additional relationships such as those involving extended family members and trusts, resulting in an increase to the previously reported $60.9 million balance of related party loans at December 31, 2017.

* * *

During 2018, we modified our analysis with respect to insider related parties and as a result included additional relationships such as those involving extended family members and trusts, resulting in an increase to the previously reported $84.3 million balance of related party deposits at December 31, 2017.

47.     Additionally, the 2018 10-K contained substantively the same statements as those quoted in ¶¶ 23-25 above concerning Eagle Bancorp's controls and procedures and internal control over financial reporting—*i.e.*, touting those controls, affirming they remained effective, and merely noting unspecified risks of speculative deficiencies in those controls.

48.     Appended as exhibits to the 2018 10-K were signed SOX certifications wherein Defendants Paul and Levingston certified that "such [2018 10-K] fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "the information contained in such [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of Eagle Bancorp, Inc."

49.     On March 8, 2019, a week after the release of the Company's 2018 10-K, media outlets began reporting on Eagle Bancorp's connection to an ethics probe into Washington D.C. Council member Jack Evans ("Evans").  For example, on that date, *The Washington Post* published an article titled "D.C. Council, Bowser administration receive federal subpoenas in Jack Evans ethics probe" (the "*Washington Post* Article"), which stated, in relevant part:

> The D.C. Council and the administration of Mayor Muriel E. Bowser have received federal subpoenas for a wide range of information related to council member Jack Evans and his constellation of private legal and consulting clients.
>
> * * *
>
> The subpoena to the office of Bowser (D), dated Tuesday, requests that a range of documents . . . be turned over to the FBI's Washington Field Office, according to city officials familiar with the matter.
>
> * * *
>
> Last week, The Washington Post reported that Evans repeatedly used his government email to solicit business from law firms that had lobbied the city government, offering to use the influence and connections he amassed as the city's longest-serving lawmaker and as chairman of the Washington Metropolitan Transit Authority to help their clients.
>
> * * *
>
> [T]he subpoena to Bowser's office asked council members to preserve documents related to about three dozen people and entities. [. . . .]
>
> The Post on Friday attempted to contact every entity named in the documents. All either declined to comment or did not return messages.

18

They are [*inter alia*]:

* * *

**Ronald Paul, chief executive and chairman of EagleBank and RDP Management, which were also named.**

(Emphasis added.)  Despite this news, Eagle Bancorp's stock price continued to climb, buoyed by Defendants' false and misleading statements, and positive remarks concerning the Company's business and prospects.

50.     The statements referenced in ¶¶ 21-49 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Eagle Bancorp's internal controls and procedures and compliance policies were inadequate; (ii) the foregoing shortcoming created a foreseeable risk of heightened regulatory scrutiny and the need for the Company undertake its own internal investigations; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

51.     On July 17, 2019, Eagle Bancorp issued a press release announcing "Net Income For Second Quarter 2019 of $37.2 Million and Total Assets of $8.7 Billion" (the "July 2019 Press Release").   In the July 2019 Press Release, Eagle Bancorp disclosed ongoing internal and government investigations into the Company's disclosure of related party transactions, the retirement of certain former officers and directors, and the relationship of the Company and certain of its former officers and directors with a local public official.   Specifically, the July 2019 Press Release stated, in relevant part:

19

During the three month periods ended June 30, 2019 and June 30, 2018, the Company incurred legal, accounting and professional fees and expenses of $2.7 million and $2.2 million, respectively, which represented an increase of 26%. For the six month periods ended June 30, 2019 and June 30, 2018, the Company incurred legal, accounting and professional fees and expenses of $4.4 million and $5.2 million, respectively, which represented a decrease of 14%. During the three months ended June 30, 2018, *these expenses related substantially to the Company's engagement of independent accounting, legal and compliance consultants who conducted various investigations for the Company, in addition to consulting costs to enhance our governance and risk management systems*. During the three months ended June 30, 2019, *such expenses related primarily to legal fees and expenditures in connection with our responses to investigations and related document requests and subpoenas from government agencies examining matters, including the Company's identification, classification and disclosure of related party transactions; the retirement of certain former officers and directors; and the relationship of the Company and certain of its former officers and directors with a local public official*. The Company has D&O insurance that may provide reimbursement for all or part of advancement and indemnification costs requested by current and former officers and directors, and those costs can not be estimated at this time. While we are unable to estimate the amount of these legal expenditures at this time, *the Company expects that it will continue to incur elevated levels of legal and professional fees and expenses for at least the remainder of 2019 as it continues to cooperate with these investigations*. Other than these increased costs, we do not believe at this time that the resolution of these investigations will be materially adverse to the Company. As a result of these ongoing investigations, there have been no regulatory restrictions placed on the Company's ability to fully engage in its banking business as presently conducted. We are, however, unable to predict the duration, scope or outcome of these investigations.

