# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHIVA STEIN, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:19-cv-06873-LGS |
| Plaintiff, | |
| v. | <u>JURY TRIAL DEMANDED</u> |
| EAGLE BANCORP, INC., SUSAN G. RIEL, RONALD D. PAUL, CHARLES D. LEVINGSTON, JAMES H. LANGMEAD, and LAURENCE E. BENSIGNOR, | |
| Defendants. | |

## AMENDED CLASS ACTION COMPLAINT
## <u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................ 1

II.     JURISDICTION AND VENUE ................................................................... 7

III.    PARTIES ..................................................................................................... 7

IV.     RELEVANT NON-PARTIES ..................................................................... 11

V.      SUMMARY OF THE FRAUD ................................................................... 12

        A.      Background Of The Company And Its Business .............................. 12

        B.      Federal Regulations Limit Loans To Bank Executives, Directors, And Their
                Related Interests ............................................................................... 14

        C.      SEC Regulations And Guidance And GAAP Required Eagle To Report Its
                Related Party Loans To Investors ..................................................... 16

        D.      The Aurelius Report Alleges That Paul And Others Were Orchestrating An
                "Insider Loan Scheme" In Which They Used Eagle As A "Private Piggy
                Bank" ................................................................................................ 20

        E.      Eagle Quickly Defends Itself In Summarily Rejecting The Aurelius Report
                And The Allegations Therein ............................................................ 24

        F.      The Truth Begins To Emerge ............................................................ 30

        G.      Plaintiffs' Independent Investigation Confirms That Paul, Assisted By
                Bensignor And McCallum, Disguised Paul's Control Of Eagle-Financed
                Ventures ............................................................................................ 34

                1.      Paul's MakeOffices Investment Facilitated A Favorable Loan From
                        EagleBank To MakeOffices ..................................................... 36

                2.      EagleBank Financed Numerous RDP Real Estate Ventures ..... 40

                3.      Paul Disguised His Related Party Transactions Through The Potomac
                        Trust And Various Other Limited Liability Companies ............ 41

                4.      Paul's Deals Were Structured To Specifically Avoid Scrutiny In A
                        Federal Reserve Audit ............................................................. 44

5.     Eagle's General Counsel Was Entangled In Paul's Related Party Transactions; And Therefore, Could Not Independently Perform His Role in Assuring These Loans Were Not Given Preferential Treatment .................................................................................46

6.     A Former Employee Confirms Eagle Lacked Adequate Internal Controls To Determine Whether Loans Were Being Made To Related Parties And Whether Such Loans Were Not Given Preferential Treatment .................................................................................49

7.     Paul's Controlling Influence Over EagleBank's Lenders Support The Aurelius Report's Allegations Of Paul's Use Of Eagle As A "Private Piggy Bank" ...............................................................................51

VI.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD .........................................................53

A.    Defendants' False And Misleading Statements And Omissions In And Relating To Eagle Bancorp's Fiscal Year 2014 Financial Results .......................54

B.    Defendants' False And Misleading Statements And Omissions In And Relating To Eagle Bancorp's Fiscal Year 2015 Financial Results .......................60

C.    Defendants' False And Misleading Statements And Omissions In And Relating To Eagle Bancorp's Fiscal Year 2016 Financial Results .......................63

D.    Defendants' False And Misleading Statements In Response To The Aurelius Report.............................................................................................................69

E.    Defendants' False And Misleading Statements And Omissions In And Relating To Eagle Bancorp's Fiscal Year 2017 Financial Results .......................77

F.    Defendants' False And Misleading Statements And Omissions In Eagle Bancorp's Q1 2018 Earnings Call .........................................................................83

G.    Defendants' False And Misleading Statements And Omissions In And Relating To Eagle Bancorp's Fiscal Year 2018 Financial Results .......................85

VII.   SCHEME LIABILITY.................................................................................................90

VIII.  LOSS CAUSATION....................................................................................................92

IX.    ADDITIONAL SCIENTER ALLEGATIONS ...........................................................96

A.    Paul's Tying Arrangements .....................................................................................96

B.    Paul Had Financial Motives To Conceal The Company's Insider Loan Scheme.......................................................................................................................97

|   |   |   |
|---|---|---|
| | 1. | Paul Had A Personal Financial Motive To Conceal His Financial Interest And Role In The Undisclosed Related Party Transactions ..........98 |
| | 2. | Paul Began Selling Eagle Bancorp Stock Shortly After Learning That Certain Of His Conduct Had Been Reported To Federal Law Enforcement Authorities ...........................................................................99 |
| C. | | EagleBank Financed Numerous RDP Real Estate Ventures ...............................101 |
| D. | | Defendants' Reflexive Denial Of The Allegations In The Aurelius Report And Their Ongoing Failure To Disclose Transaction-Level Details In Connection With Their Modified Related Party Disclosures Support A Strong Inference Of Scienter ...........................................................................108 |
| E. | | Eagle Bancorp's Code Of Business Conduct And Ethics.....................................108 |
| F. | | The Significant Number Departures Of Eagle Leadership Support An Inference Of Scienter ...........................................................................110 |
| G. | | The Disappearance Of Numerous Properties From The RDP Website Support An Inference Of Scienter ...........................................................................111 |

X.    ALTER EGO ALLEGATIONS.......................................................................112

XI.   CORPORATE SCIENTER ALLEGATIONS...................................................114

XII.  CLASS ACTION ALLEGATIONS ................................................................115

XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) .................................................................................117

XIV.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ................................................................................119

XV.   CLAIMS FOR RELIEF .................................................................................120

XVI.  PRAYER FOR RELIEF .................................................................................125

XVII. DEMAND FOR TRIAL BY JURY .................................................................126

## TABLE OF EXHIBITS

| __Exhibit__ | |
|---|---|
| A | Complaint and exhibits thereto filed in *Rahbar v. Paul, et al.*, CL 2017-02133 (Va. Cir. Ct., Fairfax, Feb. 10, 2017) |
| B | Complaint filed in *MRP UO Partners, LLC, et al. v. MakeOffices, LLC, et al.*, CL 2017-00817 (Va. Cir. Ct., Fairfax, Jan. 18, 2017) |
| C | Email from Larry Bensignor to Jackson Prentice and others dated September 24, 2015, titled "RE: UberOfficesLLC (Final Revised Version" |
| D | Email from Raymond Rahbar to Yulissa Guerra-Reyes dated February 3, 2016, titled "Fwd: Guaranty Fee" |
| E | Email from Ronald D. Paul to Raymond Rahbar and others dated June 15, 2016, titled "Make office" |
| F | Email from Kathy McCallum to Metthew B. Leydig and others dated June 16, 2016, titled "Make Offices" |
| G | Properties Featured on the RDP Website |
| H | Excerpts from Deed Records and UCC Filings |
| I | Marcus Aurelius Value, *Eagle Bancorp's Insider Loan Scheme Exposed*, Dec. 1, 2017 |

Lead Plaintiff Anthony Cassinelli, as Trustee of the Danilee Cassinelli Trust DTD 7-23-93 ("Lead Plaintiff"), along with Plaintiff Norfolk County Retirement System ("Norfolk") (collectively, "Plaintiffs"), by their undersigned attorneys, hereby bring this Amended Class Action Complaint ("Complaint") against Eagle Bancorp, Inc. ("Eagle Bancorp" or the "Company"), Susan G. Riel ("Riel"), Ronald D. Paul ("Paul"), Charles D. Levingston ("Levingston"), James H. Langmead ("Langmead"), and Laurence E. Bensignor ("Bensignor") (together, "Defendants").  The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Eagle Bancorp; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; consultations with accounting and financial institution regulatory consultants; and interviews of former employees of Eagle and other persons with knowledge of the matters alleged herein.  Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

## I.      NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who or which purchased or otherwise acquired Eagle securities between March 2, 2015 and July 17, 2019, inclusive (the "Class Period") and who were damaged thereby, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Eagle Bancorp is a holding company for EagleBank.  EagleBank serves as a community bank for the Washington, D.C. metropolitan area, and provides banking services to a target market of small and medium-sized businesses, with a focus on commercial real estate lending.

3.      The Company was founded in 1997 by Paul, a commercial real estate investor, and other local businessmen.  Since its founding, Paul has served as Eagle Bancorp's Chairman, President and Chief Executive Officer ("CEO") until his recent retirement.  Paul simultaneously served as CEO of EagleBank from June 2006 until his retirement.

4.      As the Company and EagleBank's founder and leader, Paul took significant advantage of the funding EagleBank could provide to his real estate and private investing ventures. Paul entered into ventures by providing a project "cheap debt" through EagleBank, *i.e.*, favorable or otherwise unavailable loan terms, and/or by hastily driving a loan through the approval process at the expense of the underwriting process.  In exchange for this "cheap debt" provided by the Bank, Paul would receive a personal financial benefit: either Paul (through an entity in which Paul had a financial interest) would receive a fee or equity interest in the venture or project, or the debt would be issued to entities in which Paul had a financial interest.

5.      These deals were structured by Paul, through Bensignor and another trusted friend and employee of Paul's, in such a way to avoid the appearance of a related interest loan from EagleBank—which would otherwise be restricted and regulated by the Federal Reserve, and would otherwise need to be disclosed to investors under SEC and GAAP disclosure requirements.

6.      Despite Paul burying these deals through layers of limited liability companies and his family trust, in fact, Paul had "the power to exercise a controlling influence" in the ventures and projects that received EagleBank loans, and thus these ventures and projects were related interests subject to regulation and disclosure.  This is made clear in Paul's orchestration of his deal with

MakeOffices, a business that provides co-working space in the D.C. metro area.

7.      Paul facilitated a $10 million loan from EagleBank, in exchange for a $1 million equity interest (via a limited liability company created for this investment) and a guarantee fee on the EagleBank loan (to be paid to Paul's family trust for its guaranty of the loan).

8.      Notwithstanding the use of a number of entities to obscure Paul's role in the deal and his control over the borrower, a June 15, 2016 email from Paul makes it clear Paul believed that MakeOffices was his own personal investment and that the guarantee on the loan was his own personal guarantee:

> I had a lengthy, honest conversation … tonight and expressed my total dissatisfaction in the way our company is being run ….  I made a bad business decision on a *minimal ownership interest for a $10,000,000 risk.* … *As a guarantor on the loan, I immediately am insisting that the Bank not issue any letters of credit nor loan advances without my consent.  I am not going to put my guarantee* at further risk until we make some major structural adjustments. [1]

9.      As detailed *infra*, additional documents demonstrate that Paul and Bensignor participated in a scheme to mislead the Company's auditors and regulators about the terms and substance of the MakeOffices deal.  Months after the loan was given to MakeOffices, Paul and Bensignor coerced the founder of MakeOffices to sign a letter retroactively "confirm[ing]" that there was no "tying arrangement" between the terms of EagleBank's loan to MakeOffices and the terms of Paul's investment into MakeOffices.  That letter was false, as the favorable terms that MakeOffices received on the loan were directly tied to the favorable valuation Paul received for his equity investment.  Such a tying arrangement is a violation of the bank bribery statute, which makes it a felony for the officer of a financial institution to solicit or accept anything of value from anyone, "intending to be influenced or rewarded in connection with any business or transaction of such an

---

[1] Unless otherwise noted, all emphasis in this Complaint has been added.

institution." 18 U.S.C. §215(a)(2).  Paul told the MakeOffices founder that he needed the "no tying" letter for use in a "routine Federal Reserve Audit."

10.     The structure of the MakeOffices deal was similar to many of Paul's other investment ventures and projects.  It was not until a December 1, 2017 report from the short seller Marcus Aurelius Value ("Aurelius"), entitled "Eagle Bancorp's Insider Loan Scheme Exposed" (the "Aurelius Report") that the public began to learn about Eagle's extensive undisclosed related party loans to Paul and his businesses.  In the Aurelius Report, Aurelius accused Paul and certain board members of an "insider loan scheme" that "jeopardizes the safety and soundness of the bank while potentially leading to severe regulatory penalties."  The Aurelius Report detailed Paul's MakeOffices deal and revealed, among other things, that the Company made and held a material amount of related party loans that had not been previously disclosed, including loans to entities controlled by Paul.

11.     Upon the publication of the Aurelius Report, the price of Eagle Bancorp's stock declined $16.20 per share, approximately 24.5%, to close on December 1, 2017 at $49.95, on heavy volume, damaging investors.

12.     Eagle Bancorp, Paul, and Bensignor quickly denied the allegations in the Aurelius Report as frivolous.  The Company issued two press releases denying the allegations and defending the Bank's controls and regulatory compliance, and additionally issued a letter assuring its banking customers.  Bensignor was interviewed in *Bisnow*, in which he responded to the Aurelius Report's discussion of Paul's MakeOffices deal by saying, "This phrase 'cheap equity' is not supported by the facts[.] … [Paul's] equity was paid for in hard cash, pro rata, no special treatment, no cheap equity. It was what it was, the same as anybody else who became an investor."

13.     Paul was interviewed by the *Washington Post* for a December 5, 2017 article, which stated:

Paul denied claims made in the Aurelius report that suggested the bank approved preferential loans to developers who, in return, gave Paul's company a favorable stake in the project.

"Never, never, never, never, never.  There were no sweetheart deals, no 'wink, wink,' no nothing," he said.

He said his dual roles are appropriate and beneficial to the community.

14.     As a result of Defendants' efforts to reassure the market, the Company's stock price partially recovered, rising $7.15 per share, or 14.3%, to close at $57.10 on December 4, 2017.

15.     Notwithstanding Defendants' fervent denials of the Aurelius Report, about fifteen months later the Company was forced to admit that its previous disclosures had drastically understated the amount of related party loans that the Bank had issued to insiders, effectively validating the material allegations of the Aurelius Report.  On March 1, 2019, in the Company's 2018 yearly financial report filed on SEC Form 10-K, Eagle Bancorp stated that it had "modified [its] analysis with respect to insider related parties, and as a result included additional relationships such as those involving extended family members and trusts, ***resulting in an increase to the previously reported $60.9 million balance of related party loans at December 31, 2017***."  This "modifi[cation]" amounted to a ***$177.33 million increase*** (*i.e.*, a 291% increase) from the company's previously reported related party loans outstanding as of December 31, 2017.  Notable, this increase closely approximated the amount of loans to Paul-related projects detailed in the Aurelius Report, thus corroborating the Aurelius Report's allegations of an undisclosed insider loan scheme.

16.     Three months later, the Company further disclosed that it had been paying elevated legal fees in responding to various government investigations concerning the Company's related party transactions, thereby fulfilling the Aurelius Report's prediction of adverse regulatory consequences in relation to the scheme.  Specifically, on July 17, 2019 after market close, Eagle Bancorp announced its financial results for the second quarter of 2019.  Within this announcement,

the Company disclosed that its legal, accounting and professional fees had increased by 26% for the year as compared to the first six months of 2018.  Eagle Bancorp explained that expenses for the quarter related primarily to: "legal fees and expenditures in connection with ***our responses to investigations and related document requests and subpoenas from government agencies examining matters, including the Company's identification, classification and disclosure of related party transactions;*** the retirement of certain former officers and directors; and the relationship of the Company and certain of its former officers and directors with a local public official."  Eagle Bancorp further disclosed that it would "continue to incur elevated levels of legal and professional fees and expenses for at least the remainder of 2019 as it continues to cooperate with these investigations."

17.     The following morning, on the Company's second quarter 2019 earnings call, Riel explained that the scope of the governmental investigations "expanded significantly" in the second quarter of 2019.  In the question and answer portion of the call, Levingston further disclosed that while the specific related party transactions that were being investigated has not been individually identified by Eagle Bancorp in its public filings, "[t]he overall amounts and totals were -- ***are represented in our public filings in the 2018 10-K filed March of this year***."

18.     Following this news, the Company's stock price fell $14.30, or approximately 26.75%, to close at $39.15 per share on July 18, 2019, damaging investors.

19.     As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.  Accordingly, Plaintiffs seek to pursue securities fraud claims under Section 10(b) of the Exchange Act against Defendants and under Section 20(a) of the Exchange Act against each of the Individual Defendants.

## II.    JURISDICTION AND VENUE

20.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

22.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Eagle Bancorp's common stock trades on the Nasdaq Stock Market ("NASDAQ"), located within this Judicial District.

23.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

24.    Lead Plaintiff Anthony Cassinelli, as Trustee of the Danilee Cassinelli Trust DTD 7-23-93, as set forth in the certification previously filed with the Court, incorporated by reference herein (Dkt. No. 9-2), purchased Eagle Bancorp securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

25.    Plaintiff Norfolk County Retirement System ("Norfolk"), as set forth in the certification previously filed with the Court, incorporated by reference herein (Dkt. No. 13-1), purchased Eagle Bancorp securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

26.     Defendant Eagle Bancorp is incorporated in Maryland with its principal executive offices located at 7830 Old Georgetown Road, Third Floor, Bethesda, Maryland 20814.  Eagle Bancorp is a bank holding company for EagleBank (the "Bank," and together with Eagle Bancorp, "Eagle").  Eagle Bancorp's securities trade in an efficient market on the NASDAQ under the symbol "EGBN."

27.     Defendant Susan G. Riel ("Riel") has served as President and CEO of Eagle Bancorp and EagleBank since March 21, 2019, first as interim President and CEO and then as permanent President and CEO as of May 6, 2019.  Riel has been with Eagle since 1998, and has been a member of the Company's Board of Directors (the "Board") since 2017 and a member of the Bank board since 2018.  Riel most recently served as Senior Executive Vice President ("EVP") and Chief Operating Officer ("COO") of the Bank and EVP of the Company during all relevant times prior to her current appointment as President and CEO, "where she was a major influence on the business model."[2]  Riel stated that she "was Mr. Paul's only report[.]  …  The rest of the bank reported up to me."[3]  Riel has 43 years of experience in the banking industry.

28.     Throughout the Class Period, Riel spoke to investors and analysts on conference calls. Riel possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Riel signed Eagle Bancorp's yearly reports on SEC Form 10-K for the fiscal years ended December 31, 2017 and December 31, 2018, and signed and certified the accuracy of Eagle Bancorp's quarterly report on SEC Form 10-Q for the quarterly period ended March 31, 2019.

29.     Defendant Ronald D. Paul ("Paul") served as Eagle Bancorp's Chairman, President

---

[2] John Reosti, *Reputation rehab job one for Eagle Bancorp's new chief*, Nat'l Mortgage News, Dec. 31, 2019.

[3] *Id.* (internal quotations omitted).

and CEO at all relevant times until he retired on March 20, 2019, citing serious health developments. Paul co-founded the Company, serving as CEO of the Company since its founding, was appointed Chairman of the Board in May 2008, and prior to that time was Vice Chairman of the Board.  Paul also served as CEO of the Bank from June 2006 until his retirement.  Paul has been involved in community banking for 28 years.

30.     Throughout the Class Period, Paul frequently spoke to investors and analysts on conference calls.  Paul possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Paul signed and certified the accuracy of Eagle Bancorp's yearly reports on SEC Form 10-K for each of the fiscal years ended December 31, 2014 through December 31, 2018 and quarterly reports on SEC Form 10-Q for each quarterly period ended March 31, 2015 through September 30, 2018.

31.     Defendant Charles D. Levingston ("Levingston") has served as Eagle Bancorp's and EagleBank's EVP and Chief Financial Officer ("CFO") since April 7, 2017.  Levingston joined EagleBank in January 2012, serving as EVP of Finance of EagleBank prior to his current role. Levingston has previously worked at The Federal Reserve Banks of Atlanta and Philadelphia as a Bank Examiner, and has 19 years of experience in the banking industry.  He is a certified public accountant ("CPA").

32.     Throughout the Class Period, Levingston frequently spoke to investors and analysts on conference calls.  Levingston possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Levingston signed and certified the accuracy of Eagle Bancorp's yearly reports on SEC Form 10-K for the fiscal years ended December 31, 2017 and December 31, 2018 and quarterly reports on SEC Form 10-Q for each quarterly period ended March 31, 2017 through March 31, 2019.

33.     Defendant James H. Langmead ("Langmead") served as EVP and CFO of the Company from January 2007 until his retirement effective April 7, 2017.  He also served as EVP and CFO of EagleBank from January 2005 until April 7, 2017.  Langmead had over 45 years of experience in the commercial banking industry, previously serving as CFO of Sandy Spring Bank and Sandy Spring Bancorp, Inc., and CFO at the Bank of Baltimore and Baltimore Bancorp.  He is a CPA.

34.     Throughout the Class Period, Langmead frequently spoke to investors and analysts on conference calls.  Langmead possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Langmead signed and certified the accuracy of Eagle Bancorp's yearly reports on SEC Form 10-K for each of the fiscal years ended December 31, 2014 through December 31, 2016 and quarterly reports on SEC Form 10-Q for each quarterly period ended March 31, 2015 through September 30, 2016.

35.     Defendant Laurence E. Bensignor ("Bensignor") served as an EVP and General Counsel of Eagle Bancorp and EagleBank from approximately April 2010 until March 2018, when he reportedly retired for health reasons.  Bensignor served as Eagle Bancorp's chief legal officer and, as late as March 9, 2015, he was the only in-house counsel for EagleBank.  Bensignor had 29 years in the legal and real estate industries in the Washington, DC metropolitan area prior to joining the Company, including serving as a trustee of the Van Metre Family Trusts, the controlling owner of a private, multifaceted real estate organization.

36.     Defendants Riel, Paul, Levingston, Langmead, and Bensignor are sometimes referred to herein as the "Individual Defendants."

37.     The Individual Defendants, because of their high-ranking positions and direct involvement in the everyday business of the Company, possessed the power and authority to control

the contents of Eagle Bancorp's reports to the SEC, press releases and other public statements, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. The Individual Defendants are liable for the false statements and omissions pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.    RELEVANT NON-PARTIES

38.    Ronald D. Paul Companies and RDP Management, Inc. (collectively, "RDP") are both real estate investment and property management companies founded by Paul in 1987, where he has continuously served as President. RDP's website touts their "strong commitment to hands-on management," noting their involvement in day-to-day operations at their properties, and highlighting Paul's direct involvement in all aspects of their business. RDP properties include office buildings and multi-family apartment projects primarily in the Washington, D.C. metropolitan region.

39.    Potomac Investment Trust ("Potomac") is an investment trust purportedly managed by Paul's family members, in which Paul does not have a vote. According to Paul, Potomac manages numerous RDP projects, including those financed by Eagle, and as explained further herein, Potomac also guaranteed loans made by Eagle to certain of Paul's speculative investments that could not otherwise obtain funding.

40.    Kathleen McCallum ("McCallum") is the Chief Operating Officer ("COO") of RDP. She has worked with Paul since 1982. McCallum has been with RDP since the company was formed in 1987, working her way up from a secretary to her current position as COO. McCallum was the signatory on loan documents for various entities that were created in association with RDP's

11

projects, and is the trustee of Potomac.  Evidencing the close relationship between Paul and McCallum, McCallum immediately offered to donate her kidney to Paul upon learning that he would need a second kidney replacement.  Paul thereafter received his second kidney transplant from McCallum in 2009.

## V.      SUMMARY OF THE FRAUD

### A.      Background Of The Company And Its Business

41.     Eagle Bancorp (the "Company") was founded in 1997 and is headquartered in Bethesda, Maryland.  Eagle Bancorp operates as the bank holding company for EagleBank (the "Bank"), which operates as a community bank and a member of the Federal Reserve System servicing the Washington, D.C. metropolitan area.

42.     The Company was founded by Paul and other local businessmen with prior experience in community banking in the Washington, D.C. metropolitan area.  Eagle claims its customer base has benefitted from the extensive business and personal contacts of its directors and executive officers.

43.     The Bank's target market segment is small and medium-sized businesses and it competes against other large banking institutions, other community banks, and finance companies. The Bank claims to provide superior, personalized service to its clients, providing each with a number of services, and familiarizing itself with client needs in a proactive, personalized fashion.  It provides commercial banking services, a full range of retail banking services, online and mobile banking.

44.     The Company's earnings are largely dependent on net interest income, *i.e.*, the difference between the interest yields received by Eagle on loans and other interest bearing assets and the interest rates paid by Eagle on interest bearing deposits and other liabilities.

45.     Loans accounted for nearly $7 billion of Eagle Bancorp's $8.39 billion in total assets as of December 31, 2018.  The Company's loan portfolio is heavily weighted toward commercial real estate, with 75% of its loan portfolio consisting of commercial real estate and real estate construction loans as of December 31, 2018.  In addition, commercial loans comprised 22% of the Company's loan portfolio, with the remainder of the loan portfolio being comprised of residential mortgages, home equity, and consumer loans.  Real estate served as collateral for 85% of Eagle Bancorp's loans.  The Company's loan portfolio includes higher risk loans made for real estate acquisition, development, and construction purposes ("ADC Loans"), including both income producing and owner occupied projects.  ADC Loans amounted from $851.5 million at December 31, 2014 and $1.62 billion at December 31, 2018.

46.     The Bank states that it carefully enforces its loan policies and procedures, evaluates each borrower's business plan during the underwriting process and throughout the term of the loan, identifies alternative sources for loan repayment, and obtains collateral to mitigate loss in the event of liquidation.  The Bank's lending policy requires that loan value not exceed a percentage of "market value" or "fair value" based upon appraisals or evaluations obtained in the ordinary course of the Bank's underwriting practices.  Eagle claims that its loan pricing discipline and underwriting standards were cornerstones to its long-term success.  On the Company's third quarter 2015 earnings conference call, for example, Paul stated that:

> The key to EagleBank's underwriting has always been that we study and understand the various submarkets within the greater Washington area, and we monitor and control our portfolio composition by product type and location.  …It is our knowledge of the individual submarket, our relationships with quality developers, and our certainty of execution which allow us to generate loan volume, and it is our disciplined underwriting which allows us to maintain the credit quality and profitability of our loan portfolio.

**B.      Federal Regulations Limit Loans To Bank Executives, Directors, And Their Related Interests**

47.      Regulation O, 12 C.F.R. §215, *et seq.*, governs any extension of credit by a Federal Reserve member bank ("a member bank") to an executive officer, director, or principal shareholder of that bank, of a bank holding company of which the member bank is a subsidiary, and of any other subsidiary of that bank holding company.  Regulation O also applies to any extension of credit by a member bank to a company controlled by a bank official.

48.      Regulation O defines "[a]n extension of credit [as] a making or renewal of any loan, a granting of a line of credit, or an extending of credit in any manner whatsoever[.]"  12 C.F.R. §215.3(a).

49.      In general, Regulation O prohibits a member bank from extending credit to any insider of a bank unless that extension of credit:

> (i) [i]s made on substantially the same terms (including interest rates and collateral) as, and following credit underwriting procedures that are not less stringent than, those prevailing at the time for comparable transactions by the bank with other persons that are not covered by this part and who are not employed by the bank; and (ii) [d]oes not involve more than the normal risk of repayment or present other unfavorable features.

