**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

SHIVA STEIN, Individually and On Behalf    :
of All Others Similarly Situated,          :    INDEX NO.: 1:19-CV-06873-LGS
                                           :
            Plaintiff,                     :
                                           :
      -against-                            :
                                           :
EAGLE BANCORP, INC., SUSAN G. RIEL,        :
RONALD D. PAUL, CHARLES D.                 :
LEVINGSTON, JAMES H. LANGMEAD,             :
and LAURENCE E. BENSIGNOR,                 :
                                           :
            Defendants.                    :
                                           :
-------------------------------------------------------X

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**
**<u>THE AMENDED CLASS ACTION COMPLAINT</u>**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants*

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................................1

II.     FACTUAL BACKGROUND ...............................................................................................3

      A.      Eagle Is a Highly Successful Community Bank ........................................................3

      B.      Eagle's Loan Approval Process and Disclosures Reflect a Conscientious,
            Good Faith Effort to Comply with All Regulatory Obligations .............................4

      C.      Short-Seller Aurelius Falsely Accuses Eagle of an "Insider Loan Scheme" ...........7

      D.      Eagle Later Modifies Its Related Party Transaction Analysis and Discloses
            Additional Loan Amounts and the Market Does Not React ...................................8

      E.      Eagle's Stock Drops Many Months Later in Response to Uncertainty
            Surrounding Legal and Professional Fees...............................................................10

III.    ARGUMENT.......................................................................................................................10

      A.      Heightened Pleading Standards Govern Plaintiffs' Claims ...................................10

      B.      Plaintiffs Cannot Plead a Section 10(b) Claim ......................................................11

            1.      Plaintiffs Cannot Plead Loss Causation......................................................11

            2.      None of the Challenged Statements Were Materially False or
                    Misleading.......................................................................................................13

                    a.      The Related Party Loan Amounts Disclosed in Eagle's Form
                          10-Ks Were True Statements of Opinion and Not Misleading......14

                    b.      Statements that Eagle's Internal Controls Were Adequate and
                          Its Financial Statements Conformed to GAAP Also Were True
                          Statements of Opinion and Were Not Misleading ........................18

                    c.      Statements Made in Response to the Aurelius Report and
                          Thereafter Were Genuinely Held Opinions and Not
                          Misleading......................................................................................19

             3.      Plaintiffs Fail to Allege a Strong Inference of Scienter ............................21

      C.      Plaintiffs Also Fail to State a Claim for Scheme Liability ...................................24

IV.     CONCLUSION...................................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) ........................................................................................21, 22

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
   No. 17-CV-1545 (LAK), 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)............................16, 19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)....................................................................................25

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
   129 F. Supp. 3d 48 (S.D.N.Y. 2015)........................................................................16

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)..............................................................................21, 25

*Fait v. Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011)...................................................................................15

*In re Gildan Activewear, Inc. Sec. Litig.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009).......................................................................22

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011).......................................................................22

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
   277 F. Supp. 3d 500 (S.D.N.Y. 2017)..................................................................24, 25

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ..............................................................................13

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)......................................................................................11, 16

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)..............................................................................11, 13

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) .................................................................................22

*Roofer's Pension Fund v. Papa*,
   No. 16-2805, 2018 WL 3601229 (D.N.J. July 27, 2018) .........................................19

ii

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019)........................................................................24

*Teacher's Ret. Sys. of La. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ....................................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................11, 21

*Turner v. MagicJack VocalTec, Ltd.*,
    No. 13 Civ. 0448, 2014 WL 406917 (S.D.N.Y. Feb. 3, 2014) .................................22

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................................24

**Statutes**

15 U.S.C. § 78u-4(b)......................................................................................................11, 16

**Other Authorities**

12 C.F.R. § 215 .....................................................................................................................5

12 C.F.R. § 215.2 ..............................................................................................................5, 15

12 C.F.R. § 215.4(a)(1).........................................................................................................5

17 C.F.R. § 229.404 ..........................................................................................................6, 15

17 C.F.R. § 240.10b-5.........................................................................................................24

Charles F. Walker, Colin D. Forbes, *SEC Enforcement Actions and Issuer
    Litigation in the Context of a "Short Attack,"* 68 Bus. Law. 687 (2013)................19

Geeyoung Min, *The SEC and the Courts' Cooperative Policing of Related Party
    Transactions*, 2014 Colum. Bus. L. Rev. 663 (2014) .................................................6

Jeremy Blum, *An Insider's Guide to the Community Bank Industry - 102 Banks
    Summarized*, Seeking Alpha (Nov. 27, 2018),
    https://seekingalpha.com/article/4224612-insiders-guide-community-bank-
    industry-102-banks-summarized...............................................................................3, 4

Joshua Mitts, *Short and Distort,* Columbia Law & Econ. Working Paper No. 592
    (Feb. 13, 2020), *available at* https://ssrn.com/abstract=3198384...........................19

Petition for Rulemaking on Short and Distort (Feb. 12, 2020), *available at*
    https://www.sec.gov/rules/petitions/2020/petn4-758.pdf.........................................19

## I.    INTRODUCTION

Eagle Bancorp ("Eagle" or the "Company") is a longstanding, profitable community bank with deep roots in the Washington, D.C. metro area's commercial real estate community. Like most successful community banks, it has achieved that success in significant part thanks to its directors' and officers' ability to translate strong connections within the community into profitable business relationships, including through related party transactions. This is expected and desired in the community banking context—indeed, it is the operating model of Eagle and its peers—and is entirely to the bank's benefit so long as any related party loans are made on fair, arm's-length terms and sufficiently reviewed. Eagle has always taken these obligations seriously and made a good faith effort to comply with the complex multiple regulatory frameworks that govern related party transactions. The loans challenged here were not made in a smoke-filled room: they were made pursuant to an established commercial loan policy and subject to scrutiny by Eagle's outside lawyers and auditors. The Company's compliance with Regulation O ("Reg. O") also was examined annually by regulators. And not surprisingly, as Plaintiffs concede, all of Eagle's related party loans have continued to perform and be profitable for Eagle.

This is not, then, as Plaintiffs insinuate, a case of fraudulent "sweetheart deals" dragging down a bank. Quite the opposite, Eagle's financial condition is strong and its stock was delivering shareholder value until the Company became the target of a manipulative short-seller attack. On December 1, 2017, an anonymous, self-identified short seller published an inflammatory report ("Aurelius Report"), accusing its then-CEO, Ron Paul, of using Eagle as his "own private piggy bank" based on untested allegations in recently filed lawsuits. Eagle responded to this false and misleading narrative with forceful, detailed public rebuttals.

To this day, Eagle and the individual defendants reject the Aurelius Report's narrative as false and misleading; indeed, the loans at issue have performed consistent with their terms.

Although the Company subsequently modified its related party loan analysis in certain respects, and disclosed additional loans that it had previously determined did not meet the requirements for such disclosure, the market *did not react* to these announcements. Rather, Plaintiffs' own allegations demonstrate that it was the short seller's false and misleading narrative of self-dealing, and, *more than a year later*, the Company's announcement of large legal and consulting expenses incurred in the Aurelius Report's aftermath, that caused Eagle's stock price to drop—*not* the Company's earlier disclosures of additional related party loan amounts. And this makes perfect sense, considering that the market understood Eagle's success to be driven by relationships, and the historical and newly disclosed related party loans continued to perform.

Plaintiffs' claims—all rooted in the Company's past related party lending—fail:

*Plaintiffs cannot plead loss causation.* Plaintiffs do not and cannot connect their allegations of stock drops—following the Aurelius Report and Eagle's later disclosure of increased legal and accounting expenses—to the statements they allege were false or misleading.

*Plaintiffs cannot plead a false or misleading statement.* Each of the statements Plaintiffs challenge was a statement of opinion, and Plaintiffs cannot clear the high hurdle the Supreme Court has set for demonstrating that an opinion was false or misleading when it was expressed.

*Plaintiffs cannot plead the required strong inference of scienter.* Supreme Court precedent requires courts to weigh the competing inferences to be drawn from factual allegations in their full context. Here, the facts and inferences show good faith conduct; indeed, the posited fraud makes little sense in context. The loans in question were subject to Eagle's commercial lending policy. External reporting of such loans required principles-based legal and accounting judgments informed by an array of experts. And regulators examined Eagle's compliance with Reg. O. Moreover, the defendants had no reason to hide the related party loans at issue from investors. The

incremental additional loans Eagle subsequently reported represented less than 3% of its overall lending portfolio, and all such loans have performed and been profitable *for Eagle.* Investors understood from the Company's disclosures that Eagle's operating model embraced relationship banking, and they did not care when Eagle reported increased related party loan amounts. The only concrete financial motive Plaintiffs offer is Mr. Paul's sale of a mere 11% of his Eagle holdings— which of course means he retained the vast majority (89%), setting himself up, on Plaintiffs' theory, to be one of the biggest victims of the fraud he allegedly perpetrated. Plaintiffs do not and cannot allege that any individual defendants made suspicious stock sales, which strongly suggests defendants believed in the value of Eagle's stock. Thus, Plaintiffs cannot plead scienter.

The Court should dismiss the Amended Complaint in its entirety, with prejudice.

## II.    FACTUAL BACKGROUND

### A.  Eagle Is a Highly Successful Community Bank

Eagle was formed in 1997 by Mr. Paul and other local professionals as a community bank alternative to the big banks that dominate its primary market. Ex. 1[1] (2019 Form 10-K), at 3. In the two decades since its founding, Eagle has grown to be not only one of the most successful and prominent community banks in its region—with total assets of $8.99 billion and net income of $142.9 million at 2019 year-end—but also one of the most involved in its community. *See id.* at 39-40; Ex. 2 (Eagle's 2018 Report to Shareholders).

The operating model for a community bank is different from big banks in important respects. Often, as here, community banks have a larger focus on commercial real estate lending than larger banks because they have more intimate knowledge of their communities.[2] Partly as a

---

[1] Lettered exhibits refer to those filed with the Amended Complaint. The numbered exhibits are attached to the Defendants' Request for Full Context Review and/or Judicial Notice, filed concurrently herewith.

[2] Ex. 1, at 4 (as of 12/31/19, ~78% of Eagle's loan portfolio consisted of commercial real estate loans). *See generally* Jeremy Blum, *An Insider's Guide to the Community Bank Industry - 102 Banks Summarized*, Seeking Alpha (Nov.

consequence of this local focus, community banking success is all about cultivating and capitalizing on relationships within the community. *See* Blum, *Insider's Guide*. As Eagle has explained: "In most banks, you will find that the making of loans to insiders is not just present but desired. This is especially the case at community banks, where directors bring in those they know to the bank, whether as friends, business partners or peers in the community." Amended Complaint ("AC") ¶ 194. So long as related party loans are made in the usual course of business, on substantially similar terms as arm's-length transactions, they are not just acceptable but are desired and beneficial. *See id.* ¶ 86 ("It's not only not surprising that the bank may be making loans to entities in which the director has an interest, it's frankly encouraged because that's how you build a community bank."). Eagle has been highly successful in capitalizing on its relationships within the community in exactly this manner, and has made it perfectly clear to investors that this is a fundamental part of its operating model:

> "Eagle's portfolio of loans to insiders is part of the Bank's long successful history, and is not a recent change in practice. Eagle has always been a business-oriented community bank with significant commercial real estate lending. The vast majority of board members have a deep understanding of the market and the risk in this area. In fact, that significant background and knowledge of effective underwriting, market conditions and market participants has resulted in the Company experiencing low levels of credit losses over the Bank's entire 19 year history. We have been an institution that has weathered the various business cycles better than most (including during the 2007-2009 down cycle) . . . . Identifying well structured loan opportunities and participating in the growth of the local community is what community banks do." *Id.* ¶ 194 (quoting 12/3/17 Press Release).

### B. Eagle's Loan Approval Process and Disclosures Reflect a Conscientious, Good Faith Effort to Comply with All Regulatory Obligations

As a state-member bank and public company, Eagle is subject to significant federal and state regulatory oversight, with a strong focus on ensuring that all transactions with Company

---

27,     2018),     https://seekingalpha.com/article/4224612-insiders-guide-community-bank-industry-102-banks-summarized.

"insiders" are made on substantially the same terms as loans to third parties and are properly reviewed and disclosed, consistent with various governing regulations.

First, the Federal Reserve's Regulation O, 12 C.F.R. § 215, allows state member banks to extend credit to a bank "insider" provided the extension of credit "(i) [is] made on substantially the same terms . . . as, and following credit underwriting procedures that are not less stringent than, those prevailing at the time for comparable transactions by the bank with [non-insiders]; and (ii) [d]oes not involve more than the normal risk of repayment or present other unfavorable features." *Id.* § 215.4(a)(1).[3] Reg. O does not, as Plaintiffs suggest, discourage or prohibit loans to insiders. On the contrary, it provides a regulatory framework pursuant to which loans to insiders can be made. The critical subjective judgment for Reg. O compliance, then, is what constitutes an "insider." Reg. O defines an "insider" as an "executive officer, director, or principal shareholder, and includes any related interest of such a person." *Id.* § 215.2(h). A "related interest" is further defined as one that is "controlled" by any insider—that is, when an insider "directly or indirectly . . . (i) [o]wns, controls, or has the power to vote 25 percent or more of any class of voting securities of the company or bank; (ii) [c]ontrols in any manner the election of a majority of the directors of the company or bank; or (iii) [h]as the power to exercise a controlling influence over the management or policies of the company or bank." *Id.* § 215.2(c)(1), (n)(1). Reg. O then sets out several rebuttable presumptions whereby a person is presumed to have such control if they (a) are an officer or director and control more than 10% of a class of voting stock, or (b) control more than 10% of a class of voting stock and no other person controls a greater percentage of that stock. *Id.* § 215.2(c)(2). Reg. O does not, however, provide any prescriptive guidance as to how "controlling influence" is to be interpreted or applied in more complicated contexts, including with

---

[3] Federal Reserve regulations also require banks to file quarterly "Call Reports" disclosing insider loan amounts.

respect to trusts and other estate planning entities.

Second, Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404 ("Item 404") requires public companies to disclose transactions involving more than $120,000 "in which any related person had or will have a direct or indirect material interest." The Instructions to Item 404(a) define "related person" as including a director or executive officer, or any "immediate family member" (defined broadly as "any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law") or person sharing the director or officer's home. The term "material interest" is not defined, however, nor is it accompanied by any instructions in the item.[4] Thus Item 404—like Reg. O—does not provide any prescriptive guidance on how to apply it in more complex transactional situations, such as those involving irrevocable trusts.

Finally, Generally Accepted Accounting Principles ("GAAP") provide a similarly subjective, principle-based standard, requiring entities to disclose "[i]nformation about transactions with related parties that would make a difference in decision making." ASC 850-10-10-1. For these purposes, "related parties" are defined as including, "management of the entity and members of their immediate families" and other parties "if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests." ASC 850-10-20.

Throughout the time period at issue, Eagle's Commercial Lending Policy subjected commercial and real estate loans to a standard review process that involved multiple layers of review and approval. *See generally* Ex. 3 (Lending Policy). As explained in each Form 10-K:

---

[4] The SEC used to provide more specific guidance—including instructions listing various factors that could be considered in determining materiality—but significantly amended Item 404 in 2006 to move towards a more "principle-based"—i.e. subjective—analysis. *See* Geeyoung Min, *The SEC and the Courts' Cooperative Policing of Related Party Transactions*, 2014 Colum. Bus. L. Rev. 663, 682-85 (2014).

> The Bank has had, and expects to have in the future, banking transactions in the ordinary course of business with some of the Company's directors, executive officers, and employees and their associates. In the past, all of such transactions have been on substantially the same terms, including interest rates, maturities and collateral requirements as those prevailing at the time for comparable transactions with non-affiliated persons and did not involve more than the normal risk of collectability or present other unfavorable features. Loans to insiders require approval by the Board of Directors, with any interested director not participating. The Company also applies the same standards to any other transaction with an insider. Additionally, loans and other related party transactions involving Company directors must be reviewed and approved by the Audit Committee.

AC ¶ 174 (quoting Form DEF 14A, dated Apr. 10, 2015, incorporated into 2014 Form 10-K). During the class period, Eagle's Form 10-Ks all contained substantially the same language, and clearly identified the amount of loans made to "officers, directors and affiliates of the Company" during each fiscal year, and those same amounts outstanding at year end. AC ¶¶ 174, 181, 188,204, 214. As discussed below, each of those amounts represented the Company's best judgment at the time, in consultation with outside experts, as to which loans fell within the Company's disclosure obligations. And each Form 10-K also reflected that all such loans were still performing. *Id.*

Eagle's outside auditors did not raise concerns about Eagle's related party loan review and approval process or related party loan disclosures prior to the Aurelius Report. In addition, Eagle's primary banking regulators—the Board of Governors of the Federal Reserve System and the Maryland Office of the Commissioner of Financial Regulation—took turns annually reviewing Eagle's compliance with Reg. O and the Maryland Financial Institutions Code.

**C. Short-Seller Aurelius Falsely Accuses Eagle of an "Insider Loan Scheme"**

On December 1, 2017, self-identified short seller "Aurelius" published a report that combined publicly available loan information with untested, self-serving allegations taken from recently filed lawsuits to suggest that Mr. Paul was using Eagle as his "own private piggybank" by getting the Company to provide "sweetheart deals" to entities owned by, controlled by, or

associated with Mr. Paul. *See* Ex. I (Aurelius Report).

Eagle's stock price dropped almost 25% on this false and misleading "news," and the Company responded with strong, swift, and reasoned denials. It explained in multiple media outlets, to both the public and its customers, that: (1) Aurelius had a substantial financial interest in spreading false information to cause the Company's stock to drop; (2) the Company has never given any sweetheart deals (to Mr. Paul or anyone else), and that all insider loans are made in the ordinary course of business on arm's-length terms; (3) the Company's Reg. O compliance is regularly examined internally, as well as by regulators; and (4) related party loans are beneficial in the community banking context and have contributed greatly to Eagle's success. *See* AC ¶¶ 193-99. Eagle also emphasized that all insider loans were current and performing. In other words, Eagle was continuing to profit from the loans at issue—as one would expect of deals done and approved in the ordinary course of business on arm's-length terms and subject to oversight from auditors and regulators. *See* AC ¶ 195. The market price of Eagle partially corrected upwards based on these good faith explanations.

### D. Eagle Later Modifies Its Related Party Transaction Analysis and Discloses Additional Loan Amounts and the Market Does Not React

In a conscientious effort to confirm that its related party loan analysis and disclosures were consistent with all relevant regulations, the Company brought in additional outside experts to take a hard look. *See* AC ¶ 209 (quoting Q1 2018 Earnings Call) ("[T]he first quarter had some extraordinary expenses, including $1.4 million in legal and professional fees for independent due diligence related to the Internet event in late 2017.").

In the midst of that review, on March 1, 2018, the Company filed its 2017 Form 10-K, which reflected Eagle's continued belief in its related party loan analysis—the Form 10-K included substantially the same related party disclosures as previous filings, but also disclosed, in an

abundance of caution, certain additional loans that the Company explained it did not believe qualified as "related party transactions":

> The Bank has made an aggregate of $4.0 million of loans to a trust with an independent third party trustee, established by an executive officer and director, of which the children of such executive officer and director are discretionary beneficiaries, and over which such individuals have no investment or operational authority, and an aggregate of $65.6 million of loans to entities in which the trust has an ownership interest in excess of 10%, which the Company does not consider to be related party transactions.

AC ¶ 202. These loans were not included in the related party loan calculations set out on the same page, but the filing noted that they too were made in the ordinary course of business on arm's-length terms, and were still performing. *Id.* This announcement did not cause any change to Eagle's stock price. *See* Ex. 4 (Eagle's historical stock prices).

Based on extensive consultation with outside lawyers, accountants, and auditors, and discussions with regulators, the Company changed its opinion and subsequently modified certain aspects of its related party loan analysis. The Company did not restate any prior financials, but it did disclose additional loans made to parties affiliated with Mr. Paul and other directors that the Company, in good faith, had previously believed fell outside its disclosure obligations. The 2018 Form 10-K, filed March 1, 2019, was the first to reflect this new approach and explained that "[d]uring 2018, we modified our analysis with respect to insider related parties and as a result included additional relationships such as those involving extended family members and trusts, resulting in an increase to the previously reported $60.9 million balance of related party loans at December 31, 2017." AC ¶ 212. This increased the total loans outstanding to "officers, directors and affiliates of the Company and their related parties" as of December 31, 2017 from $60.9 million to $238.2 million. *Id.* At the same time, the Form 10-K reflected that these additional loan amounts too had been made in the ordinary course of business, on substantially the same terms as

9

those prevailing at the time for comparable third-party loans, and did not involve more than the normal amount of risk, and that "[a]ll of such loans are performing." *Id*.

Importantly, this disclosure of additional related party loan amounts—like the additional loan amounts disclosed a year earlier, in the previous Form 10-K—did *not* cause Eagle's stock price to drop. *See* Ex. 4; AC ¶¶ 93-94, 235-36. Rather, the market absorbed this new information and apparently concluded that it already understood it and was not concerned about it.

### E.  Eagle's Stock Drops Many Months Later in Response to Uncertainty Surrounding Legal and Professional Fees

The stock drop alleged in the Amended Complaint actually came many months later when, on July 17, 2019—more than a year and a half after the Aurelius Report—the Company announced lower year over year income in the second quarter due in part to "legal fees and expenditures in connection with our responses to investigations and related document requests and subpoenas from government agencies examining matters, including the Company's identification, classification and disclosure of related party transactions; the retirement of certain former officers and directors; and the relationship of the Company and certain of its former officers and directors with a local public official." AC ¶ 94. It was this news—not the Company's previous disclosures regarding its related party loan analysis and amounts—that caused the stock drop triggering Plaintiffs' claims.

### III.    ARGUMENT

### A.  Heightened Pleading Standards Govern Plaintiffs' Claims

Securities claims must meet the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("Reform Act"). A plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," (15 U.S.C. § 78u-4(b)(1)(B)), and, "with respect to each act or omission," must "state with particularity facts giving rise to a strong inference" of scienter—that is, that *the particular defendant* made the allegedly

false or misleading statement intentionally or with deliberate recklessness (*id.* § 78u-4(b)(2)(A)). A "strong inference" of scienter is "more than merely plausible or reasonable"; it must be "powerful" and "at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323 (2007). In performing this analysis, the Supreme Court requires courts to go beyond the pleadings to consider the full factual context of the statements and conduct at issue. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190-91 (2015); *Tellabs*, 551 U.S. at 323-24; *see also* Request for Full Context Review and/or Judicial Notice filed herewith.

### B. Plaintiffs Cannot Plead a Section 10(b) Claim

Plaintiffs' claims under Section 10(b) and Rule 10b-5(b) fail for several reasons.

#### 1. Plaintiffs Cannot Plead Loss Causation

First, a fundamental, structural problem: Plaintiffs cannot plead loss causation because their alleged losses were not caused by the statements they claim were false and misleading— namely, defendants' statements regarding related party loans. To establish loss causation, a plaintiff must show "a sufficient connection between [the fraudulent conduct] and the losses suffered." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010). In other words, a plaintiff must show that the stock price was inflated by the false statement, and that the plaintiff was injured when the hidden truth was revealed and the market reacted negatively.

No such showing is possible here because the losses Plaintiffs claim to have suffered were not caused by the alleged misrepresentations they identify. Plaintiffs' claims are premised on the theory that Eagle's stock price was inflated because the Company allegedly failed to disclose all of its related party loans, and investors were injured when the true extent of those loans became known. But this is not what the pleaded facts demonstrate. The only disclosures during the class period that provided new information *about Eagle's related party loans* were (i) the 2017 Form

10-K, filed on March 1, 2018, which described certain additional loans made to an irrevocable family trust established by Mr. Paul that Eagle "[did] not consider to be related party transactions," and (ii) the 2018 Form 10-K, filed a year later, which announced Eagle's modified related party loan analysis and additional related party loan amounts for fiscal years 2017 and 2018. In each case, the market absorbed this news and *did not react* (Ex. 4)[5]—which makes sense given that these loans are part of Eagle's operating model, and all the loans continued to perform.

Instead, Plaintiffs base their claims on drops in Eagle's stock price at two very different points in time: (1) following the Aurelius Report, and (2) a year and a half later, when the Company announced larger than expected legal and professional fees for the second quarter of 2019. AC ¶¶ 230, 238. Neither is causally connected to the challenged statements.

First, the stock drop following the Aurelius Report was in response to Aurelius's baseless assertion that Mr. Paul was using Eagle as his "own private piggybank" and providing undisclosed "sweetheart deals" to related parties. This false and misleading narrative was understandably concerning to investors, but it did not disclose any new facts about the Company's related party loans; indeed, it was based entirely on publicly available information. *See* Ex. I, at I-1-2. Based on public documents, Aurelius identified several loans Eagle made to various entities in connection with real estate development projects that appeared, based on public information, to also involve the Ronald D. Paul Companies ("RDP") in some capacity, and on that basis concluded that they must have constituted "related party loans." Aurelius then wove that together with self-serving and untested allegations from two sets of related lawsuits—only one of which involved Eagle as a party, and all of which were resolved before the allegations could be adjudicated[6]—to suggest that

---

[5] Nor did the stock price react negatively to new information about related party transaction processes and disclosures provided in the Company's most recent Form 10-K, filed March 2, 2020. *See* Ex. 4.

[6] Aurelius took at face value the unsubstantiated and clearly self-serving allegations made in a countersuit by Mr. Rahbar, the founder of a small start-up (MakeOffices), against his primary investors, including a trust established by

all the loans Aurelius identified must have been "sweetheart deals" done for Mr. Paul's benefit. By extrapolating from the self-serving MakeOffices allegations and the publicly available loan information to the conclusion that Mr. Paul was treating Eagle as his "own private piggy bank," Aurelius was able to drive down Eagle's stock price to Aurelius's substantial financial benefit.[7]

Accordingly, Plaintiffs can only credibly allege that the Aurelius Report stoked fears in the market, which led to a drop in Eagle's stock price. This is insufficient as a matter of law to establish the requisite causal connection between the alleged misrepresentation and loss. *See, e.g.*, *Omnicom*, 597 F.3d at 512 ("[N]egative characterization of already-public information . . . does not constitute a corrective disclosure of anything but the journalists' opinions.").[8]

Nor does the July 2019 stock drop suffice. It was precipitated by the Company's announcement that its legal and professional fees had increased significantly in the second quarter "in connection with our responses to investigations and related document requests and subpoenas from government agencies" regarding *several different matters*, only one of which concerned Eagle's related party transactions. AC ¶ 94. This is *not* the same as a revelation of fraud. No pleaded facts suggest that the market reaction was in response to the regulatory scrutiny of *related party transactions*, and the fact that the market did not react to Eagle's previous disclosures of additional related party loan amounts suggests that it was not.

### 2.    None of the Challenged Statements Were Materially False or Misleading

Plaintiffs' claims also fail for the independent reason that they have not sufficiently pleaded

---

Mr. Paul, after the investors took action to oust Mr. Rahbar in order to protect their investment from Mr. Rahbar's fraudulent conduct and mismanagement.

[7] *See* Ex. I, at I-1 ("You should assume that [Aurelius] . . . [has] a short position in the stock . . . [and] stand[s] to realize significant gains in the event that the prices of either equity or debt securities of Eagle Bancorp decline.").

[8] *See also Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) (dismissing for lack of loss causation: "the mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure"); *Teacher's Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 187-88 (4th Cir. 2007) (negative characterization of previously known information cannot constitute a corrective disclosure).

a false or misleading statement. Here, the challenged statements are of three types:

- Related party loan amounts and statements regarding their review and approval.
- Statements about Eagle's internal controls and conformity of its financials with GAAP.
- Statements responding to the Aurelius Report.

Each of these statements is one of opinion rather than fact under the securities laws, and Plaintiffs have not adequately alleged that these opinions were false or misleading.[9]

### a. The Related Party Loan Amounts Disclosed in Eagle's Form 10-Ks Were True Statements of Opinion and Not Misleading

First, Plaintiffs allege that each of the related party loan amounts disclosed in Eagle's Form 10-Ks for 2014-2017 was false and misleading in that it failed to include additional loan amounts. In fact, these related party loan calculations were premised on complex, subjective judgment calls that rendered the resulting amounts opinions under the securities laws.

As previously described, Reg. O, Item 404, and GAAP together create a complicated, overlapping set of principles-based regulatory requirements that govern the analysis, review, and disclosure of related party loans. All three are directed at the same goal—identification and disclosure of loans that warrant special attention because an insider has a personal interest—but each provides its own definitions as to which relationships bring a loan within its governance, and its own limited direction regarding how to apply those definitions. None of these regulatory provisions, however, offer prescriptive guidance regarding their application in the more complicated factual contexts at issue here—namely, multi-party commercial real estate deals and their intersection with estate planning trusts.

This lack of prescriptive guidance meant that Eagle, in consultation with its array of outside

---

[9] Of course, each defendant is only legally responsible for statements he or she made. Mr. Bensignor, for example, did not sign Eagle's Form 10-Ks and thus is not legally responsible for statements in them.

experts, had to make a series of subjective judgments on both legal and accounting issues to determine which transactions properly fell within the contours of these disclosure requirements. For example, Potomac Investment Trust ("Potomac") is an irrevocable grantor trust established many years ago by Mr. Paul for the benefit of his now-adult children, in which his children have a discretionary interest but no right to control distributions of income or principal, which are left to the sole discretion of the third-party trustee. *See* AC ¶¶ 39, 202. Based on its understanding of all the circumstances, including Mr. Paul's and his children's lack of "ownership" or investment or operational authority over the trust, the Company held the opinion over many years that Potomac did not meet the definitions requiring disclosure under Reg. O and Item 404, and therefore did not disclose loans made to Potomac and entities controlled by Potomac.[10] In the absence of clear guidance from the governing regulations, this required the Company to make its own subjective determination, in consultation with its outside experts, as to whether a discretionary trust over which it understood the insider had permanently ceded all operational authority should nonetheless be considered "controlled by" him, and/or whether his children had a "material interest" in that entity in light of all the circumstances.

Where financial metrics stated in SEC filings are based on subjective estimates and judgment calls of the type described above, courts have found them to constitute statements of opinion for purposes of the securities laws. *See, e.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-13 (2d Cir. 2011); *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545 (LAK), 2019 WL 4257110, at *13-22 (S.D.N.Y. Sept. 9, 2019); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 68 (S.D.N.Y. 2015). As the *AmTrust* court explained, "[w]hen

---

[10] AC ¶ 202 (quoting 2017 Form 10-K); *see* 12 C.F.R. § 215.2 (defining "related interest" for Reg. O as one "controlled by" an insider, and setting out rebuttable presumptions of control based on "ownership"); 17 C.F.R. § 229.404 (Item 404 requires disclosure of loan in which any "related person" has a "material interest").

the 'errors' resulted from 'management's interpretation of accounting guidance,' as defendants assert happened here, they are errors of opinion, not of fact." 2019 WL 4257110, at *15.

This is important because statements of fact and statements of opinion are analyzed differently under the securities laws. A statement of *fact* is false or misleading if the fact was untrue at the time or if it omitted a material fact necessary to make the statement not misleading. 15 U.S.C. § 78u-4(b). For a statement of *opinion* to be "false," however, Plaintiffs must do more: they must plead (1) facts sufficient to show that the speaker did not actually hold the stated belief at the time; or (2) "particular (and material) facts . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 188-89, 194. The Supreme Court has emphasized that this is "no small task." *Id.*

Here, Plaintiffs have not pleaded any facts, as opposed to conclusory allegations, suggesting that the defendants did not actually believe the Company's related party loan analysis to be correct and the disclosed loan amounts accurate when reported, or that the omission of particular information about their underlying inquiry rendered these opinion statements misleading. Indeed, many facts before the Court suggest the opposite. For example, the 2017 Form 10-K, filed a few months after the Aurelius Report, reflected the Company's continued, genuine belief that Potomac was not a "related party" under the governing disclosure laws. AC ¶ 202 (explaining trust structure and that the Company "does not consider [it] to be [a] related party").

Nor is the fact that the Company later modified its related party analysis an "admission" (as Plaintiffs would have it) that the loans should originally have been treated as "related." This modification merely reflects that after extensive expert consultation and independent analysis, and additional input from regulators, Eagle opted to change certain aspects of this fundamentally subjective analysis. Given the lack of clear guidance in the governing regulations, it should come

16

as no surprise that any two reasonable lawyers, accountants, auditors, or regulators—particularly in combination, and at different points in time—might have reached different conclusions as to which specific loans had to be disclosed under those subjective regulatory standards. Thus, Eagle's annual disclosures of related party loan amounts cannot ground Plaintiffs' claims.

In addition to disclosing related party loan amounts, each Form 10-K also stated that all such loans were made in the ordinary course of business on arm's-length terms, and were still performing. To the extent Plaintiffs claim these statements were misleading because certain additional loans were not identified and reviewed as "related," this duplicates their claims about allegedly false related party loan amounts and fails for the same reasons. Moreover, the Company's statements about Eagle's review and approval process appear to have been *true*, at a minimum, with respect to the loans identified by Eagle as insider loans, and Plaintiffs have not pleaded facts suggesting otherwise. Indeed, Eagle's SEC filings reflect that even the loans that were subsequently identified as "related party" were made in the ordinary course of business on arm's-length terms. AC ¶ 214. They also were subject to Eagle's Commercial Lending Policy. *See* Ex. 3 (Lending Policy); AC ¶ 174. That all related party loans continued to perform suggests strongly that they were, in fact, made on arm's-length terms and were not "sweetheart deals."

Finally, the allegations from Plaintiffs' confidential witness do not compel a different result; indeed, her relative silence speaks volumes in Eagle's favor. That employees might pay special attention to or move faster on a loan application associated with the CEO is neither unusual nor improper, and it does not suggest that those loans were not correctly reviewed, approved, and made on substantially the same terms as third-party loans. Indeed, it confirms that these loans were in fact scrutinized under Eagle's lending policy; a confidential witness to true fraud would have more than this neutral information to share.

17

**b. Statements that Eagle's Internal Controls Were Adequate and Its Financial Statements Conformed with GAAP Also Were True Statements of Opinion and Were Not Misleading**

The certifications and statements in Eagle's Form 10-Ks attesting to the adequacy of its internal controls and its compliance with GAAP also were true and not misleading opinions.

Each of the Sarbanes-Oxley and reciprocal certifications challenged by Plaintiffs is explicitly phrased in terms of the individual's knowledge or belief. *See, e.g.*, AC ¶¶ 176-77; Ex. 5 (2014 Form 10-K), at Exs. 31.1 & 31.2 ("*Based on my knowledge*, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition . . . of the registrant"; "*based on our most recent evaluation* of internal control over financial reporting" (emphasis added)).[11] The other challenged statements regarding GAAP compliance and internal controls also clearly represent subjective judgments on the part of the Company's management when viewed in context. *See, e.g.*, AC ¶ 175 (2014 Form 10-K) ("Based on this assessment, management believes that the Company maintained effective internal control over financial reporting as of December 31, 2014."); *id.* ("The financial statements have been prepared in conformity with [GAAP] and reflect management's judgments and estimates concerning the effects of events and transactions that are accounted for or disclosed."); *see also* AC ¶¶ 182, 189, 205, 215 (similar in 2015-2018 Form 10-Ks).

Courts have consistently held that certifications and statements of compliance such as these are statements of opinion for purposes of the securities laws. *See, e.g.*, *In re AmTrust*, 2019 WL 4257110, at *23-24 (finding both statements of GAAP compliance and signed SOX certifications to be opinions); *Roofer's Pension Fund v. Papa*, No. 16-2805, 2018 WL 3601229, at *10 (D.N.J.

---

[11] *See also* Ex. 5, at Exs. 32.1 & 32.2 (certifying "*to the best of my knowledge and belief*, that . . . the information contained in such Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Eagle" (emphasis added)); AC ¶¶ 183-84, 190-91, 206-07, 216-17 (pleading that Exs. 31.1, 31.2, 32.1 and 32.2 to the 2015-2018 Form 10-Ks are substantively identical to those same exhibits to the 2014 Form 10-K).

July 27, 2018) ("Statements about GAAP compliance are frequently deemed opinions because GAAP standards are often subjective and involve a range of possible treatments."). As discussed above, Plaintiffs have not pleaded any facts showing either that the defendants did not actually believe their opinions, or that they were misleading in context.

### c. Statements Made in Response to the Aurelius Report and Thereafter Were Genuinely Held Opinions and Not Misleading

The remaining challenged statements were made (1) in response to the Aurelius Report, rebutting its assertions, and (2) in subsequent earnings calls "standing by" previous statements. As an initial matter, the Company's responses to the Aurelius Report must be understood in the context of the pernicious short-seller attacks that have occurred in recent years. In numerous cases, short sellers have disseminated misleading and inflammatory information about a healthy company to drive down its stock price for their own financial benefit.[12] While this market manipulation often amounts to securities fraud, it is seldom prosecuted or otherwise punished, particularly when the short sellers are anonymous.[13] This situation is understandably frustrating and alarming for companies that suddenly find themselves targeted, and they often must act quickly and forcefully to prevent significant harm to the company and its shareholders.

When confronted with Aurelius's misleading narrative of self-dealing, and its immediate and dramatic effect on Eagle's stock price, Eagle mounted a strong defense. Plaintiffs do not actually challenge the vast majority of the factual statements they quote from the Company's

---

[12] *See* Charles F. Walker, Colin D. Forbes, *SEC Enforcement Actions and Issuer Litigation in the Context of a "Short Attack,"* 68 Bus. Law. 687, 687-88 (2013) (discussing "short attacks"); Joshua Mitts, *Short and Distort*, Columbia Law & Econ. Working Paper No. 592 (Feb. 13, 2020), *available at* https://ssrn.com/abstract=3198384 (examining 2,900 "attack articles against mid- and large-cap firms" published on Seeking Alpha, and showing that these attacks have caused stock declines "leading to over $20.1 billion in mispricing").

[13] *See* Petition for Rulemaking on Short and Distort (Feb. 12, 2020), *available at* https://www.sec.gov/rules/petitions/2020/petn4-758.pdf (petition by group of distinguished academics asking SEC to adopt rules addressing "short and distort" practices).

19

12/1/17 and 12/3/17 Press Releases, its 12/4/17 letter to customers, and related news coverage.[14] What Plaintiffs challenge are the Company's statements categorically rejecting the allegations of a "private piggy bank"; denying that there were any "sweetheart deals"; and attesting to the adequacy of the Company's related party loan analysis and disclosures and the strength of its internal controls. But there is nothing meaningfully different about these statements; they too were defendants' genuine opinions that Eagle was not Mr. Paul's "piggy bank" and did not give him "sweetheart deals," that the Company's related party loan disclosures were accurate, that internal controls were adequate, and that the Company was compliant with all relevant regulations. No pleaded facts suggest that the defendants did not actually believe these statements of opinion at the time. And for the reasons previously discussed, Plaintiffs cannot reasonably rely on the unsubstantiated pleadings in the MakeOffices litigation as the sole example of what they allege "on information and belief" was a pattern of "sweetheart deals." Those self-serving and untested allegations, from contentious litigation to which Eagle was not even a party, cannot provide the particularized "facts" necessary to show falsity.

Finally, Mr. Paul's statements in subsequent earnings calls "stand[ing] by our previous statements" regarding the Aurelius Report also are statements of opinion, the falsity of which Plaintiffs have not shown. Plaintiffs offer only the conclusory assertion that Mr. Paul could not possibly have still believed the Company's "previous statements" because he also stated that the Company had not "expect[ed] the initial findings." This is a non sequitur—Plaintiffs must, but do not, demonstrate how any "initial findings" undermined Mr. Paul's genuine belief in the continued

---

[14] *E.g.*, that Aurelius was a self-interested short-seller who took many of the details of his or her article from "papers filed by one side in pending litigation" and that "[n]o evidence has yet been submitted to the court, nor has any finding been made"; that related party loans are helpful to community banks and encouraged so long as they are made on arm's-length terms and properly reviewed; and that Eagle's "[n]on-performing assets and more than 90 day past due loans are only .24% of assets as of September 30, 2017." *See* AC ¶¶ 193-95.

truth of Eagle's previous statements. These allegations thus are also insufficient.

### 3.    Plaintiffs Fail to Allege a Strong Inference of Scienter

Plaintiffs' claims fail for yet another, independent reason: lack of scienter. To plead scienter, a plaintiff must state with particularity facts giving rise to a "strong inference" that each defendant acted with "an intent to deceive, manipulate, or defraud." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). This strong inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. And this "inherently comparative" inquiry—unlike the usual motion to dismiss analysis—requires courts to consider and weigh "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id*. at 323-24.[15]

Here, non-fraudulent inferences abound. Plaintiffs offer no cogent reason why defendants would have committed the alleged fraud. Indeed, their only such allegation, that Mr. Paul—a man in his mid-sixties and nearing retirement—sold 11% of his Eagle holdings simply cannot demonstrate scienter.[16] This, of course, means that Mr. Paul retained nearly all of his Eagle holdings, setting himself up to be one of the biggest victims of the fraud he supposedly perpetrated. Since Eagle's founding, Mr. Paul has received a high percentage of his compensation in stock grants and options, and for decades was the largest single individual shareholder.[17] By Plaintiffs'

---

[15] In the Second Circuit, scienter can be established by alleging facts showing either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. Defendants' discussion of scienter is framed within the Supreme Court's *Tellabs* analysis but addresses both prongs of the Second Circuit's test.

[16] By Plaintiffs' own accounting, these sales represented only 11.66% of Mr. Paul's Eagle stock holdings during the class period. AC ¶ 250. Courts have consistently found the sale of much larger portions of total holdings not to be unusual or suspicious. *See, e.g.*, *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (sale of 11% of holdings not unusual); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (sales of 10% and 17% of holdings not suspicious); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (sale of 22.5% not unusual).

[17] Between 2016 and 2018, Mr. Paul received $2,733,692 in salary compared to $7,118,725 in vested stock awards, as well as additional unvested stock awards.

21

own calculations, Mr. Paul retained more than 1.3 million shares and options during the alleged class period. As a result, the drop in Eagle stock from the class period high closing price ($68.85 on 10/10/2017) to the last day of the class period ($53.45) caused the value of Mr. Paul's holdings to fall by more than $20 million, nearly twice the proceeds of his stock sales during the alleged class period. *See* Ex. 4. Taken together, it is hardly a reasonable inference that Mr. Paul would have been motivated to defraud or injure Eagle. And the fact that Plaintiffs have not alleged that any of the other individual defendants engaged in unusual or suspicious stock sales during the class period[18] confirms that those defendants also believed in the Company's future and the value of its stock.[19] Indeed, the CFO, Mr. Levingston, actually bought stock on the open market when the stock price dropped following the Aurelius Report. *See* Ex. 6 (12/4/17 Form 4). Nor can Plaintiffs explain why Eagle had any motive to hide the loans at issue when the $177.33 million of additional related party loans disclosed for fiscal year 2017 in its 2018 Form 10-K (AC ¶ 235) represented less than 3% of its total loan portfolio at 2017 year-end. *See* Ex. 7 (2017 Form 10-K), at 38.

Moreover, plaintiffs allege an implausible fraud. Eagle had an established commercial loan review and approval process for all loans, including related party loans, and its related party loan analysis and reporting was subject to review by outside advisors and examined annually by regulators for Reg. O compliance. This extensive scrutiny gave the defendants every reason to believe that the Company was accurately identifying and disclosing its related party loans, and that these loans did not present any more than the normal risk of repayment. Moreover, these were good, profitable loans that continued to perform. This strong loan performance similarly gave the

---

[18] *See, e.g.*, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) ("[I]t is well established that trades under 10b5–1 plan do not raise a strong inference of scienter.").

[19] *See, e.g.*, *Acito*, 47 F.3d at 54 ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit."); *Turner v. MagicJack VocalTec, Ltd.*, No. 13 Civ. 0448, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) (lack of suspicious stock sales "rebuts an inference of scienter").

defendants comfort that related party loans were being properly vetted and made on arm's-length terms that involved no more risk than those with third parties.

Against these strong inferences of good faith conduct, Plaintiffs' allegations are especially weak. A motive-less alleged fraud rarely survives the Reform Act's strict scrutiny, and Plaintiffs' allegations support this maxim. As previously discussed, the allegations of a "sweetheart deal" and "tying arrangement" in connection with Eagle's loan to MakeOffices are unfounded and based on self-serving allegations that were made in contentious litigation and never judicially tested.[20] Plaintiffs extrapolate from these baseless allegations to assert in a conclusory fashion that Mr. Paul *must have* improperly, personally benefited from numerous related party loans, including all of the loans that the Aurelius Report identified as possibly having been with "related parties." The law requires more from Plaintiffs. The fact that Eagle helped finance real estate ventures in which RDP appears, based on public website content, to have been involved in some capacity, does not in itself make those related party loans, nor does it suggest any wrongdoing or culpable intent. Plaintiffs have not alleged that the loans for these ventures were actually made to RDP; indeed, the Aurelius Report indicates that several of the loans were made to other entities that the defendants reasonably understood at the time not to be "related parties." *See, e.g.*, Ex. I, at I-16-20 (identifying loans made to LLCs managed by Potomac).

Plaintiffs' other scienter allegations are equally unavailing. Contrary to Plaintiffs' assertions, Eagle's denial of the allegations in the Aurelius Report strongly suggests that the

---

[20] Indeed, the plain language of the email exhibits attached to the Amended Complaint indicate that (1) what Mr. Rahbar characterized as a "favorable valuation" for the Harris LLC's investment was based on Potomac's agreement to guarantee Eagle's loan (in exchange for a guarantor fee), and *not* based on the terms or approval of the loan itself (Ex. C, at C-8 ("The entire basis of this [LLC] valuation is the facility gaurantee [sic].")); and (2) Mr. Paul's request for the "no tying" letter was a *request* and not an unlawful demand (Ex. A, at A-99 ("As we discussed, and if ok with you, please reprint the attached letter and send back to me at your earliest convenience. Thanks and best regards, Ron")). There is nothing wrong with asking a business partner to furnish a letter attesting to a true state of affairs, and Plaintiffs have not pleaded any *facts* indicating that the contents of the letter were not accurate.

defendants genuinely believed the allegations were false. Likewise, the fact that Eagle has a code of business conduct and ethics does not in itself suggest that any defendant knew about any particular alleged violation of that code; rather, it is at least as indicative of good faith efforts to discourage misconduct of the type alleged here. Nor do subsequent high-level departures suggest scienter. "For executive resignations to raise a strong inference of scienter, they must be highly unusual and suspicious." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019).[21] Plaintiffs allege nothing probative, much less the highly unusual or suspicious circumstances required to show a strong inference of scienter.

Because Plaintiffs fail to allege facts sufficient to raise a strong inference of scienter with respect to any of the defendants—and indeed, the competing inferences of non-culpable, good faith conduct are far stronger for each—all of Plaintiffs' claims must be dismissed.

### C. Plaintiffs Also Fail to State a Claim for Scheme Liability

Finally, for many of the same reasons discussed above, Plaintiffs also cannot state a claim for scheme liability under Section 10(b) and Rule 10b-5(a) or (c).[22] Here the alleged "tying arrangement" on which Plaintiffs' scheme liability claim rests cannot ground their claim.

First, as previously discussed, Plaintiffs' theory is based entirely on unsubstantiated, self-serving allegations in a set of contentious litigations that were resolved before the allegations could be adjudicated. They are inherently unreliable, and *reasonable* inferences cannot be drawn from them.[23] Moreover, the purported "tying arrangement" is not alleged to have been in furtherance of

---

[21] *See also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) ("Mere conclusory allegations that a financial manager resigns or retires . . . without more, cannot support a strong inference of scienter.").

[22] To state a scheme liability claim, Plaintiffs must show "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017). In addition, the alleged scheme must be "in connection with the purchase or sale of any security." *Id.* (quoting 17 C.F.R. § 240.10b-5).

[23] Indeed, it appears that the emails on which Mr. Rahbar's allegations were based do not actually show a wrongful "tying arrangement" of the type he asserted. *See supra* note 20.

a scheme to defraud *in connection with the purchase or sale of securities*. "Not all conduct that negatively affects a company's stock price is actionable as a federal securities fraud. The scheme to defraud . . . itself must be integral to the purchase and sale of the securities in question." *Menaldi*, 277 F. Supp. 3d at 518. On Plaintiffs' theory, the purpose of the alleged scheme was to use Mr. Paul's relationship with Eagle to secure favorable deals for himself on personal investments. This has nothing to do with stock sales or the Company's stock price.

This is also fatal to Plaintiffs' efforts to plead scienter. Under Section 10(b), "the facts alleged must support an inference of an intent to defraud the *plaintiffs* rather than some other group." *ECA*, 553 F.3d at 198 (emphasis added). Here, Plaintiffs fail to raise a strong inference that Mr. Paul or Mr. Bensignor took *any* action—with respect to the MakeOffices transaction or anything else—with the requisite intent to defraud investors.

## IV.    CONCLUSION

Because Plaintiffs fail to state a claim under Section 10(b), their Section 20(a) claim must be dismissed as well.[24] Repleading would be futile: Plaintiffs have had ample opportunity to try to plead a claim but cannot, due to several fatal flaws. The Court thus should dismiss with prejudice.

Dated: New York, New York          Respectfully submitted,
         April 2, 2020

                                   BAKER & HOSTETLER LLP

                                   By:    */s/ Douglas W. Greene*

---

[24] *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

26

Douglas W. Greene (*pro hac vice*)
dgreene@bakerlaw.com
Jessie Gabriel
jgabriel@bakerlaw.com
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212.589.4200

Genevieve York-Erwin
gyorkerwin@bakerlaw.com
999 Third Avenue, Suite 3600
Seattle, WA  98104
Telephone: 206.566.7079

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was electronically filed on April 2, 2020 with the Clerk of the United States District Court, Southern District of New York, using its electronic case filing system, CM/ECF, thereby serving all counsel of record in this case.

/s/ Douglas W. Greene
Douglas W. Greene

*Attorney for Defendants*

27