# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHIVA STEIN, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:19-cv-06873-LGS |
| Plaintiff, | |
| v. | |
| EAGLE BANCORP, INC., SUSAN G. RIEL, RONALD D. PAUL, CHARLES D. LEVINGSTON, JAMES H. LANGMEAD, and LAURENCE E. BENSIGNOR, | |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ......................................................................................1

II.  STATEMENT OF FACTS .........................................................................................3

    A.  Background Of The Company And Its Business.................................................3

    B.  Eagle And The Bank Are Subject To Regulations Concerning Loans To Insiders...................................................................................................................3

    C.  The Aurelius Report Details Numerous Undisclosed Related Party Loans ...........4

    D.  Eagle Bancorp Amends Its Related Party Loan Totals.........................................6

    E.  Eagle Announces Elevated Legal Fees Due To Investigations .............................6

    F.  The MakeOffices Deal.........................................................................................7

    G.  Relevant Developments Following The Filing Of The Complaint........................7

III.  APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION...........8

IV.  THE COURT MUST CREDIT PLAINTIFFS' ALLEGATIONS BASED ON PLEADINGS AND DOCUMENTS FROM THE MAKEOFFICES LITIGATION .........9

V.  THE DEFENDANTS' MISREPRESENTATIONS ARE ACTIONABLE ....................10

    A.  Defendants' Related Party Loan Totals Were Materially False And Misleading...........................................................................................................10

        1.  Related Party Totals Are Statements Of Fact, Not Opinion .....................11

        2.  Even If The Related Party Loan Totals Were Opinions, The Complaint Pleads Falsity Under *Omnicare* ...............................................12

    B.  Defendants' Representations Concerning The Terms Of Eagle's Related Party Loans  Were Materially False And Misleading............................................14

    C.  Defendants' Attestations As To The Effectiveness Of Eagle's Internal Controls And SOX Certifications Were Materially False And Misleading ..........15

    D.  The Denials Of The Aurelius Report Were Materially False And Misleading .....16

VI.  THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER ...................16

    A.  Paul's And Bensignor's Conduct Demonstrates That Eagle's Failure To Classify Potomac As A Related Party Was Not In Good Faith............................17

B.      The "No Tying" Letter Supports A Strong Inference Of Scienter.........................18

C.      Paul Had Financial Motives To Conceal The Related Party Transactions............20

D.      Eagle's Internal Control Deficiencies Support A Strong Inference Of Scienter ...22

E.      The Denials Of The Aurelius Report Support A Strong Inference Of Scienter ....22

F.      The Multiple Departures At Eagle Support A Strong Inference Of Scienter ........23

G.      The Complaint Pleads A Strong Inference Of Scienter As To Each Defendant ...24

VII.    THE COMPLAINT ADEQUATELY PLEADS SCHEME LIABILITY CLAIMS .........25

VIII.   THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION ..........................26

IX.     CONCLUSION...................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
  544 F. Supp. 2d 199 (S.D.N.Y. 2008) .................................................................. 10

*Akerman v. Arotech Corp.*,
  608 F. Supp. 2d 372 (E.D.N.Y. 2009) .................................................................. 19

*Ashcraft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................................. 9

*Batwin v. Occam Networks, Inc.*,
  2008 WL 2676364 (C.D. Cal. July 1, 2008) ...................................................... 23

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................. 9

*Brown v. China Integrated Energy, Inc.*,
  875 F. Supp. 2d 1096 (C.D. Cal. 2012) .............................................................. 12

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) ............................................................................ 9, 30

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs.*,
  2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020) .................................................... 10

*Cohen v. Kitov Pharms.*,
  2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) ................................................ 32, 33

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ............................................................................................ 29

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ................................................................................. 9

*Epstein v. World Acceptance Corp.*,
  203 F. Supp. 3d 655 (D.S.C. 2016) .................................................................... 31

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011) ............................................................................... 12

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................................ 30

*Garcia v. Guo*,
  2016 WL 102213 (C.D. Cal. Jan. 7, 2016)............................................................ 22

*Hall v. The Children's Place Retail Stores. Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008) ........................................................... 25, 26

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
  298 F.R.D. 116 (S.D.N.Y. 2014)................................................................... 10, 11

*In re ArthroCare Corp. Sec. Litig.*,
  726 F. Supp. 2d 696 (W.D. Tex. 2010)............................................................. 25

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012)............................................................... 10

*In re Bradley Pharms., Inc. Sec. Litig.*,
  421 F. Supp. 2d 822 (D.N.J. 2006) ................................................................ 32

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ........................................... 2, 27, 28

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013)............................................................. 33

*In re Grupo Televisa Sec. Litig.*,
  368 F. Supp. 3d 711 (S.D.N.Y. 2019)............................................................. 17

*In re Guilford Mills, Inc. Sec. Litig.*,
  1999 WL 33248953 (S.D.N.Y. July 21, 1999) ................................................. 23

*In re Henry Schein, Inc. Sec. Litig.*,
  2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019).................................................. 29

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
  251 F. Supp. 3d 596 (S.D.N.Y. 2017)............................................................. 11

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  78 F. Supp. 3d 1215 (N.D. Cal. 2015) ........................................................... 12

*In re Mylan N.V. Sec. Litig.*,
  379 F. Supp. 3d 198 (S.D.N.Y. 2019)............................................................. 10

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ............................................. 27, 28

*In re Mylan N.V. Sec. Litig.*,
 2020 WL 1673811 (S.D.N.Y. Apr. 6, 2020) .......................................................................... 33

*In re Omnicom Grp., Inc. Sec. Litig.*,
 597 F.3d 501 (2d Cir. 2010) ...................................................................................... 30, 31

*In re OSG Sec. Litig.*,
 12 F. Supp. 3d 619 (S.D.N.Y. 2014) .......................................................................... 10

*In re OSG Sec. Litig.*,
 12 F. Supp. 3d 622 (S.D.N.Y. 2014) .......................................................................... 24

*In re OSG Sec. Litig.*,
 971 F. Supp. 2d 387 (S.D.N.Y. 2013) ........................................................................ 13

*In re Petrobras Sec. Litig.*,
 116 F. Supp. 3d 368 (S.D.N.Y. 2015) ........................................................................ 17

*In re Sadia, S.A. Sec. Litig.*,
 643 F. Supp. 2d 521 (S.D.N.Y. 2009) ........................................................................ 26

*In re Scholastic Corp. Sec. Litig.*,
 252 F.3d 63 (2d Cir. 2001) ........................................................................................ 24

*In re Scottish Re Grp. Sec. Litig.*,
 524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................................... 16, 26

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
 266 F. Supp. 2d 1150 (C.D. Cal. 2003) ............................................................... 23, 24

*In re Seitel, Inc. Sec. Litig.*,
 447 F. Supp. 2d 693 (S.D. Tex. 2006) ....................................................................... 32

*In re Spear & Jackson Sec. Litig.*,
 399 F. Supp. 2d 1350 (S.D. Fla. 2005) ...................................................................... 26

*In re Stillwater Cap. Partners, Inc. Litig.*,
 858 F. Supp. 2d 277 (S.D.N.Y. 2012) ................................................................... 20, 22

*In re Sunbeam Sec. Litig.*,
 89 F. Supp. 2d 1326 (S.D. Fla. 1999) ........................................................................ 25

*In re Take-Two Interactive Sec. Litig.*,
 551 F. Supp. 2d 247 (S.D.N.Y. 2008) ................................................................... 30, 31

*In re Turbodyne Techs., Inc. Sec. Litig.*,
  2000 WL 33961193 (C.D. Cal. Mar. 15, 2000) ....................................................... 26

*In re Veeco Instruments, Inc. Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006) ........................................................................... 25

*In re Vivendi Universal, S.A. Sec. Litig.*,
  634 F. Supp. 2d 352 (S.D.N.Y. 2009) .................................................................... 30

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011) .................................................................... 31

*In re Winstar Commc'ns*,
  2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ............................................................ 31

*In re: Cannavest Corp. Sec. Litig.*,
  307 F. Supp. 3d 222 (S.D.N.Y. 2018) .................................................................... 24

*In re: Petrobras Sec. Litig.*,
  150 F. Supp. 3d 337 (S.D.N.Y. 2015) .................................................................... 31

*In re: Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006) ................................................................................. 23

*Lea v. TAL Educ. Grp.*,
  2019 WL 4688691 (S.D.N.Y. Sept. 25, 2019) ......................................................... 13

*Limantour v. Cray Inc.*,
  432 F. Supp. 2d 1129 (W.D. Wash. 2006) ............................................................. 17

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) .................................................................... 30, 32, 33

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ............................................................................................. 10

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ................................................................................ 18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) .............................................................................. 12, 14, 15

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015) ..................................................................... 33

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ..................................................................... 30, 33

*Richard v. Nw. Pipe Co.*,
  2011 WL 3813073  (W.D. Wash. Aug. 26, 2011) ....................................... 32

*SEC v. China Ne. Petroleum Holdings, Ltd.*,
  27 F. Supp. 3d 379 (S.D.N.Y. 2014) ....................................................... 12, 22

*SEC v. Das*,
  2010 WL 4615336 (D. Neb. Nov. 4, 2010) .................................................. 12

*SEC v. Langford*,
  2013 WL 1943484 (D. Neb. May 9, 2013) ................................................... 29

*Sharette v. Credit Suisse Int'l*,
  127 F. Supp. 3d 60 (S.D.N.Y. 2015) ........................................................... 29

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015) ........................................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .............................................................. 18, 19, 20, 21

**Statutes**

15 U.S.C. §78j ...................................................................................................... 11

15 U.S.C. §78u-4(b)(1)(B) .................................................................................. 11

15 U.S.C. §78u-4(b)(2)(A) .................................................................................. 18

15 U.S.C. § 78u-4(b)(2) ....................................................................................... 9

**Rules**

Fed. R. Civ. P. 15(a)(2) ....................................................................................... 34

**Regulations**

17 C.F.R. §240.10b-5 ........................................................................................... 11

## Glossary of Defined Terms

| Term | Definition |
|---|---|
| 1934 Act | The Securities Exchange Act of 1934 |
| 2014 10-K | Eagle Bancorp's Annual Report on Form 10-K for the year ended December 31, 2014 filed with the SEC on March 2, 2015 |
| 2015 10-K | Eagle Bancorp's Annual Report on Form 10-K for the year ended December 31, 2015 filed with the SEC on February 29, 2016 |
| 2016 10-K | Eagle Bancorp's Annual Report on Form 10-K for the year ended December 31, 2016 filed with the SEC on March 1, 2017 |
| 2017 10-K | Eagle Bancorp's Annual Report on Form 10-K for the year ended December 31, 2017 filed with the SEC on March 1, 2018 |
| 2018 10-K | Eagle Bancorp's Annual Report on Form 10-K for the year ended December 31, 2018 filed with the SEC on March 1, 2019 |
| 2019 10-K | Eagle Bancorp's Annual Report on Form 10-K for the year ended December 31, 2019 filed with the SEC on March 2, 2020 |
| Aurelius Report and/or the Report | Marcus Aurelius Value, *Eagle Bancorp's Insider Loan Scheme Exposed*, December 1, 2017 |
| Bank | EagleBank, Eagle Bancorp's principal operating subsidiary |
| Bensignor | Defendant Laurence E. Bensignor, EVP and General Counsel of Eagle Bancorp and EagleBank (April 2010 – March 2018) |
| Complaint | Amended Class Action Complaint for Violations of the Federal Securities Laws, filed January 21, 2020 (Dkt. No. 37) |
| Defendants | Eagle Bancorp, Inc., Susan G. Riel, Ronald D. Paul, Charles D. Levingston, James H. Langmead, and Laurence E. Bensignor |
| Eagle and/or the Company | Defendant Eagle Bancorp, Inc., the bank holding company for EagleBank |
| Harris | Harris UO Investors LLC |
| Individual Defendants | Susan G. Riel, Ronald D. Paul, Charles D. Levingston, James H. Langmead, and Laurence E. Bensignor |
| Item 9A | Controls and Procedures, the section of SEC Form 10-K reporting on internal control over financial reporting |
| Langmead | Defendant James H. Langmead, EVP and CFO of Eagle Bancorp (January 2007 – April 7, 2017) |
| Levingston | Defendant Charles D. Levingston, EVP and CFO of Eagle Bancorp and EagleBank (April 2017 – present) |
| Leydig | Matthew Leydig, SVP of EagleBank, Commercial Real Estate |
| MakeOffices | MakeOffices, LLC, formerly UberOffices LLC |
| Matchbox | Matchbox Food Group |
| McCallum | Kathleen McCallum, COO of RDP, trustee of the Potomac Investment Trust |
| MRP | MidAtlantic Realty Partners LLC, real estate developer and MakeOffices stakeholder |
| MTD | Defendants' Memorandum In Support of Defendants' Motion to Dismiss the Amended Class Action Complaint, filed April 2, 2020 (Dkt. No. 46) |
| Paul | Defendant Ronald D. Paul, Chairman, President, and CEO of Eagle Bancorp (until March 20, 2019), CEO of EagleBank (June 2006 – March 20, 2019), founder of Eagle Bancorp |
| Plaintiffs | Anthony Cassinelli, as Trustee of the Danilee Cassinelli Trust DTD 7-23-93 and Norfolk County Retirement System |
| Pls. RJN | Plaintiffs' Request for Judicial Notice in Support of Plaintiffs' Opposition to |

| Glossary of Defined Terms | |
|---|---|
| **Term** | **Definition** |
| | Defendants' Motion to Dismiss the Amended Class Action Complaint, filed concurrently herewith |
| Potomac | Potomac Investment Trust |
| PSLRA | Private Securities Litigation Reform Act |
| Rahbar | Raymond Rahbar, founder and former CEO of MakeOffices |
| RDP | Ronald D. Paul Management, Inc. |
| Reg O | Regulation O, 12 C.F.R. §215, *et seq.* |
| Reg S-K | Regulation S-K, 17 C.F.R. Part 229 |
| Reg S-X | Regulation S-X, 17 C.F.R. Part 210 |
| Riel | Defendant Susan G. Riel, President and CEO of Eagle Bancorp and EagleBank (March 21, 2019 – present), formerly EVP and COO of EagleBank and EVP of Eagle Bancorp |
| SOX Certifications | Certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, attached as exhibits 31.1, 31.2, 32.1, and 32.2 to Eagle Bancorp's periodic financial statements |

## I.   **PRELIMINARY STATEMENT**[1]

This securities fraud class action centers on Defendants' admitted failure to disclose roughly $177 million in related party loans that they were required to disclose under SEC regulations and Generally Accepted Accounting Principles ("GAAP"). While the Complaint alleges numerous additional material misrepresentations (concerning, *inter alia*, the terms and conditions of these related party transactions and the adequacy of Eagle's internal controls), Eagle's false related party loan totals by themselves suffice to state a claim for securities fraud.

Defendants raise multiple challenges to the sufficiency of the Complaint. As detailed *infra*, each of them fails. Three of Defendants' arguments, however, should be addressed briefly at the outset. First, Defendants assert throughout their brief that all of the undisclosed loans are still performing, as if that somehow excuses their fraud.[2] Defendants' false related party loan totals were misleading not just because they concealed heightened credit risks,[3] but also because they concealed regulatory and reputational risks—risks that came to pass, wiping out hundreds of millions of dollars of market capitalization and severely harming shareholders.

Second, Defendants argue that the Complaint fails to plead loss causation, because Eagle's stock price did not drop when Eagle finally admitted the falsity of its prior numbers and restated them. But that is only because the market had already partially corrected Eagle's stock price more than a year earlier when a short seller published an exposé identifying the undisclosed related party transactions, causing Eagle's stock price to drop almost 25%. Defendants contend that this report

---

[1] Capitalized terms not defined herein are defined in the Glossary, *supra* at viii. Unless otherwise indicated, citations in the form of "¶__" refer to the Complaint (Dkt. No. 37), citations in the form of "Ex. __" refer to the Exhibits to the Complaint, all emphasis has been added, and all internal citations, quotation marks, and alterations have been removed.

[2] *See* MTD 1-3, 7-10, 12, 17, 22.

[3] Defendants assert that Plaintiffs "concede" that "all of Eagle's related party loans have continued to perform and be profitable for Eagle." MTD 1. Plaintiffs have made no such concession. No discovery has taken place. In any event, the Complaint pleads facts showing that loans to certain ventures in which Paul was an investor were distressed, and that Paul tried to leverage that distress to obtain an increased ownership position. *See* ¶¶70, 117-23; *infra* at note16. Thus, these loans presented heightened credit risks, even if they did not result in defaults, as well as heightened litigation risks.

cannot be a corrective disclosure because it was based on analysis of already-public information, but as this Court recently held, a third party's analysis of a company's published financials can provide new, fraud-revealing information to the market and thereby constitute a corrective disclosure. *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *7 (S.D.N.Y. Mar. 23, 2020).

Another partial disclosure occurred in July 2019 (a few months after Eagle restated its related party loan totals), when Eagle announced elevated legal fees due to previously undisclosed regulatory investigations into its related party loan practices, causing another roughly 25% decline in its stock price. This disclosure provided new fraud-revealing information to the market and represented a materialization of a risk whose scope remained concealed due to Defendants' ongoing misstatements and omissions. *See infra* at 29-30. Indeed, the facts underlying Defendants' fraud still have not yet fully come to light, and additional revelations have continued after the filing of the Complaint. In March 2020, Eagle admitted to material weaknesses in its internal controls with respect to its review, categorization and reporting of related party loans due to a "culture of deference" to its former CEO, Defendant Paul. *See* §II.G, *infra*.

Third, Defendants claim that their failure to disclose the related party loans was based on their good faith belief at the time they made their statements that the loans did not meet the requirements for disclosure. But Defendants' interpretation of the regulations and accounting rules— which would be indefensible even if the facts were as Defendants claim—suffers from a more fundamental problem: the factual predicate is simply a sham. Defendants say that they believed that they were not required to disclose loans to Potomac, a trust for the benefit of Defendant Paul's children, because Paul had "permanently ceded all operational authority" over the trust. MTD 15. The Complaint identifies specific documents and emails showing that Paul had actual operational authority over Potomac at all times, and that both Paul and Eagle's General Counsel knew it.

## II.    STATEMENT OF FACTS

### A.    Background Of The Company And Its Business

Eagle Bancorp ("Eagle" or the "Company") is the holding company for EagleBank (the "Bank"). ¶41. The Bank operates as a community bank in the D.C. area, with a focus on commercial real estate loans, construction loans, and general commercial loans. ¶¶41, 43, 45. Eagle was founded in 1997 by Ronald D. Paul, a commercial real estate investor, and other local businessmen. ¶¶3, 29, 38, 41-42. Eagle has touted its loan pricing discipline and underwriting standards as cornerstones to its long-term success. ¶46. Eagle also claims that its extensive local business and personal connections are greatly beneficial to its customers and to the Bank's success. ¶¶42, 46.

Paul served as Eagle's Chairman, President, and CEO during all relevant times, until his retirement in March 2019. ¶29. He also served as CEO of the Bank since June 2006. *Id.* Throughout his tenure at Eagle, Paul was also the president of RDP Management, Inc. ("RDP") and Ronald D. Paul Companies, real estate investment and property management companies founded by Paul in 1987. ¶38. Laurence Bensignor served as Eagle's General Counsel from April 2010 to March 2018. ¶35. He has had a business relationship with Paul for over 30 years. ¶104.[4]

### B.    Eagle And The Bank Are Subject To Regulations Concerning Loans To Insiders

Eagle and the Bank are subject to "multiple regulatory frameworks" (MTD 1) that create substantive and procedural limits on loans to related parties and require their disclosure. As a member bank of the Federal Reserve System, the Bank is subject to Reg O. ¶¶41, 47. Reg O provides that a member bank may not extend credit to insiders (*i.e.*, executive officers, directors, or principal shareholders) and their related interests unless the loan (i) is made on substantially the same terms as those prevailing at the time for comparable transactions with unaffiliated parties and (ii) does not involve more than the normal risk of repayment or present other unfavorable features.

---

[4] The relevant backgrounds of the other Individual Defendants are detailed at ¶¶27-34 and discussed *infra* at §VI.G.

¶¶49, 51. An extension of credit must be preapproved by the majority of the entire board of directors of the bank (with the interested party abstaining) if the amount of the loan exceeds $500,000, or if the combined loans to that party exceed a certain threshold. ¶50. Reg O defines a related interest as a company that is controlled by an insider. ¶¶51, 52. A person has "control" over an entity if he or she has "the power or exercise a controlling influence over [its] management or policies." ¶54. Under Reg O, the Bank was required to report its extensions of credit to insiders as part of its quarterly report of condition to the Federal Reserve. ¶56.

SEC regulations required Eagle to report its related party loans. ¶¶57-68. Reg S-X requires companies to report the amounts of related party transactions that affect its financial statements (¶57), and Item 404 of Reg S-K requires companies to disclose any transactions over $120,000 in which a related person had or will have a direct or indirect material interest. ¶¶58-59. GAAP also requires companies to disclose material related party transactions. ¶¶64-68. ASC 850 defines a related party to include entities that a related party "controls or can significantly influence …." ¶65 (quoting ASC 850-10-20).

Throughout most of the Class Period (3/2/15 – 7/17/19), Eagle reported relatively modest related party loan totals in each of its Forms 10-K for the 2014-2017 fiscal years. ¶¶172-74, 179-81, 186-88, 202-04. Defendants stated that the terms of these loans were substantially the same as those prevailing for comparable loans to unaffiliated parties. *Id.* Defendants also assured investors that Eagle's internal controls, procedures and compliance mechanisms were adequate and that its annual financial statements were prepared in conformity with GAAP. ¶¶175-177, 182-84, 189-91, 205-07.

### C.   The Aurelius Report Details Numerous Undisclosed Related Party Loans

On December 1, 2017, Marcus Aurelius Value released a report entitled "Eagle Bancorp's Insider Loan Scheme Exposed." ¶¶10, 69. In the Report, Aurelius accused Paul and others of an "insider loan scheme" that "jeopardizes the safety and soundness of the bank while potentially

leading to severe regulatory penalties," concluding that "insiders treat Eagle as their own private piggy bank." ¶69. The Report found the existence of roughly $185 million of undisclosed insider loans used to finance RDP ventures and described allegations by third parties that "[f]avorable loans were used to enrich [Paul] and certain Board Members." ¶¶69-71.

In part, the Report based its findings on allegations from lawsuits concerning Eagle loans to companies in which Paul was an investor. ¶70. In one, Rahbar, the founder of MakeOffices, alleged that he received a loan from Eagle "at preferential terms not otherwise available in exchange for Rahbar personally awarding Paul an equity interest in MakeOffices at a favorable valuation." *Id.* In another, the founders of Matchbox alleged that they received a $25 million Eagle loan, followed by a $10 million investment by a Paul-led investment group. *Id.* After Matchbox's cash flow began to deteriorate, Paul threatened to "call the Senior Eagle notes" and shut down Matchbox if control was not signed over to Paul. *Id.*

Following the release of the Aurelius Report, Eagle's stock price declined $16.20 per share, roughly 24.5%, to close at $49.95 on December 1, 2017, on heavy volume. ¶¶11, 77, 230.

Defendants immediately issued vehement denials, publishing two press releases and a letter to Bank customers and giving multiple interviews to the media. ¶¶12-13, 78-91, 193-201, 231. Defendants not only rejected the allegations of favorable loan terms for insiders and "cheap debt for equity" (¶85); they also denied the existence of undisclosed related party loans, insisting that the related party disclosures in Eagle's SEC filings "have always been complete," that Eagle's "internal controls are strong and all required disclosures … have been met," and that "[a]ny loans subject to Regulation O … have been … disclosed in compliance with that regulation." ¶¶194-95.

Following these assurances, Eagle Bancorp's stock partially recovered, rising $7.15 per share, or 14.3%, to close at $57.10 on December 4, 2017. ¶¶14, 89-91, 201, 231-34.

D.     **Eagle Bancorp Amends Its Related Party Loan Totals**

On March 1, 2019, in its 2018 10-K, Eagle admitted that its previous disclosures drastically understated its related party loans. ¶¶15, 92. In the 10-K, Eagle Bancorp explained that it had "modified [its] analysis with respect to insider related parties, and as a result included additional relationships such as those involving extended family members and trusts, resulting in an increase to the previously reported $60.9 million balance of related party loans at December 31, 2017." *Id.* Under this modified analysis, the total amount of loans to related parties was ***$238.4 million*** as of December 31, 2017—***almost four times the previously disclosed amount of $60.9 million***. ¶¶15, 93. This $177.3 million increase closely approximated the amount of loans to Paul-related projects highlighted in the Aurelius Report, effectively validating its allegations. *Id.*[5]

E.     **Eagle Announces Elevated Legal Fees Due To Investigations**

On July 17, 2019 after market close, Eagle disclosed that it had been paying elevated legal and accounting fees and related expenses in responding to various government investigations concerning the Company's related party transactions. ¶¶16, 94, 236. Eagle further disclosed that it would "continue to incur elevated levels of legal and professional fees and expenses for at least the remainder of 2019 as it continues to cooperate with these investigations." *Id.* The next morning, on an earnings call, Riel and Levingston explained that the scope of the investigations "expanded significantly" in the second quarter, and that the related party transactions under investigation "are represented in our public filings in the 2018 10-K filed March of this year." ¶¶17, 96, 97, 237.

In response to this news, Eagle's stock price fell $14.30, or approximately 26.75%, to close at $39.15 per share on July 18, 2019. ¶¶18, 98, 238. Piper Jaffray stated that "the disclosure is new, and

---

[5] Defendants did not, however, provide loan-level detail as to which specific related party transactions were responsible for the increased total. While Defendants have now confirmed that at least some of the previously undisclosed related party loans were made to Potomac and "entities controlled by Potomac" (MTD 15), Defendants have not made clear whether those Potomac-related loans are responsible for the entirety of the increase or just part of it.

strikes a serious tone" and Sandler O'Neill predicted that the investigations would be a continued "overhang" for the Company. ¶¶95, 99, 239. Both analysts downgraded their ratings of Eagle. *Id.*

## F.     The MakeOffices Deal

MakeOffices was a start-up founded by Rahbar that provided co-working space. ¶105. It needed significant capital without being able to provide substantial collateral to receive funding. ¶¶105-08. MRP—an investor in MakeOffices and frequent business partner of Paul's (*see* ¶¶70-73, 106, 145, 257, 259)—referred Rahbar to Paul for "cheap debt for equity." ¶107. In exchange for a $1 million equity interest to Harris (a Paul-controlled LLC) and a 1% guaranty fee to Potomac, Paul facilitated a $10 million loan from Eagle to MakeOffices. ¶¶107-14, 164. According to Rahbar, the various agreements that he entered into with Paul represented an "overall arrangement in which Paul was to obtain an investment in MakeOffices on favorable valuation terms and was to provide MakeOffices with a credit facility with EagleBank on sweetheart terms that [MakeOffices] would not otherwise have been able to obtain." Ex. A at A-6, ¶16.

Months after the deal was consummated, Paul coerced Rahbar into signing a letter making a false representation that there was no "tying arrangement" between the terms of EagleBank's loan to MakeOffices and the terms of Paul's investment into MakeOffices, so that Paul could use the letter in a "routine Federal Reserve audit." ¶¶116-17, 142-45, 223-24. Later, Paul wielded his control over Potomac as leverage in an attempt to renegotiate the deal terms for his benefit. *See infra* at 19 n.16. Paul's and Bensignor's emails during their course of dealings with Rahbar show that they knew Paul possessed operational authority over Potomac and that McCallum, the trustee of Potomac who was also Paul's personal friend and kidney donor, was merely a figurehead. *See* §VI.A, *infra*.

## G.     Relevant Developments Following The Filing Of The Complaint

On March 2, 2020, Eagle released its 2019 10-K. Pls. RJN, Ex. 1. The 10-K reported that Eagle's management and independent auditor concluded that Eagle had not maintained effective

control over financial reporting, due to a "material weakness in internal controls resulting from tone at the top issues that contributed to a control environment … insufficiently tailored to the culture of deference afforded to [Paul]." *Id.* at 79. Management concluded that this material weakness "manifested in deficiencies" in "the review, categorization and reporting of related party loans." *Id.* The 10-K stated that had this material weakness been "identified in the relevant time, [the CEO and CFO] would have concluded that the Company's internal control over financial reporting was not effective as of December 31, 2017 and 2018." *Id.*

Eagle announced a number of steps that it would take to remediate this material weakness, including: splitting the roles of Chairman and CEO; restructuring the Board to strengthen its risk and financial reporting oversight; hiring a new Chief Legal Officer; establishing an Ethics Office with accountability to the Audit Committee; and enhancing policies and procedures relating to the identification, review and reporting of related party transactions. *Id.* at 137-38.

The 10-K also disclosed that the government agencies Eagle had received document requests and subpoenas from were "securities and banking regulators and U.S. Attorney's offices." *Id.* at 28, 36, 78, 120. Several weeks later, during Eagle's April 23, 2020 conference call, Defendant Riel confirmed that the various government investigations concerning Eagle's related party disclosures were ongoing and still in the document production phase. Pls. RJN, Ex. 2 at 15-16.

## III.   APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

Even in cases subject to the PSLRA, on a motion to dismiss a court must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). While the pleading of scienter is subject to a "strong inference" standard,[6] every other element of a securities

---

[6] 15 U.S.C. § 78u-4(b)(2).

fraud claim is subject to the "plausibility" standard of *Twombly* and *Iqbal*.[7] *See Blanford*, 794 F.3d at 304, 307 (applying plausibility standard to falsity); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (applying plausibility standard to loss causation).

To state a claim under §10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security ("nexus requirement"); (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Here, Defendants contest falsity, scienter, and loss causation (and with respect to Plaintiffs' scheme liability claims, Defendants also contest the nexus requirement). As to these and all required elements, the Complaint is sufficient.

## IV.   THE COURT MUST CREDIT PLAINTIFFS' ALLEGATIONS BASED ON PLEADINGS AND DOCUMENTS FROM THE MAKEOFFICES LITIGATION

As a threshold matter, Defendants assert throughout their brief that the Court may not rely on Plaintiffs' allegations derived from "unsubstantiated" allegations made by third parties in the MakeOffices and Matchbox cases, because those allegations were resolved before adjudication. MTD 12, 20, 24. Defendants cite no authority for this argument. On a motion to dismiss, the Court is required to accept Plaintiffs' allegations as true, even if they are based on unproven allegations made by a third party. *See 380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 224-25 (S.D.N.Y. 2008) ("The Court must accept Plaintiffs' allegations in the Complaint as true, regardless of whether the allegations are taken from a complaint in another case.").[8] This is especially true given that many of the allegations are based not just on Rahbar's say-so, but corroborating emails

---

[7] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcraft v. Iqbal*, 556 U.S. 662, 678 (2009).

[8] *See also In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014) ("While allegations from another lawsuit are not evidence ... plaintiffs need not provide admissible proof at this stage."); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012) ("It makes little sense to say that information ... which the [complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony ... is immaterial simply because it is conveyed in an unadjudicated complaint."); *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214 (S.D.N.Y. 2019) (similar); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs.*, 2020 WL 1529371, at *21 (S.D.N.Y. Mar. 30, 2020) (similar).

and documents. *See Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126 (S.D.N.Y. 2014) (plaintiffs may incorporate "allegations from other complaints if they are combined with material … that lend credence to the borrowed allegations"). Rahbar's allegations are also similar to those made in the Matchbox case, providing further reason to believe them. *See id.* ("Because they report a consistent pattern of behavior, the Court has more faith in their accuracy.").

## V.   THE DEFENDANTS' MISREPRESENTATIONS ARE ACTIONABLE

Under §10(b) of the 1934 Act and Rule 10b-5, defendants are liable for both misstatements and material omissions. 15 U.S.C. §78j; 17 C.F.R. §240.10b-5. An omission is actionable if a statute or regulation requires disclosure, or if a statement "would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).

Under the PSLRA and Rule 9(b), a plaintiff adequately pleads falsity if he or she "specif[ies] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). Whether a statement is false or misleading "is generally a question reserved for the trier of fact." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017). Disputes concerning falsity should not be decided on a motion to dismiss, "unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that ***reasonable minds could not differ*** on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." *Id.*

### A.   Defendants' Related Party Loan Totals Were Materially False And Misleading

Defendants' first set of false statements consists of Eagle's related party loan figures for fiscal years 2014 through 2017, which materially underreported the total amount of related party loans in violation of GAAP and SEC regulations. ¶¶172-92, 202-08. Eagle admitted that these amounts were false when it "modified" its related party disclosures in its 2018 10-K. ¶¶92-93. While Eagle originally reported that it only had $60.9 million in related party loans outstanding as of

December 31, 2017, Eagle later admitted that it actually had ***$238.2 million*** in related party loans outstanding as of that date. ¶92. Thus, Eagle understated the correct amount by ***$177.3 million***, ***or 74%***. These facts alone suffice to plead falsity. *See, e.g.*, *SEC v. China Ne. Petroleum Holdings, Ltd.*, 27 F. Supp. 3d 379, 391 (S.D.N.Y. 2014) (failure to disclose $59 million of related party transactions sufficient to plead material misstatement or omission); *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1118 (C.D. Cal. 2012) ("Courts have previously held that similar allegations concerning a failure to disclose related-party transactions are adequate to plead falsity.").[9]

Notwithstanding Eagle's restatement of its totals, Defendants argue that these figures were expressions of Defendants' opinions and thus subject to *Omnicare*.[10] MTD 13-21. Defendants' argument fails because (1) related party loan figures are statements of fact, not opinion, and (2) even if they were opinions, they were materially false and misleading under *Omnicare*'s standards.

### 1. Related Party Totals Are Statements Of Fact, Not Opinion

In this Circuit, financial metrics that involve "inherently subjective" valuations are treated as opinion statements, but those that can be proven false pursuant to objective criteria are treated as statements of fact. *Compare Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-13 (2d Cir. 2011) (estimates of goodwill and loan loss reserves were opinion statements, because they were based on "inherently subjective" determinations, not objective standards)*, with In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 398-400 (S.D.N.Y. 2013) (statements of tax liabilities not "inherently subjective" opinion statements under *Fait*: "Although the Internal Revenue Code is complex and often gives rise to debate, it cannot be said that statements of income tax liability are 'subjective valuations.'").

Plaintiffs will be able to establish that Eagle's related party loan totals violated GAAP and

---

[9] *See also, e.g.*, *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1224 (N.D. Cal. 2015) (failure to disclose the related party nature of transactions "establishes the falsity of [defendant's] financial disclosures"); *SEC v. Das*, 2010 WL 4615336, at *3, *8 (D. Neb. Nov. 4, 2010) (failure to disclose $5.4 million of related party transactions sufficient to plead materiality because investors base decisions on, *inter alia*, "management ethics and accountability").

[10] *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).

SEC regulations pursuant to objective criteria. For example, Defendants claim that they had a good

faith subjective belief that Potomac, a family trust for the benefit of Paul's children, was not a related

party that required disclosure, but they ultimately changed their opinion. MTD 15. Disclosure,

however, was objectively required both because (1) Paul's children had a "direct or indirect material

interest" in Potomac,[11] and (2) notwithstanding Defendants' assertions to the contrary, Paul

controlled Potomac.[12] *See* §VI.A, *infra*. When an alleged accounting misstatement hinges on

whether one person or entity "controls" another, that misstatement is subject to the pleading

standards for fact statements, not opinion statements. *See Lea v. TAL Educ. Grp.*, 2019 WL 4688691,

at *4 (S.D.N.Y. Sept. 25, 2019) ("A finding of control is less like a goodwill determination because

objective evidence can more easily be identified with regard to control.").

### 2. Even If The Related Party Loan Totals Were Opinions, The Complaint Pleads Falsity Under *Omnicare*

Assuming Eagle's related party loan totals were opinions, the Complaint pleads falsity under

*Omnicare*. An opinion statement is actionable if (1) the speaker did not actually hold the stated belief

at the time the statement was made *or* (2) the speaker omitted material facts "whose omission makes

the opinion statement at issue misleading to a reasonable person reading the statement fairly and in

context." *Omnicare*, 575 U.S. at 184-85, 194. The Complaint pleads falsity under both prongs.

First, the Complaint pleads facts showing that Paul and Bensignor subjectively believed that

Paul controlled Potomac. In a June 2016 email, Paul made it clear that he saw Potomac's guarantee

in the MakeOffices deal as his own guarantee (and Harris's investment as his own investment):

---

[11] Under Item 404 of Reg S-K, disclosure is required of any transactions exceeding $120,000 "in which any related person had or will have a direct or indirect material interest." ¶58. Paul's children are indisputably related persons. Defendants' prior position appears to have been that Paul's children did not have a "direct or indirect material interest" in Potomac because they were only "discretionary beneficiaries" (MTD 9, 15)—*i.e.*, distributions to them were conditional on certain milestones or other criteria. This position was not an "inherently subjective" opinion under *Fait*, but an objectively incorrect interpretation of Item 404 that Defendants abandoned after "discussions with regulators." MTD 9.

[12] Under Reg O, "related interest" includes any company over which a banking insider "[h]as the power to exercise a controlling influence over the management or policies." ¶54. Likewise, under ASC 850-10-20, related parties include all companies that a related party "controls or can significantly influence." ¶65.

> ***I made a bad business decision on a minimal ownership interest for a $10,000,000 risk*** …. ***As guarantor on the loan, I*** immediately am insisting that the Bank not issue any letters of credit nor loan advances without my consent. ***I*** am not going to put ***my guarantee*** at further risk until we make some major structural adjustments ….

¶119. Notwithstanding Defendants' assertion that Paul had "permanently ceded all operational authority" (MTD 15), Paul clearly believed that he had full operational authority over Potomac and the power to issue instructions and make demands on its behalf. McCallum, the trustee of Potomac to whom all decision making supposedly had been ceded, was not even included on the email. Ex. E (Dkt. No. 37-6). Similarly, in a set of emails from September 2015, Bensignor and Rahbar negotiated the final terms of the MakeOffices deal; Paul and representatives of MRP were copied; McCallum was not. ¶¶129-32; Ex. C (Dkt. No. 37-4). These documents support a strong inference that McCallum was merely a figurehead, and Paul was the one with actual control over Potomac. In addition, Bensignor issued instructions to Rahbar to wire payment of a guaranty fee to RDP (an entity clearly controlled by Paul), even though the entity to whom the fee was owed was Potomac. ¶276(a). This violation of corporate formalities and intermingling of funds supports a finding that Potomac was an alter ego of Paul. *See infra* at 18.

Second, the Complaint pleads material facts whose omission rendered Defendants' "opinions" misleading. *Omnicare*, 575 U.S. at 194. These facts include, *inter alia*, that (a) Eagle failed to disclose tens of millions of dollars of related party loans to Potomac and other entities controlled by Paul over a period of multiple years; (b) Eagle's purported basis for not counting the Potomac loans as related party transactions was that Paul supposedly lacked investment and operational authority over Potomac; (c) Paul held himself out to others (including counterparties in business transactions) as the individual with functional authority and control over Potomac; (d) Paul leveraged his role at the Bank to obtain favorable terms that would not otherwise be available for loans involving Potomac and other loans in which Paul otherwise had a direct or indirect personal

interest (¶¶107, 157-62); (e) Paul engaged in a pattern and practice of requiring counterparties in deals involving Potomac to sign false letters purporting to confirm that there was no "tying arrangement" between the terms of the loans from Eagle and the terms of Paul's investment, even though the terms of these transactions were inextricably tied (¶¶142-46; Ex. A-99–A-102); (f) Bensignor was fully aware of and facilitated Paul's misconduct in relation to the foregoing; and (g) Eagle's processes for "the review, categorization and reporting of related party loans" suffered from a material weakness stemming from a "culture of deference" to Paul. Pls. RJN, Ex. 1 at 137. These undisclosed facts were not mere minor "fact[s] cutting the other way," *Omnicare*, 575 U.S. at 189, but critical facts whose omission rendered Defendants' "opinions" materially misleading.

### B. Defendants' Representations Concerning The Terms Of Eagle's Related Party Loans Were Materially False And Misleading

Defendants' second set of misrepresentations concerns the terms of Eagle's related party loans and their approval process. For example, in Eagle's Proxy Statement dated April 10, 2015, Eagle stated that "all of such transactions have been on substantially the same terms … as those prevailing at the time for comparable transactions with non-affiliated persons." ¶174. Eagle made nearly identical statements in its Proxy Statements filed in 2016 (¶181), 2017 (¶188), 2018 (¶204), and 2019 (¶214). These statements were false because certain transactions involving Paul were not on substantially the same terms as those prevailing for comparable transactions with non-affiliated persons. For example, in connection with the MakeOffices deal, Paul was given an equity interest at a "favorable valuation rate" in exchange for Eagle providing "a 'debt facility' line of credit on extremely favorable terms that would not otherwise be available." ¶107. Beyond that deal, a former Eagle employee observed that Eagle regularly waived documentation requirements—which are part of the terms and conditions of a loan—for loans involving "Friends of Paul." ¶¶157-62.[13]

---

[13] Eagle represented that the terms of all related party loans were reviewed by management "[a]t the time each loan was

**C.**     **Defendants' Attestations As To The Effectiveness Of Eagle's Internal Controls And SOX Certifications Were Materially False And Misleading**

Defendants' third set of misstatements consist of attestations as to the effectiveness of Eagle's internal controls and SOX Certifications. *See* ¶¶175-77, 182-84, 189-91, 194, 205-07, 215-17. Such statements are actionable if the facts give rise to a plausible inference that defendants knew that internal control weaknesses existed. *See, e.g.*, *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 398 (S.D.N.Y. 2007) (statements opining on adequacy of internal controls actionable where "plaintiffs' factual allegations … suggest that the Company recklessly or intentionally misled investors as to the state of its internal controls").[14]

Here, the Complaint pleads facts showing that Defendants were aware of weaknesses in Eagle's internal controls with respect to related party disclosures. These facts include: (a) Paul's and Bensignor's knowledge that Paul controlled Potomac and that Potomac was a related party, *see* §VI.A, *infra*; (b) Eagle's management's failure to conduct a substantive review of the terms of the Potomac transactions at the time the loans were made, *see supra* at 14-15 n.13; and (c) Paul's practice of routinely obtaining documentation waivers for "Friends of Paul" loans. ¶¶157-62. Also, after the Complaint was filed, Eagle admitted to a material weakness in its internal controls with respect to its review and reporting of related party loans due to a "culture of deference" to Paul. *See Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1160 (W.D. Wash. 2006) (company's subsequent

---

made" to ensure that the loans did not pose heightened collectability risks or other unfavorable features. *See* ¶¶174, 181, 188, 204. While Eagle made this representation in its Proxy Statements filed between 2015 and 2018, the sentence was removed from the 2019 Proxy Statement (after Eagle's modification of its related party loan analysis). ¶214. This change reveals that the Potomac loans were not subject to the normal review process for related party loans. While Eagle still made a *post hoc* assertion that the loan terms were, in the opinion of its Board, "no less favorable to the Bank than terms of loans from the Bank to unaffiliated parties" (¶214), the original representations were still misleading because they suggested that all related party loans were subject to a substantive review process at the time each loan was made.

[14] *See also In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720 (S.D.N.Y. 2019) ("Misstatements made in its certifications concerning the design and efficacy of internal controls are actionable."); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380-81 (S.D.N.Y. 2015) (allegations that "the Company's management was professing its opinion that the company's internal controls were effective [and] that same management was well aware of the extensive corruption .... are sufficient to infer that the Company disbelieved the alleged statements at the time they were made").

admission of material weaknesses in internal controls and procedures sufficient to infer falsity of SOX certifications).

### D.        The Denials Of The Aurelius Report Were Materially False And Misleading

Defendants' fourth set of false statements consist of their denials of the Aurelius Report. ¶¶193-201, 209-11. Defendants disputed not only the "narrative" of the Aurelius Report and its allegations of "sweetheart deals" (MTD 1), but went further and made affirmative unequivocal representations that Eagle had disclosed every related party loan it was required to disclose. *E.g.*, ¶194 ("There are required disclosures of loans to insiders … in annual filings with the [SEC] …. ***The filings by the Company have always been complete*** …. ***Our internal controls are strong and all required disclosures, including loans to insiders, have been met***."); ¶195 ("***Any loans subject to Regulation O*** … have been made, approved and ***disclosed in compliance with that regulation***.").

Defendants maintain that these denials were mere statements of opinion. MTD 20. These statements, however, are provably false pursuant to objective criteria. *See* §V.A.I, *supra*. Even if the denials are treated as opinions, they were materially misleading because they omitted material facts concerning, *inter alia*, Paul's control over Potomac. *See* §V.A.2, *supra*. By categorically denying the Report (which alleged specific transactions that Aurelius had improperly failed to classify as related party loans), Defendants represented to the market that they were sufficiently familiar with these transactions to be in a position to issue the denials. *See* §VI.E, *infra*.

## VI.      THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER

In order to plead scienter, a plaintiff must allege facts that, when viewed holistically, give rise to a "strong inference" that the defendants acted with "the required state of mind." 15 U.S.C. §78u-4(b)(2)(A); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). A plaintiff may satisfy this standard "either (a) by alleging facts to show that defendants had both

motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Recklessness amounts to actionable scienter if the conduct was "highly unreasonable" and an "extreme departure from the standards of ordinary care"; it can be shown by alleging that defendants "knew facts or had access to information suggesting that their public statements were not accurate [or] failed to check information they had a duty to monitor." *Id.* at 308, 311.

Scienter is adequately alleged if the facts give rise to an inference that Defendants intentionally or recklessly misled the public which is at least as compelling as an inference that Defendants acted non-culpably. *Tellabs*, 551 U.S. at 324. "When the competing inferences rest in equipoise, the tie goes to the plaintiff." *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009). The proper inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S at 322-23, 326 (allegations are to be read "holistically").

## A.    Paul's And Bensignor's Conduct Demonstrates That Eagle's Failure To Classify Potomac As A Related Party Was Not In Good Faith

A key factor supporting a strong inference of scienter is that the supposed factual basis for Defendants' "good faith" opinion that Potomac was not a related party—that Paul lacked "investment or operational authority" over Potomac (MTD 15)—was a sham. Defendants assert that their original opinion that Potomac was not a related party was based on their understanding that Paul "had permanently ceded all operational authority" (MTD 15) over Potomac. Paul's and Bensignor's emails concerning the MakeOffices deal show that they knew this was not the case.

The negotiation of the final terms of the MakeOffices deal was conducted in a series of emails among Bensignor, Rahbar, Paul, and the other principals to the deal at MRP, but not McCallum, the individual to whom all operational authority supposedly had been ceded. ¶¶129-32.

Notwithstanding his role as Eagle's General Counsel, Bensignor purported to speak and negotiate on behalf of Potomac. *See* Ex. C (Dkt. No. 37-4) ("Obviously, the Trust has no intent to guarantee to continue to guaranty the loan if Harris is not member."). When an impasse over certain terms emerged, Bensignor suggested a group discussion and implied that Paul would be the ultimate decision maker. *Id.* ("Ron is in a meeting, but I will brief him when I see him.").

Months later, after MakeOffices was experiencing setbacks, Paul sent an email to Rahbar (copying Bensignor, not McCallum) stating, "***As guarantor on the loan, I immediately am insisting*** that the Bank not issue any letters of credit nor loan advances ***without my consent***. ***I*** am not going to put ***my guarantee*** at further risk until we make some major structural adjustments." ¶119. This email made clear that (i) Paul viewed Potomac's guarantee as his own guarantee and (ii) Paul was the one making the key operational decisions for Potomac. McCallum was not involved in these discussions.

Further, Bensignor instructed Rahbar to wire monies to RDP that were owed to Potomac. ¶276. This evinces a disregard of corporate separateness and an intermingling of assets, warranting a finding that Potomac and RDP are alter egos of Paul. *Id.*[15] That Bensignor and Paul treated Potomac and RDP as interchangeable accounts for moneys to be wired strongly undercuts any inference that they were acting in good faith in taking the position that Paul did not control Potomac.

## B. The "No Tying" Letter Supports A Strong Inference Of Scienter

Paul's pressure on Rahbar to sign the "no tying" letter further strengthens the inference of scienter. ¶¶116-17, 142-45, 165, 240-42. While Defendants argue that Paul's urging of Rahbar to sign the letter was only "a request and not an unlawful demand" (MTD 23), Rahbar alleges that Paul "personally threatened to cancel MakeOffices' loan under the Facility Agreement if he did not have the [letter] signed as he needed it for a 'routine Federal Reserve Audit.'" Ex. A at A-8, ¶23. Rahbar

---

[15] The Complaint makes other alter ego allegations, including: (i) a shared address for RDP and Potomac, and (ii) the multiple roles of McCallum—Paul's close friend and kidney donor—as trustee of Potomac and trustee or manager of other shell entities controlled by Paul. ¶¶276-77. Defendants did not address any of the Complaint's alter ego allegations.

says that he signed the letter under "extreme financial duress." *Id.* at A-8, ¶24.[16]

Rahbar's complaint also makes clear that the "no tying" letter's representations were untrue. Rahbar alleges that the agreements he entered into with Paul were part of an "overall arrangement in which Paul was to obtain an investment in MakeOffices on favorable valuation terms and was to provide MakeOffices with ***a credit facility with EagleBank on sweetheart terms*** that [MakeOffices] would not otherwise have been able to obtain." Ex. A at A-6, ¶16. These facts contradict the "no tying" letter, including its representations that MakeOffices "did not ask for" and did not "believe [it] received … terms from EagleBank more favorable than market" and that MakeOffices would not offer to Paul "better terms … than market or than other offerees because of [Paul's] involvement with EagleBank." *Id.* at A-101.[17] The facts of the MakeOffices deal also contradict Eagle's public representations, including that all related party loans "have been on substantially the same terms … as those prevailing at the time for comparable transactions with non-affiliated persons." ¶181.

The Complaint pleads additional facts supporting the conclusion that this conduct was not limited to the MakeOffices deal. Rahbar testified that Zach Wade from MRP told Rahbar that similar "no tying" letters were "routinely" used in EagleBank deals with MRP and were "part of the game." ¶145. A former Eagle employee has stated that Eagle regularly waived documentation requirements for loans involving "Friends of Paul." ¶¶157-62. In addition, Eagle has admitted to a material

---

[16] Paul's threat to cancel the MakeOffices loan without a "no tying" letter is just one example of Paul's use of Potomac's power as guarantor to exert leverage on Rahbar to extract concessions for his own benefit. Paul also demanded "major structural adjustments" and "insist[ed] that the Bank not issue any letters of credit nor loan advances" to MakeOffices without Paul's consent. Ex. A at A-9–A-10, ¶30. Paul later revealed that his proposed "structural adjustments" included a transfer of majority ownership to Paul for no consideration. *Id.* at A-11, ¶34. These allegations are very similar to the allegations made against Paul by separate parties in the Matchbox litigation. ¶70 ("When Matchbox's cash flow began to deteriorate, Paul threatened to 'call the Senior Eagle notes and padlock the doors and put 2,000 of [Matchbox's] employees out of work' if Ted Neal did not sign documents which gave Paul control over Matchbox through another $10 million investment made through Egg Cream LLC, which Paul controls.").

[17] Defendants argue that the letter was not false, because the "favorable valuation" was in exchange for Potomac's guarantee and "not based on the terms or approval of the loan itself." MTD 23 n.20. Rahbar, however, alleges that the guarantee was part of an "overall arrangement" in which EagleBank would provide a credit facility "on sweetheart terms." Ex. A at A-6, ¶16. This factual dispute is inappropriate for resolution on a motion to dismiss.

weakness in its internal controls with respect to "the review, categorization and reporting of related party loans" due to a "culture of deference" to Paul. Taken together, these facts support an inference that Paul engaged in a pattern of related party transactions in which parties were given special loan terms (including documentation waivers)[18] and that "no tying" letters were used create a false appearance that the loans did not involve any atypical terms or conditions.

### C.  Paul Had Financial Motives To Conceal The Related Party Transactions

Paul had two sets of motives for concealing related party transactions. First, he and his family members had financial interests in the $177 million of undisclosed related party transactions, and they had an interest in avoiding scrutiny of these transactions by regulators and the public. "[W]hile related-party transactions are not per se unlawful, [courts] view them with extreme skepticism, especially when they go undisclosed." *China Ne. Petroleum*, 27 F. Supp. 3d at 389. A failure to disclose related party transactions that benefit an insider or his family members may support a strong inference of scienter. *See id.* (CEO "had a clear, twofold motive for filing substantially misleading documents with the SEC: (1) to funnel offering proceeds into his own account and that of his relatives, and (2) to conceal this conduct from the investing public and the government").[19]

Second, Paul engaged in a series of unusual stock sales between June 29, 2017 and November 3, 2017, disposing of approximately 11.66% of his Eagle holdings for more than $11.4 million. ¶¶246-51. The trades were in small increments, consisting of 51 separate transactions on 19 different trading days. ¶250. Prior to these sales, Paul had never sold any Eagle stock *for a period of 19 years*, beginning with Eagle's IPO in 1998. ¶249. The timing of the sales was suspicious because

---

[18] Defendants argue that it is "neither unusual nor improper" for employees to "pay special attention to or move faster on a loan application associated with the CEO." MTD 17. A documentation waiver, however, is not merely the fast-tracking of a loan, but the application of a different set of underwriting requirements and substantive loan conditions.

[19] *See also In re Stillwater Cap. Partners, Inc. Litig.*, 858 F. Supp. 2d 277, 288 (S.D.N.Y. 2012) (strong inference of scienter supported by "alleged personal profits by Gerova insiders from the related-party transactions"); *Garcia v. Guo*, 2016 WL 102213, at *13 (C.D. Cal. Jan. 7, 2016) ("the FAC also pleads adequate facts supporting an inference that Lentuo was motivated to conceal the [related party] Loans as it prepared for an additional round of fundraising").

they started three months after Rahbar's deposition and ended one month before the Aurelius Report. ¶¶246, 250. During that deposition, at which Paul was present, Rahbar testified that he believed Paul's conduct in the MakeOffices deal was criminal, and that he had reported this conduct to the Federal Reserve Bank of Richmond, the House of Representatives, and the FBI. ¶¶247-48.

Defendants argue that these sales are insufficient, because Paul sold only 11.7% of his holdings. MTD 21-22. Courts, however, have held a strong of inference of scienter may be supported by even smaller percentages. *See, e.g.*, *In re Guilford Mills, Inc. Sec. Litig.*, 1999 WL 33248953, at *5 (S.D.N.Y. July 21, 1999) (10%).[20] Defendants ignore contextual factors: the sales were out of line with Paul's previous history (no trades in 19 years), and the dollar amount was high, comprising more than 12 times Paul's base salary for 2017. ¶251; *see In re: Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) (sales suspicious when they netted defendant more than four times his salary). The Complaint pleads a reason why the sales stopped: the Aurelius Report came out, which accused Paul of improper insider trading. ¶¶69, 75. Once those allegations were public, it would have been crazy for Paul to keep on selling. Had the Report not come out, Paul may well have continued his pattern of slowly disposing of Eagle stock.[21] Finally, even if the Court were to hold that the motive allegations against Paul are insufficient by themselves, pursuant to *Tellabs*, it must consider these allegations holistically in combination with all of the other evidence of scienter.[22]

---

[20] *See also Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *14-15 (C.D. Cal. July 1, 2008) (7%); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (7.6%).

[21] Paul's last sale was on 11/3/2017; the Aurelius Report was released on 12/1/2017, only 28 days later. During the roughly four month period in which Paul executed his trades, there were a number of similar sized gaps: no trades between 7/1 and 7/24 (24 days), between 7/26 and 8/24 (30 days), or between 9/29 and 10/24 (26 days). ¶250.

[22] Defendants argue that any inference of scienter is undermined because the other Individual Defendants did not engage in suspicious sales. MTD 22. At most, this fact would undermine an inference of scienter as to those Defendants, not Paul. The Second Circuit has not "established a *per se* rule that the sale by one officer of corporate stock for a relatively small sum can never amount to unusual trading." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir. 2001). Instead, each case is to be "decided on its own facts." *Id.*; *see also In re: Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 244-47 (S.D.N.Y. 2018) (strong inference of scienter with motive alleged only against CEO); *SeeBeyond*, 266 F. Supp. 2d at 1168-69 (strong inference of scienter where CEO was only defendant to sell stock during class period).

### D.    Eagle's Internal Control Deficiencies Support A Strong Inference Of Scienter

Another factor supporting scienter is the glaring weaknesses in Eagle's internal controls. The Complaint details several aspects of these weaknesses, including the routine use of documentation waivers for "Friends of Paul" loans; the steering of loans involving Paul to two senior Eagle employees loyal to Paul, Leydig and Ryan Riel; and the conflicts of interests faced by Bensignor, Eagle's chief legal officer, who acted as *de facto* personal counsel for Paul (and sometimes as an investor) in related party transactions. *See, e.g.*, ¶¶35, 120, 132, 139, 148-62, 167-68, 273-74. In March 2020, the Company admitted to a material weakness in its internal controls concerning its related party disclosures due to a "culture of deference" to Paul. Pls. RJN, Ex. 1 at 79, 137.

"Courts in this District have repeatedly held that weak internal controls will support an inference of scienter." *Cannavest*, 307 F. Supp. 3d at 246; *see In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014) ("A lack of adequate internal controls may support the inference of scienter."); *accord Hall v. The Children's Place Retail Stores. Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006).

### E.    The Denials Of The Aurelius Report Support A Strong Inference Of Scienter

When the Aurelius Report was published, Defendants did not pause to investigate but immediately denied its allegations. Defendants also firmly represented that Eagle had disclosed all of the related party transactions it was required to disclose. *See* §V.D, *supra*. Defendants did not say, as they do now, that related party determinations are "complex, subjective judgment calls" (MTD 14) subject to reasonable disagreement. They instead stated that Eagle's SEC filings "have always been complete" and that "***all required disclosures, including loans to insiders, have been met***." ¶194.

These denials were made with full knowledge of the facts concerning Paul's control of Potomac discussed *supra*. Defendants continued to stand by their denials for months. On April 19, 2018, four months after the initial denials, Paul told analysts, "we stand by our previous statements

regarding this Internet matter." ¶209. Defendants did not admit that their related party disclosures had been misstated until March 1, 2019, when Eagle issued its 2018 10-K. ¶¶92-93.

By denying the Aurelius Report, Defendants were telling the market that they were sufficiently familiar with the disputed transactions to be in a position to issue the denials. Multiple courts have held that this fact pattern supports a strong inference of scienter. *See, e.g.*, *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 712-18 (W.D. Tex. 2010) (strong inference of scienter where CEO dismissed reports alleging accounting improprieties and company ultimately restated; "the red flags in the media should have led [defendants] to investigate discrepancies between the media reports and their own knowledge, and thus are strong indicia they acted with scienter"); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) (denial of reports alleging accounting fraud showed that defendants "were either sufficiently familiar with the facts, or severely reckless in not being familiar, to be in a position to issue a denial").[23]

## F.    The Multiple Departures At Eagle Support A Strong Inference Of Scienter

Bensignor resigned in March 2018, a few months after the Aurelius Report, purportedly for "health reasons." ¶270. Paul announced his retirement on March 20, 2019, three weeks after Eagle published its 2018 10-K (which restated Eagle's related party loan totals), also citing health reasons. ¶271. In the following months, five directors departed (including two identified by Aurelius as investors in projects receiving loans from Eagle), as did multiple senior employees, including Eagle's Chief Marketing Officer, five senior vice presidents (including Leydig), and eight vice presidents. ¶¶272-73. An October 22, 2019 *Washington Business Journal* article stated "[b]anking industry experts said that *while turnover occurs at any bank of EagleBank's size, this recent spate of departures is unusual* for a bank that had long been able to retain top-level talent." ¶274.

---

[23] *See also In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1358-59 (S.D. Fla. 2005) (similar); *In re Turbodyne Techs., Inc. Sec. Litig.*, 2000 WL 33961193, at *19 (C.D. Cal. Mar. 15, 2000) (similar).

These facts support an inference that Eagle was engaged in a deliberate process of removing individuals responsible for the related party loan scandal and the deficient internal controls that allowed those loans to go unreported. *See, e.g.*, *In re Scottish Re Grp.*, 524 F. Supp. 2d at 394 n.176 ("highly unusual and suspicious" resignations "although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud").[24]

### G.    The Complaint Pleads A Strong Inference Of Scienter As To Each Defendant

All of the scienter allegations discussed in §§VI.B-VI.G, *supra*, are applicable to Paul, and all except those relating to motive are applicable to Bensignor. Viewed holistically, the Complaint's allegations raise an inference of scienter as these two Defendants that is not merely strong (*i.e.*, equally plausible), but ***substantially stronger*** than any competing inference of good faith. Further, as to these two, the facts suggest deliberate deception, not mere recklessness.

As to the remaining Individual Defendants, the Complaint gives rise to a strong inference of severe recklessness. For these Defendants, scienter may be inferred from (a) their positions and experience;[25] (b) the material weaknesses in Eagle's internal controls, *supra* at §VI.D; and (c) for Riel and Levingston, the issuance of statements after the Aurelius Report denying its allegations and/or continuing to exclude the Potomac loans from the related party totals, *supra* at §VI.E.

Defendant Riel served as Eagle's Senior EVP and COO throughout most of the Class Period, until succeeding Paul as President and CEO on March 21, 2019. ¶27. She has 43 years of experience in the banking industry. *Id.* During her time as COO, she was Eagle's second highest officer. *Id.* Her son Ryan Riel oversaw the lending relationship with entities Paul controlled in his personal business

---

[24] *See also In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 523-24, 534 (S.D.N.Y. 2009) (resignations of chairman and vice chairman less than two weeks after revelation of fraud supported strong inference of scienter); *Hall*, 580 F. Supp. 2d at 233 (CEO's and auditor's resignations "add to the overall pleading of circumstantial evidence of fraud").

[25] While an officer's position and experience cannot by themselves establish scienter, they can support a strong inference of scienter in combination with other factors. *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *13 (S.D.N.Y. Mar. 28, 2018) (individuals' high-level positions constituted circumstantial evidence that bolstered inference of scienter).

and real estate ventures. ¶¶139, 161. Defendant Riel signed a December 4, 2017 letter denying the Aurelius Report and affirming that all related party loans were disclosed. ¶195. She also signed the 2017 10-K on March 1, 2018, which continued to exclude Potomac loans from Eagle's related party totals. ¶¶169, 202-04. The inference of recklessness as to these statements is particularly strong, as Riel had a duty to investigate the facts of the disputed transactions before denying the Aurelius allegations and affirming that all related party loans were disclosed. *See* §VI.E, *supra*.

Defendant Levingston has served as Eagle's CFO since April 4, 2017 (and served earlier in the Class Period as EVP of Finance). ¶31. He has 19 years of experience in the banking industry and is a CPA. *Id.* He signed the 2017 and 2018 10-Ks, including the SOX certifications and Item 9A attestations for both years. ¶¶205-07, 215-17. The 2017 10-K was issued four months after the Aurelius Report, which raised serious red flags about Eagle's related party disclosures. Levingston had a duty to investigate the disputed transactions and Eagle's internal controls before signing the 10-K, SOX certifications, and Item 9A attestations.

Defendant Langmead served as Eagle's CFO from January 2007 to April 7, 2017. ¶33. He had over 45 years of experience in the banking industry and is a CPA. *Id.* He signed the 2014, 2015, and 2016 10-Ks, including the SOX certifications and Item 9A attestations for these years. ¶¶175-77, 182-84, 189-91. While Eagle has only admitted to a material weakness in its internal controls for 2017 and 2018, the Complaint makes clear that this material weakness did not emerge in 2017 but existed throughout the Class Period. Eagle failed to disclose tens of millions of dollars in related party loans in 2014, 2015, and 2016. The most plausible inference is that Langmead was severely reckless in signing the 10-Ks, SOX certifications and Item 9A attestations for these years.

## VII.   THE COMPLAINT ADEQUATELY PLEADS SCHEME LIABILITY CLAIMS

Separate from Defendants' misstatements made to the investing public (¶¶169-218), Paul and

Bensignor engaged in other deceptive acts as part of a scheme to conceal the use of their positions at the Bank to obtain an advantage as investors. Months after the MakeOffices deal, Paul coerced Rahbar into signing a "no tying" letter, even though Rahbar was induced into the deal with an offer of "cheap debt for equity" and viewed the terms of the loan and the terms of Paul's investment as tied. ¶¶107-08, 116-17. Paul told Rahbar that he needed the letter for a "routine Federal Reserve audit." ¶117. According to Rahbar, Paul's joint venturer told him that the "no tying" letters were standard practice for Paul's real estate ventures and "part of the game." ¶145. These facts are sufficient to state a claim for scheme liability under subsections (a) and (c) of Rule 10b-5.

Defendants argue that this scheme does not satisfy the nexus ("in connection with") requirement, because "the purpose of the alleged scheme was to use Mr. Paul's relationship with Eagle to secure favorable deals for himself on personal investments," not to increase Eagle's stock price. MTD 25. This argument confuses Paul's intent for entering into the deals with his intent for concealing the related party nature of these deals and the deal terms. The purpose of the "no tying" letters was not to facilitate entering into the favorable deals, but to prevent regulators and the public from learning that the deals were related party transactions that gave favorable treatment to Paul. *See SEC v. Langford*, 2013 WL 1943484, at *7 (D. Neb. May 9, 2013) (plaintiff stated claim for scheme liability because "the conduct was inherently designed to deceive the Bank's regulators, regardless of whether the ultimate result was a public misstatement"). Plaintiffs satisfy both the nexus requirement and reliance requirements, because the acts taken to deceive Eagle's regulators operated to conceal the true facts from the investing public and artificially inflate Eagle's stock price.

## VIII.   THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

"[C]ourts in this District have historically evaluated loss causation under the notice pleading

standard of Rule 8." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 80 (S.D.N.Y. 2015).[26] A

"short and plain statement" that provides notice of a "causal connection" between the material

misrepresentation and the loss is sufficient. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47

(2005). This causal connection can be pled by alleging (i) a corrective disclosure or (ii) "the loss was

foreseeable and caused by a materialization of the risk concealed by the fraudulent statement."

*Carpenters Pension*, 750 F.3d at 232-33 (2d Cir. 2014) (citing *In re Omnicom Grp., Inc. Sec. Litig.*,

597 F.3d 501, 511, 513 (2d Cir. 2010)). Under either theory, "loss causation may be premised on

partial revelations that do not uncover the complete extent of the falsity of specific prior statements."

*In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008).[27]

In cases involving partial disclosures, courts should not view each disclosure in a vacuum but

instead should assess them together to see if a fraud was revealed over time. *See Lloyd v. CVB Fin.

Corp.*, 811 F.3d 1200, 1209-11 (9th Cir. 2016) (loss causation pled where stock price dropped after

announcement of SEC investigation, and subsequent disclosure confirmed the falsity of defendants'

statements, even though no price reaction accompanied second disclosure); *Pub. Emps.' Ret. Sys. of

Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322-26 (5th Cir. 2014) (reviewing series of five partial

disclosures and concluding that several did not constitute corrective disclosures themselves, but

together they "collectively constitute[d] and culminate[d] in a corrective disclosure that adequately

pleads loss causation") (cited with approval by *Chicago Bridge*, 2020 WL 1329354, at *7).

In this case, the Complaint pleads two events which constituted partial corrective disclosures

and/or materializations of concealed risks: (i) the publication of the Aurelius Report on December 1,

2017, and (ii) Defendants' disclosure of elevated legal fees due to government investigations related

---

[26] *See also In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *25 (E.D.N.Y. Sept. 27, 2019) (collecting cases).

[27] *See also In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) ("For an event to qualify as a materialization of the risk, it need only disclose part of the truth that was previously concealed by the fraud."); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (corrective disclosure need not be a "'mirror image' tantamount to a confession of fraud").

to Eagle's "identification, classification and disclosure of related party transactions" on July 17, 2019. Both of these disclosures revealed new, material information about Defendants' fraud, and each was accompanied by a precipitous drop in Eagle's stock price.

Defendants argue that the Aurelius Report cannot constitute a corrective disclosure because its conclusions were based on already-public information. MTD 12. But the notion that "any third party's analysis of a company's already-public financial information cannot contribute new information to the marketplace …. is incorrect." *Chicago Bridge*, 2020 WL 1329354, at *7 (collecting cases).[28] The Aurelius Report revealed new information to the market, including the fact that Eagle had more than $100 million of undisclosed related party loans. Its conclusions were based not only on expert analysis of Eagle's SEC filings, but also on UCC filings and deed records concerning other companies that Eagle had never acknowledged were related parties. While those documents were publicly available, the information they contained is not the type that would be presumed to be immediately impounded into the price of Eagle's stock, even in an efficient market.

*Omnicom* is not to the contrary. In that case, decided at summary judgment, the Second Circuit held that a *Wall Street Journal* article concerning the resignation of a director due to accounting concerns did not constitute a corrective disclosure because the underlying accounting issue had been widely reported in the press a year earlier and the *Wall Street Journal* article provided no new facts about the accounting. 597 F.3d at 511-12.[29] In this case, however, Aurelius was the first to challenge Eagle's related party disclosures. Aurelius's conclusions directly contradicted Eagle's

---

[28] *See also In re Winstar Commc'ns*, 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006) (loss causation may be based on stock drop following short seller report, even when its findings are "not attributed to any non-public information" and "derived from an analysis of … published financials"); *Take-Two*, 551 F. Supp. 2d at 283 ("loss causation may be [based] upon ... third-party analyses of a company's financials, which contradict representations made by defendants").

[29] Multiple courts have cautioned against an expansive reading of *Omnicom. See, e.g., In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 559 (S.D.N.Y. 2011) (*Omnicom* not to be read "broadly"); *In re: Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 343-44 (S.D.N.Y. 2015) (*Omnicom* "concerned a motion for summary judgment" and provides no basis for defendants to "challenge the novelty and accuracy of plaintiffs' alleged news" at the pleading stage); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 674-75 (D.S.C. 2016) (similar).

financial statements and were later validated when Eagle modified its related party loan totals.[30]

Defendants argue that the absence of a price reaction following the filing of Eagle's 2018 10-K undermines Plaintiffs' pleading of loss causation. MTD 11-12. This ignores the fact that Eagle's stock price had already partially corrected following the Aurelius Report. *See In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) (loss causation pled where stock price increased following restatement, because "the market had already incorporated that the previously released financial statements could not be relied upon").[31] Moreover, the 2018 10-K did not reveal the full facts. Among other things, it failed to disclose that Eagle's amendment of its related party loan totals was made following "discussions with regulators" (MTD 15) who were investigating Eagle's related party disclosures.

Those investigations were not revealed until July 17, 2019, when Defendants announced elevated legal expenses in response to the investigations, leading to another huge drop in Eagle's stock price. ¶¶94-98, 236-38. Defendants argue that this announcement related to "several different matters, only one of which concerned Eagle's related party transactions." MTD 13. But the investigation into Eagle's "identification, classification and disclosure of related party transactions" was the first mentioned, and the other investigations (into the retirement of certain former officers and directors and the relationship of certain former officers and directors with a local public official) were potentially connected to related party loan issues. At best for Defendants, this raises a disaggregation issue not appropriate for resolution on a motion to dismiss. *See* note 30, *supra*.

---

[30] Defendants argue that certain allegations in the Aurelius Report are based on disputed allegations in lawsuits that settled before the allegations were tested. Plaintiffs, however, are entitled to rely on third party allegations at the pleading stage. *See* §IV, *supra*. In any event, even if a disaggregation analysis may ultimately be required, it would be premature at this stage to require Plaintiffs to apportion the December 2017 stock drop to different allegations in the Aurelius Report. *See, e.g., Cohen v. Kitov Pharms.*, 2018 WL 1406619, at *6 (S.D.N.Y. Mar. 20, 2018) ("[A] complaint can sufficiently plead loss causation without alleging facts that disaggregate losses or that rule out other causes.").

[31] *See also In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 710-11 (S.D. Tex. 2006) (fact that stock price increased after restatement did not negate loss causation, because truth began to "leak out" due to earlier partial disclosures); *Richard v. Nw. Pipe Co.*, 2011 WL 3813073, at *2-3 (W.D. Wash. Aug. 26, 2011) (similar); *Lloyd*, 811 F.3d at 1209-11.

The July 17, 2019 press release provided new, fraud-revealing information to the market. The disclosure of the investigations cast a new light on Eagle's revision to its related party loan totals four months earlier, making clear that the "modification" was made under a cloud of investigation. As Piper Jaffray commented, "the disclosure is ***new***, and strikes a serious tone." ¶95. Piper Jaffray also tied the disclosure of the investigations to Eagle's previous revision of its related party loan balances and the resignation of Paul. ¶99. Sandler O'Neill lowered its ratings of Eagle, due in part to its "view that the legal situation is going to be an overhang on the stock for some time." ¶98.

These facts are sufficient to plead loss causation, under either a corrective disclosure or materialization of risk theory. *See, e.g.*, *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 620 (S.D.N.Y. 2015) ("this Court and other courts within this District have concluded that the disclosure of an investigation into a particular business practice can be sufficient to allege loss causation with respect to alleged misstatements regarding that practice"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 387 (E.D.N.Y. 2013) ("the Court rejects the idea that the disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure"); *In re Mylan N.V. Sec. Litig.*, 2020 WL 1673811, at *3 (S.D.N.Y. Apr. 6, 2020) ("Investigation into wrongdoing is an obvious risk associated with that wrongdoing.").[32]

## IX.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion should be denied in its entirety.[33] In the event the Court grants all or part of Defendants' motion, Plaintiffs request an opportunity to re-plead. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

---

[32] *See also Kitov Pharms.*, 2018 WL 1406619, at *7 ("disclosure of the Israeli regulatory investigation is sufficient to plead loss causation"); *Lloyd*, 811 F.3d at 1209-11; *Amedisys*, 769 F.3d at 323-25.

[33] Defendants' only argument concerning the Complaint's Section 20(a) claims is their contention that it fails to plead a primary violation under Section 10(b). MTD 25. Because the Complaint adequately pleads Section 10(b) claims, it also adequately pleads Section 20(a) claims.

Dated:  May 15, 2020                            **GLANCY PRONGAY & MURRAY LLP**

                                                By:   *s/ Robert V. Prongay*
                                                Robert V. Prongay
                                                Jason L. Krajcer
                                                Leanne H. Solish
                                                Christopher R. Fallon
                                                1925 Century Park East, Suite 2100
                                                Los Angeles, California 90067
                                                Telephone: (310) 201-9150
                                                Facsimile: (310) 201-9160
                                                Email: rprongay@glancylaw.com
                                                        jkrajcer@glancylaw.com
                                                        lsolish@glancylaw.com
                                                        cfallon@glancylaw.com

                                                *Counsel for Lead Plaintiff and*
                                                *Lead Counsel for the Class*

                                                **LABATION SUCHAROW LLP**
                                                Francis P. McConville
                                                140 Broadway, 34th Floor
                                                New York, New York 10005
                                                Telephone: (212) 907-0700
                                                Facsimile: (212) 818-0477
                                                Email: fmcconville@labaton.com

                                                *Counsel for Norfolk County Retirement System*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On May 15, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 15, 2020, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay