# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

SHIVA STEIN, Individually and On Behalf
of All Others Similarly Situated,

               Plaintiff,

     -against-

EAGLE BANCORP, INC., SUSAN G. RIEL,
RONALD D. PAUL, CHARLES D.
LEVINGSTON, JAMES H. LANGMEAD,
and LAURENCE E. BENSIGNOR,

             Defendants.

-------------------------------------------------------X

:   INDEX NO.: 1:19-CV-06873-LGS

 

## REPLY BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS
## THE AMENDED CLASS ACTION COMPLAINT

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

**Page**

I.  Plaintiffs Cannot Plead Loss Causation ...............................................................................3

II. The Pleading Requirements for Falsity and Scienter Are High and Require
    Consideration of the Full Factual Context as Well as Competing Inferences ....................4

III. None of the Challenged Statements Were Materially False or Misleading........................7

IV. The Complaint Fails to Plead the Required Strong Inference of Scienter .........................11

V.  Plaintiffs Cannot Plead Scheme Liability ..........................................................................15

CONCLUSION ..................................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acito v. IMCERA Grp., Inc.*,
　47 F.3d 47 (2d Cir. 1995)..................................................................................14

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
　No. 17 Civ. 1545, 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019).............................10

*In re ArthroCare Corp. Sec. Litig.*,
　726 F. Supp. 2d 696 (W.D. Tex. 2010)..................................................................13

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
　493 F.3d 87 (2d Cir. 2007)....................................................................................15

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
　540 F. Supp. 2d 464 (S.D.N.Y. 2008)....................................................................14

*In re CRM Holdings, Ltd. Sec. Litig.*,
　No. 10 Civ. 975 (RPP), 2012 WL 1646888 (S.D.N.Y. May 10, 2012) ...................6

*Dura Pharm., Inc. v. Broudo*,
　544 U.S. 336 (2005)................................................................................................3

*Fait v. Regions Fin. Corp.*,
　655 F.3d 105 (2d Cir. 2011)....................................................................................7

*Hall v. The Children's Place Retail Stores, Inc.*,
　580 F. Supp. 2d 212 (S.D.N.Y. 2008)...................................................................13

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
　298 F.R.D. 116 (S.D.N.Y. 2014) ...........................................................................6

*Lea v. TAL Educ. Grp.*,
　No. 18 Civ. 5480 (LAP), 2019 WL 4688691 (S.D.N.Y. Sept. 25, 2019)................7

*Lefkowitz v. Synacor, Inc.*,
　No. 18 Civ. 2979 (LGS), 2019 WL 4053956 (S.D.N.Y. Aug. 28, 2019)...............13

*Leykin v. AT & T Corp.*,
　423 F. Supp. 2d 229 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007).......15

*Limantour v. Cray Inc.*,
　432 F. Supp. 2d 1129 (W.D. Wa. 2006) ...............................................................10

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976), *aff'd*, 387 F. App'x 72 (2d Cir. 2010)........................6

*Low v. Robb*,
    No. 11 Civ. 2321 (JPO), 2012 WL 173472 (S.D.N.Y. Jan. 20, 2012) ......................6

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    277 F. Supp. 3d 500 (S.D.N.Y. 2017).....................................................................15

*In re Mylan N.V. Sec. Litig.*,
    379 F. Supp. 3d 198 (S.D.N.Y. 2019).......................................................................6

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).......................................................................................4

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) .......................................................................................*passim*

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382  (S.D.N.Y. 2009)........................................................................6

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019).......................................................12, 13, 14

*SEC v. China Ne. Petroleum Holdings Ltd.*,
    27 F. Supp. 3d 379 (S.D.N.Y. 2014).......................................................................12

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010).................................................................................................5

*In re Sunbeam Sec. Litig.*,
    89 F. Supp. 2d 1326 (S.D. Fla. 1999) .....................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................................5, 11

*Turner v. MagicJack VocalTec, Ltd.*,
    No. 13 Civ. 0448, 2014 WL 406917 (S.D.N.Y. Feb. 3, 2014) ...............................12

**Statutes**

28 U.S.C. § 2072(a)-(b) ...........................................................................................5

Eagle[1] is a successful community bank with strong ties to its community and a profitable, relationship-based lending portfolio that has consistently performed. What happened here happens all the time: a bank makes good faith judgment calls regarding a particular accounting treatment—here, the characterization of certain complicated loans involving estate planning vehicles and real estate investment entities—and subsequently adopts a different analysis, resulting in new public disclosures. Eagle initially determined in good faith, with input from its professional legal and accounting advisors, that certain loans did not meet the complex, subjective regulatory requirements to constitute related party loans. Later, after additional analysis and expert consultation, Eagle concluded that those loans were better understood as related party loans and promptly disclosed both the modification to its analysis and the additional amounts. Importantly, Eagle never restated prior balances, because they reflected new subjective judgments, not correction of "errors." And, on three separate occasions when Eagle updated its related party loan disclosures, the market *did not react*, which is not surprising: related party loans were a disclosed part of Eagle's operating model, and the additional loans represented less than 3% of Eagle's lending portfolio and were still performing.

In a normal securities class action, a market shrug of this type would be the end of the matter. Yet Plaintiffs here seek to opportunistically recover losses that resulted *not* from disclosure of the allegedly hidden "truth"—the additional related party loan amounts—but from a manipulative short-seller attack by the anonymous short-seller "Aurelius" and the regulatory investigations that inevitably followed. This makes no sense, so it is no surprise that the house of cards on which Plaintiffs' complaint is built collapses: they cannot plead that disclosure of the additional related party loan amounts caused their alleged losses; they cannot plead that any of the

---

[1] All defined terms herein have the same meaning as in Defendants' Motion to Dismiss ("MTD") (Dkt. #46). Unless otherwise indicated, internal citations and quotation marks are omitted, and emphasis is added.

challenged statements—all statements of opinion—were not genuinely believed by the Defendants at the time they were made; and they cannot plead any *facts* supporting a strong inference of any Defendant's scienter. Indeed, Plaintiffs offer no allegations whatsoever specific to Ms. Riel, Mr. Levingston, or Mr. Langmead, and offer only conclusory assertions for Mr. Paul and Mr. Bensignor. Each deficiency independently requires dismissal, and together they underline the structural flaws in Plaintiffs' pleadings.

Plaintiffs try to paper over these fatal flaws with unfounded assertions and innuendo from two intrinsically unreliable sources: (i) an anonymous short-seller report, whose sole purpose was to make money for its author by driving down Eagle's stock price, and (ii) untested allegations made in an unrelated lawsuit brought by the ousted founder of MakeOffices against Mr. Paul and other investors (not against Eagle or any other Defendants) in retaliation for a suit the investors filed against him for fraud, embezzlement, and mismanagement. Whether the Court discounts these allegations entirely or merely takes them for their inherently-limited worth, these untrustworthy sources simply cannot bear the weight the Amended Complaint would have them. They also are too far removed from the supposedly hidden "truth"—additional related party loan amounts—to shed any useful light on the conduct and motivations at issue in this lawsuit.

By contrast, under the Reform Act's inference-weighing analysis, it is clear Defendants acted in good faith. They did their best to correctly identify, review, and disclose related party loans prior to the short-seller attack, based on the information and professional guidance then available to them. When they subsequently modified their related party analysis to include additional loans, with further input from outside counsel and auditors, they promptly disclosed the modification and additional loans. These loans have continued to perform, yielding significant amounts of interest to Eagle. Plaintiffs do not and cannot explain how Defendants stood to gain

anything by "hiding" them. The Court thus should dismiss the Amended Complaint with prejudice.

## I.    Plaintiffs Cannot Plead Loss Causation

Loss causation is fundamentally about a hidden "truth" being revealed and causing loss. The securities statutes make private rights of action available for fraud "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that *misrepresentations actually cause*." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

Here, the allegedly hidden "truth" Plaintiffs have identified is that Eagle had more related party loans than it initially disclosed: Plaintiffs claim that Eagle finally "admitted" the initial loan amounts were false when it subsequently modified its related party disclosures to acknowledge additional loan amounts. *But the market did not react to that "revelation."* It did not react when the Company described for the first time, in its 2017 Form 10-K (filed in March 2018), certain additional loan amounts involving an irrevocable trust established by Mr. Paul (which, at that time, Eagle still "[did] not consider to be related party transactions" but disclosed in an abundance of caution). And it did not react when, a year later, in its 2018 Form 10-K (filed in March 2019), the Company announced that it was modifying its related party loan analysis and disclosing additional loan amounts for fiscal years 2017 and 2018. In each case, the market absorbed the news that Eagle in fact had additional, previously undisclosed related party loans and concluded that the information was immaterial. It did not care.

What the market *did* care about were the spurious, self-serving allegations of "sweetheart deals" made in the Aurelius Report, and the legal expenses associated with defending Eagle in connection with investigations that were triggered by it. Eagle's stock price dropped precipitously—exactly as Aurelius intended—because investors were alarmed by the unfounded allegations. Not surprisingly, these allegations also precipitated internal and external investigations

that have cost Eagle shareholders millions. And when those significant expenses were disclosed,[2] the market reacted negatively. Yet it was the Aurelius Report that led to those expenses.

None of these claimed losses were caused by revelation of the allegedly hidden "truth" that Eagle had additional related party loans. The market did not care about those announcements in early 2018 and 2019—or additional disclosures in March 2020 about Eagle's related party loan processes[3]—and it had no reason to care: none of the material risks investors associate with undisclosed related party loans have come to pass here—the loans at issue were made on arm's-length terms and have all continued to perform, earning significant amounts of interest for Eagle and its shareholders. Investors did not react to the announcement of additional related party loan amounts because it did not significantly change their understanding of the Company or the value of their investment—it simply was not material. Because Plaintiffs cannot allege that revelation of the allegedly hidden "truth" caused their loss, their baseless claims must be dismissed.

## II.   The Pleading Requirements for Falsity and Scienter Are High and Require Consideration of the Full Factual Context as Well as Competing Inferences

Plaintiffs try to lower the pleading standards to survive them, but the Reform Act and Section 10(b) set high bars. To plead a false and misleading statement, plaintiffs must meet both Rule 9(b)'s particularity requirement and the Reform Act's "additional requirement" to plead "all facts" "with particularity." *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000). For statements of opinion, this showing is "no small task." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). The scienter standard is high too. Plaintiffs must plead "with particularity" a strong inference of scienter that "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of

---

[2] Notably, Plaintiffs do not allege that these investigations and expenses were not timely disclosed; indeed, they were.
[3] The 2019 Form 10-K, filed March 2, 2020, identified a material weakness stemming in part from deficiencies concerning review, categorization, and reporting of related party loans. *See infra.*

nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

These are substantive standards that require courts to undertake a rigorous analysis on a motion to dismiss. In *Tellabs*, the Court concluded that whether a plaintiff has pleaded a "strong inference" of scienter is an "inherently comparative" inquiry and requires courts to "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff"—a significant departure from the usual rule that courts draw all reasonable inferences in favor of the plaintiff at the pleading stage. *Id.* at 323-24. The Court reached a similar conclusion in *Omnicare* with respect to the element of falsity, holding that this too requires courts to consider not only the full challenged statement in context, but also the entirety of the surrounding facts and circumstances. 575 U.S. at 190-91.

Thus, the substantive securities statutes require courts to undertake a more expansive and demanding analysis than is typical under Rule 12(b)(6). And to the extent this substantive law mandate is incompatible with procedural rules, the securities laws must take precedence.[4] Accordingly, and contrary to Plaintiffs' simplistic assertions, under substantive law, Plaintiffs are not entitled to have all inferences construed in their favor. Rather, this Court must consider the full factual context of the challenged statements and conduct—and weigh competing inferences— when evaluating whether Plaintiffs have sufficiently pleaded the elements of falsity or scienter for their claims. The Court cannot properly weigh all inferences if it does not take both Defendants' and Plaintiffs' proffered inferences into account.

This more stringent analysis is particularly important here, where the Amended Complaint relies so heavily on unreliable sources of information. Plaintiffs argue that the Court must "credit" and "accept" as true the many allegations they have taken wholesale from unverified complaints

---

[4] *See* 28 U.S.C. § 2072(a)-(b); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010).

filed by third parties in unrelated litigations that settled. Opp. 9-10. This is dubious even as a general proposition. *See, e.g.*, *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) ("Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)." (citing *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 892-94 (2d Cir. 1976))), *aff'd*, 387 F. App'x 72 (2d Cir. 2010).[5] But in the context of the more demanding analysis that governs securities fraud claims, the Court should give these allegations no weight, if it considers them at all. Mr. Rahbar brought his retaliatory complaint against Mr. Paul and other MakeOffices investors only after they sued to remove him from his positions at the company for fraud, embezzlement, and mismanagement. The MakeOffices litigations settled globally before any of Mr. Rahbar's allegations could be adjudicated, and nothing about the allegations themselves suggest credibility. As the Court is aware, fights for control over closely held companies can become extremely nasty and personal, with parties making outrageous and unprovable statements to try to embarrass well-regarded adversaries and gain leverage against them. If every such extracted accusation of misconduct were sufficient to plead securities fraud, the heightened pleadings standards would have no force. In these circumstances, Mr. Rahbar's allegations are entitled to no weight, and they cannot provide

---

[5] *See also, e.g.*, *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975 (RPP), 2012 WL 1646888, at *26 (S.D.N.Y. May 10, 2012) (same); *Low v. Robb*, No. 11 Civ. 2321 (JPO), 2012 WL 173472, at *9 (S.D.N.Y. Jan. 20, 2012) same). While several district court decisions, cited by Plaintiffs, have broken with *Lipsky*'s bright-line rule, even they have done so only where the third-party allegations were well-pleaded and had meaningful indicia of reliability. *See, e.g.*, *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126 (S.D.N.Y. 2014) (considering confidential witness allegations taken from third-party complaint where allegations contained their own indicia of reliability and were not just "from one possible disgruntled or vindictive employee"); *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 215 (S.D.N.Y. 2019) (considering allegations taken from a state attorney general action that were verified by plaintiffs' counsel). The Matchbox and MakeOffices allegations are *not* well-pleaded and have *no* indicia of reliability. Nor does it appear Plaintiffs made any effort to contact Mr. Rahbar or obtain an affidavit from him under oath that might support their claims.

the factual predicate for Plaintiffs' claims.[6]

## III.   None of the Challenged Statements Were Materially False or Misleading

Eagle's related party loan amounts were genuinely held statements of opinion and were not materially misleading. Plaintiffs argue that because Eagle subsequently modified its related party loan amounts, the original related party loan totals must have been materially false and misleading. Not so. As Plaintiffs concede, "[i]n this Circuit, financial metrics that involve 'inherently subjective' valuations are treated as opinion statements" subject to *Omnicare*'s more rigorous pleading standard. Opp. 11; *see, e.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-13 (2d Cir. 2011). Even a cursory reading of Reg. O, Item 404, and the relevant GAAP provisions demonstrates that these are not clear, "objective" rules as Plaintiffs suggest;[7] they are highly technical, principles-based regulations that require subjective interpretation and application to complex fact patterns, often with expert assistance. *See* MTD 4-7. Their intersection here with estate-planning vehicles and multi-level real estate entities made application particularly complicated and necessitated a series of judgment calls, based in part on advice by outside legal and accounting advisors, about which loans fell within Eagle's disclosure obligations.

Plaintiffs have not demonstrated, as they must under *Omnicare*, that the Defendants did not genuinely believe these opinions. And the progression of Eagle's related party loan disclosures strongly suggests a good faith evolution of subjective thinking. Reasonable people can, and obviously did, disagree as to the proper characterization of particular loans under these subjective disclosure standards: it should come as no surprise that Defendants over time, in evolving

---

[6] The Matchbox complaint figures far less prominently in Plaintiffs' allegations but is at least as unreliable a source. Indeed, the claims against Eagle, Mr. Paul, and the other bank and investor defendants were dismissed with prejudice on the pleadings before the case settled globally.

[7] *Lea v. TAL Educ. Grp.*, No. 18 Civ. 5480 (LAP), 2019 WL 4688691 (S.D.N.Y. Sept. 25, 2019), concerned the different question of proper accounting for allegedly sham transactions. The court dismissed for failure to plead falsity, but to the extent its reasoning is inconsistent with *Fait* and *Omnicare*, it should not be followed.

circumstances, working with outside advisors, might have refined their analysis and come to different judgments with respect to the same loans. The 2017 Form 10-K, filed a few months after the Aurelius Report, described Potomac's trust structure and disclosed the loan amounts involving that entity, but explained that the Company "d[id] not consider [it] to be [a] related party." AC ¶ 202. If the Defendants had truly been trying to hide these or any other loan amounts, it would make no sense to include such a note in Eagle's 10-K. The far more reasonable inference to be drawn from that disclosure is that in early 2018 the Defendants continued to genuinely believe that loans involving Potomac were not related party loans, but that they were continuing to analyze the issue in good faith and be transparent about their analysis. And when that good faith assessment changed, they disclosed that modification as well as the additional loan amounts.[8] Yet none of these changes over time ever required a restatement of prior related party loan balances—because the changes were new subjective judgments, not correction of "errors."[9]

Likewise, Eagle's statements in Form 10-Ks about the process for its review and approval of related party loans reflect the Defendants' genuine belief as to those matters. Plaintiffs cannot plead that these statements were not truthful with respect to the loans initially identified as related party loans. And even with respect to the loans later identified as such, Plaintiffs have not alleged any facts indicating that the Defendants did not believe these statements to be true. Indeed, consistent with that belief, Eagle's SEC filings indicate that the additional loans were made on arm's-length terms; were subject to Eagle's general Commercial Lending Policy; and have continued to perform, strongly suggesting that they were not, in fact, "sweetheart deals."

Against these indicia of good faith belief, Plaintiffs offer only Mr. Rahbar's self-serving

---

[8] Plaintiffs cite a number of out-of-circuit decisions, and decisions that pre-date *Omnicare*. But those decisions largely concern materiality, not falsity, and did not consider the argument that related party loan amounts constitute statements of opinion, as required by *Omnicare*, *Fait*, and other binding precedent in this Circuit.

[9] *See infra* note 12 and accompanying text.

allegations from the MakeOffices litigation, which is far removed from any of the claims at issue here and settled before any of his unsupported allegations could be adjudicated. Plaintiffs rely heavily on Mr. Rahbar's assertion that the credit facility extended by Eagle to MakeOffices was on "sweetheart terms"—indeed, this is the *only* example in the Amended Complaint of the supposedly widespread practice, on which Plaintiffs' case is premised, of Mr. Paul allegedly offering "sweetheart deals"—yet neither Mr. Rahbar nor Plaintiffs offer *any factual support whatsoever* for this assertion. None of the emails attached to Mr. Rahbar's complaint show or even suggest that the Eagle loan to MakeOffices was not made on arm's-length terms. Nor did Mr. Rahbar identify a single, specific loan term that was unusually favorable to MakeOffices, or explain why the company could not otherwise have secured such a loan. Mr. Rahbar offered nothing more than his bare, unsupported say-so on this essential point; first Aurelius took him at his unreliable word, and now Plaintiffs are doing the same. These allegations do not suggest that the MakeOffices loan was a "sweetheart deal" or provide the basis for Plaintiffs' unfounded extrapolation of widespread fraud, particularly since there are no factual allegations regarding any lending transaction beyond the MakeOffices loan itself. And Plaintiffs provide even less support for their leap to the conclusion that Mr. Paul or Mr. Bensignor knew that this or any other loan met the technical regulatory requirements to constitute a "related party loan" or tried to conceal anything from investors.  Mr. Paul and Mr. Bensignor, like the other Defendants, had good reason to believe that the determinations the Company arrived at in consultation with professional advisors complied with regulatory requirements.

The same is true with respect to Defendants' attestations and certifications regarding the adequacy of Eagle's internal controls and compliance with GAAP. Plaintiffs concede these are statements of opinion (Opp. 15), yet they fail to allege that any of the Defendants who made those

statements actually knew or believed they were not true at the time. Plaintiffs incorrectly argue that Eagle's retrospective identification and announcement in March 2020 of a material weakness in its internal controls in 2017 and 2018—based on deficiencies regarding "the communication of certain relevant information to key constituents within the Company; the review, categorization and reporting of related party loans; and the review of certain vendor contracts" that collectively amounted to a material weakness (Opp. Ex. 1, at 137)—establishes that the Defendants must have known that the original SOX certifications were false. But the fact that certain deficiencies were subsequently identified says nothing about what Defendants knew at the time.[10] Indeed, the finding of material weakness is at least as consistent with the notion that the Defendants were acting in good faith: they consulted closely with outside advisors throughout the putative class period regarding the disclosures made in their public filings, including those concerning related party loans; they modified their analytical approach and disclosed new, revised loan amounts, when they subsequently determined that it was appropriate to do so; and they then examined Eagle's related party loan processes and, when they concluded that there had been certain deficiencies that contributed to a material weakness, took appropriate steps to remedy those deficiencies.[11] Moreover, *no prior financials were restated* in March 2020, and no additional loans were reclassified.[12] All this bespeaks good faith, confirms that Plaintiffs' allegations concern professional judgment-calls, and contradicts any suggestion that Defendants were acting fraudulently or knew internal controls were inadequate at the time.

---

[10] Plaintiffs' reliance on *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129 (W.D. Wa. 2006) is misplaced. Defendants there abandoned their argument that the SOX certifications were not false, and the decision preceded *Omnicare* and did not analyze SOX certifications as statements of opinion.

[11] *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17 Civ. 1545, 2019 WL 4257110, at *25-26 (S.D.N.Y. Sept. 9, 2019) (internal control certifications not false or misleading, despite subsequent finding of material weaknesses).

[12] Opp. Ex. 1 (2019 Form 10-K), at 136 ("Notwithstanding the material weakness, management believes that the 2017 and 2018 consolidated financial statements, as well as the interim financial statements . . . fairly present, in all material respects, [Eagle's] financial position . . . as of and for the periods presented in conformity with [GAAP].").

Finally, Defendants' denials in the wake of the Aurelius Report too were genuinely held statements of opinion. The most reasonable inference to be drawn from the facts before the Court is that the Defendants honestly believed Eagle had disclosed everything it was required to disclose. When confronted with aggressive, inflammatory short-seller accusations of self-dealing, the Defendants did what any reasonable executive or director would do: they swiftly and decisively rebutted the false accusations to contain the damage in the interests of Eagle's shareholders, employees, and customers. Their emphatic denials in this context reflect their good faith belief in the falsity of Aurelius's claims, and Plaintiffs have not pleaded any facts to the contrary.

## IV.   The Complaint Fails to Plead the Required Strong Inference of Scienter

Plaintiffs also fail to plead a strong inference of scienter with respect to any Defendant—and indeed, with respect to Ms. Riel, Mr. Levingston, and Mr. Langmead they hardly even try. Plaintiffs *cannot* plead a strong inference of fraud against any of the Defendants, because the fraud allegations flunk *Tellabs*' test: that the alleged inference of fraud "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. at 314.

As the Defendants well knew, Eagle had an established commercial loan review and approval process for all loans, under which related party loans were subject to additional review, and its related party loan analysis and reporting was subject to review by outside legal and accounting advisors, as well as examination annually by regulators for Reg. O compliance. Moreover, the related party loans at issue were part of Eagle's business plan, made on arm's-length terms, and have been profitable for Eagle and its shareholders. All of this gave the Defendants reason to believe that the Company was properly identifying and disclosing its related party loans.

In contrast, Plaintiffs cannot articulate a plausible theory as to why Defendants would have intentionally "hidden" these profitable related party loans from the market,[13] and the far more reasonable inference is that they did not. The market did not care when Eagle subsequently modified its related party loan analysis and announced additional loan amounts, because investors understood this was part of Eagle's business model and the loans continued to perform. Why, then, would Defendants have "hidden" these loans but not others? Plaintiffs do not say. The inferences of good faith conduct are far stronger than any competing inferences of intent to defraud investors.

Plaintiffs offer no specific allegations of scienter for Ms. Riel, Mr. Levingston, or Mr. Langmead.[14] None of the allegations borrowed from Aurelius or Mr. Rahbar mention any of these Defendants, and Plaintiffs' own scienter arguments underscore the implausibility of their accusations against them. While Plaintiffs argue that the departures of individuals from the bank support an inference of scienter, Ms. Riel, Mr. Levingston, and Mr. Langmead all remain with the bank. While Plaintiffs point to certain stock sales as evidence of scienter, Ms. Riel, Mr. Levingston, and Mr. Langmead are not alleged to have sold stock during the class period. Mr. Levingston actually *bought* stock on the open market, which "rebuts an inference of scienter."[15] *Turner v. MagicJack VocalTec, Ltd.*, No. 13 Civ. 0448, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014). For these three, then, Plaintiffs only allege that they were officers with experience in banking. That fails; "plaintiff[s] must either specifically identify . . . reports or statements that are contradictory to the [challenged] statements made or provide specific instances in which Defendants received information that was contrary to their public declarations." *Schiro v. Cemex, S.A.B. de C.V.*, 396

---

[13] This is in sharp contrast to the cases Plaintiffs cite in which concrete personal motive for the misrepresentation was alleged. *See, e.g.*, *SEC v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 389 (S.D.N.Y. 2014).

[14] As previously noted, each Defendant is only legally responsible for statements he or she made. Ms. Riel signed the 2017 and 2018 Form 10-Ks as well as Eagle's letter to customers in response to the Aurelius Report. Mr. Levingston signed and certified only the 2017 and 2018 10-Ks; Mr. Langmead signed and certified only the 2014-2016 10-Ks.

[15] Indeed, Defendants appear to concede as much. Opp. 21 n.22.

F. Supp. 3d 283, 307-08 (S.D.N.Y. 2019). Plaintiffs cannot do so here; indeed, as discussed above, the facts before the Court suggest that they genuinely believed the related party loan amounts and other challenged statements to be true when made, and that they acted in good faith.

Moreover, the Aurelius Report did not create some independent "duty to investigate" before responding, as Plaintiffs speciously suggest. What counts is what Defendants actually knew, not what they hypothetically might have known if they had done something else. Regardless, Defendants' decisive rebuttal of a pernicious short-seller attack, by its nature designed to harm Eagle and its shareholders, more strongly suggests a good faith effort to protect the Company and its shareholders—consistent with their fiduciary duties.[16] Likewise, Eagle's retrospective identification of a material weakness in its internal controls, particularly one that was not significant enough to require restatement of any financials, "does not contribute to an inference of scienter" because it does not suggest that the SOX-certifying officers—much less any of the other individual Defendants—knew internal controls were weak at the time or acted with intent to defraud.[17] *Schiro*, 396 F. Supp. 3d at 306-07; *see also Lefkowitz v. Synacor, Inc.*, No. 18 Civ. 2979 (LGS), 2019 WL 4053956, at *10 (S.D.N.Y. Aug. 28, 2019) (subsequent finding of material weakness insufficient to establish scienter). In short, Plaintiffs cannot plead *any* inference of scienter—much less a strong one—with respect to Ms. Riel, Mr. Levingston, or Mr. Langmead, and all claims against them should be dismissed.

---

[16] For this reason, among others, the letter to customers, signed by Mr. Paul and Ms. Riel, in the immediate aftermath of Aurelius's attack, does not suggest scienter. This context also distinguishes the present case from the decisions Plaintiffs cite. *See, e.g.*, *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 711-25 (W.D. Tex. 2010) (numerous factors collectively established strong inference of scienter, including that defendants ignored evidence of accounting irregularities raised by multiple, reputable news sources over several months); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338-39 (S.D. Fla. 1999) (numerous factors supported strong inference of scienter, including that defendants ignored *Barron*'s article and allegedly joked about improper accounting practices).

[17] Plaintiffs' cases involved additional facts supporting an inference of scienter. *See, e.g.*, *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (finding of material weakness along with other facts added to overall circumstantial evidence of fraud where defendants "failed to suggest a plausible opposing inference").

For many of the same reasons, Plaintiffs' allegations also are insufficient to raise a strong inference that either Mr. Paul or Mr. Bensignor[18] acted with intent to defraud investors. Mr. Paul's stock sales (between June 29, 2017 and November 3, 2017) were not "unusual" or "suspicious": they represented a small portion of his overall holdings during the putative class period—just 11.66%, by Plaintiffs' calculations—and were far removed in time from what Plaintiffs claim was the full "revelation" of the alleged fraud in July 2019.[19] *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (sale of 11% of holdings not unusual); *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475-76 (S.D.N.Y. 2008) (sales 10 weeks before end of class period not suspicious). Moreover, the fact that Mr. Paul *retained* the vast majority of his Eagle holdings, setting himself up, on Plaintiffs' theory, to be one of the biggest victims of his supposed fraud, strongly cuts against scienter. *See* MTD 21-22. And Mr. Bensignor is not alleged to have sold any stock during the period undermining any inference of scienter as to him. Plaintiffs also have not alleged "highly unusual and suspicious" circumstances regarding any of the high-level departures at Eagle during this unusually long putative class period. *Schiro*, 396 F. Supp. 3d at 303-04.

The Amended Complaint relies heavily on the MakeOffices pleadings to attempt to allege Mr. Paul's and Mr. Bensignor's scienter, but those allegations are fundamentally unreliable— lodged in self-defense by a desperate founder who was losing control of his company, and unsupported by any indicia of truthfulness. Nor do the documents demonstrate scienter. Plaintiffs' over-emphasis on Mr. Paul's use of the word "I" is over-the-top and cannot bear the weight they place on it. And nothing on the face of the "no tying" letter or related emails supports Mr. Rahbar's

---

[18] Mr. Bensignor did not sign Eagle's 10-Ks and is not legally responsible for statements in them. The only challenged statements he "made" were in response to the Aurelius Report, and Plaintiffs have not adequately alleged that he did not believe those statements of opinion to be true at the time or that he made them with intent to defraud investors.

[19] Plaintiffs argue that "[o]nce [the Aurelius Report] allegations were public, it would have been crazy for Paul to keep on selling" (Opp. 21), but in the same breath they claim that the stock price remained inflated, and the fraud was not fully revealed, until July 2019. Plaintiffs cannot have it both ways.

conclusory, self-serving assertion that it was coerced and false, or that Eagle's loan to MakeOffices was not on arm's-length terms. MTD 23 n.20. In these circumstances, the strength of any inference to be drawn from the MakeOffices allegations is exceptionally limited, and they suggest nothing about Mr. Paul's or Mr. Bensignor's intentions with respect to *investors*.

In short, Plaintiffs have not pleaded any *facts* that might bolster their implausible theory of fraud with respect to any of the Defendants. Because the inferences of good faith conduct are far stronger than the competing inferences of fraudulent intent, Plaintiffs' claims must be dismissed.

## V.      Plaintiffs Cannot Plead Scheme Liability

Finally, Plaintiffs cannot state a scheme liability claim against Mr. Paul or Mr. Bensignor because the alleged "tying arrangement" was not in connection with the sale or purchase of securities. Mr. Rahbar's unreliable allegations, unsupported by any facts, do not suggest that the "no tying" letter was actually untrue, or that it was intended to "deceive regulators." The Defendants regularly provided documents to regulators during the course of their examinations, and those regulators also had broad access to Eagle's books and records. But even if the alleged tying scheme had existed and been intended to deceive regulators—and it did not and was not— that alleged scheme is simply too far removed from *investors and the market* to be "in connection with" the sale of securities or to establish scienter.[20] Accordingly, this claim must be dismissed.

## CONCLUSION

Plaintiffs fail to state a claim under Section 10(b); as a result, their Section 20(a) claim must also be dismissed.[21] Moreover, repleading here would be futile due to the structural flaws detailed above. Accordingly, the Court should dismiss the Amended Complaint with prejudice.

---

[20] *Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 241-42 (S.D.N.Y. 2006) ("Conduct that is merely incidental or tangentially related to the sale of securities will not meet the 'in connection with' requirement."), *aff'd*, 216 F. App'x 14 (2d Cir. 2007); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 518 (S.D.N.Y. 2017) (same).
[21] *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Dated: June 15, 2020

Respectfully submitted,


BAKER & HOSTETLER LLP


By:    *s/ Douglas W. Greene*
       Douglas W. Greene (*pro hac vice*)
       dgreene@bakerlaw.com
       Jessie Gabriel
       jgabriel@bakerlaw.com
       45 Rockefeller Plaza
       New York, NY 10111
       Telephone: 212.589.4200

       Genevieve York-Erwin
       gyorkerwin@bakerlaw.com
       999 Third Avenue, Suite 3600
       Seattle, WA  98104
       Telephone: 206.566.7079

       *Attorneys for Defendants*

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing was electronically filed on June 15, 2020 with the Clerk of the United States District Court, Southern District of New York, using its electronic case filing system, CM/ECF, thereby serving all counsel of record in this case.

*S/ Douglas W. Greene*
Douglas W. Greene

*Attorney for Defendants*