**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHIVA STEIN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EAGLE BANCORP, INC., SUSAN G. RIEL, RONALD D. PAUL, CHARLES D. LEVINGSTON, JAMES H. LANGMEAD, and LAURENCE E. BENSIGNOR,<br><br>Defendants. | Case No. 1:19-cv-06873-LGS |

**MEMORANDUM OF LAW IN IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND**
<u>**APPROVAL OF PLAN OF ALLOCATION**</u>

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ............................................................................1

II.    STANDARDS FOR FINAL APPROVAL UNDER RULE 23 AND *GRINNELL* .............3

III.   ARGUMENT...................................................................................................5

    A.     The Settlement Is Fair, Reasonable, And Adequate In Light Of The Factors Outlined By Rule 23(e)(2) And The Remaining *Grinnell* Factors ........................5

        1.     Plaintiffs And Lead Counsel Have Adequately Represented The Settlement Class.................................................................................5

        2.     The Settlement Was Reached After Substantial Litigation And Arm's-Length Negotiations Between Experienced Counsel Conducted Under The Auspices Of A Well-Respected Mediator ..............6

        3.     The Settlement Is An Excellent Result For The Settlement Class In Light Of The Benefits Of The Settlement And The Risks Of Continued Litigation ...................................................................7

            (a)     Complexity, Expense And Duration Of Litigation ..........................8

            (b)     Risks Of Establishing Liability And Damages ...............................9

            (c)     The Risks Of Maintaining Class Certification..............................13

            (d)     Range Of Reasonableness In Light Of The Best Possible Recovery And Attendant Risks Of Litigation...............................15

        4.     Rule 23(e)(2)(C)....................................................................16

        5.     The Settlement Treats All Members Of The Settlement Class Equitably Relative To Each Other ..............................................17

        6.     The Class's Reaction To The Settlement Supports Final Approval ..........18

        7.     The Ability Of Defendants To Withstand A Greater Judgment ................18

    B.     The Plan Of Allocation Is Fair And Reasonable ....................................................19

    C.     The Settlement Class Should be Finally Certified..................................................21

    D.     The Notice Program Satisfies Rule 23, The PSLRA, And Due Process ...............21

IV.    CONCLUSION................................................................................................22

## TABLE OF AUTHORITIES

CASES

*Anixter v. Home-Stake Prod. Co.*,
  77 F.3d 1215 (10th Cir. 1996) ........................................................................................ 9

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ...................................................................................................... 14

*Beach v. JPMorgan Chase Bank, N.A.*,
  2020 WL 6114545 (S.D.N.Y. Oct. 7, 2020) .................................................................. 4

*Christine Asia Co., Ltd. v. Ma*,
  2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) .............................................................. 17

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ................................................................................ 4, 7, 9, 18

*Comcast Corp. v. Behrend*,
  560 U.S. 27 (2013) ........................................................................................................ 14

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001) ............................................................................................. 7

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ...................................................................................................... 11

*Ebbert v. Nassau Cnty.*,
  2011 WL 6826121 (E.D.N.Y. Dec. 22, 2011) .............................................................. 14

*Edward Lea v. TAL Education Group*,
  2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021) ........................................................... 8, 13

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
  2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ................................................................ 19

*Goldman Sachs Grp. v. AR Teacher Ret. Sys.*,
  141 S. Ct. 1951 (June 21, 2021) ................................................................................... 14

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ...................................................................................................... 14

*In re "Agent Orange" Prod. Liab. Litig.*,
  597 F. Supp. 740 (E.D.N.Y. 1984) ............................................................................... 15

*In re AOL Time Warner, Inc.*, *Sec. and ERISA Litig.*,
   2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)....................................................................... 9

*In re Barrick Gold Sec. Litig.*,
   314 F.R.D. 91 (S.D.N.Y. 2016) ..................................................................................... 5

*In re Bear Stearns Cos., Inc., Sec., Deriv., & ERISA Litig.*,
    909 F. Supp. 2d 259 (S.D.N.Y. 2012).............................................................. 8, 13, 19

*In re China Med. Corp. Sec. Litig.*,
   2014 WL 12581781 (C.D. Cal. Jan. 7, 2014) ............................................................. 7

*In re Citigroup Inc. Sec. Litig.*,
   2014 WL 2112136 (S.D.N.Y. May 20, 2014) ............................................................. 3

*In re Citigroup, Inc. Sec. Litig.*,
   965 F. Supp. 2d 369 (S.D.N.Y. 2013)....................................................................... 18

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
   2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015)........................................................... 6, 8

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
   343 F. Supp. 3d 394 (S.D.N.Y. 2018)....................................................................... 16

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
   2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)............................................................. 19

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
   279 F.R.D. 151 (S.D.N.Y. 2011) ............................................................................... 20

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ............................................................................... 18

*In re GSE Bonds Antitrust Litig.*,
   414 F. Supp. 3d 686 (S.D.N.Y. 2019)......................................................................... 7

*In re IMAX Sec. Litig.*,
   283 F.R.D. 178 (S.D.N.Y. 2012) .................................................................... 3, 13, 19

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009)................................................................... 8, 19

*In re Marsh & McLennan Cos. Sec. Litig.*,
   2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .......................................................... 22

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) ................................................................................ 18

*In re PaineWebber Ltd. Partnerships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ................................................................................ 19

*In re Patriot Nat'l, Inc. Sec. Litig.*,
    828 F. App'x. 760 (2d Cir. Oct. 2, 2020) ..................................................................... 5

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
    330 F.R.D. 11 (E.D.N.Y. 2019) ................................................................................... 4

*In re Polaroid ERISA Litig.*,
    240 F.R.D. 65 (S.D.N.Y. 2006) ................................................................................... 5

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008) ..................................................................... 8, 10

*Kalnit v. Eichler*,
    99 F. Supp. 2d 327 (S.D.N.Y. 2000) ..................................................................... 10, 11

*Maley v. Del Global Tech. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002) .................................................................... 17, 18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) .................................................................................................... 10

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) ................................................................................... 9

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003) ......................................................................... 9

*Teachers' Ret. Sys. of La., v. A.C.L.N., Ltd.*,
    2004 WL 1087261 (S.D.N.Y. May 14, 2004) ........................................................ 18, 19

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005) ............................................................................ 3, 4, 6, 21

*Yang v. Focus Media Holding Ltd.*,
    2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ............................................................... 7

STATUTES

15 U.S.C. § 78u-4(a)(7) ...................................................................................................... 22

iv

RULES

Fed. R. Civ. P. 23 ............................................................................................................. *passim*

OTHER AUTHORITIES

*Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review*
   NERA (Jan. 25, 2021) ...................................................................................................... 15

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Court-appointed Lead Plaintiff Danilee Cassinelli, as Trustee of the Danilee Cassinelli Trust DTD 7-23-93 ("Lead Plaintiff") and additional plaintiff Norfolk County Retirement System ("Norfolk," and together with Lead Plaintiff, "Plaintiffs"), on behalf of themselves and all other members of the proposed Settlement Class, respectfully submit this memorandum of law in support of their motion for final approval of the proposed Settlement of the above-captioned class action (the "Action"), approval of the proposed plan of allocation for the proceeds of the Settlement (the "Plan of Allocation"), and final certification of the Settlement Class.[1]

## I.     PRELIMINARY STATEMENT

As detailed in the Stipulation, Plaintiffs and Defendants[2] have agreed to a settlement of the claims in the Action, and the release of all Released Defendants' Claims, in exchange for a payment of $7,500,000 in cash. The terms of the Settlement are set forth in the Stipulation, which was previously filed with the Court. ECF No. 72-1.

As detailed in the Declaration of Leanne H. Solish in Support of: (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses (the "Solish Declaration" or "Solish Decl."), filed concurrently herewith,[3] Lead Counsel: (i) conducted a detailed and robust

---

[1] Unless otherwise defined, all capitalized terms have the same meanings given to them in the Stipulation and Agreement of Settlement, dated June 28, 2021 (the "Stipulation"). *See* ECF No. 72-1.

[2] Defendants are Eagle Bancorp, Inc. ("Eagle" or the "Company"), Ronald D. Paul ("Paul"), Susan G. Riel ("Riel"), Charles D. Levingston ("Levingston"), James H. Langmead ("Langmead"), and Laurence E. Bensignor ("Bensignor") (collectively, the "Individual Defendants," and, together with Eagle, the "Defendants").

[3] The Solish Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the factual background and procedural history of the Action (¶¶14-36); the nature of the claims asserted (¶¶18-20); the negotiations leading to the Settlement (¶¶30-35); the risks and uncertainties of continued litigation (¶¶38-54); and the terms of the Plan of Allocation of the Net Settlement Fund (¶¶69-77). All citations to "¶__" and "Ex. __" in this memorandum refer, respectively, to paragraphs in, and exhibits to, the Solish Declaration.

investigation into Eagle, the Individual Defendants, and the facts forming the basis for the claims asserted in the Action, including retaining and working with a private investigator who conducted interviews with former employees, conducting interviews with other third parties with relevant information, retaining and working with banking, accounting, and damages and loss causation experts to analyze Plaintiffs' allegations, and analyzing hundreds of publicly available SEC filings, other public statements made by Defendants, court filings, deed records, and UCC filings; (ii) prepared and filed a detailed amended class action complaint (the "Complaint"); and (iii) researched and drafted an opposition to Defendants' comprehensive motion to dismiss the amended complaint.  The Settlement is also the product of extensive arm's-length negotiations between the Parties, which included the exchange of fulsome mediation statements addressing the applicable facts, law, and damages and a full-day virtual mediation session under the auspices of a respected and experienced mediator, Jed Melnick, Esq. of JAMS.  Following the mediation, the Parties continued their discussions with Mr. Melnick and ultimately agreed, in principle, to a settlement based on the mediator's recommendation, subject to the negotiation of a mutually acceptable long form stipulation of settlement.  ¶¶17-20, 25-28, 30-35.  At the time the Settlement was reached, Lead Counsel had a thorough understanding of the strengths and weaknesses of the Action.

The Settlement is a favorable result in light of the risks of continued litigation.  While Plaintiffs and Lead Counsel believe the claims asserted against Defendants are strong, they recognize that the Action presented a number of substantial risks.  At the time the Parties agreed to a settlement, Defendants' motion to dismiss the Complaint was pending.  Defendants raised significant arguments concerning falsity and scienter, as well as Plaintiffs' alleged partial corrective disclosures, and would have likely raised additional significant arguments concerning

the length of the class period if Plaintiffs prevailed on the motion to dismiss. While Plaintiffs advanced credible counterarguments to Defendants' arguments, they nonetheless recognize a risk that Defendants' motion to dismiss might have been granted, in whole or in part. These risks existed in addition to the genuine risk of a much smaller recovery, or no recovery at all, had the litigation continued.

In light of the recovery for the Settlement Class and the risks of continued litigation, as discussed further below and in the Solish Declaration, Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate, and warrants final approval by the Court.

Additionally, Plaintiffs request that the Court approve the proposed Plan of Allocation, which was set forth in the Notice sent to Settlement Class Members. The Plan of Allocation, which was developed by Lead Counsel in consultation with Plaintiffs' damages consultant, provides a reasonable and equitable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims. The Plan of Allocation is fair and reasonable and should likewise be approved.

## II.    STANDARDS FOR FINAL APPROVAL UNDER RULE 23(e) AND *GRINNELL*

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement must be presented to the Court for approval. The Settlement should be approved if the Court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).[4]  In ruling on final approval of a class settlement, courts in the Second Circuit have held that a court should examine both the negotiating process leading to the settlement, and the settlement's substantive terms. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *In re Citigroup Inc. Sec. Litig.*, 2014 WL 2112136, at *2-3 (S.D.N.Y. May 20, 2014); *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 188 (S.D.N.Y.

---

[4] All internal quotations and citations are omitted unless otherwise stated.

2012).

Pursuant to the amendments to Rule 23(e)(2), a court may approve a settlement as "fair, reasonable, and adequate" after considering the following four factors:

> (A)    whether the class representatives and class counsel have adequately represented the class;
>
> (B)    whether the proposal was negotiated at arm's length;
>
> (C)    whether the relief provided for the class is adequate, taking into account:
>
>> i.    the costs, risks, and delay of trial and appeal;
>>
>> ii.   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> iii.  the terms of any proposed ward of attorneys' fees, including timing of payment;
>>
>> iv.   any agreement required to be identified under Rule 23(e)(3); and
>
> (D)    whether the proposal treats class members equitably relative to each other.

These Rule 23(e)(2) factors add to, rather than displace, the factors previously adopted by the courts. *See In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019). Thus, the Second Circuit's traditional factors outlined in *City of Detroit v. Grinnell Corp.* to evaluate the propriety of a class action settlement (certain of which overlap with Rule 23(e)(2)) are still relevant:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by, Goldberger v. Integrated Res.,*

*Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also Beach v. JPMorgan Chase Bank, N.A.*, 2020 WL 6114545, at *2 (S.D.N.Y. Oct. 7, 2020) (evaluating settlement based on factors set forth in Fed. R. Civ. P. 23(e)(2) and *Grinnell*).  As set forth below, the proposed Settlement satisfies the criteria for final approval under Rule 23(e)(2), as well as the relevant, non-duplicative *Grinnell* factors.

## III.    ARGUMENT

### A.    The Settlement Is Fair, Reasonable, And Adequate In Light Of The Factors Outlined By Rule 23(e)(2) And The Remaining *Grinnell* Factors

#### 1.    Plaintiffs And Lead Counsel Have Adequately Represented The Settlement Class

In determining whether to approve a class action settlement, the court should consider whether the "class representatives and class counsel have adequately represented the class."  Fed. R. Civ. P. 23(e)(2)(A).  *See also In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) ("the adequacy requirement 'entails inquiry as to whether: 1) plaintiffs' interests are antagonistic to the interest of other members of the class and 2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation'").

There can be little doubt that Plaintiffs and Lead Counsel have adequately represented the Settlement Class.  Plaintiffs, like all members of the Settlement Class, acquired Eagle Securities during the Settlement Class Period, when their values were allegedly artificially inflated by false and misleading statements and omissions.  Thus, the claims of the Settlement Class and Plaintiffs would prevail or fail in unison, and the common objective of maximizing recovery from Defendants aligns the interests of Plaintiffs and all members of the Settlement Class.  *See, e.g.*, *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x. 760, 764 (2d Cir. Oct. 2, 2020) (in considering adequacy, "the primary factors are whether the class representatives have any 'interests antagonistic to the interests of other class members' and whether the representatives 'have an interest in vigorously pursuing the claims of the class'"); *In re Polaroid ERISA Litig.*, 240 F.R.D.

5

65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

Further, Plaintiffs were active and informed participants in the litigation and, among other things: (i) regularly communicated with Lead Counsel regarding the posture and progress of the Action; (ii) reviewed and/or discussed all significant pleadings and motions filed in the Action; (iii) reviewed and/or discussed significant decisions in the Action; and (iv) evaluated and approved the proposed Settlement. Ex. 1 at ¶5; Ex. 2 at ¶5.

Additionally, throughout the Action, Plaintiffs had the benefit of the advice of knowledgeable counsel well-versed in shareholder class action litigation and securities fraud cases. During the course of the litigation, Lead Counsel developed a deep understanding of the facts of the case and the merits of the claims. *See generally* Solish Decl. at §§ II & III. Moreover, Lead Counsel is highly qualified and experienced in securities litigation, as set forth in its firm resume (*see* Ex. 4-C) and was able to successfully conduct the litigation against skilled opposing counsel.[5] Accordingly, the Settlement Class has been, and remains, well represented.

> **2.  The Settlement Was Reached After Substantial Litigation And Arm's-Length Negotiations Between Experienced Counsel Conducted Under The Auspices Of A Well-Respected Mediator**

In weighing approval of a class action settlement, the Court must consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). A settlement is entitled to a "presumption of fairness, adequacy, and reasonableness" when "reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *Visa*, 396 F.3d

---

[5] Defendants were represented by a well-regarded law firm, Baker & Hostetler LLP.

at 116; *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *3 (S.D.N.Y. Nov. 9, 2015), *aff'd*, 674 F. App'x. 37 (2d Cir. 2016).

Here, the Settlement was reached only after extensive arm's-length negotiations between experienced counsel, who thoroughly evaluated the merits of the claims and were well-aware of the strengths and weaknesses of the case following two years of hard-fought litigation.  ¶¶9-11. And, the mediation process—which included a full-day mediation where the Parties were unable to reach an agreement, followed by additional negotiations—was led by Mr. Melnick, an experienced and well-respected neutral.  ¶10.  The manner by which the Settlement was achieved supports the conclusion that the Settlement is fair and was achieved free of collusion.  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "mediator's involvement in … settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure"); *Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014) ("The participation of this highly qualified mediator [Mr. Melnick] strongly supports a finding that negotiations were conducted at arm's length and without collusion."); *In re China Med. Corp. Sec. Litig.*, 2014 WL 12581781, at *4 (C.D. Cal. Jan. 7, 2014) (finding settlement reached as a result of mediation before Mr. Melnick weighs in favor of approval).

### 3.     The Settlement Is An Excellent Result For The Settlement Class In Light Of The Benefits Of The Settlement And The Risks Of Continued Litigation

Under Rule 23(e)(2)(C), when evaluating the fairness, reasonableness, and adequacy of a settlement, the Court must also consider whether "the relief provided for the class is adequate, taking into account ... the costs, risks, and delay of trial and appeal" along with other relevant factors.  Fed. R. Civ. P. 23(e)(2)(C).[6]  As discussed below, each supports the Settlement's approval.

---

[6] Rule 23(e)(2)(C)(i) incorporates six of the *Grinnell* factors: the complexity, expense, and likely duration of the litigation (first factor); the risks of establishing liability and damages (fourth and fifth factors); the risks of maintaining

7

### (a)      Complexity, Expense And Duration Of Litigation

Securities class actions like this one are by their nature complicated, and district courts in this Circuit have long recognized that "[a]s a general rule, securities class actions are 'notably difficult and notoriously uncertain' to litigate." *In re Facebook,* 2015 WL 6971424, at *3; *In re Bear Stearns Cos., Inc., Sec., Deriv., & ERISA Litig.,* 909 F. Supp. 2d 259, 266 (S.D.N.Y. 2012); *Edward Lea v. TAL Education Group*, 2021 WL 5578665, at *9 (S.D.N.Y. Nov. 30, 2021) ("Class action suits have a well-deserved reputation as being most complex, and securities class actions are notably difficult and notoriously uncertain to litigate.").

This case was no exception.  As discussed in the Solish Declaration, the case involved complicated and intricate issues related to loss causation, falsity, scienter, and scheme liability.  At the time the parties agreed to settle, Defendants' motion to dismiss the Complaint was fully briefed and pending.  Even if the Court were to sustain the Action, prevailing on summary judgment and then achieving a litigated verdict at trial (and sustaining any such verdict in the appeals that would inevitably ensue) would have been a very complex and risky undertaking that would have required substantial additional time and expense.  *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 481 (S.D.N.Y. 2009) (finding that the complexity, expense and duration of continued litigation supports final approval where, among other things "motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable").

Indeed, the trial of the Action here would have required extensive expert testimony on numerous contested issues, including falsity, materiality, scienter, causation and damages.  Courts routinely observe that these sorts of disputes—requiring dueling testimony from experts—are

---

class action status through trial (sixth factor); and the range of reasonableness of the settlement fund in light of the best possible recovery and the risks of litigation (eighth and ninth factors).  *See Grinnell*, 495 F.2d at 463; *In re GSE Bonds Antitrust Litig*., 414 F. Supp. 3d 686, 693 (S.D.N.Y. 2019) ("This inquiry overlaps significantly with a number of *Grinnell* factors, which help guide the Court's application of Rule 23(e)(2)(C)(i).").

particularly difficult for plaintiffs to litigate.  *See*, *e.g.*, *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2008) (in a "battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited").

Even if Plaintiffs had prevailed at trial, it is virtually certain that appeals would be taken, which would have, at best, substantially delayed any recovery.  *See Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks ... and would in light of the time value of money, make future recoveries less valuable than this current recovery.").  At worst, there is always a risk that the verdict could be reversed by the trial court or on appeal.  *See, e.g.*, *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing securities action with prejudice); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation).

### (b)    Risks Of Establishing Liability And Damages

In assessing the fairness, reasonableness, and adequacy of a settlement, courts should consider the "risks of establishing liability [and] the risks of establishing damages."  *Grinnell*, 495 F.2d at 463.  In most cases, this will be the most important factor for the Court to consider in its analysis of the proposed settlement.  *See id.* at 455 ("The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.").  While Plaintiffs and Lead Counsel believe the claims asserted against Defendants are meritorious, they recognize that the Action presented several substantial risks to establishing both liability and damages.  Securities class actions present hurdles to proving liability that are difficult for plaintiffs to meet.  *See In re AOL Time Warner, Inc.*, *Sec. and ERISA Litig.*, 2006 WL 903236, at *11 (S.D.N.Y. Apr. 6, 2006) (noting that "[t]he difficulty of establishing liability is a common risk of

9

securities litigation"). Here, in particular, Defendants would have vigorously challenged Plaintiffs on falsity, scienter and loss causation.

*Falsity*. In their motion to dismiss, Defendants argued that their statements were not false and misleading, but rather true statements of opinion and therefore subject to the heightened pleading standards of *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015) ("*Omnicare*"). ¶39. Under *Omnicare*, to show that an opinion is false and misleading, a plaintiff must plead facts sufficient to show that the speaker did not actually hold the stated belief at the time; or particular facts whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement in context. *Id*. at 188-89, 94. For example, Defendants argued that the determination as to which loans needed to be disclosed pursuant to the framework of Reg. O, Item 404, and GAAP required Eagle to make a host of highly subjective judgment calls, and such that statements have been found to constitute statements of opinion for purposes of the securities laws. ¶40. Defendants also argued they believed Eagle's related party loan amounts to be truthful when they were reported. *Id*. There is no way to know how the Court would decide this issue on Defendants' pending motion to dismiss.

*Scienter*. Plaintiffs also faced a significant challenge in proving that Defendants acted with scienter as "[p]roving a defendant's state of mind is hard in any circumstances." *Telik*, 576 F. Supp. 2d at 579; *Kalnit v. Eichler*, 99 F. Supp. 2d 327, 345 (S.D.N.Y. 2000) ("The element of scienter is often the most difficult and controversial aspect of a securities fraud claim"), *aff'd*, 264 F.3d 131 (2d Cir. 2001). On their motion to dismiss, Defendants argued that Plaintiffs failed to plead a strong inference of scienter because there was no reason as to why Defendants would have committed the alleged fraud, and that due to the extensive regulatory scrutiny Eagle's related party loans received, Defendants had every reason to believe that the Company was accurately

10

identifying and disclosing loans, and moreover, these loans continued to have strong loan performance. ¶42. In particular, Defendants maintained that they acted in good faith in reporting the amounts, terms and approval process of Eagle's related-party loans, explaining that, *inter alia*: (a) the related-party loan review and approval process was subject to review by outside advisors and examined annually by regulators to ensure Regulation O compliance and that this extensive outside scrutiny gave Defendants reason to believe Eagle was accurately identifying and disclosing its related party loans; and (b) the related party loans were performing well, providing Defendants comfort that the loans were properly vetted and made on arm's-length terms and involved no more risk than a third-party loan. *Id*. While Plaintiffs and Lead Counsel strongly disagreed with this assertion, there was no guarantee that Plaintiffs would have prevailed on the scienter issue at the pleading stage. Moreover, had the litigation continued, there is simply no guarantee that the trier of fact would have adopted Plaintiffs' view of the case.

*Loss Causation And Damages*. Another principal challenge in continuing the litigation is the difficulty of proving loss causation and damages, which would have been hotly contested by Defendants, particularly in the context of class certification and summary judgment, and would continue to be challenged in *Daubert* motions, at trial, in post-trial proceedings and appeals. To succeed at trial "a plaintiff [must] prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharms*., *Inc. v. Broudo*, 544 U.S. 336, 346 (2005).

Lead Counsel expects that Defendants would have vigorously persisted in arguing, at summary judgment, trial, and on appeal, that all or a significant portion of the declines in Eagle's stock price were not attributable to Defendants' allegedly false and misleading statements and omissions. ¶43. Plaintiffs alleged that the disclosures on December 1, 2017 and July 17, 2019

11

constituted partial corrective disclosures and/or partial materializations of concealed risks. Regarding the alleged disclosure on December 1, 2017, Plaintiffs allege that the Aurelius Report revealed, among other things, that Eagle failed to disclose roughly $185 million of insider loans used to finance various of Defendant Paul's ventures. ¶44. Following the release of the Aurelius Report, Eagle's stock price declined $16.20 per share, roughly 24.5%, to close at $49.95 on December 1, 2017. *Id.* Defendants argued in their motion to dismiss that the Aurelius Report could not constitute a corrective disclosure because it was merely a "[n]egative characterization of already public information"—*i.e.*, Defendants argued, and likely would have continued to argue, that there was no sufficiently *new* non-public news in the Aurelius Report to establish loss causation. *Id.*

Regarding the alleged disclosure on July 17, 2019, Plaintiffs allege that Eagle announced on that day that it been paying elevated legal and accounting fees and related expenses in responding to various government investigations concerning the Company's related party transactions. ¶45. Defendants argued that this disclosure did not constitute a corrective disclosure, because all of the information concerning the classification of the previously undisclosed related party loans had already been revealed to the market by, at the very latest, March 1, 2019, when Eagle issued its 2018 Form 10-K. *Id.* Eagle disclosed in its 2018 Form 10-K that it had modified its related party analysis, resulting in a significant increase in the Company's related party loan totals, effectively validating the Aurelius Report allegations. *Id.* Defendants argued that the absence of a price reaction following the filing of Eagle's 2018 10-K on March 1, 2019, undermined Plaintiffs' pleading of loss causation. *Id.* Defendants also argued in their motion to dismiss, and would continue to argue, that the July 2019 disclosure referred to multiple government investigations concerning several different matters and that a significant portion of

12

the decline following the July 2019 disclosure was caused by confounding non-fraud related information. ¶46. If Defendants' arguments were accepted by the Court, Plaintiffs would need to disaggregate the market's reaction to the revelation of fraud from non-fraud related information.

While Plaintiffs did and would continue to advance a number of arguments in response, including that each disclosure in fact revealed new, previously concealed information about the alleged fraud, there is no certainty as to how the Court or a jury would decide these issues. If Defendants' loss causation arguments were sustained, and these corrective disclosures were eliminated, the amount of recoverable damages would be severely reduced, if not entirely eliminated. Additionally, the impact of non-fraud related information on the alleged stock price declines would also likely need to be identified and quantified in order to determine damages.

Furthermore, while Lead Counsel would work extensively with Plaintiffs' damages expert with a view towards presenting compelling arguments to the jury and prevailing on these matters at trial, Defendants would have put forth well-qualified experts of their own who were likely to opine at trial that the Settlement Class suffered little or no damages. ¶¶48-49. As courts have long recognized, the substantial uncertainty as to which side's experts' view might be credited by the jury presents a serious litigation risk. *See TAL Education*, 2021 WL 5578665, at \*9 ("proof of damages in a securities fraud case is always difficult and invariably requires expert testimony"); *IMAX*, 283 F.R.D. at 193 ("[I]t is well established that damages calculations in securities class actions often descend into a battle of experts.").

Given all of these risks with respect to liability, loss causation, and damages, Plaintiffs and Lead Counsel respectfully submit that it is in the best interests of the Settlement Class to accept the certain and substantial benefit conferred by the Settlement.

### (c)    The Risks Of Maintaining Class Certification

At the time the Parties agreed to settle the Action, Plaintiffs had not yet moved for class

13

certification.  Substantial risks and challenges remained in connection with certifying a class. Defendants' vigorous challenges to class certification "could well devolve into yet another battle of the experts."  *Bear Stearns*, 909 F. Supp. 2d at 268.  Defendants would likely argue that certification of a class would be difficult because any damages model on the Settlement Class Period would be inappropriate under *Comcast Corp. v. Behrend*, 560 U.S. 27, 34 (2013), which held that a damages class was improperly certified where the damages model offered in support of class certification was not tied to plaintiffs' theory of liability.  ¶51.  Additionally, a recent ruling by the United States Supreme Court has made obtaining class certification for plaintiffs more difficult and potentially could have presented additional challenges if the case did not settle.  In *Goldman Sachs Grp. v. AR Teacher Ret.*, 141 S. Ct. 1951 (June 21, 2021), the Supreme Court held, in part, that when defendants are seeking to rebut the presumption of reliance established under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), as modified by *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), courts may consider the generic nature of an alleged misrepresentation as evidence of lack of price impact.  Accordingly, courts are now permitted to assess materiality of an alleged misstatement and consider "all evidence relevant to price impact" at the class certification stage.[7]

Even if Plaintiffs were successful in certifying a class, class certification can be reviewed and modified at any time by the Court before final judgment.  *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). Although Plaintiffs believe there are strong grounds for certifying a litigation class, discussed in Plaintiffs' motion for preliminary approval of the Settlement (ECF No. 71), the Settlement avoids

---

[7] On the plus side for Plaintiffs, the Supreme Court did clarify that defendants bear the burden of persuasion of showing a lack of price impact by a preponderance of the evidence.

any uncertainty with respect to class certification and the risks of maintaining certification of the Settlement Class through trial and on appeal. *See Ebbert v. Nassau Cnty.*, 2011 WL 6826121, at *12 (E.D.N.Y. Dec. 22, 2011) (risk of de-certification of the certified class supported approval of Settlement).

### (d) Range Of Reasonableness In Light Of The Best Possible Recovery And Attendant Risks Of Litigation

The adequacy of the amount offered in settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987).

Plaintiffs' consulting damages expert estimates that if Plaintiffs had fully prevailed on all their claims at summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiffs' theory of loss causation as to the stock drops on December 1, 2017 and July 17, 2019—*i.e.*, Plaintiffs' best case scenario—the total ***maximum*** damages potentially available in this Action would be approximately $304 million. Under this scenario, the Settlement represents a recovery of 2.5% of the Settlement Class's maximum estimated damages. ¶55. In comparison, the median recovery in securities class actions in 2020 was approximately 1.7% of estimated damages. *See* Ex. 6 (Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA Jan. 25, 2021 at p. 20 (Fig. 16)).

Conversely, had Defendants prevailed on any of their liability or loss causation arguments, recoverable damages would have been substantially reduced, if not altogether eliminated. Indeed, Defendants would argue that if the class period were shortened to end after the issuance of the Aurelius Report on December 1, 2017, maximum estimated damages would be approximately $26

15

million.  If the class period were to end after the issuance of the 2018 Form 10-K on March 1, 2019, Defendants estimate that maximum damages would be approximately $75 million.  Under these scenarios, the Settlement represents a recovery of approximately 10% to 28.8% of estimated damages.  These estimates do not include any reductions for disaggregation.  ¶56.  The Settlement Amount is, therefore, fair and reasonable, especially when juxtaposed against the significant obstacles that Plaintiffs would need to overcome in order to prevail in this complex securities fraud litigation.  *See In re Facebook, Inc. IPO Sec. & Deriv. Litig.,* 343 F. Supp. 3d 394, 414 (S.D.N.Y. 2018) ("Because Plaintiffs face serious challenges to establishing liability, consideration of Plaintiffs' best possible recovery must be accompanied by the risk of non-recovery.").

### 4.      Rule 23(e)(2)(C)

Under Rule 23(e)(2)(C), courts also must consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." FED. R. CIV. P. 23(e)(2)(C)(ii)-(iv).  Each of these factors either supports approval of the Settlement or is neutral and does not suggest any basis for inadequacy of the Settlement.

**Rule 23(e)(2)(C)(ii):** The method for processing Settlement Class Members' claims and distributing relief to eligible claimants includes well-established, effective procedures for processing claims and efficiently distributing the Net Settlement Fund.  The Claims Administrator will process claims under Lead Counsel's guidance, allow Claimants an opportunity to cure claim deficiencies or request the Court to review their claim denial, and, lastly, mail Authorized Claimants their *pro rata* share of the Net Settlement Fund (per the Plan of Allocation), after Court approval.  This proposed method for claims processing is standard in securities class action settlements as it has been long found to be effective, as well as necessary because neither Plaintiffs

16

nor Defendants possess the individual investor trading data required to distribute the Net Settlement Fund.

**Rule 23(e)(2)(C)(iii):** As disclosed in the Notice, Lead Counsel will be applying for a percentage of the common fund fee award, in an amount not to exceed 33⅓% to compensate them for the services they rendered on behalf of the Settlement Class. Ex. 3-A (Notice) at ¶¶5, 70. Lead Counsel is requesting an attorneys' fee of 30% of the Settlement Fund. A proposed attorneys' fee of 30% of the Settlement Fund (which, by definition, includes interest earned on the Settlement Amount) is reasonable in light of the work performed and the results obtained. It is also consistent with awards in similar complex class action cases. *See Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) ("Petitioners' request [for 33⅓% of the Class Settlement Fund] falls comfortably within the range of fees typically awarded in securities class actions."); *see also* Fee Memorandum, § III.C.1. More importantly, approval of the requested attorneys' fees is separate from approval of the Settlement, and the Settlement may not be terminated based on any ruling with respect to attorneys' fees. *See* Stipulation, ¶16.

**Rule 23(e)(2)(C)(iv):** The Parties entered into a confidential agreement establishing certain conditions under which Eagle may terminate the Settlement if Settlement Class Members who collectively purchased a specific number of Eagle common stock request exclusion from the Settlement. "This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement." *Christine Asia Co., Ltd. v. Ma*, 2019 WL 5257534, at *15 (S.D.N.Y. Oct. 16, 2019).

5.     **The Settlement Treats All Members Of The Settlement Class Equitably Relative To Each Other**

Rule 23(e)(2)(D) requires courts to evaluate whether the settlement treats class members equitably relative to one another. The Settlement easily satisfies this standard. Under the proposed

17

Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. ¶72. Courts have repeatedly approved similar plans. *See e.g.*, *In re Citigroup, Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 386-87 (S.D.N.Y. 2013); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145-46 (S.D.N.Y. 2010).

### 6.     The Class's Reaction To The Settlement Supports Final Approval

The second *Grinnell* factor—the reaction of the class—overlaps with Rules 23(e)(4), on the opportunity for exclusion, and 23(e)(5), on the opportunity to object. As required by Rule 23(e)(4) & (5), the Settlement affords Settlement Class Members the opportunity to request exclusion from, or object to, the Settlement. Segura Decl., Ex. 3-A (Notice) at pp. 4, 20-22. A total of 35,448 Notice Packets have been distributed to potential Settlement Class Members. *Id.* ¶12. As of December 2, 2021, no requests for exclusion have been received (*id.* ¶19), and to date, no objections have been filed with the Court.[8] The Settlement Class's overwhelmingly positive reaction strongly supports final approval of the Settlement. *See, e.g.*, *Maley*, 186 F. Supp. 2d at 362 ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.").

### 7.     The Ability Of Defendants To Withstand A Greater Judgment

The ability of a defendant to pay a judgment greater than the amount offered in settlement is relevant to whether the settlement is fair. *Grinnell*, 495 F.2d at 463. While it is Plaintiffs' understanding that Defendants have the ability to fund a settlement given available insurance, continued litigation would put that insurance at risk of dwindling. *See In re Global Crossing Sec.*

---

[8] The deadline to request exclusion from, or to object to any aspect of, the Settlement is December 30, 2021; if objections or additional exclusions are received after the date of this filing, they will be addressed on reply.

& *ERISA Litig.*, 225 F.R.D. 436, 460 (S.D.N.Y. 2004) (ability to withstand a greater judgment supports final approval where the "main settlement funds available to the individuals are the insurance proceeds" which "would be largely consumed by defense costs if this litigation were to continue"); *Teachers' Ret. Sys. of La., v. A.C.L.N., Ltd.*, 2004 WL 1087261, at *4 (S.D.N.Y. May 14, 2004) (likely depletion of insurance supports settlement approval). Indeed, here, the amount of insurance available was rapidly wasting as a result of multiple government investigations, as well as a derivative action premised upon the allegations in this litigation.

Armed with this substantial base of knowledge, Plaintiffs were in a position to balance the proposed settlement with a well-educated assessment of the likelihood of overcoming the risks of litigation. Accordingly, Plaintiffs and Lead Counsel respectfully submit that they had "a clear view of the strengths and weaknesses of their case[]" and of the range of possible outcomes at trial. *Teachers Ret. Sys. of La.*, 2004 WL 1087261, at *3. The Court thus should find that this factor also supports approval.

**B.     The Plan Of Allocation Is Fair And Reasonable**

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate. *See IMAX*, 283 F.R.D. at 192; *Bear Stearns*, 909 F. Supp. 2d at 270. A plan of allocation with a "rational basis" satisfies this requirement. *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *21 (S.D.N.Y. Nov. 8, 2010); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 497. A plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable. *See IMAX*, 283 F.R.D. at 192. However, a plan of allocation does not need to be tailored to fit each and every class member with "mathematical precision." *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997).

The proposed Plan of Allocation, developed by Lead Counsel in consultation with

19

Plaintiffs' damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms. The Plan is set forth in full in the Notice. *See* Ex. 3-A at pp. 12-20. It provides for the distribution of the Net Settlement Fund based upon each Settlement Class Member's "Recognized Claim," as calculated by the formulas described in the Notice. In developing the Plan, Plaintiffs' expert considered the amount of artificial inflation (in the price of Eagle's Common Stock and Call Options) and artificial deflation (in the price of Eagle's Put Options) due to Defendants' alleged materially false and misleading statements and omissions. The Plan of Allocation is based on the premise that the decreases in the price of Eagle common stock that followed the alleged corrective disclosures that occurred on December 1, 2017 and July 17, 2019 may be used to measure the alleged artificial inflation in the price of Eagle Securities prior to these disclosures. ¶71; Ex. 3-A at ¶¶ 49-51.

JND, as the Court-approved Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Claim compared to the aggregate Recognized Claims of all Authorized Claimants, as calculated according to the Plan of Allocation. A Claimant's total Recognized Claim will depend on, among other things, when the Claimant purchased, acquired, and/or sold Eagle Securities during the Settlement Class Period, in what amounts, and if any securities were sold, when they were sold and in what amounts, as well as the number of valid claims filed by other Claimants. ¶73. Accordingly, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of this Settlement among the Settlement Class.

For these reasons, Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund. *See In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011) ("[i]n determining whether a plan of

allocation is fair, courts look primarily to the opinion of counsel"). Moreover, as noted above, as of December 2, 2021, 35,448 copies of the Notice, which contain the Plan of Allocation and advise Settlement Class Members of their right to object to the proposed plan, have been sent to potential Settlement Class Members and their nominees (*see* Ex. 3 at ¶12) and, to date, no objections to the proposed plan have been received.

### C.     The Settlement Class Should be Finally Certified

In the Preliminary Approval Order (ECF No. 77), the Court preliminarily certified the Settlement Class for settlement purposes only under Fed. R. Civ. P. 23(a) and (b)(3). *See* ECF No. 77 at ¶ 1. There have been no developments in the case that would undermine that determination. Thus, for the reasons stated in the Memorandum of Law in Support of Plaintiffs' Unopposed to Motion for (I) Preliminary Approval of Proposed Class Action Settlement; (II) Certification of the Settlement Class; and (III) Approval of Notice to the Settlement Class (ECF No. 71), incorporated herein by reference, Plaintiffs now request that the Court affirm its prior certification of the Settlement Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3), for settlement purposes, and the appointment of Plaintiffs as Class Representatives and Lead Counsel as Class Counsel.

### D.     The Notice Program Satisfies Rule 23, The PSLRA, And Due Process

Plaintiffs have provided the Settlement Class with notice of the proposed Settlement that satisfied all the requirements of Rule 23(e) and due process, which require that notice of a settlement be "reasonable"—*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Visa*, 396 F.3d at 114. Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards.

The Notice provided all of the necessary information for Settlement Class Members to make an informed decision regarding the Settlement, the Fee and Expense Application, and the

Plan of Allocation. The Notice informed Settlement Class Members of, among other things: (i) the amount of the Settlement; (ii) the reasons why the Parties are proposing the Settlement; (iii) the estimated average recovery per affected share of Eagle Common Stock; (iv) the maximum amount of attorneys' fees and expenses that will be sought; (v) the identity and contact information for the representatives of Lead Counsel who are reasonably available to answer questions from Settlement Class Members concerning matters contained in the Notice; (vi) the right of Settlement Class Members to object to the Settlement; (vii) the binding effect of a judgment on Settlement Class Members; and (viii) the dates and deadlines for certain Settlement-related events. *See* 15 U.S.C. § 78u-4(a)(7). The Notice also contained the Plan of Allocation and provided Settlement Class Members with information about how to submit a Claim Form in order to be eligible to receive a distribution from the Net Settlement Fund.

In addition, JND caused the Summary Settlement Notice to be published in *Investor's Business Daily* and to be released over the internet using *PR Newswire*. Ex. 3 at ¶13. JND also created a webpage for this case, www.EagleSecuritiesSettlement.com, to provide members of the Settlement Class and other interested persons with information about the Settlement and the applicable deadlines, as well as access to copies of the Notice, the Claim Form, Stipulation, and the Preliminary Approval Order. *Id.* at ¶15.

This combination of individual first-class mail to those who could be identified with reasonable effort, supplemented by publication and internet notice, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Marsh & McLennan Cos. Sec. Litig.*, 2009 WL 5178546, at *12-13 (S.D.N.Y. Dec. 23, 2009).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court approve the

proposed Settlement as fair, reasonable, and adequate and approve the Plan of Allocation as fair, reasonable, and adequate. Proposed orders will be submitted with Plaintiffs' reply papers, after the deadlines for objections and seeking exclusion have passed.

DATED: December 16, 2021            **GLANCY PRONGAY & MURRAY LLP**

By: */s/ Leanne H. Solish*
Robert V. Prongay (*pro hac vice*)
Joseph D. Cohen (*pro hac vice*)
Jason L. Krajcer (*pro hac vice*)
Leanne H. Solish (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
       jcohen@glancylaw.com
       jkrajcer@glancylaw.com
       lsolish@glancylaw.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Proposed Settlement Class*

**LABATON SUCHAROW LLP**
Francis P. McConville
140 Broadway, 34th Floor
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: fmcconville@labaton.com

*Counsel for Norfolk County Retirement System*

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants.

*s/ Leanne H. Solish*
Leanne H. Solish