(Emphases added.)

52.     On this news, Eagle Bancorp's stock price fell $14.30 per share, or 26.75%, to close at $39.15 per share on July 18, 2019.

53.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Eagle Bancorp securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

55.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Eagle Bancorp securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Eagle Bancorp or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

56.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

57.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Eagle Bancorp;

- whether the Individual Defendants caused Eagle Bancorp to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Eagle Bancorp securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

59.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

60.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Eagle Bancorp  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Eagle Bancorp securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

61. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

62. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

63. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

64. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

65. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Eagle Bancorp securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Eagle Bancorp securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

66.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Eagle Bancorp securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Eagle Bancorp's finances and business prospects.

67.     By virtue of their positions at Eagle Bancorp, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each

Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

68.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Eagle Bancorp, the Individual Defendants had knowledge of the details of Eagle Bancorp's internal affairs.

69.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Eagle Bancorp. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Eagle Bancorp's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Eagle Bancorp securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Eagle Bancorp's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Eagle Bancorp securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

70.     During the Class Period, Eagle Bancorp securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares

of Eagle Bancorp securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Eagle Bancorp securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Eagle Bancorp securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

71.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

73.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

74.     During the Class Period, the Individual Defendants participated in the operation and management of Eagle Bancorp, and conducted and participated, directly and indirectly, in the conduct of Eagle Bancorp's business affairs.  Because of their senior positions, they knew the

26

adverse non-public information about Eagle Bancorp's misstatement of income and expenses and false financial statements.

75.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Eagle Bancorp's financial condition and results of operations, and to correct promptly any public statements issued by Eagle Bancorp which had become materially false or misleading.

76.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Eagle Bancorp disseminated in the marketplace during the Class Period concerning Eagle Bancorp's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Eagle Bancorp to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Eagle Bancorp within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Eagle Bancorp securities.

77.     Each of the Individual Defendants, therefore, acted as a controlling person of Eagle Bancorp.  By reason of their senior management positions and/or being directors of Eagle Bancorp, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Eagle Bancorp to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Eagle Bancorp and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

78.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Eagle Bancorp.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  July 24, 2019

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Gustavo F. Bruckner
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: gfbruckner@pomlaw.com
Email: ahood@pomlaw.com
Email: jlindenfeld@pomlaw.com

28

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

**CERTIFICATION PURSUANT**
**TO FEDERAL SECURITIES LAWS**

1. I, ___Shiva Stein___, make this declaration pursuant to Section 27(a) (2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Eagle Bancorp, Inc. ("Eagle Bancorp" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire Eagle Bancorp securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Eagle Bancorp securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in Eagle Bancorp securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have sought to serve as a representative party and/or filed a complaint on behalf of a class under the federal securities laws in the following actions:

- *Stein v. Bridgepoint Education, Inc. et al*, 3:19-cv-00460 (S.D. Cal.)
- *Stein v. Callidus Software Inc. et al*, 3:18-cv-01453 (N.D. Cal.)
- *In re Almost Family, Inc. Securities Litigation*, 3:18-cv-00040 (W.D. Ky.)
- *Stein v. Cavium, Inc. et al*, 5:18-cv-00141 (N.D. Cal.)
- *Stein v. Bazaarvoice, et al*, 1:18-cv-00067 (D. Del.)
- *Stein v. Ampio Pharmaceuticals, Inc. et al*, 2:15-cv-3640 (C.D. Cal.)
- *Stein v. Quicksilver, Inc. et al*, 2:15-cv-2810 (C.D. Cal.)

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed ___7/22/19___

**(Date)**

___(Signature)___

Shiva Stein

**(Type or Print Name)**

**Eagle Bancorp, Inc. (EGBN)**                                                                 **Stein, Shiva**

**List of Purchases and Sales**

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 2/19/2019 | Purchase | 7 | $58.9529 |