12 C.F.R. §215.4(a).

50.      If the aggregate extension of credit to an insider of the bank or their related interest exceeds the higher of (i) $25,000 or (ii) five percent of the member bank's unimpaired capital and unimpaired sales, then the extension of credit to the insider or their related interest must be preapproved by a majority of the entire board of directors of that bank (with the interested party abstaining from voting, either directly or indirectly).  Notwithstanding these aggregate dollar limits, if an extension of credit to an insider or their related interest exceeds $500,000, preapproval by a majority of the entire board of directors of that bank, with the interested party abstaining from the

voting, is required.  12 C.F.R. §215.4(b)(1), (2).[4]

51.     For purposes of these restrictions, Regulation O defines an insider as "an executive officer, director, or principal shareholder, and includes any related interest of such a person."  12 C.F.R. §215.2(h).

52.     A "related interest" is defined as "[a] company that is controlled by that person …." 12 C.F.R. §215.2(n).

53.     A "[c]ompany means any corporation, partnership, trust (business or otherwise), association, joint venture, pool syndicate, sole proprietorship, unincorporated organization, or any other form of business entity not specifically listed herein."  12 C.F.R. §215.2(b).

54.     Regulation O further defines "[c]ontrol of a company or bank" as:

a person directly or indirectly, or acting through or in concert with one or more persons: (i) [o]wns, controls, or has the power to vote 25 percent or more of any class of voting securities of the company or bank; (ii) [c]ontrols in any manner the election of a majority of the directors of the company or bank; or (iii) *[h]as the power to exercise a controlling influence over the management or policies of the company or bank.*

12 C.F.R. §215.2(c)(1).

55.     Furthermore, control is defined as:

[a] person is presumed to have control, including the power to exercise a controlling influence over the management or policies, of a company or bank if: (i) [t]he person is: (A) [a]n executive officer or director of the company or bank; and (B) [d]irectly or indirectly owns, controls, or has the power to vote more than 10 percent of any class of voting securities of the company or bank; or (ii)(A) [t]he person directly or indirectly owns, controls, or has the power to vote more than 10 percent of any class of voting securities of the company or bank; and (B) [n]o other person owns,

---

[4] Additional restrictions apply on extensions of credit to any executive officers of a member bank. In general, subject to certain exemptions, the aggregate amount of extension of credit to an executive officer, or a partnership in which one or more of the bank's executive officers are partners, and individually or together, hold a majority interest, may not exceed at any one time the higher of (i) 2.5% of the bank's unimpaired capital and unimpaired surplus or (ii) $25,000—but in no event, may the aggregate amount of extensions of credit exceed $100,000.  12 C.F.R. §215.5(b), (c).

controls, or has the power to vote a greater percentage of that class of voting securities.

12 C.F.R. §215.2(c)(2).

56.     A report of all extensions of credit made by a member bank to executive officers must be included in a member banks' quarterly report of condition to the Federal Reserve.  In addition, upon receipt of a written request from the public, a member bank must disclose the names of its executive officers and principal shareholders who, along with their related interest, has received extensions of credit from the member bank that in aggregate equaled or exceeded five percent of the member bank's capital and unimpaired surplus or $500,000, whichever is less.  However, the bank is not required to disclose the specific amounts of individual extensions of credit.  12 C.F.R. §215.9(b)(2).

### C.     SEC Regulations And Guidance And GAAP Required Eagle To Report Its Related Party Loans To Investors

57.     Federal regulations strictly govern what must be included in documents filed with the SEC.  SEC Regulation S-X requires that the amounts of related party transactions that affect the registrant's financial statements "shall be set forth on the face of the appropriate statement or in appropriately captioned notes."  17 C.F.R. §210.4-08(a), (k)(1).

58.     Item 404 of SEC Regulation S-K requires Eagle Bancorp to describe any transaction during the latest fiscal year, in which Eagle Bancorp "was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."  17 C.F.R. § 229.404(a).  This description must include:

(1) The name of the related person and the basis on which the person is a related person.

(2) The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership in, a firm, corporation, or other entity that is a party to, or has an interest in, the transaction.

(3) The approximate dollar value of the amount involved in the transaction.

(4) The approximate dollar value of the amount of the related person's interest in the transaction, which shall be computed without regard to the amount of profit or loss.

(5) In the case of indebtedness, disclosure of the amount involved in the transaction shall include the largest aggregate amount of principal outstanding during the period for which disclosure is provided, the amount thereof outstanding as of the latest practicable date, the amount of principal paid during the periods for which disclosure is provided, the amount of interest paid during the period for which disclosure is provided, and the rate or amount of interest payable on the indebtedness.

(6) Any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction.

*Id.*

59.     In the instructions to Item 404(a) of Regulation S-K, a related person means, *inter alia*: any director or executive office of the Company; or any immediate family member[5] of a director or executive officer. *Id.* The instructions further provide that for transactions involving indebtedness, if the lender is a bank, disclosure under Item 404(a) "may consist of a statement, if such is the case that the loans to such persons:"

i. Were made in the ordinary course of business;

ii. Were made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable loans with persons not related to the lender; and

iii. Did not involve more than the normal risk of collectibility or present other unfavorable features.

60.     SEC Release No. 33-8056 instructs that in disclosing transactions with related and certain other parties:

---

[5] Defined as "any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of such director [or] executive officer …, and any person (other than a tenant or employee) sharing the household of such director [or] executive officer."

Statement of Financial Accounting Standards No. 57 (FAS 57), *Related Party Disclosures*, sets forth the requirements under GAAP concerning transactions with related parties. ***As noted in that standard, "[t]ransactions involving related parties cannot be presumed to be carried out on an arm's length basis, as the requisite conditions of competitive, free-market dealings may not exist."*** Accordingly, where related party transactions are material, MD&A should include discussion of those transactions to the extent necessary for an understanding of the company's current and prospective financial position and operating results. In addition, Item 404 of Regulation S-K . . . require disclosure of certain relationships and transactions with related parties.

Registrants should consider whether investors would better understand financial statements in many circumstances if MD&A included descriptions of all material transactions involving related persons or entities, with clear discussion of arrangements that may involve transaction terms or other aspects that differ from those which would likely be negotiated with clearly independent parties. Registrants should consider describing the elements of the transactions that are necessary for an understanding of the transactions' business purpose and economic substance, their effects on the financial statements, and the special risks or contingencies arising from these transactions. Discussion of the following may be necessary:

- the business purpose of the arrangement;

- identification of the related parties transacting business with the registrant;

- how transaction prices were determined by the parties;

- if disclosures represent that transactions have been evaluated for fairness, a description of how the evaluation was made; and

- any ongoing contractual or other commitments as a result of the arrangement.

***Registrants should also consider the need for disclosure about parties that fall outside the definition of "related parties," but with whom the registrant or its related parties have a relationship that enables the parties to negotiate terms of material transactions that may not be available from other, more clearly independent, parties on an arm's-length basis.*** In some cases, investors may be unable to understand the registrant's reported results of operations without a clear explanation of these arrangements and relationships.

61.     In particular, federal regulations required Eagle Bancorp and the Individual Defendants to comply with United States generally accepted accounting principles ("GAAP"), which are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. Specifically, SEC

Regulation S-X requires that financial statements as filed with the SEC be prepared in accordance with GAAP.  Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1).

62.     Eagle Bancorp's 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K violated GAAP, rendering them materially false and misleading.

63.     Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") as the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities.  Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants.  Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

64.     ASC Topic 850, Related Party Disclosures ("ASC 850") explains that "[i]nformation about transactions with related parties that would make a difference in decision making shall be disclosed so that users of financial statements can evaluate their significance.  Therefore, this Topic establishes requirements to disclose certain significant related party transactions and control relationships."  ASC 850-10-1.

65.     ASC 850-10-20 defines a related party to include, *inter alia*: (i) "Management of the entity and members of their immediate family;" (ii) "Other parties with which the entity may deal if one party controls or ***can significantly influence the management or operating policies of the other*** to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests;" and (iii) "***Other parties that can significantly influence the management or operating policies of the transacting parties*** or that have an ***ownership interest in one of the***

*transacting parties* and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests."

66.     ASC 850-50-1 requires that financial statements include disclosures of material related party transactions, including: (a) the nature of the relationship(s) involved; (b) a description of the transactions; (c) the dollar amounts of the transactions for each of the periods in which an income statements is present and "the effects of any change in the method of establishing the terms from that used in the preceding period;" and (d) amounts due from or to related parties as of the date of each balance sheet presented.

67.     ASC 850-50-2 requires that "[n]otes or accounts receivable from officers, employees, or affiliated entities *must be shown separately* and not included under a general heading such as notes receivable or accounts receivable."

68.     ASC 850-50-3 further states that "[i]f necessary to the understanding of the relations, the name of the related party shall be disclosed."

   **D.     The Aurelius Report Alleges That Paul And Others Were Orchestrating An "Insider Loan Scheme" In Which They Used Eagle As A "Private Piggy Bank"**

69.     On December 1, 2017, Aurelius published the Aurelius Report, which was titled "Eagle Bancorp's Insider Loan Scheme Exposed" (the "Aurelius Report," attached as Exhibit I).[6] Therein, Aurelius accused Paul and certain board members of an "insider loan scheme" that "jeopardizes the safety and soundness of the bank while potentially leading to severe regulatory penalties." Aurelius concluded, based on its research, that "insiders treat Eagle as their own private piggy bank" and identified "a pattern of conduct that … is hauntingly similar to the characteristics that have preceded previous bank failures," including:

---

[6] The Aurelius Report is also accessible on Aurelius's website: http://www.aureliusvalue.com/research/egbn/ (last accessed on January 19, 2020).

- Large, undisclosed, insiders loans that finance certain of RDP's ventures;

- "[F]avorable loans are used to enrich [Paul] and certain Board Members," including allegations that these loans were issued in exchange for Paul being awarded cheap equity interest in the borrower;

- "Undisclosed financial entanglements between largest borrowers and [Paul];"

- Indications that loans to insiders were distressed;

- Compromised and conflicted Board oversight; and

- Large recent insider stock sales.

70.    Through its review of allegations in a number of lawsuits related to Paul and Eagle (discussed herein),[7] Aurelius determined that "Paul has used Eagle to issue preferential loans in exchange for being awarded cheap equity stakes in Eagle borrowers."  In the first of these lawsuits, the founder of a co-working business,[8] MakeOffices, was referred to Eagle by one of its stakeholders, MidAtlantic Realty Partners LLC ("MRP").[9]  MakeOffices then received a "$10 million line of credit from Eagle at preferential terms not otherwise available in exchange for Rahbar personally awarding Paul an equity interest in MakeOffices at a favorable valuation."[10]  Similarly,

---

[7] According to Aurelius, its research process included analysis of "thousands of pages of public documents including court records, corporate entity ownership records, county deed records of real estate transactions, and state UCC filings (which are used to perfect loans)."  Aurelius also "engaged a former senior FDIC attorney … who has over 40 years of experience focusing on banking regulations.  The FDIC attorney consultant helped [Aurelius] assess Eagle's compliance with banking regulations as well as the potential implications for Eagle's regulatory exams."

[8] Co-working space is a business service provision model which lets individuals and teams work independently or collaboratively in a shared office space.

[9] MRP is a real estate developer headquartered in Washington, D.C. and is one of Eagle's largest borrowers.

[10] The Aurelius Report stated that in order to "conceal his self-dealing from regulators," Paul began to pressure MakeOffices founder, Raymond Rahbar ("Rahbar"), to retroactively sign documents Paul apparently needed to "demonstrate legitimacy" to the Federal Reserve during routine audits, including a letter drafted by Eagle's General Counsel, defendant Bensignor, to be put on

Aurelius detailed allegations from another complaint in which the co-founders of Matchbox Food Group ("Matchbox"), Ted and Mark Neal, claimed that Eagle lent $25 million to Matchbox, and that later, a group of investors led by Paul made a $10 million investment in Matchbox.[11]  When Matchbox's cash flow began to deteriorate, Paul threatened to "call the Senior Eagle notes and padlock the doors and put 2,000 of [Matchbox's] employees out of work" if Ted Neal did not sign documents which gave Paul control over Matchbox through another $10 million investment made through Egg Cream LLC, which Paul controls.[12]

71.     The Aurelius Report also shed light on Eagle's issuance of numerous ADC Loans that financed real estate ventures of RDP.  These loans provided RDP real estate ventures with at least $185 million in financing.  Aurelius explained that each of the properties detailed in the Aurelius Report was listed as one of RDP's properties on its website, that deed records and UCC filings confirm the existence of loans from Eagle, and that in certain instances, the signature on these records are that of McCallum, RDP's COO.  The following tables lists the RDP real estate ventures financed by EagleBank that were highlighted in the Aurelius Report:

| Property | Eagle Loan Amount | RDP Involvement |
| --- | --- | --- |
| Tysons Center, Vienna, VA | $34.6 million | Joint venture between RDP and NVCommercial. |
| One Florida Avenue, N.E., Washington, D.C. | $10.3 million | RDP owns through St. Elmo Bethesda LLC, and the Eagle loan was signed by McCallum |

MakeOffices letterhead, and state that there were "no tying arrangements" between the Eagle loan to MakeOffices and Paul's investment in MakeOffices.

[11] The Aurelius Report also notes that Bensignor was personally invested in Matchbox and was appointed to its board of managers, and that documents filed in the Matchbox lawsuits show that Eagle Directors Harvey Goodman ("Goodman"), Steve Fanaroff, and retired Vice Chairman, Robert Pincus, invested alongside Paul and Bensignor in Matchbox.  Goodman invested through Forum Hill Partners, LLC and KLD-HMG, Ltd, and Eagle lent money to Forum Hill to finance the  investment.

[12] A Form D filed by Egg Cream LLC with the SEC on August 29, 2016 lists Paul as the "President of the Issuer's Manager."

| | | |
|---|---|---|
| | | on behalf of Potomac. |
| Collington Park Industrial Building, Collington, MD | $11.9 million | RDP joint venture with MRP. |
| 1319 South Capitol Street, S.W., Washington, D.C. | $7.5 million, later up-sized to $9.3 million | 1319 South Capitol Associates, LLC was managed by Potomac, and McCallum signed the loan documents. |
| 600 Rhode Island Avenue N.E., Washington, D.C. | $5 million | Joint venture between RDP and MRP. |
| 2009 8th Street, N.W., Washington, D.C. | $14 million | Joint venture between RDP and the Jefferson Apartment Group. |
| 8 P Street, Washington, D.C. | $2.2 million | Eagle loan to Bethesda St. Elmo, owned by RDP, which purchased property from 8 P Street NE LLC, a different RDP entity, managed by McCallum. |
| 1701 Rhode Island Avenue N.W., Washington, D.C. (formerly 1711 Rhode Island Avenue) | $63 million | Joint venture between RDP and Akridge. |
| 700 Constitution Avenue N.E., Washington D.C. | $35 million | Joint venture between RDP and Borger Management, Inc. |
| 1760 Reston Parkway, Reston, VA | unknown | Joint venture between RDP and Akridge. |

72.     The Aurelius Report further found "it unusual that the majority of the properties RDP lists as being 'under development' are financed by loans from Eagle while the majority of RDP's stabilized properties are financed by loans from other banks[,]" suggesting RDP "might be using Eagle to finance riskier ventures at terms it could not get elsewhere."

73.     The Aurelius Report noted that "RDP's website lists ten different 'Venture Capital Investments' in properties that are *simultaneously featured* as 'portfolio' properties on MRP's website" (emphasis in original), and that Eagle has financed numerous MRP real estate deals, two of which are MRP/RDP ventures listed in the chart above.

74.     Aurelius also highlighted that based on its research, certain of Eagle's independent directors have received large loans from the Bank, which, while not necessarily prohibited by

Regulation O, has historically been symptomatic of poor board oversight preceding bank failures. Aurelius provided multiple examples in which Eagle's Board of Directors received loans or otherwise are benefitting from transactions with EagleBank: (i) three Board members – Harvey Goodman, Steve Fanaroff, and Robert Pincus – invested in Matchbox with Paul and Bensignor according to documents filed in the Matchbox lawsuit; (ii) EagleBank is financing Frederick Road, LLC, an entity managed by Eagle's former Audit Committee Chairman, Dudley Dworken according to a Maryland UCC filing; and (iii) Eagle financed Ridemarkerz, where a member of Eagle's Audit Committee member, Norman Pozez, was the CEO, according to a Delaware UCC filing.

75.     The Aurelius Report pointed out that since the lawsuits detailed therein were filed, Paul and his wife had suspiciously made 19 open market sales to dump over $10 million of stock, yet prior to this time Paul had never sold a single share.

76.     On December 1, 2017 *Motley Fool* published an article stating, "Aurelius Value's research does not paint a very rosy picture of Eagle Bancorp's internal controls, and it raises important questions about the quality of the loan book from which the bank ultimately derives its value."

77.     Following the release of the Aurelius Report, Eagle Bancorp's stock price fell $16.20 per share, or 24.49%, to close at $49.95 per share on December 1, 2017.

**E.     Eagle Quickly Defends Itself In Summarily Rejecting The Aurelius Report And The Allegations Therein**

78.     Eagle immediately responded to the Aurelius Report, posting two press releases in the days following the Aurelius Report's release.  Each of these responses, along with a letter from Paul and Riel, were later attached to a SEC Form 8-K signed by Paul and filed on December 4, 2017.

79.     In its first response to the Aurelius Report, Eagle Bancorp issued a press release on December 1, 2017 (the same day as the Aurelius Report) at 9:06 p.m. EST. The press release stated

that Aurelius "published a deceptive and materially misleading piece about Eagle Bancorp" and that

it "categorically rejects the assertions and implications in the [Aurelius Report]."  Eagle Bancorp

continued by stating that the Aurelius Report was "filled with demonstrable falsehoods and material

omissions" such as:

- **Selective Quoting of Baseless Allegations from Meritless Lawsuits**.  The internet piece relies on unsubstantiated claims in two pending lawsuits.  Aurelius fails to disclose that Eagle is not even a party to one of them and thus has had no reason to address the allegations.  Eagle has moved to dismiss the other lawsuit in its entirety.  It is utterly frivolous.  While it may further Aurelius' financial purpose to selectively quote from these lawsuits and omit material information that investors would surely consider important, such behavior is both disturbing and misleading.

- **All Loans Referenced in the Piece Fully Meet Legal Requirements**.  The only credit issued by Eagle to the identified executive was a line of credit in case of an overdraft; the line never was used and has not been funded.  Eagle takes seriously its obligation to comply with all applicable laws and regulations, including Regulation O.  Its compliance is regularly examined internally, and is also examined by agency regulators.  Contrary to the misrepresentations by Aurelius, the loans identified in the piece were not made to the identified executive, and, in any event, were approved and disclosed (where required) in compliance with Regulation O.

- **Mischaracterization of Stock Transactions.**  Contrary to the incorrect assertions in the piece, the referenced stock sales by an Eagle executive constituted only a small fraction of his holdings.  The majority of the proceeds of those sales was used to further charitable purposes.  There have been no non-routine stock sales by Eagle executive management.

80.     Then, on Sunday, December 3, 2017 at 11:37 p.m. EST, Eagle Bancorp issued a

second press release response, entitled "Eagle Bancorp Rebuts Claims of Internal Control

Weaknesses and Alerts Shareholders and Customers to be Wary of Unscrupulous Short Seller

Tactics."  In this second press release, the Company again "summarily reject[ed] the allegations" in

the Aurelius Report, furthering commenting that "[w]e are just the latest prey of the short seller[.]"

81.     Eagle further explained that:

We certify our financial statements and our financial controls.  An independent
public accounting firm audits us annually, and is required to attest to our financial

controls.  Board governance at Eagle is very detailed and comprehensive.  Board members are both in control of policies and practices and receive detailed reporting on all aspects of Bank activities.  Regulation O loans to insiders must receive approval of the Company Audit Committee and the full Board of the Bank.

82.    Eagle continued by explaining that in most banks, but particularly in community banks, loans to insiders was "not just present but desired[,]" and further that:

> There are required disclosures of loans to insiders (as defined in Regulation O), both in annual filings with the Securities and Exchange Commission and in quarterly Bank regulatory reports.  The filings by the Company have always been complete, receiving the attention of monthly Board meetings, the Bank's Compliance team, the internal Disclosure Controls Committee and the Audit Committee of the Board.  In addition, there are external independent auditor reviews.  In all such cases, the loans are made on market-rate, not preferential, rates and terms.  The Bank treats insider and related party loans exactly the same as borrowers who have no director or officer relationship with the Bank.
>
> On top of that, insider loan transactions receive added scrutiny in annual regulatory examinations - - by both the Federal Reserve, which is the Bank's primary federal regulator, and the State of Maryland, where the bank is chartered.  Furthermore, all insider loans receive scrutiny by the Bank's Audit and Compliance areas (so as to assure that terms and conditions are not more favorable than for so called arms-length transactions).  Such loans must be approved by the Audit Committee and also must be approved by the full Bank Board of Directors (those directors who are not involved in the transaction).  This goes beyond the normal approval process by the applicable Board Committee for loans not involving insiders.
>
> *      *      *
>
> In fact, the stock market's regard for Eagle and its favorable stock price (absent the event of last Friday) is predicated in part on the Company's consistent and stable financial performance over a long period and not any short-term positives or negatives.  This long-term performance includes lower credit losses and better yields on the bank's loan portfolio (as compared to area and peer size banks), which negates the unfounded assertion expressed by the short seller that the Bank is generally providing "preferential loan rates" as a quid pro quo.  It is not.  (Emphasis in original).

83.    Eagle closed the second press release by stating that "[o]ur internal controls are strong and all required disclosures, including loans to insiders, have been met.…  Please do not allow anonymous fast buck artists to rattle your confidence in us, and our systems, our controls, our regulators, and our success.  Eagle Bancorp is accountable to shareholders and customers.  The short

sellers behind the apparent libel and defamation are not.  The Board of Directors stand behind the Company's proven success and deserved reputation of integrity and discipline."

84.    Lastly, a letter to customers signed by Paul and Riel and released December 4, 2017, attached as Exhibit 99.3 to the Form 8-K filed with the SEC on December 4, 2017, stated that "we wanted to provide you with accurate information in response to the false and misleading statements contained in a piece about Eagle Bancorp and EagleBank that was floated on the internet Friday." The letter continued: "The short seller alleged that EagleBank and its directors and officers acted improperly in making loans to insiders.  EagleBank categorically rejects this deceptive and misleading allegation and has responded accordingly in the two press releases that follow this letter." Paul and Riel further stated in the letter that "EagleBank adheres to sound underwriting practices which are internally and independently reviewed.  Any loans subject to Regulation O (the regulation that addresses the rules and processes for making loans to insiders) have been made, approved and disclosed in compliance with that regulation[,]" and further that "EagleBank is proud of its history and culture of compliance, which includes . . . active board oversight."  Paul and Riel advised the Bank's customers: "You should view very skeptically the false information being circulated by Aurelius Value and its ilk.  EagleBank and its holding company were founded on, and remain strongly committed to, the highest professional and ethical standards....  There is no 'there' there in the internet piece."

85.    Following Eagle's response to the Aurelius report, *Bisnow*[13] published an exclusive article entitled "EagleBank Counsel Denies Insider Loan Accusation, Says It's Under Attack" on

---

[13] Headquartered in Washington, D.C., *Bisnow* is a website that aims to be a hyper-local news, events, and education platform for the commercial real estate industry.  The article is accessible at https://www.bisnow.com/washington-dc/news/capital-markets/eaglebank-stock-drops-24-following-allegations-of-insider-loan-scheme-82198?utm_source=CopyShare&utm_medium=Browser (last accessed January 19, 2020).

December 4, 2017.  The article featured an exclusive interview with Bensignor that had been held

earlier that day.  In response to the MakeOffices lawsuit allegation of "cheap debt for equity"

featured in the Aurelius Report (and discussed in greater detail herein), the *Bisnow* article stated:

"'This phrase 'cheap equity' is not supported by the facts,' Bensignor said.  '[Paul's] equity was paid

for in hard cash, pro rata, no special treatment, no cheap equity.  It was what it was, the same as

anybody else who became an investor.'"  (Alteration in original).

86.     The article further stated:

Bensignor said EagleBank has fully complied with Regulation O in any loans it has
made to entities associated with its directors.

"It's not only not surprising that the bank may be making loans to entities in which
the director has an interest, it's frankly encouraged because that's how you build a
community bank," Bensignor said.

Bensignor said that while Ronald D. Paul Cos. bears Paul's name, the CEO is not
personally the owner of every company associated with a project it has invested in,
so loans made to the projects are not being made directly to Paul.

"If you take 1701 Rhode Island, the old YMCA building, a family trust that Ron is
not a trustee of, and not a beneficiary of, owns a fraction of a fraction of the interest
in that building," Bensignor said.  "It's totally allowed.  It's disclosed to the extent
required.  It received all necessary approvals."

87.     Similarly, Paul was interviewed for a December 4, 2017 article on S&P Global

Market Intelligence's website for an article entitled "Eagle CEO hits back at short seller; stock

recovers some ground after big drop."[14]  The article stated that in a December 4, 2017 interview,

"Paul defended the bank's lending and internal decision-making as consistently aboveboard,

appropriately documented, verified by auditors and fully reviewed by regulators.  Aurelius'

assertions, he said, have 'no merit.'"  The article further quoted Paul as saying "'as hurt as I am' by

the Aurelius allegations, Eagle does not plan litigation against the short seller.  'That's just not our

---

[14] Available at:
https://platform.mi.spglobal.com/web/client?auth=inherit#news/article?id=42830801&cdid=A-
42830801-13106 (last accessed January 19, 2020).

style,' he said, but the bank does intend to be fully prepared to refute further allegations that it determines to be false."

88.    On December 5, 2017, the *Washington Post* published a story entitled, "EagleBank's chief executive attacks report alleging insider loan scheme: Ronald D. Paul denies 'bogus' allegations, calling them the work of a short-seller."   The story was published after a phone interview with Paul held the previous day, and stated in relevant part:

> EagleBank sharply criticized the report, which Paul described as a "bogus, self-serving article" meant to hurt his financial institution.   EagleBank representatives said they do not know who is behind the report and did not hear from its author before its release....
>
> *        *        *        *
>
> At least eight projects managed by Ronald D. Paul Companies have received multimillion-dollar loans from EagleBank, company officials confirmed Monday.   They include a former YMCA building in the center of the District that is being converted into high-end office space, a 2 million-square foot mixed-use space in Tysons Corner, and a 220,000 square-foot mixed-use development across from Nationals Park in Southwest, all of them joint ventures with other prominent developers.
>
> *        *        *        *
>
> EagleBank officials said the deals have been carefully structured to avoid the appearance of a conflict of interest, and the company has never been formally cited for violating federal regulations pertaining to Paul's dual involvement.
>
> Paul says he recuses himself from all loan-approval decisions at EagleBank when the deals involve ventures he is involved in.   He said that when his construction projects get loans from his bank they are managed through Potomac Investment Trust, an investment trust managed by his family members in which he himself does not have a vote.
>
> *        *        *        *
>
> Paul denied claims made in the Aurelius report that suggested the bank approved preferential loans to developers who, in return, gave Paul's company a favorable stake in the project.
>
> "Never, never, never, never, never.   There were no sweetheart deals, no 'wink, wink,' no nothing," he said.

He said his dual roles are appropriate and beneficial to the community.

89.     Defendants' continued positive statements and rebuke of any allegations of wrongdoing against the Company had its intended effect: Eagle Bancorp's stock price quickly recovered, rising $7.15 per share, or 14.3%, to close at $57.10 on December 4, 2017.

90.     Although a few securities analysts noted that the Aurelius Report raised some questions that could only be answered with time, most were assured by the Company's response to the Aurelius Report.  For example, a December 4, 2017 analyst report from FIG Partners reiterated its "Outperform" rating on shares of Eagle Bancorp after speaking with the Company's management over the weekend; and an analyst for FIG Partners was further quoted as stating: "I'm happy with management's response.  I'm satisfied the checks and balances you want to see are in place" in the December 4, 2017 S&P Global Market Intelligence article.  Another securities analyst Stephens, in its December 4, 2017 report noted that "we are not surprised EGBN is up today.  We see Eagle as a high-quality DC growth bank, achieving consistent positive operating leverage and stable credit through the cycle."  And Merion Capital Group raised its rating of Eagle Bancorp to Outperform from Neutral on December 4, 2017.

91.     Even one of the analysts, Boenning & Scattergood, that had previously "reallocat[ed] resources from shares of EGBN until there is further clearness surrounding these issues[,]" quickly resumed coverage of Eagle Bancorp on March 28, 2018 with an Outperform rating following the filing of the Company's 2017 10-K.

### F.     The Truth Begins To Emerge

92.     On March 1, 2019, Eagle Bancorp filed its annual report for the year ended December 31, 2018 on SEC Form 10-K.  In the report, Eagle Bancorp announced that it had "modified [its] analysis with respect to insider related parties, and as a result included additional relationships such as those involving extended family members and trusts, resulting in an increase to the previously

reported $60.9 million balance of related party loans at December 31, 2017."

93.     As part of this modified analysis, Eagle Bancorp reported $167.88 million in related party loans outstanding as of December 31, 2018, or over 15% of the Company's total shareholders' equity at December 31, 2018.  Further, under the Company's new analysis, the amount of related party loans outstanding as of December 31, 2017 was $238.24 million, or 25% of the Company's total shareholders' equity at that time.  This newly reported total of $238.4 million in related party loans as of December 31, 2017 amounted to a ***$177.33 million*** increase (*i.e.*, a 291% increase) from the $60.91 million total that Eagle Bancorp had previously reported in its 2017 Form 10-K.  In comparison, the loans to entities controlled by Paul or in which he had a direct or indirect material interest detailed in the Aurelius Report amount to $195.471 million (as of origination)—an amount similar to the increase in related party loans reported by the Company.  These facts support a strong inference that a substantial portion (if not all) of the insider loans identified in the Aurelius report[15] were not previously classified as related party loans by the Company in its 2017 Form 10-K but were acknowledged to be related party loans once the Company adopted its "modified" analysis.  These facts further support a strong inference that the previously undisclosed related party loans were to entities over which Paul has "the power to exercise a controlling influence" pursuant to Regulation O (*see* ¶54, *supra*) and in which Paul has "a direct or indirect material interest" pursuant to Item 404 of

---

[15] The difference between the $177.33 million increase in related party loans and the $195.471 million in loans to Paul-related ventures identified in the Aurelius report might be due to some portion of these loans having been paid down as of December 31, 2017 (the amounts reported by Aurelius were origination amounts and the related party disclosures reported the amount of the loans outstanding).  In any event, the giant increase in the amount of related party loans that were reported in the "modified" disclosure and the rough similarity between that number and the amount of the Aurelius-identified Paul-related loans strongly suggests that most of the increase corresponded to the reclassification of the Aurelius-identified loans, which the Company now acknowledges are related party transactions.

Regulation S-K (*see* ¶58, *supra*), notwithstanding the Company's previous exclusion of these transactions from its reported totals of related party loans.

94.     Then, on July 17, 2019 after the market close, as part of its press release announcing Eagle Bancorp's financial results for the second quarter of 2019,[16] the Company disclosed that its legal, accounting and professional fees had increased by 26% for the year as compared to the first six months of 2018.  Eagle Bancorp explained that expenses for the quarter related primarily to:

> legal fees and expenditures in connection with our responses to investigations and related document requests and subpoenas from government agencies examining matters, including the Company's identification, classification and disclosure of related party transactions; the retirement of certain former officers and directors; and the relationship of the Company and certain of its former officers and directors with a local public official."  Eagle Bancorp further disclosed that it will "continue to incur elevated levels of legal and professional fees and expenses for at least the remainder of 2019 as it continues to cooperate with these investigations.

95.     In response to the Company's elevated legal expenses, Piper Jaffray commented on July 17, 2019 that "**the disclosure is new, and strikes a serious tone, in our view.  On the call, we aim to learn more[.]"** (Emphasis in original).  Similarly, Sandler O'Neill noted that "[w]hile the dollar amount was not that concerning … the reason for the elevated costs raises some questions" and stated that it "hope[d] to get more color on the situation on the conference call."

96.     On the morning of July 18, 2019, Eagle Bancorp held its second quarter 2019 earnings conference call with investors and analysts, in which Riel and Levingston participated.  In her opening remarks, Riel noted that during the quarter, the Company's net income declined 11 basis points due in part to "an elevated level of legal and professional fees."  Riel further explained that:

> We reported for the second quarter an increase in legal fees and other expenses related to investigations by government agencies, the scope of which expanded significantly during the spring of this year.  ***The expenses include legal and professional fees for the preparation of responses to subpoenas and document***

---

[16] The Company also filed a Form 8-K with the SEC on the morning of July 18, 2019 attaching this press release.

*requests from multiple agencies, examining various matters, including the company's identification, classification and disclosure of related party transactions*, the retirement of certain former officers and directors and the relationship of the company and certain of its former officers and directors with a local public official.

The company has advanced and will likely continue to advance indemnification costs for certain officers and directors.  The level of disclosure we are making at this time is due to the increasing level of expenses associated with the government agency investigation.

In the second quarter of 2019, legal, accounting and professional fees grew from $1.7 million in the first quarter of 2019 to $2.7 million in the second quarter.  In addition, the company expects that it will continue to incur elevated levels of legal, accounting and professional fees at least through the remainder of 2019 as it continues to cooperate with these investigations.  Other than these increased costs, we do not believe at this point that the resolution of these investigations will be materially adverse to the company.

97.     Later on the call, Riel and Levingston were asked to elaborate on the related party transactions that were subject to the government investigations:

AUSTIN LINCOLN NICHOLAS: Okay, that's helpful.  And then maybe can you, to the extent that you can*, can you elaborate on the related party transactions just more in general on what type of related party transactions that are being looked at in terms of loan relationships* or deposit relationships or any sort of other kind of relationship that is being looked at?

CHARLES D. LEVINGSTON: Austin, we haven't identified the transactions with particularity in our public filings.  *The overall amounts and totals were -- are represented in our public filings in the 2018 10-K filed March of this year.*  So that's about as detailed as we can get on the particulars of what those related party transactions were.

98.     Following this news, the Company's stock price fell $14.30, or approximately 26.75%, to close at $39.15 per share on July 18, 2019.

99.     In response to the earnings call, Sandler O'Neill lowered its rating of Eagle Bancorp, due in part to its "view that the legal situation is going to be an overhang on the stock for some time[.]"  Piper Jaffray similarly downgraded Eagle Bancorp's shares because of their belief that the "investigations will be continued overhang on the stock."  In this July 19, 2019 report, Piper Jaffray

further stated that:

> On the conference call, management indicated that the scope of the investigations expanded significantly this spring, but did not provide much else in the way of details.

> In the absence of more specific details, and given what we know from the company's description of what they are facing, three recent items stand out to us as potentially illuminating: 1.) Increased reports of a federal grand jury investigation opened into DC Councilman Jack Evans regarding potential ethical violations and criminal activities committed by Mr. Evans while serving as chairman of the WMATA board of directors.   Various reports have linked Ron Paul, RDP Management, and EagleBank to Mr. Evans; 2) *Within EGBN's 10-K, filed on March 1st, was a table which outlined the company's related party loans that included a footnote that indicated they had revised 2017 balances substantially higher by to ~238M from ~$61M previously*; and 3) Ron Paul stepping down as Chairman, President and CEO of EGBN.   Importantly, these three items – increased media reports of the investigation into Jack Evans, the disclosure of the revised 10-K balances, and Ron Paul stepping down – occurred within the month of March 2019.

> To be clear, EGBN has been tight lipped on details surrounding the investigations, and, at this time, there is no evidence to suggest that any of these items are interrelated.  However, *given the tight time frame, and similar description from the company surrounding the items under investigation in its 2Q19 release in comparison to the items listed above, we believe these issues are worth considering as the potential underlying causes of the new disclosures.*

### G.    Plaintiffs' Independent Investigation Confirms That Paul, Assisted By Bensignor And McCallum, Disguised Paul's Control Of Eagle-Financed Ventures

100.    Numerous of Paul's real estate and business ventures were financed by EagleBank loans.  To "avoid the appearance of a conflict of interest" and to avoid the appearance of these ventures being a related interest of Paul, Paul shielded his participation in these ventures through layers of limited liability companies and the Potomac Investment Trust.

101.    In reality, both Potomac and these various limited liability companies were controlled by Paul.  This is most clearly reflected in Paul's MakeOffices investment, which at bottom was a Paul-orchestrated deal in which MakeOffices would receive a $10 million facility loan from EagleBank, guaranteed by Potomac, in exchange for (i) an annual guarantee fee; and (ii) a $1 million

equity investment in MakeOffices with a favorable valuation made through a different Paul-controlled entity, Harris UO Investors LLC ("Harris").

102.    Plaintiffs were able to uncover numerous facts concerning Paul's MakeOffices investment through various court filings and deposition testimony in the MakeOffices Litigation,[17] additional emails related to this litigation obtained by Plaintiffs' counsel, and media articles discussing the MakeOffices Litigation.  Evidence from these sources demonstrate Paul's pattern of improperly leveraging his positions at the Company and the Bank for his personal financial benefit in exchange for providing loan terms that were not otherwise available to borrowers.  This pattern was in direct contravention of the Company's public representations concerning related party transactions.

103.    In addition, upon review of deed records and UCC financing statements, it is clear that Paul similarly used layers of limited liability companies, frequently managed by Potomac, to receive EagleBank financing for his RDP real estate ventures.

104.    As detailed further herein, Paul was able to orchestrate this scheme through the assistance of McCallum, Bensignor, and through his influence at the Bank as Eagle's founder, CEO, and Chairman.  McCallum—Paul's close personal friend, kidney donor, and long-time employee—was not actually an independent trustee of Potomac or the manager of various limited liability companies, but rather followed Paul's direction in directing business decisions on behalf of Potomac and numerous other limited liability companies.  Similarly, Bensignor, in addition to his role as

---

[17] As used herein, the "MakeOffices Litigation" refers to the various lawsuits filed after Paul's investment in MakeOffices involving Paul, Eagle, MakeOffices, its founder and former CEO, Raymond Rahbar ("Rahbar"), and various other individuals and entities. These lawsuits include: *MRP UO Partners, LLC, et al. v. Raymond Rahbar, et al.*, CL 2016-11747 (Va. Cir. Ct., Fairfax, Aug. 2016); *MRP UO Partners, LLC, et al. v. MakeOffices, LLC, et al.*, CL 2017-00817 (Va. Cir. Ct., Fairfax, Jan. 18, 2017); *Rahbar v. Paul, et al.*, CL 2017-02133 (Va. Cir. Ct., Fairfax, Feb. 10, 2017); *Shapiro v. Katten Muchin Mosenman LLP, et al.*, 17-cv-01759 (EGS) (D.C. Nov. 6, 2017); and *MakeOffices v. Bredhoft, et al.*, 1:17-cv-01010 (E.D. Va. 2017).

Eagle's general counsel, negotiated numerous deals for his very first client, Paul, with whom Bensignor has had a business relationship with for over 30 years.

## 1.   Paul's MakeOffices Investment Facilitated A Favorable Loan From EagleBank To MakeOffices

105.   MakeOffices, formerly Uber Offices, LLC, is a business providing co-working space that was founded by Rahbar[18] and Chris Junior in 2011.  As a growing start-up, MakeOffices needed to raise capital to enter new leases for office space and to build out any leased space into workspaces attractive to prospective clients.  Ex. A (the "*Rahbar* Complaint") at A-4, ¶11.

106.   MRP UO, an entity affiliated with and controlled by MRP,[19] became a member of MakeOffices on December 31, 2014.  Ex. B at B-10, ¶25.  J. Zachary Wade ("Wade") was thereafter appointed as the MRP director to MakeOffices, and was the only director besides Rahbar at that time.  *Id*. at B-10, ¶27.

107.   In 2015, MRP told Rahbar that Paul could offer MakeOffices "cheap debt for equity." Ex. A  at A-5, ¶13.  Specifically, MRP indicated that "Paul could use his position with EagleBank to obtain a 'debt facility' line of credit on extremely favorable terms that would not otherwise be available, in exchange for an interest in the Company at a favorable valuation rate."  *Id*.

108.   Crucially, MakeOffices was unable to provide substantial collateral, and therefore, would not be able to get funding on its own for a substantial loan from Eagle or any other lender.  To allow MakeOffices to obtain a $10,000,000 loan from Eagle, Paul structured a deal in such a way that in exchange for Potomac guaranteeing the loan, Harris would receive an equity interest in MakeOffices at a favorable valuation and Potomac would receive a 1% annual guarantee fee on the

---

[18] Rahbar served as MakeOffice's CEO and Treasurer from the time it was founded until he was ousted by Paul and MRP in second half of 2016.  Ex. A at A-2, ¶3; Ex. B at B-10, ¶26.

[19] MRP, as detailed in the Aurelius Report, was involved in several joint ventures with RDP (*see* ¶¶70, 71, 73, *supra*; ¶¶257, 259, *infra* (confirming MRP/RDP realty ventures).

loan.

109.    The arrangement was detailed in a series of emails dated September 24-25, 2015 between Bensignor, Rahbar, Paul, and Wade, Jackson Prentice ("Prentice") and Rick Saas ("Saas") of MRP, hammering out the terms of the agreement.  Ex. C (excerpts from email chain with subject line: "UberOffices LLC (Final Revised Version)").

110.    The main terms of Paul's investment deal in MakeOffices were finalized, resulting in a Subscription Agreement (Ex. A at A-26 – A-30), a Payment and Indemnity Agreement (*id.* at A-33 – A-38, the "Indemnity Agreement"), and an Amended and Restated Operating Agreement (*id.* at A-39 – A-88, the "Operating Agreement"), all effective on or around September 30, 2015.

111.    The Subscription Agreement entitled Harris to 815 Class A Membership Units in exchange for $1,000,000 capital contribution.  *Id.* at A-27.

112.    The Indemnity Agreement stated that as a condition of the credit facility from EagleBank, the Bank required Potomac to execute a guaranty agreement to repay a portion of the loan.  Ex. A at A-33.  In consideration, Potomac was to receive an annual fee amounting to one percent of the amount guaranteed, paid by MakeOffices or MRP UO, Harris, and IBB (a limited liability company in which Rahbar was the manager).  *Id*. at A-34, A-38.  In addition, the Indemnification Agreement required that in the event EagleBank required Potomac to pay on its guaranty agreement, MRP UO, IBB, and Harris would pay a certain percentage of that guaranty to Potomac, thus indemnifying Potomac from its guaranty.  Ex. A at A-33 – A-34.

113.    The amended MakeOffices Operating Agreement reflected Harris's ownership interest, and names Paul as the "Harris Director."  *Id*. at A-40, A-47, A-88.

114.    Similarly, on or about September 30, 2015, MakeOffices entered into a Facility Agreement with EagleBank in the amount of $10 million, consisting of a $3 million revolving line of

credit, and $7 million letter of credit facility.  *Id*. at A-6, ¶17.

115.    Relatively shortly thereafter, the business relationship with Paul and MRP on the one hand, and Rahbar, the MakeOffices founder, on the other, began to sour.

116.    On or about May 17, 2016, approximately seven months after the Facility Agreement between EagleBank and MakeOffices was entered into, Paul personally requested that Rahbar sign and return to him a letter drafted by Bensignor that retroactively "confirm[ed]," in various different ways, that there was no "tying arrangement" between the Facility Agreement or its terms, and Paul's investment in MakeOffices via Harris.  *Id*. at A-99 – A-102 (the "Tying Arrangement Letter").

117.    Nearly one month later, on or about June 8, 2016, the MakeOffices Litigation alleged that Paul threatened to cancel MakeOffices' loan if Rahbar did not sign the Tying Arrangement Letter as Paul needed it for a "routine Federal Reserve Audit."  *Id*. at A-8, ¶23.  Rahbar claimed that "having the loan unilaterally cancelled would likely subject the Company to Chapter 11 Bankruptcy" and thus he signed the letter "while under extreme financial duress."  Ex. A at A-8, ¶24.

118.    The following day, June 9, 2016, Paul asked Rahbar to sign a new indemnification agreement which would require Rahbar to personally indemnify Paul, through Harris, for liability on Potomac's guarantee of EagleBank's loan to MakeOffices.  *Id*. at A-8, ¶25.  On June 15, 2016, Paul followed up with Rahbar with the same request.  *Id.* at A-8, ¶26.

119.    Later that same night, Paul emailed Rahbar, Wade, Prentice, and Bensignor stating "I made a bad business decision on a ***minimal ownership interest for a $10,000,000 risk***…  As a guarantor on the loan, ***I immediately am insisting that the Bank not issue any letters of credit nor loan advances without my consent.***  I am not going to put ***my guarantee*** at further risk until we make some major structural adjustments….  Raymond, please re-send me the copy of the indemnification agreement you sent from your copier…"  Ex. E.

120.    The next morning, on June 16, 2016, McCallum carried out Paul's orders on behalf of Potomac, emailing Matthew Leydig, SVP of EagleBank[20] with the subject "Make Offices" and stating, "Effective immediately, please do not make any additional line of credit advances to or issue any letters of credit for the referenced entity, on which Potomac Investment Trust is a guarantor." Ex. F.  Leydig replied shortly after, stating, "Given the email below, I'm going to need approval for every draw and every letter of credit request moving forward in the form of a signed requisition from Raymond, MRP, and PIT."  *Id*.

121.    On June 24, 2016, following up on Paul's threat of "structural adjustments," Prentice emailed Rahbar a draft Memorandum of Understanding ("MOU") which called for Rahbar to transfer his majority ownership in MakeOffices to Paul and MRP for no cash or monetary compensation.  Ex. A at A-11, ¶34, A-121 – A-126.

122.    The draft MOU stated "In consideration of the terms and conditions set forth herein, Harris and MRP agree to make[] certain arrangements with EagleBank such that the Facility shall be amended and increased …." Ex. A  at A-11, ¶34, A-123.  The draft MOU further stated that the loan to MakeOffices was not in good standing, stating that Harris and MRP would "[p]ut current EagleBank loan facility back in good standing and start consistent contribution to cash reserves in accordance with the loan documents.  MakeOffices and EagleBank will sit together to discuss the current standing of the facility documents and amend the facility documents in accordance with those conversations and to reflect the increases in the facility amounts."  *Id*. at A-126.

123.    Rahbar refused to agree to the proposed MOU or the revised Indemnification Agreement, and as a result, MRP and Paul, attempting to remove Rahbar as CEO and take control of

---

[20] Leydig was the EagleBank employee overseeing the lending relationship with the entities Paul controlled in connection with Paul's real estate ventures as detailed herein at ¶¶255, 256, 258, 259, 261, *infra*.  Ex. H at H-4, H-7, H-14, H-16, H-22.

MakeOffices, accused him of mismanagement and other wrong deeds in a lawsuit filed August 2016. Ex. A at A-10 – A-12, ¶¶33-36; *MRP UO Partners, LLC, et al. v. Raymond Rahbar, et al.*, CL 2016-11747 (Va. Cir. Ct., Fairfax, Aug. 2016).  On January 18, 2017, MRP UO and Harris UO re-filed a new action with the same factual allegations against Rahbar, MakeOffices, and thirteen other corporate and individual defendants, in *MRP UO Partners, LLC, et al. v. MakeOffices, LLC, et al.,* CL 2017-00817 (Va. Cir. Ct., Fairfax, Jan. 18, 2017).  Ex. B at B-1 – B-3.  In this second lawsuit, MRP and Harris alleged that Rahbar and the other defendants had taken actions which violated the Facility Agreement with EagleBank and constituted immediate Events of Default.  *Id.* at B-31 – B-32, ¶¶74-76.

124.    The MakeOffices Litigation continued throughout 2017 and the month after the Aurelius Report was published, in January 2018, the parties reportedly reached a settlement, the terms of which were not publicly disclosed, and all related suits were subsequently dismissed.[21]

## 2.    EagleBank Financed Numerous RDP Real Estate Ventures

125.    Plaintiffs' independent investigation, as detailed in Section IX.C, *infra*, has confirmed that Eagle financed the ten RDP real estate projects referenced in the Aurelius Report.  Publicly available UCC and deed documents—along with internet images from RDP's website, both current and archived images obtained through the Wayback Machine[22]—verify the Aurelius Report's allegations concerning substantial related party transactions that Defendants attempted to conceal from the public's view prior to the "modifi[cation]" of the Company's related party disclosure in the 2018 10-K filed on March 1, 2019.

126.    Plaintiffs are not alone in their conclusions.  Indeed, a December 5, 2017 *Washington*

---

[21] *See* https://www.bizjournals.com/washington/news/2018/01/23/the-battle-over-makeoffices-has-come-to-an-abrupt.html (last accessed January 19, 2020).

[22] Through the Wayback Machine, more than twenty years of web history is accessible to the public. *See* https://archive.org/about/ (last accessed January 19, 2020).

*Post* article[23] reported that:

> [a]t least eight projects managed by Ronald D. Paul Companies have received multimillion-dollar loans from EagleBank, company officials confirmed Monday. They include a former YMCA building in the center of the District that is being converted into high-end office space, a 2 million-square-foot mixed-use space in Tysons Corner, and a 220,000 square-foot mixed-use development across from Nationals Park in Southwest, all of them joint ventures with other prominent developers.

### 3.   Paul Disguised His Related Party Transactions Through The Potomac Trust And Various Other Limited Liability Companies

127.   The transactions detailed above in Sections V.G.1, and below in Section IX.C, demonstrate that Paul, through McCallum and Bensignor, structured numerous real estate and investment deals in such a way to avoid the appearance of a related interest loan from EagleBank, when in fact Paul had "the power to exercise a controlling influence" and "a direct or indirect material interest" in the entities receiving the loans, as implicitly admitted by the Company when it "modified" its related party disclosures in the 2018 Form 10-K. *See* ¶¶54, 58, *supra* (delineating standards for control under Regulation O and related party transactions under Item 404 of Regulation S-K).

128.   Paul's orchestration of the MakeOffices deal is one clear example: numerous documents and emails that Paul, Bensignor, and McCallum sent and/or signed in connection with the MakeOffices deal reflect that Paul and his agents Bensignor and McCallum considered Paul, Potomac, and Harris to be one and the same.

129.   This is made apparent through the emails exchanged between Paul, Rahbar, certain persons from MRP, and Bensignor on September 24-25, 2015 to finalize the details of the MakeOffices agreement. Ex. C. On September 24, 2015, Bensignor wrote, "Since the guarantor is

---

[23]   Available at: https://www.washingtonpost.com/business/capitalbusiness/short-seller-accuses-eaglebank-ceo-of-insider-loan-scheme/2017/12/05/bd8b4d26-d949-11e7-a841-2066faf731ef_story.html (last accessed January 19, 2020).

not a member in the deal, the LLC needs to reference the 1% guaranty fee and that it goes directly to Potomac Investment Trust … the bank needs it ratified by closing, as it constitutes the consideration for the non-member to guaranty the loan." *Id*. at C-1 – C-2.  The following day, September 25, Bensignor added:

> If Harris is bought out through the sale 'put' process, the guaranty from PIT needs to be replaced contemporaneously.  ***Obviously, the Trust has no intent to continue to guaranty the loan if Harris is not a member***.  With the change, ***I am ready to have Kathy (as trustee of the Trust) sign*** the operating agreement.

*Id*. at C-4.

130.    Rahbar responded the same day on a separate email thread to Prentice and Wade, "***The entire reason for a lower valuation is that he's guaranteeing the loan*** …"  *Id*. at C-5.  Prentice responded to Rahbar and Wade moments later, "1000% agree."  *Id*.  Shortly after, Rahbar replied to Bensignor, Paul, Wade, Prentice, and Saas stating, "***The entire basis for the lower valuation is the guaranteeing of the loan.  Without the facility guarantee, the LLC investment at this valuation would not occur***."  *Id*. at C-6.  Rahbar wrote separately to Prentice, "The entire basis of this valuation is the facility.  If he yanks the facility, I yank the llc."  *Id*. at C-7.

131.    Moments later, Bensignor replied to Rahbar's email and did not deny Rahbar's characterization of the arrangement; but rather, stated, "***Everybody is going into this with the same business plan***, but any buyout must (***and always does***) include a release of any LLC related liabilities, including bank guarant[e]es…. Ron is in a meeting, but I will brief him when I see him." Ex. C at C-8.  Contrary to the transaction Bensignor was documenting, this email exchange demonstrates that the consideration for the guaranty was not the 1% guaranty fee, but rather, Paul's Make Offices (via Harris) investment granted at the lower, more favorable, valuation.

132.    Notably, McCallum is absent from the email chain, despite her role as trustee of Potomac, the guarantor of the loan.  Bensignor's email reflects that he acted on Paul's behalf with

respect to Potomac, regardless of any conflict with the interests of the Company's shareholders, and McCallum's role was merely to provide a signature as trustee.

133.    McCallum was the signatory for Paul's investment in MakeOffices via Harris.  Ex. A at A-30, A-37, A-85.   Likewise, Paul's ownership interest via Harris was 8.15%, and the Indemnification Agreement acknowledged that "Guarantor [Potomac] is an affiliate of the owner of an 8.15% membership interest in the Borrower [MakeOffices]," thus acknowledging Paul's control over the two seemingly unrelated entities.  *Id.* at A-33, A-38.

134.    An email sent on September 30, 2015, after the MakeOffices deal was finalized, states:  "Ron – Congratulations and officially welcome to UberOffices!  …Raymond [Rahbar] – Please send Ron wiring instructions for his $1,000,000 investment into the Company for a quarter end investment today.  MRP is pumped about this next wave of growth and having Ron involved in the venture."  *Id*. at A-26.  This email reflects that MRP likewise understood Paul to control Harris.

135.    A third email dated January 27, 2016, sent by Bensignor and copying McCallum and Paul, requested payment of the guaranty fee:  "As you know the 2015-2016 guaranty fee, deferred from last September, is now due.  Here is the account info at EagleBank for the transfer."  The email included wiring instructions for "RDPManagement, Inc."—not Potomac, who, under the Indemnity Agreement, should have received such payments.  Ex. D.

136.    Paul's control of Potomac and Harris are also clearly reflected in emails sent in June 2016, when Paul requested Rahbar to sign a new indemnification agreement which would require Rahbar, in addition to IBB, to indemnify Paul, through Harris, for liability on Paul's guaranty of the Facility Agreement through Potomac.  Ex. A at A-8, ¶¶25-26.

137.    On June 15, 2016, Paul emailed Rahbar, Wade, Prentice, and Bensignor, stating:

I made a bad business decision on a ***minimal ownership interest for a $10,000,000 risk***… ***As a guarantor on the loan, I*** immediately am insisting that the Bank not

43

issue any letters of credit nor loan advances without my consent.  I am not going to put ***my guarantee*** at further risk until we make some major structural adjustments….  Raymond, please re-send me the copy of the indemnification agreement you sent from your copier…

Ex. E.  Paul's email confirms that (i) that Harris's ownership interest in MakeOffices was in fact Paul's; (ii) that the guarantor, Potomac, was controlled by Paul; and (iii) that Paul directed EagleBank to violate the terms of the loan to advance his business interests.

138.    Paul similarly used Potomac and McCallum for numerous RDP real estate ventures that were financed by EagleBank.  The One Florida Avenue, 8 P Street, and 1319 Capitol Street projects reflect that EagleBank financed these projects through loans to limited liability companies managed by Potomac (or managed by other entities that Potomac managed or controlled), with McCallum as the signatory.  *See* ¶¶255, 256, 258, *infra*.

139.    Paul also regularly used the same high level employees at Eagle to oversee the lending relationship with the entities Paul controlled in connection with his personal business and real estate ventures.  For example, Leydig, SVP at the Bank, and the same employee who followed Paul's directive to cease issuing any letters of credit or loan advances (*see* ¶120, *supra*), and/or Ryan Riel, defendant Riel's son, were listed on the deed documents for several RDP ventures financed by Eagle, including One Florida Avenue, 8 P Street, 1319 South Capitol Street, 600 Rhode Island, and 1701 Rhode Island Avenue, as reflected in financing documents excerpted at Exhibit H at H-4, H-7, H-14, H-16, H-22.

### 4.    Paul's Deals Were Structured To Specifically Avoid Scrutiny In A Federal Reserve Audit

140.    A consistent theme with Paul's investments that received financing from EagleBank is that Paul was rarely the signatory on any documents concerning those entities, despite his ownership or control.  Rather, the documents were signed by Paul's business partners or McCallum on behalf of Potomac or a limited liability company, created specifically for the purpose of holding

his interest, depending on the structure of the deal.  On information and belief, as described herein, Paul's absence was specifically designed to avoid regulatory scrutiny as to these deals.

141.    Conspicuously absent from the Make Offices Indemnity Agreement is Potomac's signature—rather, only the indemnitors signed the agreement. Ex. A at A-35 – A-37.  Pleadings in the MakeOffices litigation explain that this was because Paul insisted that Potomac not be party to the Indemnification Agreement in order to demonstrate "legitimacy" to the Federal Reserve during routine audits.  *Id*. at A-5 – A-6, ¶15.

142.    On or about May 17, 2016, approximately seven months after the Facility Agreement between EagleBank and MakeOffices was entered into, Paul personally requested that Rahbar sign and return to him a letter drafted by Bensignor that would have retroactively "confirm[ed]," in various different ways, that there was no "tying arrangement" between the Facility Agreement or its terms, and Paul's investment in MakeOffices via Harris.  *Id*. at A-99 – A-102 (Exhibit 4, the "Tying Arrangement Letter").

143.    Nearly one month later, on or about June 8, 2016, Paul threatened to cancel MakeOffices' loan under the Facility Agreement if Rahbar did not sign the Tying Arrangement Letter as Paul needed it for a "routine Federal Reserve Audit."  *Id*. at A-8, ¶23.

144.    Contrary to the pretense of Paul's Tying Arrangement Letter, Paul's June 15, 2016 email confirms that there was indeed a tying arrangement between EagleBank's facility loan to and Paul's ownership interest in MakeOffices:

> ***I made a bad business decision on a minimal ownership interest for a $10,000,000 risk*** … ***As a guarantor on the loan, I*** immediately am insisting that the Bank not issue any letters of credit nor loan advances without my consent.  I am not going to put ***my guarantee*** at further risk until we make some major structural adjustments ….

Ex. E.

145.     In a March 21, 2017 deposition, at which Paul was present, Rahbar testified that he did want to sign the Tying Arrangement Letter and that he discussed the issue with Zach Wade at MRP.  According to Rahbar, Wade stated that MRP routinely signed similar letters attesting that there was no tying arrangement in other deals with Paul and that these letters were part of the game.

146.     As detailed in ¶¶70, 71, 73, *supra* and ¶¶257, 259, *infra*, RDP frequently joined MRP in real estate ventures financed by EagleBank.  Similarly, Bensignor noted in the September 25, 2015 email that the MakeOffices transaction was the way Eagle "always does" business.  Ex. C at C-8.

147.     In addition, as demonstrated in Section IX.C, *infra*, deeds and UCC filings for properties listed on RDP's website also reflect that Paul shrouded his ownership and control of his real estate ventures that had been financed by EagleBank.

**5.     Eagle's General Counsel Was Entangled In Paul's Related Party Transactions; And Therefore, Could Not Independently Perform His Role in Assuring These Loans Were Not Given Preferential Treatment**

148.     A former employee, "FE1"[24] indicated that real estate loans were supposed to be handled by the office of Eagle's General Counsel, *i.e.*, Bensignor, and thus loans involving Paul and/or his entities would go through Bensignor's office.

149.     Bensignor however, was hardly a disinterested party capable of providing independent oversight of Eagle's loans to Paul or entities in which Paul held a financial interest.  In fact, Bensignor did just the opposite—negotiating on Paul's behalf in his MakeOffices investment. *See* Ex. C at C-4 (Bensignor states "Obviously, the Trust has no intent to continue to guaranty the loan if Harris is not a member.  With the change, I am ready to have Kathy (as trustee of the Trust) sign the operating agreement."), C-8 ("Everybody is going into this with the same business plan, but

---

[24] Section V.G.6, *infra* provides details on FE1's job description and employment at Eagle.

any buyout must (and always does) include a release of any LLC related liabilities, including bank guarant[e]es …. Ron is in a meeting, but I will brief him when I see him.").

150.     Additional emails reflect that Bensignor not only negotiated the MakeOffices deal on behalf of Paul, but acted on Paul's and Potomac's behalf in enforcing terms of this deal.  On January 27, 2016, Bensignor emailed Rahbar and copied Paul and McCallum, stating, "As you know the 2015-2016 guaranty fee, deferred from last September, is now due.  Here is the account info at EagleBank for the transfer[,]" and including the routing instructions for RDP.  Ex. D.  Bensignor, as Eagle's General Counsel, not Potomac's, was not in a position to be demanding payment of the guaranty.

151.     Furthermore, Bensignor indicated in his communications with Rahbar that the use of Potomac to guaranty Eagle loans given to Paul's speculative business ventures was a regular practice, and that Bensignor regularly negotiated, and/or was familiar with the terms of these deals. On February 8, 2016, Bensignor emailed Rahbar, copying Paul, regarding the payment of the guaranty fee:

**Fee**

---

**Larry Bensignor** <LBensignor@eaglebankcorp.com>                           Mon, Feb 8, 2016 at 3:28 PM
To: Raymond Rahbar <raymond@makeoffices.com>
Cc: Ronald Paul <RPaul@ronaldpaulcos.com>

I looked at the Indemnification Agreement, which contains the fee. And I can tell you it is consistent with the other guaranty fee deals Ron has done.

Larry

152.     After some disagreement over the guaranty payment terms, Rahbar emailed Prentice, Wade, and Shapiro on February 11, 2016:

**Fee**

---

Raymond Rahbar <raymond@makeoffices.com>                    Thu, Feb 11, 2016 at 11:31 AM
To: Jackson Prentice <JPrentice@mrprealty.com>
Cc: Zach Wade <zwade@mrprealty.com>, Jaimie Shapiro <jaimie@makeoffices.com>

Just spoke with Ron. He agrees with me on the principle of the deal and on what the doc actually
says.

Thinks Larry might be confusing it with a different deal.

153.     Lastly, Bensignor drafted the Tying Arrangement Letter for Paul, which declared

there was no "tying arrangement," in preparation for a Federal Reserve audit.  The letter also

indicated that it was to be printed on MakeOffices letterhead.  Bensignor attached the letter to an

email to Paul, who forwarded it to Rahbar to sign and put on MakeOffices letterhead. Ex. A at A-99

– A-102.

154.     The Aurelius Report noted that Bensignor was also an investor and on the Board of

Managers of Matchbox (*see* n.11, *supra*).  Bensignor's inability to be a disinterested party capable of

providing independent oversight of Eagle's loans to Paul-related entities is further supported by a

March 9, 2015 feature on Bensignor in *Bisnow*.  *Bisnow* reported that Bensignor has "been a

customer and shareholder of [EagleBank] from its inception.  When Larry started practicing law,

Ron Paul was his very first client; Paul is now CEO of EagleBank.  It's very rewarding to work with

someone with whom you have a relationship of more than 30 years, says Larry."  *Bisnow* also

reported that Bensignor was the only in-house counsel at EagleBank.

155.     Days after the Aurelius Report was published, on December 4, 2017, Bensignor did

an exclude interview with *Bisnow*,[25] vehemently denying the allegations in the report and claiming it

was "a multipronged attack."  Bensignor told *Bisnow* that the "'phrase cheap equity is not supported

by the facts ….'  '[Paul's] equity was paid for in hard cash, pro rata, no special treatment, no cheap

---

[25]     https://www.bisnow.com/washington-dc/news/capital-markets/eaglebank-stock-drops-24-
following-allegations-of-insider-loan-scheme-82198 (last accessed January 19, 2020).

equity.  It was what it was, the same as anybody else who became an investor.'"  Bensignor further told *Bisnow* that Paul's family trust (Potomac) owned an interest in 1701 Rhode Island, but that Paul "is not a trustee of, and not a beneficiary of" and that "It's totally allowed.  It's disclosed to the extent required.  It received all necessary approvals."  Bensignor's direct involvement in the related party transactions involving Paul, RDP, and Potomac, and his role as Eagle's General Counsel responsible for handling the real estate loans, including Paul's real estate ventures/projects, presented a substantial conflict of interests.

### 6. A Former Employee Confirms Eagle Lacked Adequate Internal Controls To Determine Whether Loans Were Being Made To Related Parties And Whether Such Loans Were Not Given Preferential Treatment

156.   Former Employee 1 ("FE1") was an AVP, Commercial Loan Documentation Manager at EagleBank until approximately March 2019.  FE1 began employment with Eagle in approximately April 2011 as a Commercial Loan Documentation Paralegal, was promoted in August 2015 to an Officer and Commercial Loan Documentation Assistant Manager, and later promoted to AVP in April 2016.  FE1's duties entailed gathering the various documents identified during the underwriting and loan approval process that were necessary for a given commercial or industrial ("C&I") loan to receive funding.  In FE1's last year at Eagle, FE1 reported to Deputy Chief Credit Officer, Jeri Fellerman, who reported to Jan Williams ("Williams"), Chief Credit Officer, who reported to Paul for the last few years of FE1's employment, and previously reported to Bensignor.

157.   FE1 said it was "common knowledge" throughout FE1's tenure that certain loans were for so-called "Friends of Ron", which were referred to in abbreviated form "FOR" loans. Personnel assigned to work on the FOR loans[26] were to ensure that these loans were handled as expeditiously as possible, even if this meant putting aside other work the personnel were engaged in.

---

[26] Including the Lender, the Lender's Portfolio Assistant, Underwriter, and Loan Documentation specialist.

158.    FE1 explained that Paul would apparently network with various individuals and/or entities with whom and which he would develop deals that would then be assigned to particular Eagle Lenders (loan officers), who he instructed to "get on it" – *i.e.*, ensure the loan was closed expeditiously.

159.    FE1 stated that that the standard loan requirements were often waived for FOR borrowers.  FE1 noted that there was often "pushback" from senior management to approve FOR loans when personnel working on the loans identified missing and incomplete documentation, which would have resulted in the loans not being approved for other borrowers.  FE1 noted that items missing included "organizational documents" such as, "bylaws of a corporation" that would specify what the requirements were for that entity to "create a contract, say, a resolution from [the borrower's] Board."  This "pushback" from senior management to not ask borrowers for items at issue, included being told that Paul would be notified if the closing of the FOR loan was being held up.

160.    FE1 estimated that FE1 personally worked on thirty to forty FOR loans, but noted that the entire loan documentation team worked on FOR loans.  Every single FOR loan FE1 was aware of lacked some item, received a waiver, and ended up being approved even though the missing item would have resulted in the loan not being approved if it had not been a FOR loan.  FE1 indicated that the waiver came either from "team leads" in the loan documentation group or from Williams.

161.    During the most FE1's tenure, John Richardson was the team lead who authorized the waivers for C&I loans in the Washington, D.C. office.  In the Bethesda, Maryland office, the team lead for C&I loans was an individual named "Derek" (whose last name FE1 could not recall), who

was replaced by Leydig,[27] who was subsequently replaced by Ryan Riel[28] (son of Defendant Riel). For Real Estate, the team leads involved in approving waivers for loan documentation for the FOR loans were Tony Marquez[29] in Maryland and Ken Gray[30] in Virginia.

162.    FE1 did not work on loans that involved Paul directly and/or entities with which he was an owner or principal, because those were real estate deals which would go to the office of Eagle's General Counsel, although Leydig and Scott Kinlaw were involved in at least some FOR real estate loans.  FE1 may have worked "one or two" that possibly pertained to renewals or extensions, but not new loans.  FE1 believed that one of these loans involved Paul's trust and had been signed by the same woman who had donated her kidney to Paul, who apparently signed for all of the loans that involved Paul's trust.

> **7.    Paul's Controlling Influence Over EagleBank's Lenders Support The Aurelius Report's Allegations Of Paul's Use Of Eagle As A "Private Piggy Bank"**

163.    FE1 explained how "Friend of Ron" loans were pushed through expeditiously to gain approval without having all the documentation that was otherwise required.  FE1's statements are consistent with and reinforced by Rahbar's allegations in the MakeOffices cases.

164.    Rahbar's MakeOffices Litigation deposition testimony confirms Paul's pattern and practice of pushing through deals, promising financing through EagleBank with minimal diligence.

---

[27] Leydig was the Eagle employee who emailed Rahbar regarding changing the terms of MakeOffices' Facility Agreement (*see* ¶120, *supra*), and was also listed on the deed documents for numerous RDP properties including 1701 Rhode Island Avenue, 1319 South Capitol, One Florida Avenue, 8 P Street, 600 Rhode Island Avenue (*see* Ex. H at H-4, H-7, H-14, H-16, H-22).

[28] Ryan Riel was the Eagle employee listed on the deed documents for numerous RDP properties including 1319 South Capitol, One Florida Avenue, and 8 P Street.  *See* Ex. H at H-4, H-7, H-14.

[29] Marquez was the Eagle employee listed on the deed document for 1701 Rhode Island Avenue, an RDP property.  Ex. H at H-22.

[30] Gray was the Eagle employee listed on the deed document for 2009 8th Avenue, an RDP property. Ex. H at H-21.

At this deposition Rahbar testified that Paul did minimal due diligence prior to investing in MakeOffices, and did not, for example, interview MakeOffice's officers or conduct any financial or operational due diligence.

165.    Additionally, at the time of loan origination, Rahbar was not asked to sign a no "tying arrangement" letter, but he was asked to sign a false letter to that effect approximately seven months after MakeOffices received the $10 million Eagle loan, supposedly for the purpose of a "routine Federal Reserve Audit."

166.    Similarly, the MakeOffices MOU further demonstrates how Paul used his position at Eagle to leverage greater ownership and control over his personal investments, while neglecting his fiduciary duties to Eagle shareholders.   The MOU, along with the allegations in *MRP v. MakeOffices*, indicate that Eagle's loan to MakeOffices was distressed and MakeOffices had violated the terms and conditions of the loan; yet rather than enforcing the loan, the MOU provided that Paul would work with Eagle to amend and increase the loan in exchange for granting Paul an increased ownership interest.

167.    Emails further demonstrate Paul's controlling influence over EagleBank's enforcement over the terms of its Facility Agreement with MakeOffices.  On June 16, 2016, the day after Paul's email stating that he would insist that "the Bank not issue any letters of credit nor loan advances without [his] consent[,]" (*see* ¶119, *supra*), Matthew Leydig at EagleBank responded to direction from McCallum (on behalf of Potomac) that "Given the email below, I'm going to need approval for every draw and every letter of credit request moving forward in the form of a signed requisition from Raymond, MRP, and PIT."  Ex. F.  Leydig understood that McCallum was a stand-in for Paul, and enforced new requirements on the facility loan that were not part of the original

Facility Agreement, *i.e.*, accepting amendments to the term of the loans without agreement of the parties to the Facility Agreement.

168.    Not surprisingly, Leydig was the EagleBank employee overseeing the lending relationship with the entities Paul controlled in connection with his real estate ventures,  detailed at ¶¶255, 256, 258, 259, 261, *infra* and reflected in financing documents excerpted at Exhibit H at H-4, H-7, H-14, H-16, H-22.

## VI.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

169.    During the Class Period, Eagle Bancorp filed periodic reports with the SEC, including Annual Reports on Form 10-K, containing the Company's reported financial statements.   The following chart identifies the date, signatories, and period covered by each report:

| EAGLE BANCORP'S ANNUAL REPORTS FILED WITH THE SEC ON FORM 10-K DURING THE CLASS PERIOD | | | |
|---|---|---|---|
| *PERIOD* | *DATE FILED* | *SIGNATORIES* | *REFERRED TO BELOW AS* |
| 2014 Fiscal Year | 3/2/15 | Defendants Paul and Langmead | 2014 10-K |
| 2015 Fiscal Year | 2/29/16 | Defendants Paul and Langmead | 2015 10-K |
| 2016 Fiscal Year | 3/1/17 | Defendants Paul and Langmead | 2016 10-K |
| 2017 Fiscal Year | 3/1/18 | Defendants Paul, Levingston, and Riel | 2017 10-K |
| 2018 Fiscal Year | 3/1/19 | Defendants Paul, Levingston, and Riel | 2018 10-K |

170.    As detailed herein, Defendants' statements identified in Section VI constitute materially false and misleading statements that are actionable pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder.  Specifically, Section 10(b) of the Exchange Act makes it unlawful:

> for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails, or of any facility of any national securities exchange … [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. §78j(b).

171.    SEC Rule 10b-5(b) makes it unlawful:

for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange … [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

17 C.F.R. §240.10b-5(b).

### A.    Defendants' False And Misleading Statements And Omissions In And Relating To Eagle Bancorp's Fiscal Year 2014 Financial Results

172.    The Class Period begins on March 2, 2015.  On that date, Eagle Bancorp filed its 2014 10-K, reporting its financial results for the fiscal year ended December 31, 2014.  Under the subheading "Related Party Loans" to Note 5 – Loans and Allowances for Credit Losses to the Company's consolidated financial statements, the 2014 10-K stated:

Certain directors and executive officers have had loan transactions with the Company.  Such loans were made in the ordinary course of business on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with outsiders.  The following table summarizes changes in amounts of loans outstanding, both direct and indirect, to those persons during 2014 and 2013.

| (dollars in thousands) | 2014 | 2013 |
|---|---|---|
| Balance at January 1, | $        30,123 | $        31,435 |
| Additions | 10,000 | 7,091 |
| Repayments | (23,041) | (8,403) |
| Balance at December 31, | $        17,082 | $        30,123 |

173.    In Note 14 – Related Party Transactions to the Company's consolidated financial statements, the 2014 10-K stated:

During 2014, approximately $801 thousand in interest was paid to the current or former directors of the Company or accounts for the benefit of such persons in respect of subordinated notes, which were amended in 2013.  . . .

54

The Bank leases office space, at a current monthly base rental of $132,938, excluding certain pass through expenses, from limited liability companies in which a trust for the benefit of an executive officer's children has an 85% interest in one instance and a 51% interest in another.

A director is a partner in the law firm Shulman, Rogers, Gandal, Pordy & Ecker, P.A. which has provided, and continues to provide, legal services to the Company and its subsidiaries.  During 2014, the Company and its subsidiaries paid aggregate fees of $907,603 to that firm.  Under the director's arrangement with his firm, he does not participate in the profits or revenues resulting from the provision of legal services to the Company and its subsidiaries, and he receives no other compensation or benefits in lieu of such participation.

174.    Item 13 of the 2014 10-K, entitled "Certain Relationships and Related Transactions and Director Independence," incorporated by reference material in Eagle Bancorp's Proxy Statement, filed April 10, 2015 on Form DEF 14A with the SEC, including the material under the caption "Certain Relationships and Related Transactions," which stated in relevant part:

The Bank has had, and expects to have in the future, banking transactions in the ordinary course of business with some of the Company's directors, executive officers, and employees and their associates.  In the past, all of such transactions have been on substantially the same terms, including interest rates, maturities and collateral requirements as those prevailing at the time for comparable transactions with non-affiliated persons and did not involve more than the normal risk of collectability or present other unfavorable features.  Loans to insiders require approval by the Board of Directors, with any interested director not participating.  The Company also applies the same standards to any other transaction with an insider.  Additionally, loans and other related party transactions involving Company directors must be reviewed and approved by the Audit Committee.

**The maximum aggregate amount of loans (including lines of credit) to officers, directors and affiliates of the Company during the year ended December 31, 2014 amounted to $67.4 million, representing approximately 10.8% of the Company's total shareholders' equity at December 31, 2014 and approximately 12.3% of common shareholders' equity at that date.  In the opinion of the Board of Directors, the terms of these loans are no less favorable to the Bank than terms of the loans from the Bank to unaffiliated parties.  On December 31, 2014, $49.1 million of loans were outstanding to individuals who, during 2014, were officers, directors or affiliates of the Company.**  At the time each loan was made, management believed that these loans involved no more than the normal risk of collectability and did not present other unfavorable features.  None of such loans were classified as Substandard, Doubtful or Loss.

The Bank leases certain office space from a limited liability company in which a trust for the benefit of Mr. Paul's children has a 51% interest. During 2014, the Bank paid an aggregate of $1,282,935 in rent in respect of these properties, excluding certain pass through expenses.

Mr. Rogers is a partner in the law firm Shulman, Rogers, Gandal, Pordy & Ecker, P.A. which has provided, and continues to provide, legal services to the Company and its subsidiaries. During 2014, the Company and its subsidiaries paid aggregate fees of $907,603 to that firm. Under Mr. Roger's arrangement with his firm, he does not participate significantly in the profits or revenues resulting from the provision of legal services to the Company and its subsidiaries.

175.    Further, under Item 9A, "Controls and Procedures" of Eagle Bancorp's 2014 10-K, which was signed by Defendants Paul and Langmead, Eagle Bancorp and its management stated that they had concluded that the Company's controls and procedures were effective as of the last day of the period covered by the 2014 10-K and that the 2014 10-K was GAAP compliant. In addition, Item 9A touted Eagle Bancorp's compliance mechanisms and procedures, noting that management had concluded that the Company maintained effective internal control over financial reporting as of December 31, 2014, and that there were no material weaknesses within the Company's internal control structure. Specifically, Item 9A stated in relevant part:

> The Company's management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer, evaluated, as of the last day of the period covered by this report, the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective.***
>
> **MANAGEMENT REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**
>
> The management of Eagle Bancorp, Inc. (the "Company") is responsible for the preparation, integrity and fair presentation of the financial statements included in this Annual Report. ***The financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America*** and reflect management's judgments and estimates concerning the effects of events and transactions that are accounted for or disclosed.

Management is also responsible for establishing and maintaining effective internal control over financial reporting. The Company's internal control over financial reporting includes those policies and procedures that pertain to the Company's ability to record, process, summarize and report reliable financial data. The internal control system contains monitoring mechanisms, and appropriate actions taken to correct identified deficiencies. Management believes that internal controls over financial reporting, which are subject to scrutiny by management and the Company's internal auditors, support the integrity and reliability of the financial statements. . . .

***Management assessed the Company's system of internal control over financial reporting as of December 31, 2014.*** This assessment was conducted based on the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission "Internal Control—Integrated Framework (2013)." ***Based on this assessment, management believes that the Company maintained effective internal control over financial reporting as of December 31, 2014. Management's assessment concluded that there were no material weaknesses within the Company's internal control structure.***

There were no changes in the Company's internal control over financial reporting (as defined in Rule 13a-15 under the Securities Act of 1934) during the quarter ended December 31, 2014 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

176.    Eagle Bancorp's 2014 10-K also contained certifications pursuant to Section 302 of

the Sarbanes-Oxley Act of 2002[31] (the "SOX 302 Certifications"), signed by Paul and Langmead,

certifying that:

1.    I have reviewed this annual report on Form 10-K of Eagle Bancorp, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined

---

[31] SOX requires a public company to evaluate and report on the effectiveness of its internal controls over financial reporting annually and that the principal officers certify their responsibilities for financial reports in each quarterly and annual filing.

in Exchange Act Rules 13a—15(e) and 15d—15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a—15(f) and 15d—15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

177.    Eagle Bancorp's 2014 10-K also contained certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "SOX 906 Certifications"), signed by Paul and Langmead, which further certified that:

(1)     such Form 10-K fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     the information contained in such Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Eagle Bancorp, Inc.

178.    The statements made in ¶¶172-177 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts:

a.      The Company made and held a material amount of related party loans, including loans to entities that were controlled by Paul, that were not reflected in the Company's reported totals of loans made to officers and directors and the Company's reported totals of loans made to officers, directors and affiliates;

b.      These undisclosed related party loans included a $34.6 million loan on the Tysons Center project, a $10.3 million loan on the One Florida Avenue project, an $11.9 million loan on the Colling Park Industrial Building project, and an additional loan of an unknown amount on the 1760 Reston Parkway project;

c.      These undisclosed related party loans were not on substantially the same terms as those prevailing at the time for comparable transactions with non-affiliated persons and instead provided favorable credit terms and/or waiver of documentation or collateral requirements in exchange for favorable terms for Paul and/or entities he controlled with respect to Paul's equity interests;

      d.    The Company's related party disclosures were not presented in accordance with GAAP, SEC regulations, and Regulation O;

      e.    The Company's internal controls and procedures and compliance policies were inadequate with respect to related party loans and self-dealing;

      f.    The foregoing facts created a foreseeable risk of heightened regulatory scrutiny and potential adverse regulatory consequences and the need for the Company to take its own internal investigations; and

      g.    As a result, the Company's public statements were materially false and misleading at all times.

## B. Defendants' False And Misleading Statements And Omissions In And Relating To Eagle Bancorp's Fiscal Year 2015 Financial Results

179.    On February 29, 2016 Eagle Bancorp issued is 2015 10-K, reporting its financial results for the fiscal year of 2015.  Under the subheading "Related Party Loans" to Note 5 – Loans and Allowances for Credit Losses to the Company's consolidated financial statements, the 2015 10-K stated:

> Certain directors and executive officers have had loan transactions with the Company.  Such loans were made in the ordinary course of business on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with outsiders.  The following table summarizes changes in amounts of loans outstanding, both direct and indirect, to those persons during 2015 and 2014.

| (dollars in thousands) | 2015 | 2014 |
|---|---|---|
| Balance at January 1, | $ 17,082 | $ 30,123 |
| Additions | 23,578 | 10,000 |
| Repayments | (10,711) | (23,041) |
| Balance at December 31, | $ 29,949 | $ 17,082 |

180.    In Note 16 – Related Party Transactions to the Company's consolidated financial statements, the 2015 10-K stated:

During 2015, approximately $427 thousand in interest was paid to the current or former directors of the Company or accounts for the benefit of such persons in respect of the Company's subordinated notes, due 2021. . . .

The Bank leases office space from limited liability companies in which a trust for the benefit of an executive officer's children has an 85% interest in one instance and a 51% interest in another.  During the fourth quarter of 2015, the Company entered into an agreement to lease office space for a second location with limited liability companies in which an executive officer indirectly owns a majority interest.  The Company paid $1.6 million, $1.3 million, and $822 thousand excluding certain pass-through expenses for the years ended December 31, 2015, 2014 and 2013, respectively.

A director is a partner in the law firm which has provided, and continues to provide, legal services to the Company and its subsidiaries.  During 2015, the Company and its subsidiaries paid aggregate fees of $1.1 million to that firm.  Under Mr. Roger's arrangement with his firm, he does not participate significantly in the profits or revenues resulting from the provision of legal services to the Company and its subsidiaries

181.    Item 13 of the 2015 10-K, entitled "Certain Relationships and Related Transactions and Director Independence," incorporated by reference material in Eagle Bancorp's Proxy Statement, filed April 1, 2016 on Form DEF 14A with the SEC, including the material under the caption "Certain Relationships and Related Transactions," which stated in relevant part:

The Bank has had, and expects to have in the future, banking transactions in the ordinary course of business with some of the Company's directors, executive officers, and their associates.  All of such transactions have been on substantially the same terms, including interest rates, maturities and collateral requirements as those prevailing at the time for comparable transactions with non-affiliated persons and did not involve more than the normal risk of collectability or present other unfavorable features.  Loans to insiders require approval by the Board of Directors, with any interested director not participating.  The Company also applies the same standards to any other transaction with an insider.  Additionally, loans and other related party transactions involving Company directors must be reviewed and approved by the Audit Committee.

***The maximum aggregate amount of loans (including lines of credit) to officers, directors and affiliates of the Company during the year ended December 31, 2015 amounted to $57.6 million, representing approximately 7.8% of the Company's total shareholders' equity at December 31, 2015.  In the opinion of the Board of Directors, the terms of these loans are no less favorable to the Bank than terms of the loans from the Bank to unaffiliated parties.  On December 31, 2015, $29.9 million of loans were outstanding to individuals who, during 2015, were officers,***

***directors or affiliates of the Company.***   At the time each loan was made, management believed that these loans involved no more than the normal risk of collectability and did not present other unfavorable features.  None of such loans were classified as Substandard, Doubtful or Loss.

The Bank leases certain office space from limited liability companies in which Mr. Paul or a trust for the benefit of Mr. Paul's children has a majority interest.  During 2015, the Bank paid an aggregate of $1,550,562 in rent in respect of these properties, excluding certain pass through expenses.

Mr. Rogers is a partner in the law firm Shulman, Rogers, Gandal, Pordy & Ecker, P.A. which has provided, and continues to provide, legal services to the Company and its subsidiaries.  During 2015, the Company and its subsidiaries paid aggregate fees of $984,093 to that firm.

182.    Item 9A "Controls and Procedures" of Eagle Bancorp's 2015 10-K, which was signed by Defendants Paul and Langmead contained a disclosure that was substantively identical to the Item 9A disclosure in Eagle Bancorp's 2014 10-K quoted in ¶175.

183.    Attached as Exhibits 31.1 and 31.2 to the 2015 10-K were the SOX 302 Certifications of Paul and Langmead, respectively, which were substantively identical to the SOX 302 Certifications of Paul and Langmead in Eagle Bancorp's 2014 10-K quoted in ¶176.

184.    Attached as Exhibits 32.1 and 32.2 to the 2015 10-K were the SOX 906 Certifications of Paul and Langmead, respectively, which were substantively identical to SOX 906 Certifications of Paul and Langmead in Eagle Bancorp's 2014 10-K quoted in ¶177.

185.    The statements made in ¶¶179-184 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts:

a.    The Company made and held a material amount of related party loans, including loans to entities that were controlled by Paul, that were not reflected in the Company's reported totals of loans made to officers and directors and the Company's reported totals of loans made to officers, directors and affiliates;

b.      These undisclosed related party loans included a $7.55 million loan on the 1319 South Capitol Street project and a $10 million facility loan on the MakeOffices project, in addition to outstanding amounts on the previously issued loans relating to the Tysons Center project, the One Florida Avenue project, the Colling Park Industrial Building project, and the 1760 Reston Parkway project;

c.      These undisclosed related party loans were not on substantially the same terms as those prevailing at the time for comparable transactions with non-affiliated persons and instead provided favorable credit terms and/or waiver of documentation or collateral requirements in exchange for favorable terms for Paul and/or entities he controlled with respect to Paul's equity interests;

d.      The Company's related party disclosures were not presented in accordance with GAAP, SEC regulations, and Regulation O;

e.      The Company's internal controls and procedures and compliance policies were inadequate with respect to related party loans and self-dealing;

f.      The foregoing facts created a foreseeable risk of heightened regulatory scrutiny and potential adverse regulatory consequences and the need for the Company to take its own internal investigations; and

g.      As a result, the Company's public statements were materially false and misleading at all times.

**C.      Defendants' False And Misleading Statements And Omissions In And Relating To Eagle Bancorp's Fiscal Year 2016 Financial Results**

186.    On March 1, 2017 Eagle Bancorp issued is 2016 10-K, reporting its financial results for the fiscal year of 2016.  Under the subheading "Related Party Loans" to Note 5 – Loans and

Allowances for Credit Losses to the Company's consolidated financial statements, the 2016 10-K stated:

> Certain directors and executive officers have had loan transactions with the Company. Such loans were made in the ordinary course of business on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with outsiders. The following table summarizes changes in amounts of loans outstanding, both direct and indirect, to those persons during 2016 and 2015.

| (dollars in thousands) | 2016 | 2015 |
|---|---|---|
| Balance at January 1, | $ 29,949 | $ 17,082 |
| Additions | 31,158 | 23,578 |
| Repayments | (8,537) | (10,711) |
| Balance at December 31, | $ 52,570 | $ 29,949 |

187.    In Note 16 – Related Party Transactions to the Company's consolidated financial statements, the 2016 10-K stated:

> The Bank leases office space from a limited liability company in which a trust for the benefit of an executive officer's children has a 51% interest. During the fourth quarter of 2015, the Company entered into an agreement to lease office space for a second location with limited liability companies in which an executive officer indirectly owns a majority interest. The Company paid $1.9 million, $1.6 million, and $1.3 million excluding certain pass-through expenses for the years ended December 31, 2016, 2015 and 2014, respectively.

> A director is a partner in the law firm which has provided, and continues to provide, legal services to the Company and its subsidiaries. During 2016, the Company and its subsidiaries paid aggregate fees of $1.0 million to that firm. Under the Director's arrangement with his firm, he does not participate significantly in the profits or revenues resulting from the provision of legal services to the Company and its subsidiaries.

188.    Item 13 of the 2016 10-K, entitled "Certain Relationships and Related Transactions and Director Independence," incorporated by reference material in Eagle Bancorp's Proxy Statement, filed April 3, 2017, on Form DEF 14A with the SEC, including the material under the caption "Certain Relationships and Related Transactions," which stated in relevant part:

The Bank has had, and expects to have in the future, banking transactions in the ordinary course of business with some of the Company's directors, executive officers, and their associates.  All of such transactions have been on substantially the same terms, including interest rates, maturities and collateral requirements as those prevailing at the time for comparable transactions with non-affiliated persons and did not involve more than the normal risk of collectability or present other unfavorable features.  Loans to insiders require approval by the Board of Directors, with any interested director not participating.  The Company also applies the same standards to any other transaction with an insider.  Additionally, loans and other related party transactions involving Company directors must be reviewed and approved by the Audit Committee.

***The maximum aggregate amount of loans (including lines of credit) to officers, directors and affiliates of the Company during the year ended December 31, 2016 amounted to $82.6 million, representing approximately 9.8% of the Company's total shareholders' equity at December 31, 2016.  In the opinion of the Board of Directors, the terms of these loans are no less favorable to the Bank than terms of the loans from the Bank to unaffiliated parties.  On December 31, 2016, $52.6 million of loans were outstanding to individuals who, during 2016, were officers, directors or affiliates of the Company.***  At the time each loan was made, management believed that these loans involved no more than the normal risk of collectability and did not present other unfavorable features.  None of such loans were classified as Substandard, Doubtful or Loss.

The Bank leases certain office space from limited liability companies in which Mr. Paul or a trust for the benefit of Mr. Paul's children has a majority interest.  During 2016, the Bank paid an aggregate of approximately $1.9 million in rent in respect of these properties, excluding certain pass through expenses; such leases reflect market rates at the time of lease negotiation.

Mr. Rogers is a partner in the law firm Shulman, Rogers, Gandal, Pordy & Ecker, P.A. which has provided, and continues to provide, legal services to the Company and its subsidiaries.  During 2016, the Company and its subsidiaries paid aggregate fees of approximately $1.0 million to that firm.  Fees are based on hourly rates at standard firm rates or below.

189.    Item 9A "Controls and Procedures" of Eagle Bancorp's 2016 10-K, which was signed

by Paul and Langmead, disclosed that:

The Company's management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer, evaluated, as of the last day of the period covered by this report, the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934.  Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company did not maintain

effective disclosure controls and procedures as a result of the material weakness in the Company's internal control relating to income tax accounting, discussed below.

There were no changes in the Company's internal control over financial reporting (as defined in Rule 13a-15 under the Securities Act of 1934) during the quarter ended December 31, 2016 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

## MANAGEMENT REPORT ON EFFECTIVENESS OF INTERNAL CONTROL OVER FINANCIAL REPORTING

The management of Eagle Bancorp, Inc. (the "Company") is responsible for the preparation, integrity and fair presentation of the financial statements included in this Annual Report. *The financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America* and reflect management's judgments and estimates concerning the effects of events and transactions that are accounted for or disclosed.

Management is also responsible for establishing and maintaining effective internal control over financial reporting. The Company's internal control over financial reporting includes those policies and procedures that pertain to the Company's ability to record, process, summarize and report reliable financial data. The internal control system contains monitoring mechanisms, and appropriate actions taken to correct identified deficiencies. Management believes that internal controls over financial reporting, which are subject to scrutiny by management and the Company's internal auditors, support the integrity and reliability of the financial statements. . . .

*Management assessed the Company's system of internal control over financial reporting as of December 31, 2016.* This assessment was conducted based on the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission "Internal Control—Integrated Framework (2013)." *Based on this assessment, management believes that the Company did not maintain effective internal control over financial reporting as of December 31, 2016 as a result of a material weakness in the Company's internal control relating to income tax accounting, as discussed below.*

\*       \*       \*       \*

The Company did not maintain effective controls over its income tax accounting. Specifically, the Company did not maintain effective controls related to: state income tax apportionment; an error in federal tax rates; financial statement to tax return reconciliation errors; and matters related to accounting for share based compensation. While these errors were determined not to be material to the consolidated financial statements, and no adjustments were made as a result of these errors, this control deficiency could result in a misstatement of the tax accruals or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected on a timely basis.

*Remediation Plan.* Management, with oversight from our Audit Committee and in consultation with our tax advisors, has begun development of a remediation plan to address the control deficiency that led to the material weakness. Upon full implementation, the remediation plan will include the following:

- Specific review procedures, including the enhanced involvement of outside independent tax consulting services in the review of tax accounting, designed to enhance our income tax accruals and deferrals; and

- Stronger quarterly income tax controls with improved documentation standards, technical oversight and training.

We currently plan to have our enhanced review procedures and documentation standards in place and operating beginning in the first quarter of 2017. These new controls and procedures will be tested as we apply our controls related to tax accounting during 2017. Our goal is to remediate this material weakness by the end of 2017, subject to there being sufficient opportunities to conclude, through testing, that the enhanced control is operating effectively.

190.     Attached as Exhibits 31.1 and 31.2 to the 2016 10-K were the SOX 302 Certifications of Paul and Langmead, respectively, which were substantively identical to the SOX 302 Certifications of Paul and Langmead in Eagle Bancorp's 2014 10-K quoted in ¶176.

191.     Attached as Exhibits 32.1 and 32.2 to the 2016 10-K were the SOX 906 Certifications of Paul and Langmead, respectively, which were substantively identical to SOX 906 Certifications of Paul and Langmead in Eagle Bancorp's 2014 10-K quoted in ¶177.

192.     The statements made in ¶¶186-191 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts:

                a.     The Company made and held a material amount of related party loans, including loans to entities that were controlled by Paul, that were not reflected in the Company's reported totals of loans made to officers and directors and the Company's reported totals of loans made to officers, directors and affiliates;

b.     These undisclosed related party loans included a $5 million loan on the 600 Rhode Island Avenue project, an increase of $1.845 million on the loan on the 1319 South Capitol project (for a total $9.396 million loan), a $2.275 million loan on the 8 P Street project, and a $63 million loan on the 1701 Rhode Island Avenue project, in addition to outstanding amounts on the previously issued loans relating to the Tysons Center project, the One Florida Avenue project, the Colling Park Industrial Building project, the 1760 Reston Parkway project, and the MakeOffices project;

c.     These undisclosed related party loans were not on substantially the same terms as those prevailing at the time for comparable transactions with non-affiliated persons and instead provided favorable credit terms and/or waiver of documentation or collateral requirements in exchange for favorable terms for Paul and/or entities he controlled with respect to Paul's equity interests;

d.     The Company's related party disclosures were not presented in accordance with GAAP, SEC regulations, and Regulation O;

e.     The Company's internal controls and procedures and compliance policies were inadequate with respect to related party loans and self-dealing;

f.     The foregoing facts created a foreseeable risk of heightened regulatory scrutiny and potential adverse regulatory consequences and the need for the Company to take its own internal investigations; and

g.     As a result, the Company's public statements were materially false and misleading at all times.

**D.      Defendants' False And Misleading Statements In Response To The Aurelius Report**

193.      On late Friday evening, December 1, 2017, Eagle responded to the Aurelius Report in

a press release titled "Eagle Bancorp, Inc. Denies Allegations In Deceptive And Misleading Report,"

which was later filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Paul on December 4,

2017. Therein, Eagle Bancorp stated:

> Early this morning, Aurelius Value—an anonymous online firm that supports short-sellers—published a deceptive and materially misleading piece about Eagle Bancorp ("Eagle"). Eagle categorically rejects the assertions and implications in the piece.
>
> Based on a 36 percent increase in short positions month over month leading up to the release of the article, it appears that the goal of this piece was to manipulate and depress Eagle's stock price. The piece, which was issued without contacting Eagle for comment, is filled with demonstrable falsehoods and material omissions. For example:
>
> - **Selective Quoting of Baseless Allegations from Meritless Lawsuits.** The internet piece relies on unsubstantiated claims in two pending lawsuits. Aurelius fails to disclose that Eagle is not even a party to one of them and thus has had no reason to address the allegations. Eagle has moved to dismiss the other lawsuit in its entirety. It is utterly frivolous. While it may further Aurelius' financial purpose to selectively quote from these lawsuits and omit material information that investors would surely consider important, such behavior is both disturbing and misleading.
>
> - **All Loans Referenced in the Piece Fully Meet Legal Requirements.** The only credit issued by Eagle to the identified executive was a line of credit in case of an overdraft; the line never was used and has not been funded. Eagle takes seriously its obligation to comply with all applicable laws and regulations, including Regulation O. Its compliance is regularly examined internally, and is also examined by agency regulators. Contrary to the misrepresentations by Aurelius, the loans identified in the piece were not made to the identified executive, and, in any event, were approved and disclosed (where required) in compliance with Regulation O.
>
> - **Mischaracterization of Stock Transactions.** Contrary to the incorrect assertions in the piece, the referenced stock sales by an Eagle executive constituted only a small fraction of his holdings. The majority of the proceeds of those sales was used to further charitable purposes. There have been no non-routine stock sales by Eagle executive management.

- **Falsehoods About "Distressed" Loans.** The piece's claim that two alleged related party loans are distressed is false. Those loans are current and performing.

These are but a few examples of the blatant mischaracterizations, falsehoods, and misleading statements in the Aurelius Value report. Eagle categorically rejects the assertions and implications in the piece.

Eagle was founded on, and remains strongly committed to, abiding by the law and the highest professional and ethical standards.

194.   On Sunday, December 3, 2017, the Company released a second rebuke of the

Aurelius Report in a press release titled "Eagle Bancorp Rebuts Claims of Internal Control

Weaknesses and Alerts Shareholders and Customers to be Wary of Unscrupulous Short Seller

Tactics," which was later filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Paul on

December 4, 2017.  Therein, Eagle Bancorp stated:

Trading activity in Eagle Bancorp stock (Nasdaq:EGBN) last Friday was extreme and related to a very large short sale position and an internet piece floated by someone who goes by the pseudonym Aurelius Value, which pushed the closing stock price lower by more than 24%.  The Company issued a responding Press Release late Friday evening (press release) which identified numerous misleading statements and factual errors in the internet piece.

A short sale involves the selling of shares that are not owned in the hopes of repurchasing those shares at a lower price.  The persons involved in the short sale, who hide behind the anonymous name Aurelius Value, released a piece on the internet last Friday claiming that Eagle has engaged in excessive amounts of improper loans to insiders.  By extension, the short seller argued that the Company's system of controls was lacking and that its financial health is weaker than the market generally perceives.  We summarily reject the allegations.

We are the latest prey of the short seller, and so are those of you who were shareholders prior to last Friday.  There is a long list of successful banks and other public companies that this short seller has attacked recently in order to make a fast buck.  Companies that have been attacked have asserted that the short seller and its cohorts have misrepresented the facts and are attempting to illegally manipulate the market.  It should not go unnoted that in order to read the Aurelius piece, one must first click on a disclaimer that says do not take anything in the piece as being accurate and that the reader should not rely on what it says.

It is against the law for a short seller to manipulate the market by intentionally spreading false rumors about a public company.  All appropriate government

70

authorities should act swiftly and decisively against those who seek to profit by disseminating false information in the marketplace. And readers should be wary of any further releases by the short seller or its cohorts as they are intent on continuing to manipulate the market for their own financial gain.

If you research the name of the alleged perpetrator, you will find no fingerprints: no list of directors, officers, principals, or agents. Nothing. If you go to our website www.EagleBankCorp.com or that of the SEC www.sec.gov, you will find everything you need to know about us, and our management and Board, to make informed investment decisions.

Eagle Bancorp stock is listed on Nasdaq. As such, we report our activities and financial condition to the SEC. Our bank is subject to annual examinations from the Federal Reserve and the state. We certify our financial statements and our financial controls. An independent public accounting firm audits us annually, and is required to attest to our financial controls.

Board governance at Eagle is very detailed and comprehensive. Board members are both in control of policies and practices and receive detailed reporting on all aspects of Bank activities. Regulation O loans to insiders must receive approval of the Company Audit Committee and the full Board of the Bank.

The vast majority of the trading volume last Friday occurred late afternoon and by end of the normal trading day at 4:00 p.m. amounted to almost 5 million shares, as compared to normal daily volume of about 140,000 shares. The release on the internet just prior to a weekend seems particularly designed to place particular pressure on the stock price.

We note that many details in the article derived from papers filed by one side in pending litigation that involves a bank executive's independent investments. No evidence has yet been submitted to the court, nor has any finding been made. And the Company has moved to dismiss in its entirety the one case in which it is a party because the case filings fail to even state a cause of action under law.

In most banks, you will find that the making of loans to insiders is not just present but desired. This is especially the case at community banks, where directors bring in those they know to the bank, whether as friends, business partners or peers in the community. There are required disclosures of loans to insiders (as defined in Regulation O), both in annual filings with the Securities and Exchange Commission and in quarterly Bank regulatory reports. The filings by the Company have always been complete, receiving the attention of monthly Board meetings, the Bank's Compliance team, the internal Disclosure Controls Committee and the Audit Committee of the Board. In addition, there are external independent auditor reviews. In all such cases, the loans are made on market-rate, not preferential, rates and terms. The Bank treats insider and related party loans exactly the same as borrowers who have no director or officer relationship with the Bank.

On top of that, insider loan transactions receive added scrutiny in annual regulatory examinations -- by both the Federal Reserve, which is the Bank's primary federal regulator, and the State of Maryland, where the bank is chartered.  Furthermore, all insider loans receive scrutiny by the Bank's Audit and Compliance areas (so as to assure that terms and conditions are not more favorable than for so called arms-length transactions).  Such loans must be approved by the Audit Committee and also must be approved by the full Bank Board of Directors (those directors who are not involved in the transaction).  This goes beyond the normal approval process by the applicable Board Committee for loans not involving insiders.

Eagle's portfolio of loans to insiders is part of the Bank's long successful history, and is not a recent change in practice.  Eagle has always been a business-oriented community bank with significant commercial real estate lending.  The vast majority of board members have a deep understanding of the market and the risk in this area.  In fact, that significant background and knowledge of effective underwriting, market conditions and market participants has resulted in the Company experiencing low levels of credit losses over the Bank's entire 19 year history.  We have been an institution that has weathered the various business cycles better than most (including during the 2007-2009 down cycle) and that includes construction type lending.

Identifying well structured loan opportunities and participating in the growth of the local community is what community banks do.  So long as lending relationships involving Board Members and Executive Officers are underwritten well, monitored, reported in accordance with disclosure requirements and fall below regulatory limits, they are appropriate and encouraged.  Eagle's public filings discuss in detail the risk elements of all types of lending.  The 19-year history of Eagle has demonstrated a high degree of lending success, with a low level of credit issues.

In fact, the stock market's regard for Eagle and its favorable stock price (absent the event of last Friday) is predicated in part on the Company's consistent and stable financial performance over a long period and not any short-term positives or negatives.  This long-term performance includes lower credit losses and better yields on the bank's loan portfolio (as compared to area and peer size banks), which negates the unfounded assertion expressed by the short seller that the Bank is generally providing "preferential loan rates" as a quid pro quo.  It is not.

The Board of Directors at Eagle is quite strong in both background and knowledge of the local real estate market and its participants.  The Board consists of the CEO, the COO and independent directors; members have broad business knowledge and success.  The Board requires and receives significant reporting on all areas of enterprise risk, most especially the quality of the loan portfolio.  Our internal controls are strong and all required disclosures, including loans to insiders, have been met.

The allegations intimated last Friday by the short seller who calls himself or herself Aurelius Value that Eagle's pricing, underwriting, internal controls and/or its disclosures are somehow lacking are totally unfounded.

Please do not allow anonymous fast buck artists to rattle your confidence in us, and our systems, our controls, our regulators, and our success.

Eagle Bancorp is accountable to shareholders and customers.  The short sellers behind the apparent libel and defamation are not.  The Board of Directors stand behind the Company's proven success and deserved reputation of integrity and discipline.

195.    Attached as Exhibit 99.3 to the Form 8-K filed with the SEC on December 4, 2017

was a December 4, 2017 letter released to EagleBank Customers.  The letter, signed by Paul and Riel

stated:

Dear Friend,

At EagleBank our relationships with our customers come first.  With that in mind, we wanted to provide you with <u>accurate</u> information in response to false and misleading statements contained in a piece about Eagle Bancorp and EagleBank that was floated on the internet on Friday.  It was sent out by a predatory "short seller" writing with a self-interest in seeing EGBN stock drop.

This short seller has a history of attacking successful banks and other companies in order to manipulate stock prices and to profit from the trades that benefitted from the manipulations.  We do not intend to let the manipulator get away with this illegal activity.

The short seller alleged that EagleBank and its directors and officers acted improperly in making loans to insiders.  EagleBank categorically rejects this deceptive and misleading allegation and has responded accordingly in the two press releases that follow this letter.  We will not repeat the responses here; I encourage you to read the next few pages.

**Your bank is as strong today as it was a week ago**.  The same directors and executives — with the same high level of integrity and attention to detail — continue to supervise and manage what has become the area's largest and Maryland's most profitable local community bank.  We founded EagleBank in 1998.  We now have well over $7 billion in assets.  For just the first nine months of the year, Eagle Bancorp reported net income of over $84 million — another record for us.  (In fact, we have reported record earnings each quarter for the last 35 quarters).  Our capital base is over $900 million.

Our credit quality remains pristine.  Non—performing assets and more than 90 day past due  loans are only .24% of assets as of September 30, 2017.  Eagle Bancorp's capital exceeds regulatory requirements.  These are strong numbers.

As evidenced by the tiny percentage of non-performing assets, EagleBank adheres to sound underwriting practices which are internally and independently reviewed.  Any

loans subject to Regulation O (the regulation that addresses the rules and processes for making loans to insiders) have been made, approved and disclosed in compliance with that regulation.  EagleBank is proud of its history and culture of compliance, which includes rigorous regulatory review by its compliance department and audit executives and active board oversight.

Further, as a publicly traded company, Eagle Bancorp files certified periodic financial reports with the SEC.  They are publicly available on our website and on the SEC's website.  EagleBank and Eagle Bancorp are both highly regulated, and are supervised by both the Federal Reserve and the State of Maryland.  The bank is subject to annual examinations.

Eagle Bancorp's fundamentals are strong.  The numbers speak for themselves.  The truth is in our financials, not in some anonymous internet piece by a known short-seller who preys on others by issuing false and misleading statements about us and other companies to produce outsized returns for itself and its cohorts.  The truth is supported by our consistent outstanding performance and the hard won integrity of our Board and executive management.  You should view very skeptically the false information being circulated by Aurelius Value and its ilk.

EagleBank and its holding company were founded on, and remain strongly committed to, the highest professional and ethical standards.  Our focus will continue to be on fueling the success of our customers, our employees, our shareholders and our community.

We value your business and our relationship.  There is no "there" there in the internet piece.  But please, should you have any questions, do not hesitate to contact us.  We are here for you, as we always have been.  And as we always will be.  (Emphasis in original).

196.   On December 4, 2017 a story written by Jon Banister entitled "EXCLUSIVE: EagleBank Counsel Denies Insider Loan Accusation, Says It's Under Attack" was published in *Bisnow*.  In response to the Aurelius Report's detailing of a MakeOffices litigation allegation that "Paul used his position as CEO of EagleBank to offer 'cheap debt for equity,'" Bensignor was quoted in the article:

"This phrase 'cheap equity' is not supported by the facts," Bensignor said.  "[Paul's] equity was paid for in hard cash, pro rata, no special treatment, no cheap equity.  It was what it was, the same as anybody else who became an investor."

197.   The *Bisnow* story further detailed its interview with Bensignor:

Bensignor said EagleBank has fully complied with Regulation O in any loans it has made to entities associated with its directors.

"It's not only not surprising that the bank may be making loans to entities in which the director has an interest, it's frankly encouraged because that's how you build a community bank," Bensignor said.

Bensignor said that while Ronald D. Paul Cos. bears Paul's name, the CEO is not personally the owner of every company associated with a project it has invested in, so loans made to the projects are not being made directly to Paul.

"If you take 1701 Rhode Island, the old YMCA building, a family trust that Ron is not a trustee of, and not a beneficiary of, owns a fraction of a fraction of the interest in that building," Bensignor said.  "It's totally allowed.  It's disclosed to the extent required.  It received all necessary approvals."

198.    Also on December 4, 2017, an article on S&P Global Market Intelligence's website entitled "Eagle CEO hits back at short seller; stock recovers some ground after big drop" was published, and contained an interview with Paul that same day.  The article stated:

Paul defended the bank's lending and internal decision-making as consistently aboveboard, appropriately documented, verified by auditors and fully reviewed by regulators.  Aurelius' assertions, he said, have 'no merit.'"

199.    On December 5, 2017, the *Washington Post* published a story entitled, "EagleBank's chief executive attacks report alleging insider loan scheme: Ronald D. Paul denies 'bogus' allegations, calling them the work of a short-seller."  The story was published after a phone interview with Paul the previous day, and stated in relevant part:

EagleBank sharply criticized the report, which Paul described as a "bogus, self-serving article" meant to hurt his financial institution.

*          *          *          *

EagleBank officials said the deals have been carefully structured to avoid the appearance of a conflict of interest, and the company has never been formally cited for violating federal regulations pertaining to Paul's dual involvement.

Paul says he recuses himself from all loan-approval decisions at EagleBank when the deals involve ventures he is involved in.  He said that when his construction projects get loans from his bank they are managed through Potomac Investment Trust, an investment trust managed by his family members in which he himself does not have a vote.

                              *       *       *       *

Paul denied claims made in the Aurelius report that suggested the bank approved
preferential loans to developers who, in return, gave Paul's company a favorable
stake in the project.

"Never, never, never, never, never.  There were no sweetheart deals, no 'wink,
wink,' no nothing," he said.

He said his dual roles are appropriate and beneficial to the community.

200.    On January 18, 2018, Eagle Bancorp held an earnings call to discuss the Company's

financial results for the fourth quarter of 2017.  As part of his opening comments to the call, Paul

stated: "We have already responded to the anonymous short seller Internet post that surfaced online,

December 1, 2017, and we stand by our previous statements."

201.    The statements made in ¶¶193-200 were materially false and/or misleading when

made and/or omitted to state material facts necessary to make the statements not misleading, because

they failed to disclose, among other things, the following adverse facts:

        a.      The Company made and held a material amount of related party loans,

including loans to entities that were controlled by Paul, that were not reflected in the Company's

reported totals of loans made to officers and directors and the Company's reported totals of loans

made to officers, directors and affiliates;

        b.      These undisclosed related party loans included a $14 million loan on the 2009

8th Street project and a $35 million loan on the 700 Constitution Avenue project, in addition to

outstanding amounts on the previously issued loans relating to the Tysons Center project, the One

Florida Avenue project, the Colling Park Industrial Building project, the 1760 Reston Parkway

project, the 1319 South Capital project, the MakeOffices project, the 600 Rhode Island Avenue

project, the 8 P Street project, and the 1701 Rhode Island Avenue project;

c.      These undisclosed related party loans were not on substantially the same terms as those prevailing at the time for comparable transactions with non-affiliated persons and instead provided favorable credit terms and/or waiver of documentation or collateral requirements in exchange for favorable terms for Paul and/or entities he controlled with respect to Paul's equity interests;

d.      The Company's related party disclosures were not presented in accordance with GAAP, SEC regulations, and Regulation O;

e.      The Company's internal controls and procedures and compliance policies were inadequate with respect to related party loans and self-dealing;

f.      The foregoing facts created a foreseeable risk of heightened regulatory scrutiny and potential adverse regulatory consequences and the need for the Company to take its own internal investigations;

g.      There had been "non-routine stock sales by Eagle executive management," specifically by Paul, as detailed in Section IX.B.2, *infra*; and

h.      As a result, the Company's public statements were materially false and misleading at all times.

**E.      Defendants' False And Misleading Statements And Omissions In And Relating To Eagle Bancorp's Fiscal Year 2017 Financial Results**

202.      On March 1, 2018 Eagle Bancorp issued is 2017 10-K, reporting its financial results for the fiscal year of 2017.  Under the subheading "Related Party Loans" to Note 4 – Loans and Allowances for Credit Losses to the Company's consolidated financial statements, the 2017 10-K stated:

> Certain directors and executive officers have had loan transactions with the Company.  Such loans were made in the ordinary course of business on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with outsiders.  The following

table summarizes changes in amounts of loans outstanding, both direct and indirect, to those persons during 2017 and 2016.

| (dollars in thousands) | 2017 | 2016 |
|---|---|---|
| Balance at January 1, | $ 52,570 | $ 29,949 |
| Additions | 44,221 | 31,158 |
| Repayments | (35,886) | (8,537) |
| Balance at December 31, | $ 60,905 | $ 52,570 |

The Bank has made an aggregate of $4.0 million of loans to a trust with an independent third party trustee, established by an executive officer and director, of which the children of such executive officer and director are discretionary beneficiaries, and over which such individuals have no investment or operational authority, and an aggregate of $65.6 million of loans to entities in which the trust has an ownership interest in excess of 10%, which the Company does not consider to be related party transactions. All of such loans were made in the ordinary course of the Company's lending business, were made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable loans with third parties; and did not involve more than the normal risk of collectability or present other unfavorable features.  All of such loans are performing and none of such loans are disclosed as nonaccrual, past due, restructured or potential problem loans.

203.    In Note 16 – Related Party Transactions to the Company's consolidated financial statements, the 2017 10-K stated:

The Bank leases office space from a limited liability company in which a trust for the benefit of an executive officer's children has a 51% interest.  During the fourth quarter of 2015, the Company entered into an agreement to lease office space for a second location with limited liability companies in which an executive officer indirectly owns a majority interest.  The Company leased additional space at this location starting with the third quarter of 2017.  The Company paid $2.1 million, $1.9 million, and $1.6 million excluding certain pass-through expenses for the years ended December 31, 2017, 2016 and 2015, respectively.

A director is a partner in the law firm which has provided, and continues to provide, legal services to the Company and its subsidiaries.  During 2017, the Company and its subsidiaries paid aggregate fees of $871 thousand to that firm.  Under the Director's arrangement with his firm, he does not participate significantly in the profits or revenues resulting from the provision of legal services to the Company and its subsidiaries.

Certain directors and executive officers have had loan transactions with the Company.  Such loans were made in the ordinary course of business on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with outsiders.

204.    Item 13 of the 2017 10-K, entitled "Certain Relationships and Related Transactions and Director Independence," incorporated by reference material in Eagle Bancorp's Proxy Statement, filed April 3, 2018, on Form DEF 14A with the SEC, including the material under the caption "Certain Relationships and Related Transactions," which stated in relevant part:

> The Bank has had, and expects to have in the future, banking transactions in the ordinary course of business with some of the Company's directors, executive officers, and their associates.  All of such transactions have been on substantially the same terms, including interest rates, maturities and collateral requirements as those prevailing at the time for comparable transactions with non-affiliated persons and did not involve more than the normal risk of collectability or present other unfavorable features.  Loans to insiders and their related interests require approval by the Bank Board of Directors, with any interested director not participating.  The Company also applies the same standards to any other transaction with an insider.  Additionally, loans and other related party transactions involving Company directors must be reviewed and approved by the Audit Committee.
>
> *The maximum aggregate amount of loans (including lines of credit) to officers, directors and affiliates of the Company and their related interests during the year ended December 31, 2017 amounted to $85 million, representing approximately 8.9% of the Company's total shareholders' equity at December 31, 2017.  In the opinion of the Board of Directors, the terms of these loans are no less favorable to the Bank than terms of the loans from the Bank to unaffiliated parties.  On December 31, 2017, $65.5 million of loans were outstanding to individuals who, during 2017, were officers, directors or affiliates of the Company.*  At the time each loan was made, management believed that these loans involved no more than the normal risk of collectability and did not present other unfavorable features.  None of such loans were reported as a nonaccrual, past due, troubled debt restructuring or potential problem loan in the Company's financial statement for the year ended December 31, 2017. *The Bank has made an aggregate of $4.0 million of loans to a trust with an independent third party trustee, established by an executive officer and director, of which the children of such executive officer and director are discretionary beneficiaries, and over which such individuals have no investment or operational authority, and an aggregate of $65.6 million of loans to entities in which the trust has an ownership interest in excess of 10%, which the Company does not consider to be related party transactions.* All of such loans were made in the ordinary course of the Company's lending business, were made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable loans with third parties; and did not involve more than the normal risk of collectability or present other unfavorable features.  All of such loans are performing and none of such loans are disclosed as nonaccrual, past due, restructured or potential problem loans.

79

The Bank leases certain office space from limited liability companies in which Mr. Paul or a trust for the benefit of Mr. Paul's children has a majority interest.  During 2017, the Bank paid an aggregate of approximately $2.1 million in rent in respect of these properties, excluding certain pass through expenses; such leases reflect market rates at the time of lease negotiation.

Mr. Rogers is a partner in the law firm Shulman, Rogers, Gandal, Pordy & Ecker, P.A. which has provided, and continues to provide, legal services to the Company and its subsidiaries.  During 2017, the Company and its subsidiaries paid aggregate fees of approximately $871,000 to that firm.  Fees are based on hourly rates at standard firm rates or below.

205.    Further, under Item 9A, "Controls and Procedures" of Eagle Bancorp's 2017 10-K, which was signed by Paul and Levingston, Eagle Bancorp and its management stated that they had concluded that the Company's controls and procedures were effective as of the last day of the period covered by the 2017 10-K and that the 2017 10-K was GAAP compliant.  In addition, Item 9A touted Eagle Bancorp's compliance mechanisms and procedures, noting that management had concluded that the Company maintained effective internal control over financial reporting as of December 31, 2017, and that there were no material weaknesses within the Company's internal control structure.  Specifically, Item 9A stated in relevant part:

The Company's management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer, evaluated, as of the last day of the period covered by this report, the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934.  ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective.***

There were no changes in the Company's internal control over financial reporting (as defined in Rule 13a-15 under the Securities Act of 1934) during the quarter ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting, other than as described below under the caption "Remediation Plan."

**MANAGEMENT REPORT ON EFFECTIVENESS OF INTERNAL CONTROL OVER FINANCIAL REPORTING**

The management of Eagle Bancorp, Inc. (the "Company") is responsible for the preparation, integrity and fair presentation of the financial statements included in

this Annual Report.  ***The financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America*** and reflect management's judgments and estimates concerning the effects of events and transactions that are accounted for or disclosed.

Management is also responsible for establishing and maintaining effective internal control over financial reporting.  The Company's internal control over financial reporting includes those policies and procedures that pertain to the Company's ability to record, process, summarize and report reliable financial data.  The internal control system contains monitoring mechanisms, and appropriate actions taken to correct identified deficiencies.  Management believes that internal controls over financial reporting, which are subject to scrutiny by management and the Company's internal auditors, support the integrity and reliability of the financial statements. . . .

***Management assessed the Company's system of internal control over financial reporting as of December 31, 2017.***  This assessment was conducted based on the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission "Internal Control — Integrated Framework (2013)."  ***Based on this assessment, management believes that the Company maintained effective internal control over financial reporting as of December 31, 2017.  Management's assessment concluded that there was no material weakness within the Company's internal control structure as of December 31, 2017 and that the material weakness that existed as of December 31, 2016 has been fully remediated.***

\*      \*      \*      \*

*Remediation Procedure*.  Management, with oversight from our Audit Committee and in consultation with our tax advisors, implemented remediation procedures to address the control deficiency that led to the material weakness as of December 31, 2016.  The following controls were implemented during 2017:

- Specific review procedures, including the enhanced involvement of outside independent tax consulting services in the review of tax accounting, designed to enhance our income tax accruals and deferrals; and

- Stronger quarterly income tax controls with improved documentation standards, technical oversight and training.

206.    Attached as Exhibits 31.1 and 31.2 to the 2017 10-K were the SOX 302 Certifications of Paul and Levingston, respectively, which were substantively identical to the SOX 302 Certifications of Paul and Langmead in Eagle Bancorp's 2014 10-K quoted in ¶176.

207.     Attached as Exhibits 32.1 and 32.2 to the 2017 10-K were the SOX 906 Certifications of Paul and Levingston, respectively, which were substantively identical to SOX 906 Certifications of Paul and Langmead in Eagle Bancorp's 2014 10-K quoted in ¶177.

208.     The statements made in ¶¶202-207 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts:

a.     The Company made and held a material amount of related party loans, including loans to entities that were controlled by Paul, that were not reflected in the Company's reported totals of loans made to officers and directors and the Company's reported totals of loans made to officers, directors and affiliates;

b.     These undisclosed related party loans included a $14 million loan on the 2009 8th Street project and a $35 million loan on the 700 Constitution Avenue project, in addition to outstanding amounts on the previously issued loans relating to the Tysons Center project, the One Florida Avenue project, the Colling Park Industrial Building project, the 1760 Reston Parkway project, the 1319 South Capital project, the MakeOffices project, the 600 Rhode Island Avenue project, the 8 P Street project, and the 1701 Rhode Island Avenue project;

c.     These undisclosed related party loans were not on substantially the same terms as those prevailing at the time for comparable transactions with non-affiliated persons and instead provided favorable credit terms and/or waiver of documentation or collateral requirements in exchange for favorable terms for Paul and/or entities he controlled with respect to Paul's equity interests;

d.     The Company's related party disclosures were not presented in accordance with GAAP, SEC regulations, and Regulation O;

e.       The Company's internal controls and procedures and compliance policies were inadequate with respect to related party loans and self-dealing;

f.       The foregoing facts created a foreseeable risk of heightened regulatory scrutiny and potential adverse regulatory consequences and the need for the Company to take its own internal investigations; and

g.       As a result, the Company's public statements were materially false and misleading at all times.

### F.    Defendants' False And Misleading Statements And Omissions In Eagle Bancorp's Q1 2018 Earnings Call

209.    On April 19, 2018, Eagle Bancorp held an earnings call to discuss the Company's financial results for the first quarter of 2018.  As part of his opening comments to the call, Paul stated: "On the inverse, the first quarter of 2018 had some extraordinary expenses, including $1.4 million in legal and professional fees for independent due diligence related to the Internet event in late 2017.  Based upon the information provided, *we stand by our previous statements regarding this Internet matter.*"

210.    Later, during the question and answer portion of the earnings call, in response to a question as to whether elevated legal and professional fees from the "Internet event" would continue, Paul stated: "We have some potential run-off that we might have into the second quarter, but we don't know whether there will be further.  We don't -- *we didn't expect the initial findings*, so I really can't comment as to whether or not there will be additional expected costs.

211.    The statements made in ¶¶209-210 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts:

a.      The Company made and held a material amount of related party loans, including loans to entities that were controlled by Paul, that were not reflected in the Company's reported totals of loans made to officers and directors and the Company's reported totals of loans made to officers, directors and affiliates;

b.      These undisclosed related party loans included outstanding amounts on the previously issued loans relating to the Tysons Center project, the One Florida Avenue project, the Colling Park Industrial Building project, the 1760 Reston Parkway project, the 1319 South Capital project, the MakeOffices project, the 600 Rhode Island Avenue project, the 8 P Street project, the 1701 Rhode Island Avenue project, the 2009 8th Street project, and the 700 Constitution Avenue project;

c.      These undisclosed related party loans were not on substantially the same terms as those prevailing at the time for comparable transactions with non-affiliated persons and instead provided favorable credit terms and/or waiver of documentation or collateral requirements in exchange for favorable terms for Paul and/or entities he controlled with respect to Paul's equity interests;

d.      The Company's related party disclosures were not presented in accordance with GAAP, SEC regulations, and Regulation O;

e.      The Company's internal controls and procedures and compliance policies were inadequate with respect to related party loans and self-dealing;

f.      The foregoing facts created a foreseeable risk of heightened regulatory scrutiny and potential adverse regulatory consequences and the need for the Company to take its own internal investigations;

g.      The "initial findings" of the Company's investigation into the Aurelius Report and related matters resulted in a determination that the Company's previous practices for classifying and disclosing related party transactions were improper and in violation of GAAP, SEC regulations, and Regulation O, and the Company determined that it should revise those practices while drawing as little attention as possible to those changes; and

h.      As a result, the Company's public statements were materially false and misleading at all times.

### G.   Defendants' False And Misleading Statements And Omissions In And Relating To Eagle Bancorp's Fiscal Year 2018 Financial Results

212.    On March 1, 2019 Eagle Bancorp issued is 2018 10-K, reporting its financial results for the fiscal year of 2015.  Under the subheading "Related Party Loans" to Note 4 – Loans and Allowances for Credit Losses to the Company's consolidated financial statements, the 2018 10-K stated:

> Certain directors and executive officers have had loan transactions with the Company.  Such loans were made in the ordinary course of the Company's lending business, were made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable loans with third parties; and did not involve more than the normal risk of collectability or present other unfavorable features.  All of such loans are performing and none of such loans are disclosed as nonaccrual, past due, restructured or potential problem loans.  The following table summarizes changes in amounts of loans outstanding, both direct and indirect, to those persons during 2018 and 2017.

| (dollars in thousands) | 2018 | | 2017 | |
|---|---|---|---|---|
| Balance at January 1, | $ | 238,236 | $ | 137,816 |
| Additions | | 55,657 | | 138,565 |
| Repayments | | (126,009) | | (38,145) |
| Balance at December 31, | $ | 167,884 | $ | 238,236 |

> During 2018, we modified our analysis with respect to insider related parties and as a result included additional relationships such as those involving extended family members and trusts, resulting in an increase to the previously reported $60.9 million balance of related party loans at December 31, 2017.

213.    In Note 16 – Related Party Transactions to the Company's consolidated financial statements, the 2018 10-K stated:

> The Bank leases office space from a limited liability company in which a trust for the benefit of an executive officer's children has a 51% interest. During the fourth quarter of 2015, the Company entered into an agreement to lease office space for a second location with limited liability companies in which an executive officer indirectly owns a majority interest. The Company leased additional space at this location starting with the third quarter of 2017. The Company paid $2.2 million, $2.1 million, and $1.9 million excluding certain pass-through expenses for the years ended December 31, 2018, 2017 and 2016, respectively.

> A director is a shareholder in the law firm which has provided, and continues to provide, legal services to the Company and its subsidiaries. During 2018, the Company and its subsidiaries paid aggregate fees of $750 thousand to that firm. Under the Director's arrangement with his firm, he does not participate significantly in the profits or revenues resulting from the provision of legal services to the Company and its subsidiaries.

> The EagleBank Foundation, a 501(c)3 non-profit, seeks to improve the well being of our community by providing financial support to local charitable organizations that help foster and strengthen vibrant, healthy, cultural and sustainable communities. The Company paid $150 thousand, $145 thousand, and $139 thousand to the EagleBank Foundation for the years ended December 31, 2018, 2017 and 2016, respectively.

> Certain directors and executive officers have had loan transactions with the Company. Such loans were made in the ordinary course of business on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with outsiders. Please see further detail regarding Related Party Loans in Note 4 to the Consolidated Financial Statements.

214.    Item 13 of the 2018 10-K, entitled "Certain Relationships and Related Transactions and Director Independence," incorporated by reference material in Eagle Bancorp's Proxy Statement, filed April 5, 2019, on Form DEF 14A with the SEC, including the material under the caption "Certain Relationships and Related Transactions," which stated in relevant part:

> The Bank has had, and expects to have in the future, banking transactions in the ordinary course of business with some of the Company's directors, executive officers, and their associates. All of such transactions have been on substantially the same terms, including interest rates, maturities and collateral requirements as those prevailing at the time for comparable transactions with non-affiliated persons and did not involve more than the normal risk of collectability or present other unfavorable

features.  Loans to insiders and their related interests require approval by the Bank Board of Directors, with any interested director not participating.  The Company also applies the same standards to any other transaction with an insider.  Additionally, loans and other related party transactions involving Company directors must be reviewed and approved for commensurate terms by the Audit Committee.

***The maximum aggregate amount of loans (including lines of credit) to officers, directors and affiliates of the Company and their related parties during the year ended December 31, 2018 amounted to $249 million, representing approximately 22% of the Company's total shareholders' equity at December 31, 2018.  In the opinion of the Board of Directors, the terms of these loans are no less favorable to the Bank than terms of the loans from the Bank to unaffiliated parties.  On December 31, 2018, $167.9 million of loans were outstanding to officers, directors and affiliates of the Company and their related parties.***  All of such loans were made in the ordinary course of the Company's lending business, were made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable loans with third parties; and did not involve more than the normal risk of collectability or present other unfavorable features.  All of such loans are performing and none of such loans are disclosed as nonaccrual, past due, restructured or potential problem loans.

The Bank leases certain office space from limited liability companies in which Mr. Paul or a trust for the benefit of Mr. Paul's children has a majority interest. During 2018, the Bank paid an aggregate of approximately $2.2 million in rent in respect of these properties, excluding certain pass through expenses; such leases reflect market rates at the time of lease negotiation.

Mr. Rogers is a shareholder in the law firm Shulman, Rogers, Gandal, Pordy & Ecker, P.A. which has provided, and continues to provide, legal services to the Company and its subsidiaries.  During 2018, the Company and its subsidiaries paid aggregate fees of approximately $750,000 to that firm.  Fees are based on hourly rates at standard firm rates or below.

215.    Further, under Item 9A, "Controls and Procedures" of Eagle Bancorp's 2018 10-K, which was signed by Paul and Levingston, Eagle Bancorp and its management stated that they had concluded that the Company's controls and procedures were effective as of the last day of the period covered by the 2018 10-K and that the 2018 10-K was GAAP compliant.  In addition, Item 9A touted Eagle Bancorp's compliance mechanisms and procedures, noting that management had concluded that the Company maintained effective internal control over financial reporting as of

December 31, 2018, and that there were no material weaknesses within the Company's internal control structure.  Specifically, Item 9A stated in relevant part:

> The Company's management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer, evaluated, as of the last day of the period covered by this report, the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934.  ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective.***

> There were no changes in the Company's internal control over financial reporting (as defined in Rule 13a-15 under the Securities Act of 1934) during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

> **MANAGEMENT REPORT ON EFFECTIVENESS OF INTERNAL CONTROL OVER FINANCIAL REPORTING**

> The management of Eagle Bancorp, Inc. (the "Company") is responsible for the preparation, integrity and fair presentation of the financial statements included in this Annual Report.  ***The financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America*** and reflect management's judgments and estimates concerning the effects of events and transactions that are accounted for or disclosed.

> Management is also responsible for establishing and maintaining effective internal control over financial reporting.  The Company's internal control over financial reporting includes those policies and procedures that pertain to the Company's ability to record, process, summarize and report reliable financial data.  The internal control system contains monitoring mechanisms, and appropriate actions taken to correct identified deficiencies.  Management believes that internal controls over financial reporting, which are subject to scrutiny by management and the Company's internal auditors, support the integrity and reliability of the financial statements. . . .

> ***Management assessed the Company's system of internal control over financial reporting as of December 31, 2018.***  This assessment was conducted based on the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission "Internal Control – Integrated Framework (2013)."  ***Based on this assessment, management believes that the Company maintained effective internal control over financial reporting as of December 31, 2018.  Management's assessment concluded that there was no material weakness within the Company's internal control structure as of December 31, 2018.***

216.     Attached as Exhibits 31.1 and 31.2 to the 2018 10-K were the SOX 302 Certifications of Paul and Levingston, respectively, which were substantively identical to the SOX 302 Certifications of Paul and Langmead in Eagle Bancorp's 2014 10-K quoted in ¶176.

217.     Attached as Exhibits 32.1 and 32.2 to the 2018 10-K were the SOX 906 Certifications of Paul and Levingston, respectively, which were substantively identical to SOX 906 Certifications of Paul and Langmead in Eagle Bancorp's 2014 10-K quoted in ¶177.

218.     The statements made in ¶¶212-217 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts:

a.     The Company made and held a material amount of related party loans, including loans to entities that were controlled by Paul, including outstanding amounts on the previously issued loans relating to the Tysons Center project, the One Florida Avenue project, the Colling Park Industrial Building project, the 1760 Reston Parkway project, the 1319 South Capital project, the MakeOffices project, the 600 Rhode Island Avenue project, the 8 P Street project, the 1701 Rhode Island Avenue project, the 2009 8th Street project, and the 700 Constitution Avenue project;

b.     These related party loans were not on substantially the same terms as those prevailing at the time for comparable transactions with non-affiliated persons and instead provided favorable credit terms and/or waiver of documentation or collateral requirements in exchange for favorable terms for Paul and/or entities he controlled with respect to Paul's equity interests;

c.     The Company's internal controls and procedures and compliance policies were inadequate with respect to related party loans and self-dealing;

d.      The foregoing facts created a foreseeable risk of heightened regulatory scrutiny and potential adverse regulatory consequences and the need for the Company to take its own internal investigations;

e.      As a result, the Company's public statements were materially false and misleading at all times.

## VII.   SCHEME LIABILITY

219.    In addition to Defendants' public false and misleading statements identified in Section VI, *supra*, Paul and Bensignor also engaged devices, schemes, and artifices to defraud under SEC Rule 10b-5(a) and acts, practices, and courses of business that operated as a fraud and deceit under SEC Rule 10b-5(c).

220.    SEC Rule 10b-5(a) makes it unlawful:

for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange … [t]o employ any device, scheme, or artifice to defraud.

17 C.F.R. §240.10b-5(a).

221.    SEC Rule 10b-5(c) makes it unlawful to:

for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange … [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5(c).

222.    These provisions cover misconduct beyond direct misrepresentations made to the investing public and can include actions such as lying to a company's auditor or its regulators as part of an overall scheme to deceive the securities markets.

223.    One clear example of a deceptive device and act in furtherance of a scheme to defraud was the Tying Arrangement Letter that Paul coerced Rahbar into signing in relation to the

90

MakeOffices investment. *See* ¶¶116, 117, 142-146, *supra*. This letter purported to retroactively "confirm" that there was no tying arrangement between EagleBank's facility loan to MakeOffices and Paul's ownership interest in MakeOffices. That assertion of no tying was a lie, because EagleBank's grant of a debt facility line of credit on terms that Rahbar acknowledged were "extremely favorable" and "would not otherwise be available" was conditioned on Rahbar giving Paul a "favorable valuation rate" on his investment into MakeOffices. Thus, there was a direct tie between the loan terms and the terms of Paul's ownership interest. Paul demanded that the letter be signed by Rahbar, because Paul needed it for a "routine Federal Reserve Audit." Thus, the letter was designed for the very purpose of deceiving the Federal Reserve and deceiving the Company's own auditors, to give the false appearance that the transaction was on substantially the same terms as comparable transactions with outsiders (as the Company represented in its public statements to be the case for all related party transactions), when in fact that was not true. Bensignor, the Company's General Counsel, directly participated in this scheme to defraud by drafting the letter, to be printed on MakeOffices letterhead.

224. The use of the false Tying Arrangement Letter was not unique to the MakeOffices transaction. Rahbar testified at his deposition that Zach Wade, MRP's appointed director to MakeOffices, told him that MRP routinely signed such letters in connection with EagleBank deals and that they were part of the game. MRP regularly worked on joint ventures with RDP, including the Collington Park Industrial Building project and the 600 Rhode Island Avenue project. These facts support an inference that Paul regularly employed deceptive "no tying" letters in connection with the multiple undisclosed related party transactions at the heart of this case and that these letters constituted deceptive acts and devices as part of a scheme to defraud.

225. The statements of FE1 further support this conclusion. FE1 stated that loans

involving Paul and the entities he controlled were handled by Bensignor's office.  FE1 also stated that "Friends of Ron" ("FOR") loans were expedited and received waivers for the missing documents that would have resulted in the loan not being approved if it were not a FOR loan.  In other words, there were regularly documentation gaps in related party transactions involving Paul, which dovetails perfectly with Rahbar's claim that he was coerced to retroactively sign a false no tying letter after the loan was already complete.

## VIII.   LOSS CAUSATION

226.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

227.    During the Class Period, Plaintiffs and the Class purchased Eagle Bancorp's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed or materialized, causing investors' losses.

228.    Artificial inflation in EGBN's stock price was removed when concealed risks partially materialized and/or the truth about the material misrepresentations and omissions was partially revealed to the public on December 1, 2017 and July 17, 2019.  As a direct result of these partial disclosures, the price of Eagle Bancorp's publicly traded securities declined precipitously on heavy trading volume, causing economic injury to Plaintiffs and other members of the Class.

229.    On December 1, 2017, Aurelius issued the Aurelius Report.  As discussed *supra* at ¶¶69-75, the Aurelius Report revealed, among other things, that the Company made and held a material amount of related party loans, including loans to entities that were controlled by Paul, that were not reflected in the Company's reported totals of loans made to officers, directors and affiliates;

that the Company's internal controls and procedures and compliance policies were inadequate with respect to related party loans and self-dealing; and that the Company was at risk of heightened regulatory scrutiny and potential adverse regulatory consequences.

230.     On this news, the price of Eagle Bancorp's stock declined $16.20 per share, approximately 24.5%, to close on December 1, 2017 at $49.95, on heavy volume, damaging investors.

231.     Late in the evening on December 1, 2017 and on Sunday, December 3, 2017, Eagle issued two press releases in which Defendants strongly denied the allegations in the Aurelius Report, refuting the allegations in the Aurelius Report, and highlighting Eagle's commitment to compliance to applicable laws, regulations, and ethical standards (as detailed at ¶¶78-83, *supra*). These press releases, along with a letter from Paul and Riel to EagleBank's customers (detailed at ¶84, *supra*) were attached as exhibits to a Form 8-K filed with the SEC on December 4, 2017. The Company and defendants Paul and Bensignor further strongly denied the Aurelius Report's allegations in interviews to the press in articles published on December 4 & 5, 2017 (as detailed at ¶¶85-88, *supra*). As a result of the Company's efforts to reassure the market, the stock price partially rising $7.15 per share, or 14.3%, to close at $57.10 on December 4, 2017.

232.     Analysts were mostly assured by Eagle's response to the Aurelius Report. For example, analysts with Merion Capital Group upgraded Eagle Bancorp to "Outperform," noting "we do not see any reason in the short-seller article to alter our earnings estimates." Similarly, analysts at FIG Partners reiterated their "Outperform" rating on shares of Eagle Bancorp, explaining that they "were encouraged to see EGBN respond [to] the report after the close Friday and our conversation with EGBN executives over the weekend allowed for a window into the response. At its face, if the

allegations were true it would paint a picture of … a lack of internal oversight.  The issues raised run counter to a company that is top-tier, in our opinion, in almost every aspect."

233.    Analysts at Stephens likewise concluded on December 4, 2017 that "we are not surprised EGBN is up today.  We see Eagle as a high-quality DC growth bank . . . .  Eagle reports insider loans to regulators consistent with Regulation O, which at 3Q17, stood at ~1.6% of loans." However, Stephens noted that "[w]e believe the market may need some clarity on any insider interest at Eagle's borrowers[.]"

234.    Other analysts also commented that the Aurelius Report raised concerns that could only be answered with time.  For example, analysts with Sandler O'Neill issued a report on December 4, 2017, stating, "We view the fundamental question here as the legality of the actions the bank and the CEO have taken, and the company's press releases seem to address those concerns. However, there are some linkages that raise more questions than answers . . . .  While we would like to give management the full benefit of the doubt, we aren't sure how this situation will ultimately play out."  Similarly, in response to the Aurelius Report and Eagle's response, Motley Fool stated:

> Eagle Bancorp's response is standard fare.  When pressed by short-sellers, companies frequently point to their auditing practices, historical performance, and the quality of their internal controls and disclosure.  Bulls can point to Eagle Bancorp's low historical credit losses, while bears can point to the bank's fast loan growth, which dilutes the impact of bad loans.
>
> What Eagle Bancorp didn't do is quantify its exposure to loans made to insiders, or companies where the bank's insiders have a financial interest.  I take that to mean that Eagle Bancorp does have substantial exposure to such loans.
>
> Only time will tell who is right and who is wrong, but the market seems to be giving Eagle Bancorp a little more credit after hearing its side of the story on Monday.

235.    As discussed *supra* at ¶¶92-93, on March 1, 2019, in the Company's 2018 10-K, Eagle Bancorp "modified [its] analysis with respect to insider related parties, and as a result included additional relationships such as those involving extended family members and trusts, resulting in an

increase to the previously reported $60.9 million balance of related party loans at December 31, 2017." This increase amounted to $177.33 million more in reported related party loans at December 31, 2017 and closely approximated the amount of loans to Paul related projects detailed in the Aurelius Report, thus corroborating the Aurelius Report's allegations of an undisclosed insider loan scheme.

236.    On July 17, 2019 after the market close, Eagle Bancorp's announced its financial results for the second quarter of 2019. Within this announcement, the Company disclosed that its legal, accounting and professional fees had increased by 26% for the year as compared to the first six months of 2018. Eagle Bancorp explained that expenses for the quarter related primarily to "legal fees and expenditures in connection with *our responses to investigations and related document requests and subpoenas from government agencies examining matters, including the Company's identification, classification and disclosure of related party transactions;* the retirement of certain former officers and directors; and the relationship of the Company and certain of its former officers and directors with a local public official." Eagle Bancorp further disclosed that it will "continue to incur elevated levels of legal and professional fees and expenses for at least the remainder of 2019 as it continues to cooperate with these investigations."

237.    The following morning, on the July 18, 2019 earnings call, Riel explained that the scope of the governmental investigations "expanded significantly" in the second quarter of 2019. In the question and answer portion of the call, Levingston further disclosed that related party transactions "that are being looked at," although not individually identified by Eagle Bancorp in its public filings, "[t]he overall amounts and totals were -- are represented in our public filings in the 2018 10-K filed March of this year."

238.    Following this news, the Company's stock price fell $14.30, or approximately 26.75%, to close at $39.15 per share on July 18, 2019, on heavy volume, damaging investors.

239.    On July 18, 2019, the analyst firm Stephens, concluded that "Eagle's stock closed ~27% today partly due to fundamental NIM pressure, but more importantly investor uncertainty around the impact and scope of disclosed legal issues (details in note) related to former officers/directors & related party transactions."  That same day, Sandler O'Neill lowered its rating of Eagle Bancorp, due in part to its "view that the legal situation is going to be an overhang on the stock for some time[.]"  Piper Jaffray similarly downgraded Eagle Bancorp's shares on July 19, 2019, after earlier commenting that the disclosure was new, because of their belief that the "investigations will be continued overhang on the stock[,]" further commenting that Eagle Bancorp's substantially higher revisions of the Company's related party loans from approximately $61 million to approximately $238 million, was "worth considering as the potential underlying causes of the new disclosures."

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    Paul's Tying Arrangements

240.    The allegation in the *Rahbar* Complaint that Paul arranged for Eagle to provide MakeOffices with cheap debt which it could not otherwise obtain in exchange for granting Paul an equity interest at a favorable valuation is a classic tying arrangement prohibited by 18 U.S.C. §215(a)(2), which states:

> Whoever as an officer, director, employee, agent, or attorney of a financial institution, corruptly solicits or demands for the benefit of any person, or corruptly accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution;
>
> shall be fined not more than $1,000,000 or three times the value of the thing given, offered, promised, solicited, demanded, accepted, or agreed to be accepted, whichever is greater, or imprisoned not more than 30 years, or both, but if

the value of the thing given, offered, promised, solicited, demanded, accepted, or agreed to be accepted does not exceed $1,000, shall be fined under this title or imprisoned not more than one year, or both.

241.    The tying arrangement was explicitly laid out in the September 24-25, 2015 email exchange, where Rahbar wrote to Bensignor and Paul et al., "The entire basis for the lower valuation is the guaranteeing of the loan.  Without the facility guarantee, the LLC investment at this valuation would not occur."  Ex. C at C-6.  Bensignor's response confirmed that Rahbar was not mistaken, stating, "[e]verybody is going into this with the same business plan…"  *Id*. at C-8.

242.    Then, approximately seven months after the loan was made, Bensignor drafted the Tying Arrangement Letter, to be put on MakeOffices letterhead and signed by Rahbar, falsely claiming that there was "no tying arrangement" in advance of a Federal Reserve audit.  The Tying Arrangement Letter, along with Rahbar's testimony that MRP ***routinely*** signed similar tying arrangement letters for Paul, are evidence that Paul and Eagle were aware their actions were in violation of Eagle's own publicly stated policies relating to related party transactions and constituted an illegal kickback scheme.

### B.    Paul Had Financial Motives To Conceal The Company's Insider Loan Scheme

243.    As described herein, Paul had a two-fold financial motive to conceal the Company's insider loan scheme.  First, Paul had a personal financial interest in the more than $175 million in loans that the Company originally failed to disclose as related party transactions (but ultimately was forced to acknowledge were related party transactions after investigations following the issuance of the Aurelius Report).  By concealing the fact that these loans were related party transactions, Paul was able to avoid regulatory and shareholder scrutiny of the terms of these deals (at least until the scheme was revealed), including at least one deal where Paul illegally leveraged his position at EagleBank to obtain cheap equity in the borrower that he would not otherwise have been able to obtain.  Second, Paul reaped more than $11 million in illicit insider trading proceeds by selling his

stock in the Company at artificially inflated prices shortly after learning at Rahbar's deposition that Rahbar had reported Paul's criminal conduct to regulatory authorities, but before the insider loan scheme had been made public.

           **1.**      **Paul Had A Personal Financial Motive To Conceal His Financial Interest And Role In The Undisclosed Related Party Transactions**

244.     Throughout the Class Period (until his retirement from the Company on March 20, 2019), Paul not only served as the President and CEO of the Company, but also as the President and owner of RDP, a private real estate investment and property management company. While these dual sets of positions (and the potential conflicts of interests they posed) were known to the public, what was not known to the public was the scale and scope of the loans that EagleBank gave to ventures in which RDP and Paul had a material financial interest. As detailed *supra*, the Company failed to disclose more than $175 million in related party loans in which Paul had a direct or indirect material financial interest. This resulted in an understatement of the Company's outstanding related party loans of ***almost 75%*** as of December 31, 2017.[32] This understatement caused the market to materially underestimate the degree of risk that the Company faced as a result of its related party loan practices.

245.     In addition, in at least one of these related party deals (the MakeOffices deal), Paul used his positions and control over Eagle Bancorp and EagleBank to leverage better personal financial terms for himself as an investor, in violation of the bank bribery statute. *See, e.g.*, ¶¶9, 70, 101, 107, 108, 142-145, 223, 240-242, *supra*. Strong circumstantial evidence suggests that he engaged in similarly improper self-dealing in relation to the other undisclosed related party

---

[32] The Company reported $60.91 million in related party loans as of December 31, 2017 in its 2017 Form 10-K, which was increased to $238.4 million in related party loans as of December 31, 2017, using the Company's "modified" analysis in its 2018 Form 10-K. The difference ($177.33 million) represents a 291% increase in the originally reported number. Or, looking at it another way, the correct amount of the Company's related party loans was understated by 74.4% in the 2017 10-K.

transactions.  *See* ¶264, *infra*.  Paul, therefore, had a personal financial motive to avoid auditor and regulator scrutiny in relation to these transactions and to cause them not to be classified as related party transactions.  Further, strong circumstantial evidence suggests that Paul and Bensignor designed these transactions (and the ownership structure of the special purpose entities created to effectuate the transactions and receive the moneys from the EagleBank-issued loans) to avoid the numerical reporting thresholds for related party transactions under Regulation O.  *See* ¶264(c), *infra*.

2.      **Paul Began Selling Eagle Bancorp Stock Shortly After Learning That Certain Of His Conduct Had Been Reported To Federal Law Enforcement Authorities**

246.    In Rahbar's March 21, 2017 MakeOffices Litigation deposition, Rahbar testified that he believed Paul was engaged in criminal activity, including violations of the bank bribery statute. Rahbar provided facts to support his claims, including that he was told MRP routinely signed no tying arrangement letters and that that they were part of the game, and his claims are also are corroborated by the emails discussed above (¶¶116, 117, 142-146, *supra*).

247.    At this deposition, Rahbar was asked to whom he had reported Mr. Paul's criminal conduct.  Rahbar testified that in addition to the officers at MakeOffices, his partners at IBB, and outside counsel, he informed the Federal Reserve Bank of Richmond, the House of Representatives, and the FBI.

248.    Paul was present at this deposition and thus heard that Rahbar had reported Paul's criminal conduct to multiple government authorities and/or regulatory agencies.

249.    Just a few months later, Paul began selling shares, both directly and indirectly through his spouse, of Eagle Bancorp stock, ending his sales just before the Aurelius Report was released. Prior to this highly suspicious spurt of stock trading, Paul had never sold any of his Eagle Bancorp stock during the entirety of Eagle Bancorp's life as a public company.  Thus, Paul *never* sold *any* Eagle Bancorp stock in the *19 years* between Eagle Bancorp's IPO in 1998 and his deposition in

March 2017, but began making significant sales three months after learning that allegations of his criminal conduct relating to Eagle Bancorp had been reported to the authorities.

250.    In total, between June 29, 2017 and November 3, 2017, Paul sold 176,448 shares, or 11.66% of his total Eagle Bancorp shares at that time, for proceeds of $11,457,752.  The following chart reflects Paul's sales during this approximately four month period:[33]

| Date | Shares Sold | Price Per Share | Proceeds on Sale |
|---|---|---|---|
| 06/29/2017 | 7,751 | $63.50 | $492,189 |
| 06/29/2017 | 40 | $64.20 | $2,568 |
| 06/30/2017 | 4,500 | $63.25 | $284,625 |
| 06/30/2017 | 4,500 | $63.27 | $284,733 |
| 07/25/2017 | 706 | $64.12 | $45,270 |
| 08/25/2017 | 809 | $62.25 | $50,360 |
| 08/25/2017 | 400 | $62.50 | $25,000 |
| 08/31/2017 | 2,500 | $62.16 | $155,404 |
| 08/31/2017 | 2,500 | $62.21 | $155,536 |
| 08/31/2017 | 2,500 | $62.22 | $155,556 |
| 09/01/2017 | 2,500 | $62.33 | $155,835 |
| 09/01/2017 | 2,500 | $62.45 | $156,125 |
| 09/11/2017 | 2,429 | $62.15 | $150,967 |
| 09/11/2017 | 711 | $62.31 | $44,305 |
| 09/12/2017 | 5,000 | $63.58 | $317,891 |
| 09/12/2017 | 4,198 | $63.50 | $266,574 |
| 09/12/2017 | 2,035 | $62.96 | $128,120 |
| 09/12/2017 | 1,749 | $63.06 | $110,297 |
| 09/12/2017 | 1,665 | $63.50 | $105,732 |
| 09/12/2017 | 802 | $63.55 | $50,967 |
| 09/12/2017 | 751 | $63.49 | $47,678 |
| 09/12/2017 | 465 | $63.54 | $29,546 |
| 09/13/2017 | 6,486 | $63.78 | $413,699 |
| 09/13/2017 | 5,000 | $63.30 | $316,500 |
| 09/13/2017 | 5,000 | $63.68 | $318,376 |
| 09/18/2017 | 800 | $64.40 | $51,520 |
| 09/20/2017 | 3,672 | $63.57 | $233,424 |
| 09/21/2017 | 4,217 | $63.75 | $268,834 |

---

[33] Paul's Eagle Bancorp trading activity is publicly available through Form 4s filed with the SEC, which requires directors, officers, or those that own more than 10% of a class of security to report changes in ownership of that security.

| Date | Shares Sold | Price Per Share | Proceeds on Sale |
|------|------------:|----------------:|-----------------:|
| 09/22/2017 | 5,000 | $63.50 | $317,500 |
| 09/22/2017 | 5,000 | $63.58 | $317,883 |
| 09/22/2017 | 2,113 | $63.62 | $134,421 |
| 09/22/2017 | 36 | $63.75 | $2,295 |
| 09/27/2017 | 10,000 | $65.58 | $655,844 |
| 09/27/2017 | 3,113 | $65.76 | $204,700 |
| 09/28/2017 | 5,000 | $65.71 | $328,536 |
| 09/28/2017 | 5,000 | $65.87 | $329,374 |
| 09/28/2017 | 5,000 | $65.89 | $329,428 |
| 09/28/2017 | 5,000 | $66.36 | $331,805 |
| 09/28/2017 | 5,000 | $66.41 | $332,061 |
| 10/25/2017 | 5,000 | $67.45 | $337,250 |
| 10/25/2017 | 5,000 | $67.46 | $337,296 |
| 10/25/2017 | 2,842 | $67.46 | $191,733 |
| 10/25/2017 | 2,158 | $67.50 | $145,665 |
| 11/01/2017 | 3,537 | $66.25 | $234,340 |
| 11/01/2017 | 1,463 | $67.00 | $98,021 |
| 11/02/2017 | 6,000 | $67.09 | $402,532 |
| 11/02/2017 | 5,500 | $67.03 | $368,646 |
| 11/02/2017 | 3,541 | $67.17 | $237,837 |
| 11/03/2017 | 5,209 | $67.02 | $349,095 |
| 11/03/2017 | 5,000 | $67.05 | $335,228 |
| 11/03/2017 | 4,750 | $67.08 | $318,634 |

251.    Paul's proceeds from these sales also dwarf his salary for the year.  According to the Company's Proxy Statement filed with the SEC on April 3, 2018, Paul's base salary was $906,743 for 2017.  The proceeds from the sales identified above in this approximately four month time period more than twelve (12) times his base salary.

### C.    EagleBank Financed Numerous RDP Real Estate Ventures

252.    Plaintiffs' independent investigation has confirmed that Eagle financed the ten RDP real estate projects referenced in the Aurelius Report.  Publicly available UCC and deed documents—along with internet images from RDP's website, both current and archived images obtained through the Wayback Machine—verify the Aurelius Report's allegations concerning substantial related party transactions that Defendants attempted to conceal from the public's view

prior to the "modifi[cation]" of the Company's related party disclosure in the 2018 10-K filed on March 1, 2019.

253.    In addition, a December 5, 2017 *Washington Post* article reported that:

At least eight projects managed by Ronald D. Paul Companies have received multimillion-dollar loans from EagleBank, company officials confirmed Monday. They include a former YMCA building in the center of the District that is being converted into high-end office space, a 2 million-square-foot mixed-use space in Tysons Corner, and a 220,000 square-foot mixed-use development across from Nationals Park in Southwest, all of them joint ventures with other prominent developers.

254.    ***Tysons Center:***  Using the Wayback Machine, Plaintiffs were able to confirm that the RDP website previously listed Tysons Center as a commercial property under development until at least January 2018.  In the description provided on RDP's website, Tysons Center is an RDP joint venture that will bring "up to 2 million square feet in mixed use development to the heart of Tysons Corner, Virginia.  The site occupies … property located at the intersections of Route 123 and Route 7, … and abutting the new Greensboro Station, part of the … Metro rail system."  Ex. G at G-1.  A UCC financing statement filed on June 17, 2014[34] reflects that EagleBank is the secured party and holds an interest in land matching the description of the location provided on RDP's website, granted by the debtors, Tysons Central, LLC.  Ex. H at H-1–H-3.  In addition, the RDP description matches Eagle's confirmation to the *Washington Post* that "a 2 million-square-foot mixed-use space in Tysons Corner" was in fact an RDP-managed project that received a multimillion-dollar loan from EagleBank.

255.    ***One Florida Avenue and 8 P Street:***  RDP's website currently lists One Florida Avenue as a former residential property of RDP.  Ex. G at G-2.  Deed records filed with the District

---

[34] Obtained through the UCC and Federal Lien Search available on the Clerk's Information System of the State Corporation Commission of the Commonwealth of Virginia.

of Columbia on August 4, 2014[35] reflect that EagleBank lent $10.3 million to Bethesda St. Elmo, LLC, secured by the lot referred to as One Florida Avenue.  The manager of Bethesda St. Elmo, LLC was Potomac, and the Deed of Trust and Security Agreement was signed by McCallum, in her role at trustee of Potomac.  Ex. H at H-4–H-6.

256.    8 P Street is adjacent to RDP's One Florida Avenue.  Deed records filed with the District of Columbia reflect that EagleBank lent $2.275 million to Bethesda St. Elmo, LLC, secured by the 8 P Street and One Florida Avenue properties.  Ex. H at H-7–H-9.  Deed records filed with the District of Columbia on December 1, 2016 also reflect that Bethesda St. Elmo LLC purchased the 8 P Street property from 8 P Street NE LLC.  McCallum was the manager of 8 P Street NE LLC.  Ex. H at H-10–H-11.

257.    ***Collington Park Industrial Building:***  Using the Wayback Machine, Plaintiffs were able to confirm that the RDP website previously listed Collington Park as an industrial property that "Mr. Paul has invested [in] as a co-general partner in [a] joint venture fund[]" until at least October 2018.  MRP Industrial, "an affiliate of MRP," currently lists Collington Park on its website as "an industrial/flex development in Bowie Marlyand [that is] [c]entrally located in Prince George's County."  Both the RDP website and the MRP Industrial website display the same picture of Collington Park.  Ex. G at G-3–G-4.  A UCC financing statement filed on August 8, 2014[36] reflects that EagleBank is the secured party and holds an interest in land matching the description of the location provided on MRP Industrial's website, granted by the debtors, P7/MRPI Collington, LLC.

---

[35] All deed records filed with the District of Columbia were obtained through the Office of Tax and Revenue Recorder of Deeds website, available at https://countyfusion4.kofiletech.us/countyweb/login.do?countyname=WashingtonDC.

[36] Obtained through a "Delaware Authorized Server" who has been certified by the Delaware Division of Corporations in performing online UCC searches.

The mailing address for P7/MRPI Collington, LLC is 3050 K Street, NW, Suite 125, Washington, D.C., the same address MRP lists for its Washington, D.C. office.  Ex. H at H-12–H-13.

258.  *1319 South Capitol Street:*  RDP's website currently lists 1319 South Capitol Street, S.W. as a residential property under development by RDP.  Ex. G at G-5.  Deed records filed with the District of Columbia and dated August 24, 2015 reflect that EagleBank lent $7.55 million to 1319 South Capitol Associates LLC, secured by this property.  The manager of 1319 South Capitol Associates LLC was 1319 South Capitol Investors, LLC, who in turn was managed by Potomac, and the Deed of Trust and Security Agreement was signed by McCallum, in her role at trustee of Potomac.  Ex. H at H-14–H-15.  This loan was increased to $9.396 million on June 30, 2016, according to deed records filed with the District of Columbia.  *Id.* at H-16–H-17.  In addition,  the description of 1319 South Capitol Street matches Eagle's confirmation to the *Washington Post* that "a 220,000 square-foot mixed-use development across from Nationals Park" was in fact an RDP-managed project that received a multimillion-dollar loan from EagleBank.

259.  *600 Rhode Island Avenue:*  Using the Wayback Machine, Plaintiffs were able to confirm that the RDP website previously listed 600 Rhode Island Avenue as a commercial property under development until at least November 2018.  The RDP website stated that the property was "acquired through a joint venture between Ronald D. Paul Companies and MRP Realty."  Ex. G at G-6.  Deed records filed with the District of Columbia and dated January 8, 2016 reflect that EagleBank lent $5 million to MRP 600 RI LLC, secured by this property.  The administrative member of MRP 600 RI LLC was MRP 600 RI Partners LLC, who was managed by MRP.  Ex. H at H-17–H-19.

260.  *2009 8th Street:*  Using the Wayback Machine, Plaintiffs were able to confirm that the RDP website previously listed 2009 8th Street as a residential property under development until

at least November 2018.  Ex. G at G-7.  Deed records filed with the District of Columbia and dated June 1, 2017 reflect that EagleBank lent $14 million to 2009 8th Street Lender LLC.  Ex. H at H-21.[37]

261.   ***1701 Rhode Island Avenue (formerly 1711 Rhode Island Avenue):***  Using the Wayback Machine, Plaintiffs were able to confirm that the RDP website previously listed 1701 Rhode Island Avenue as a commercial property under development until at least November 2017. The RDP website stated that the property "is a joint venture between Ronald D. Paul Companies and Ackridge (sic)... [that] will transform the former YMCA National Capital building at 1711 Rhode Island Avenue, NW, into a ... boutique office building."  Ex. G at G-8.  Deed records filed with the District of Columbia and dated December 19, 2016 reflect that EagleBank lent $63 million to 1711 Rhode Island Owner, LLC, secured by this property.  Ex. H at H-22–H-23.  In addition, the description of 1701 Rhode Island Avenue matches Eagle's confirmation to the *Washington Post* that "a former YMCA building in the center of the District that is being converted into high-end office space" was in fact an RDP-managed project that received a multimillion-dollar loan from EagleBank.

262.   ***700 Constitution Avenue:***  RDP's website currently lists 700 Constitution Avenue as a current RDP residential property.  The RDP website stated that "[t]his project is a joint venture between Ronald D. Paul Companies, Inc. and Borger Management, Inc."  Ex. G at G-9.  Deed records filed with the District of Columbia and dated September 29, 2017 reflect that EagleBank lent $35 million to 700 LLC, secured by this property.  The manager of 700 LLC is BPB LLC, who was

---

[37] A similarly named entity, RLH 2009 8th Street Investors, LLC, filed an SEC Form D on September 16, 2016.  McCallum signed this Form D as the trustee of Potomac, the manager of RLH 2009 8th Street Investors, LLC.

managed by Thomas Borger.   Additionally, 700 LLC's address is listed as care of Borger Management, Inc.  Ex. H at H-24–H-26.

263.   ***1760 Reston Parkway:***  Using the Wayback Machine, Plaintiffs were able to confirm that the RDP website previously listed 1760 Reston Parkway was a commercial property under development until at least December 6, 2017.  The RDP website stated that "[t]his project is a joint venture between Ronald D. Paul Companies and Ackridge (sic)[.]"  Ex. G at G-10.  A UCC financing statement filed on December 5, 2014[38] reflects that EagleBank is the secured party and holds a secured interest in 1760 Reston Parkway, Reston, Virginia granted by the debtors, 1760 Reston Investors, LLC and JACo 1760 Investors LLC.  The mailing address for 1760 Reston Investors, LLC is 4416 East West Highway, Suite 300, Bethesda Maryland, the same address as RDP.  Ex. H at H-27–H-28.

264.   On information and belief, Plaintiffs allege that the loans detailed in this section, like the MakeOffices transactions, were structured in a way to give favorable credit terms in exchange for cheap equity or other preferential financial terms to Paul.  Plaintiffs' information and belief is based on the following facts:

a.   These real estate ventures or projects were structured in such a way that EagleBank was not making a loan to RDP, but rather to a limited liability company that was managed by Potomac, or to companies which frequently entered into joint ventures with RDP, including MRP and Akridge.  Thus, just like the MakeOffices deal, Paul's interests in and control of these ventures were obscured by layers of companies, trusts, and joint ventures.

b.   Circumstantial evidence suggests that Paul structured his real estate deals and other investments in the same manner that he structured the MakeOffices investment deal.  This

---

[38] Obtained through a "Delaware Authorized Server" who has been certified by the Delaware Division of Corporations in performing online UCC searches.

evidence includes, *inter alia*:

        i.     In a February 8, 2016 email, Bensignor confused the MakeOffices guaranty fee deal with other deals Paul had done (¶¶151, 152, *supra*).  This suggests that Paul personally guaranteed (or guaranteed through entities he owned) loans made by EagleBank to other third parties in transactions in which Paul had a personal financial interest, and that notwithstanding the fact that these loans between EagleBank and the third parties were ostensibly arm's length transactions, Paul personally controlled both sides of the transaction and the overall financial structure of the deals;

        ii.     MRP stated to Rahbar, upon Rahbar expressing his discomfort in signing the Tying Arrangement Letter, that MRP routinely signed similar tying arrangement letters and that it these letters were "part of the game" (¶¶145, 146, *supra*);

        iii.     Two of the real estate ventures listed above were joint RDP/MRP projects (¶¶257, 259 *supra*); and

        iv.     The EagleBank employee listed on the deeds for the loans to these projects are the same employees that represented EagleBank in the MakeOffices deal (¶120, *supra*) and in numerous "Friend of Ron" loans (*see* Section V.G.6, *supra*).

        c.     The $177.33 million increase in the Company's modified analysis with respect to insider related parties due to the inclusion of additional relationships, such as with trusts, closely approximated the $195.471 million in EagleBank loans (as of origination) detailed herein. This supports the conclusion that these deals are ones that the Company did not originally classify as related party transactions (because Paul's investments were structured such that he had less than a 25% ownership/voting interest in the entity receiving the loan, and therefore his ownership/voting interest was below the numerical threshold for "control" under Regulation O, *see* ¶54, *supra*), but the

Company's modified related party analysis constitutes an admission that, under the specific facts and circumstances of these transactions, Paul did in fact exercise control over these entities and Paul did in fact have a "direct or indirect material interest" in the transactions requiring related party disclosure under Item 404(a) of Regulation S-K (*see* ¶58, *supra*).

> ### D. Defendants' Reflexive Denial Of The Allegations In The Aurelius Report And Their Ongoing Failure To Disclose Transaction-Level Details In Connection With Their Modified Related Party Disclosures Support A Strong Inference Of Scienter

265.     Instead of conducting an investigation into the allegations made in the Aurelius Report (through an independent committee of the Board of Directors or otherwise), Defendants immediately and reflexively denied the allegations—publishing three responses and giving interviews to media organizations three days after the Aurelius Report was published. But Eagle had not disclosed numerous related party transactions involving Paul and RDP. As such, Eagle's extremely fast denial of the allegations in the Aurelius Report—the substance of which were ultimately validated by the Company's subsequent modification of its related party disclosure— supports an inference that Defendants knew that they had failed to disclose related party transactions as alleged in the Aurelius Report.

266.     The inference that Defendants acted with scienter is further strengthened by the Company's decision not to provide transaction-level details in connection with its modified related party disclosures. By refusing to identify the specific transactions that account for the $177.33 million increase in related party loans, Defendants seek to obscure the fact that the Aurelius Report was right all along, and that it was the very transactions identified in that report that Defendants are now acknowledging should have been reported as related party transactions all along.

> ### E. Eagle Bancorp's Code Of Business Conduct And Ethics

267.     The Individual Defendants, including Paul, as well as "all employees as well as

directors and executive officers of the Eagle Bancorp, Inc. and its subsidiaries" were and are
required to comply with the Company's Code of Business Conduct and Ethics (the "Code").  In his
opening message to the December 2018 version of the Code,[39] Paul explained that the Code
"provides a guideline for how we align our day-to-day actions in service to our customers,
employees and shareholders ....  EagleBank employees work hard every day to build a bank that is
trusted and respected in the community, and as such we do not tolerate unethical or inappropriate
behavior, be it from employees, directors or third-parties with whom we do business."

268.    In the Self-Dealing section of the Code, employees and directors of Eagle Bancorp
"must not make any personal investment in an enterprise if the investment might affect or ***appear to
affect your ability to make unbiased business decisions for the Company***.  ...  Investments subject
to this provision include investments in a public or private company that … otherwise does business
with or is doing a transaction with the Company."   In addition the Code stated: ***"'Tying'
arrangements, whereby customers are required to purchase or provide one product or service as a
condition for another being made available, are unlawful in certain instances.***"  Furthermore, the
Code noted that:

> We are committed to dealing fairly with our customers.  ...No person may take unfair
> advantage of anyone through manipulation, concealment, abuse of confidential
> information, misrepresentation of material facts, or any other unfair dealing practice.
>
> - ***Never request or accept any kickbacks or other inappropriate personal
>   benefit from a current or prospective customer*** or supplier.
>
> *       *       *       *
>
> - ***Avoid any actual or potential conflicts of interests in personal financial
>   transactions with customers***, suppliers, or any other Company business
>   partner unless the transaction is with a family member or other person with

---

[39] Available at https://www.eaglebankcorp.com/media/filer_public/6a/73/6a73472e-73e0-4df7-b1b7-
1eb5e6cfc597/60-165_code_of_business_conduct_and_ethics_v3.pdf (last accessed January 19,
2020).

whom you have a relationship established separate and apart from the your Company employment.

269.    The Code also included additional responsibilities for directors and executive officers, including responsibilities under the subheading "Related Party Business Dealings" which required Paul and other executive officers and directors to:

You must notify, the Ethics Office and receive approval from, the Audit Committee of any business relationship or proposed business relationship transaction the Company may have with any company in which *you or a related party has a direct or indirect interest or from which you or a related party may derive a benefit, or where a related party member is employed, if such a relationship or transaction might give rise to a potential conflict of interest.*

**F.    The Significant Number Departures Of Eagle Leadership Support An Inference Of Scienter**

270.    In March 2018, just a few months after the allegations of undisclosed related party loans were published in the Aurelius Report, Bensignor retired for "health reasons."[40]

271.    Shortly after Eagle Bancorp almost tripled its reported related party loans as of December 31, 2017 in its 2018 10-K, a significant number of individuals in Eagle's leadership began leaving the Company and/or the Bank.  First, on March 20, 2019, Paul advised the Company's Board of Directors of his immediate retirement "as a result of serious health developments which would substantially interfere with his ability to perform his duties and obligations to the Company and the Bank."

272.    On July 1, 2019, as part of its announcement that Eagle Bancorp has effected a strategic re-organization of its Board of Directors, Eagle Bancorp disclosed that two Board members were resigning, including Dudley Dworken (one of the Board members featured in the Aurelius Report, *see* ¶74, *supra*).  Then, on October 1, 2019, Eagle Bancorp announced the resignation of

---

[40] https://www.bisnow.com/washington-dc/news/capital-markets/eaglebank-ceo-ron-paul-retires-98101 (last accessed January 19, 2020); https://www.linkedin.com/in/laurence-bensignor-538b3aa (last accessed January 19, 2020).

three more of its Board members, including Harvey Goodman, a founding director of EagleBank and one of the Board members featured in the Aurelius Report (*see id.*), and Leslie Alperstein, a long-time director of the Company and EagleBank.

273.     On October 22, 2019, the *Washington Business Journal* reported that EagleBank has seen a number of senior-level departures in recent months, including its Chief Marketing Officer, five senior vice presidents, including two from commercial lending, Len Rann and Leydig, and eight vice presidents and relationship and portfolio managers.[41]   Leydig was the Eagle employee who emailed Rahbar regarding changing the terms of MakeOffices' Facility Agreement (*see* ¶120, *supra*) and was listed as a responsible party for EagleBank on numerous of the publicly available UCC and deed documents reflecting EagleBank's financing of RDP real estate ventures.  *See* Ex. H at H-4, H-7, H-14, H-16, H-22.  The *Washington Business Journal* also noted that a longtime member of the EagleBank board of directors, Bruce Lee, had stepped down in March 2019.

274.     The *Washington Business Journal* noted that "[b]anking industry experts said that while turnover occurs at any bank of EagleBank's size, this recent spate of departures is unusual for a bank that had long been able to retain top-level talent."   The exodus, which included Paul, Bensignor, Leydig, and other directors named in the Aurelius Report, supports the conclusion that the Company was aware of its deficient internal controls which had allowed its deeply conflicted leadership to be party to numerous undisclosed related party transactions.

### G.     The Disappearance Of Numerous Properties From The RDP Website Support An Inference Of Scienter

275.     Subsequent to the release of the Aurelius Report, many of the properties referenced therein were removed from RDP's website.  Specifically, Tyson's Center, Collington Park, 600

---

[41]   https://www.bizjournals.com/washington/news/2019/10/22/eaglebank-sees-some-senior-level-departures-amid.html (last accessed January 19, 2020).

Rhode Island Avenue, 2009 8th Street, 1701 Rhode Island Avenue, and 1760 Reston Parkway are no longer listed on RDP's website,[42] even though the website does contain a section listing former RDP properties. As a result, Plaintiffs had to use Wayback Machine to capture images of the properties listed on the website. The removal of these properties reflects Paul's awareness that RDP and Eagle were under increased scrutiny for these undisclosed related party transactions and suggest an attempt to cover up these prior projects.

## X.    ALTER EGO ALLEGATIONS

276.    Ronald D. Paul Companies, RDP Management, Inc., Potomac Investment Trust, Harris UO Investors LLC, Egg Cream LLC, Bethesda St. Elmo LLC, 8 P Street NE LLC, 1319 South Capitol Associates LLC, 1319 South Capitol Investors, LLC, and 1760 Reston Investors, LLC all acted as alter egos of each other and of Defendant Paul. As alleged herein, facts that support an alter ego theory of liability include, but are not limited to, the following: (i) disregard of corporate formalities; (ii) intermingling of funds and property; (iii) overlap in ownership, officers, directors, and personnel; (iv) common office space, address and telephone number of each entity; (v) the absence of independent business discretion shown by each entity; (vi) dealings between the entities were not at arm's length; (vii) entities were not treated as independent profit centers; and (viii) amounts owed to one entity were paid to another. Without limiting the generality of the foregoing, the following specific facts support a finding of alter ego liability:

a.    As detailed in ¶135, *supra*, in connection with the MakeOffices deal, on January 27, 2016, Bensignor sent an email to Rahbar, copying Paul and McCallum, that requested payment of the guaranty fee and included wiring instructions for RDP Management, Inc. However, **the entity to whom the guaranty payments were obligated under the Indemnity Agreement was**

---

[42] *See* Ex. G at G-1, G-3, G-6, G-7, G-8, and G-10.

***Potomac Investment Trust, not RDP Management, Inc.*** These wiring instructions, in which Rahbar was directed to pay the money owed to one entity controlled by Paul to another entity controlled by Paul, evidenced a disregard of corporate formalities and the corporate separateness of these respective entities. In addition, the instructions reflected the reality that Paul was effectively the beneficial owner of and the person who exercised actual control over each of these entities, notwithstanding the fact that McCallum was the trustee of Potomac and that Bensignor had publicly characterized Potomac as "a family trust that Ron is not a trustee of, and not a beneficiary of." *See* ¶¶39, 40, 86, 197.

   b.   Similarly, in connection with the MakeOffices deal, on September 30, 2015, Jackson Prentice of MRP sent an email to Paul and Rahbar, among others, asking Rahbar to send Paul wiring instructions for "his $1,000,000 investment" into MakeOffices. *See* ¶134, *supra*; Ex. A at A-26. This email reflected MRP's understanding that Paul controlled Harris UO Investors, LLC (the shell that Paul used to make his investment into MakeOffices) and that the investment was "his"—*i.e.*, Paul's.

   c.   McCallum, who acted as both the trustee of Potomac and as Paul's close personal friend and kidney donor, also acted as trustee and/or manager for numerous shell LLCs used to conduct Paul's business through RDP and Potomac. For example, McCallum signed Deeds of Trust on behalf of Bethesda St. Elmo, LLC[43] for the One Florida Avenue and 8 P Street projects (*see* Ex. H at H-5, H-8); she signed a special warranty deed on behalf of 8 P Street NE LLC in connection with the 8 P Street project (*see* Ex. H at H-11); and she signed a Purchase Money and Credit Line Deed of Trust, Security Agreement and Fixture Filing and a Purchase Money Deed of

---

[43] Specifically, McCallum signed these documents as Trustee of Potomac in Potomac's capacity as Manager of Bethesda St. Elmo LLC.

Trust Modification and Spreader Agreement on behalf of 1319 South Capitol Associates LLC in connection with the 1319 South Capitol Street project (*see* Ex. H at H-15, H-17).[44]

       d.      Both Ronald D. Paul Companies and RDP Management, Inc. and the Potomac Investment Trust share the same address at 4416 East-West Highway, Bethesda, MD 20814. *See, e.g.*, Ex. A at A-101; Ex. H at H-5.

       e.      Notwithstanding McCallum's role as trustee of Potomac, she was not included on the September 24-25 email chain, in which Bensignor negotiated the terms of the guaranty with Rahbar, copying Paul and others but not McCallum, even though the guarantee was putatively made by Potomac, rather than Paul personally. *See* ¶¶128-132; Ex. C. These emails suggest that neither McCallum nor Potomac exercised independent business discretion and instead were completely dominated and controlled by Paul.

     277.    Accordingly, Defendant Paul is liable for the acts of Ronald D. Paul Companies, RDP Management, Inc., Potomac Investment Trust, Harris UO Investors LLC, Egg Cream LLC, Bethesda St. Elmo LLC, 8 P Street NE LLC, 1319 South Capitol Associates LLC, 1319 South Capitol Investors, LLC, and 1760 Reston Investors, LLC and all of the employees and agents of those entities. Likewise, the scienter of each of these entities and persons are imputed to Paul.

## XI.   CORPORATE SCIENTER ALLEGATIONS

     278.    The Company is liable for the acts of the Individual Defendants and its other employees and agents under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

---

[44] Specifically, McCallum signed these documents as Trustee of Potomac in Potomac's capacity of Manager of 1319 South Capitol Investors, LLC ("South Capitol Investors") in South Capitol Investors' capacity as Manager of 1319 South Capitol Associates, LLC.

279.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

## XII.    CLASS ACTION ALLEGATIONS

280.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired Eagle Bancorp's securities between March 2, 2015 and July 17, 2019, inclusive and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

281.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Eagle Bancorp's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of Eagle Bancorp shares were traded publicly during the Class Period on the NASDAQ.  As of July 31, 2019, Eagle Bancorp had 34,542,796 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Eagle Bancorp or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

282.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

283.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

284.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Eagle Bancorp;

c.     whether Defendants knew or deliberately disregarded that their statements were false and misleading;

d.     whether Defendants engaged in a scheme to defraud investors;

e.     whether the price of Eagle Bancorp securities were artificially inflated because of Defendants' conduct complained of herein; and

f.     to what extent the members of the Class have sustained damages and the proper measure of damages.

285.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

286.    The market for Eagle Bancorp's securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Eagle Bancorp's securities traded at artificially inflated prices during the Class Period.  On October 10, 2017, the Company's stock closed at a Class Period high of $68.85 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Eagle Bancorp's securities and market information relating to Eagle Bancorp, and have been damaged thereby.

287.    During the Class Period, the artificial inflation of Eagle Bancorp's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Eagle Bancorp's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Eagle Bancorp and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

288.    At all relevant times, the market for Eagle Bancorp's securities was an efficient market for the following reasons, among others:

a.      Eagle Bancorp stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.      As a regulated issuer, Eagle Bancorp filed periodic public reports with the SEC and/or the NASDAQ;

c.      Eagle Bancorp regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.      Eagle Bancorp was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and/or

e.      The average daily trading volume for Eagle Bancorp securities during the Class Period was approximately 159,677 shares, with more than 34.5 million shares of stock outstanding as of July 31, 2019, and a market capitalization reaching almost $2.4 billion during the Class Period.

289.    As a result of the foregoing, the market for Eagle Bancorp's securities promptly digested current information regarding Eagle Bancorp from all publicly available sources and reflected such information in Eagle Bancorp's stock price.  Under these circumstances, all purchasers of Eagle Bancorp's securities during the Class Period suffered similar injury through their purchase of Eagle Bancorp's securities at artificially inflated prices and a presumption of reliance applies.

290.     A Class-wide presumption of reliance is also appropriate in this action under the

Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the

Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.

Because this action involves Defendants' failure to disclose material adverse information regarding

the Company's business operations and financial prospects – information that Defendants were

obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is

necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in making investment decisions.  Given the importance of the Class

Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIV.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

291.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-

looking statements under certain circumstances do not apply to any of the allegedly false statements

pleaded in this Complaint.

292.     The statements alleged to be false and misleading herein all relate to then-existing

facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements.

293.     In the alternative, to the extent that the statutory safe harbor is determined to apply to

any forward-looking statements pleaded herein, Defendants are liable for those false forward-

looking statements because at the time each of those forward-looking statements was made, the

speaker had actual knowledge that the forward-looking statement was materially false or misleading,

and/or the forward-looking statement was authorized or approved by an executive officer of Eagle Bancorp who knew that the statement was false when made.

## XV.    CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5 Promulgated Thereunder
### Against Defendant Eagle Bancorp And The Individual Defendants

294.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

295.    This Count is asserted against Eagle Bancorp and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

296.    During the Class Period, Eagle Bancorp and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew (or deliberately disregarded or were deliberately reckless in disregarding) were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

297.    Eagle Bancorp and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

298.    Eagle Bancorp and the Individual Defendants acted with scienter in that they knew (or deliberately disregarded or were deliberately reckless in disregarding) that the public documents and statements issued or disseminated in the name of Eagle Bancorp were materially false and/or

misleading; knew (or deliberately disregarded or were deliberately reckless in disregarding) that such statements or documents would be issued or disseminated to the investing public; and knowingly (or recklessly) and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Eagle Bancorp, their control over, and/or receipt and/or modification of Eagle Bancorp's allegedly materially misleading statements, and/or their associations with the Company which made them privy to material concerning Eagle Bancorp, participated in the fraudulent scheme alleged herein.

299.    Individual Defendants, who are/were the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Eagle Bancorp personnel to members of the investing public, including Plaintiffs and the Class.

300.    As a result of the foregoing, the market price of Eagle Bancorp securities was artificially inflated during the Class Period. In ignorance of the falsity of Eagle Bancorp's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Eagle Bancorp securities during the Class Period in purchasing Eagle Bancorp securities at prices that were artificially inflated as a result of Eagle Bancorp's and the Individual Defendants' false and misleading statements.

301.    Had Plaintiffs and the other members of the Class been aware that the market price of Eagle Bancorp securities had been artificially and falsely inflated by Eagle Bancorp's and the Individual Defendants' misleading statements and by the material adverse information which Eagle

Bancorp's and the Individual Defendants did not adequately disclose to market professionals, they would not have purchased Eagle Bancorp's securities at the artificially inflated prices that they did, or at all.

302.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

303.     By reason of the foregoing, Eagle Bancorp and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rules 10b-5(b) promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Eagle Bancorp securities during the Class Period.

**SECOND CLAIM**
**Violation Of Section 10(b) Of**
**The Exchange Act And SEC Rule 10b-5(a) and (c)**
**Promulgated Thereunder Against Defendants Paul And Bensignor**

304.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

305.     This Count is asserted against Defendant Paul and Defendant Bensignor and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) promulgated thereunder by the SEC.

306.     Defendants Paul and Bensignor violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) in that they:

        a.     employed devices, schemes and artifices to defraud; and/or

        b.     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Eagle Bancorp securities during the Class Period.

122

307.     Defendants Paul and Bensignor's wrongdoing under this count includes, *inter alia*, the use of the Tying Arrangement Letter in connection with the MakeOffices deal and the use of similar letters in connection with other undisclosed related party transactions and the actions outlined in Sections V.G, VII, and IX.C.

308.     Defendants Paul and Bensignor acted with scienter in that they knew (or deliberately disregarded or were deliberately reckless in disregarding) that the public documents and statements issued or disseminated in the name of Eagle Bancorp, as described above, were materially false and/or misleading; knew (or deliberately disregarded or were deliberately reckless in disregarding) that the use of Tying Arrangement Letter and similar letters would deflect scrutiny by the Company's auditors and regulators and prevent correction of the materially false and/or misleading public documents and statements; knew (or deliberately disregarded or were deliberately reckless in disregarding) that such public statements or documents would be issued or disseminated to the investing public; and knowingly (or recklessly) and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

309.     Defendants Paul and Bensignor, who were senior officers and/or directors of the Company, had actual knowledge of the truth regarding related party loans to entities that were controlled by Paul, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they employed the devices, schemes and artifices to defraud; and/or engaged in the acts, practices and a course of business described above.

310.     As a result of the foregoing, the market price of Eagle Bancorp securities was artificially inflated during the Class Period.

311.     In ignorance of the falsity of Defendants' statements, and the schemes, acts and practices described above, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Eagle Bancorp securities during the Class Period in purchasing Eagle Bancorp securities at prices that were artificially inflated as a result of Defendant Paul's and Defendant Bensignor's schemes, acts, and practices.

312.     Had Plaintiffs and the other members of the Class been aware that the market price of Eagle Bancorp securities had been artificially and falsely inflated by defendants, they would not have purchased Eagle Bancorp's securities at the artificially inflated prices that they did, or at all.

313.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

314.     By reason of the foregoing, Defendants Paul and Bensignor have violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Eagle Bancorp securities during the Class Period.

### THIRD CLAIM
### Violation Of Section 20(a) Of
### The Exchange Act Against The Individual Defendants

315.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

316.     The Individual Defendants acted as controlling persons of Eagle Bancorp within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-

making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

317.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

318.    As set forth above, Eagle Bancorp and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XVI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a)    declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b)    awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

(d)     awarding equitable, injunctive, and other relief as the Court may deem just and proper.

## XVII.  DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  January 21, 2020

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Robert V. Prongay*
Robert V. Prongay
Jason L. Krajcer
Leanne H. Solish
Christopher Fallon
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
       jkrajcer@glancylaw.com
       lsolish@glancylaw.com
       cfallon@glancylaw.com

*Counsel for Lead Plaintiff and
Lead Counsel for the Class*

**LABATION SUCHAROW LLP**
Francis P. McConville
140 Broadway, 34th Floor
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: fmcconville@labaton.com

*Counsel for Norfolk County Retirement System*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On January 21, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 21, 2020, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay