**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHIVA STEIN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EAGLE BANCORP, INC., SUSAN G. RIEL, RONALD D. PAUL, CHARLES D. LEVINGSTON, JAMES H. LANGMEAD, and LAURENCE E. BENSIGNOR,<br><br>Defendants. | Case No. 1:19-cv-06873-LGS |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S**
**MOTION FOR AN AWARD OF ATTORNEYS' FEES AND**
**REIMBURSEMENT OF LITIGATION EXPENSES**

764329.1

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   FACTUAL AND PROCEDURAL HISTORY .................................................... 5

III.  ARGUMENT ........................................................................................................ 6

      A.    The Common Fund Doctrine Applies To The Settlement ..................................... 6

      B.    The Court Should Award A Reasonable Percentage Of The Common Fund ......... 7

      C.    The *Goldberger* Factors Confirm The Requested Fee Is Fair And Reasonable ..... 8

            1.    Comparison To Court-Approved Fees In Other Class Action Common Fund Settlements ................................................................................................ 9

                  (a)    The Applicable Baseline Fee Is 30% ................................. 9

                  (b)    The Requested Fee Will Not Result In A Windfall To Plaintiffs' Counsel ........................................................... 11

                  (c)    The Magnitude And Complexity Of The Case Support The Requested Fee .................................................................... 14

            2.    Analysis Of Risk, Result And Policy Considerations.............................. 15

                  (a)    The Risk Of Litigation Supports The Baseline Fee .......... 15

                  (b)    The Quality Of Representation Supports The Baseline Fee 19

                  (c)    Policy Considerations Support The Baseline Fee ............. 21

            3.    The Lodestar "Cross-Check" Strongly Supports The Reasonableness Of The Requested Fee ....................................................................................... 22

      D.    Plaintiffs' Counsel's Expenses Are Reasonable And Were Necessarily Incurred To Achieve The Benefit Obtained.................................................................................. 24

      E.    Lead Plaintiff Should Be Awarded Her Reasonable Costs And Expenses Under 15 U.S.C. § 78u-4(a)(4) ....................................................................................... 24

IV.   CONCLUSION................................................................................................... 25

## TABLE OF AUTHORITIES

<u>CASES</u>

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) .................................................................................. 1

*Anwar v. Fairfield Greenwich Ltd.*,
2012 WL 1981505 (S.D.N.Y. June 1, 2012) ........................................................... 13

*Asare v. Change Group of New York, Inc.*,
2013 WL 6144764 (S.D.N.Y. Nov. 18, 2013)......................................................... 23

*Athale v. Sinotech Energy Ltd.*,
2013 WL 11310686 (S.D.N.Y. Sept. 4, 2013),........................................................ 23

*Bell v. Pension Comm. of ATH Holding Co., LLC*,
2019 WL 4193376 (S.D. Ind. Sept. 4, 2019) ........................................................... 5

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010)............................................................ 8

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980)................................................................................................. 6

*Burns v. Falconstor Software, Inc.*,
2014 WL 12917621 (E.D.N.Y. Apr. 10, 2014) ....................................................... 23

*City of Birmingham Ret. & Relief System v. Credit Suisse Group AG*,
2020 WL 7413926 (S.D.N.Y. Dec. 17, 2020) ................................................. *passim*

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)..................................................................................... 16

*City of Providence v. Aeropostale, Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014) ..................................................... 15, 21

*Davis v. J.P. Morgan Chase & Co.*,
827 F. Supp. 2d 172 (W.D.N.Y. 2011) ............................................................... 8, 23

*Edward Lea v. TAL Educ. Grp.*,
2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021)....................................... 13, 14, 22, 25

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000)............................................................................... *passim*

*Gross v. GFI Group, Inc.*,
   784 Fed. App'x. 27 (2d Cir. Sept. 13 2019) ............................................................... 17

*Guevoura Fund Ltd. v. Sillerman*,
   2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ................................................... 13, 23

*Hicks v. Morgan Stanley,*
   *& Co.*, 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ........................................... 6, 8

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
   2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) ........................................................ 20

*In re Akazoo S.A. Sec. Litig.*,
   2021 WL 4316717 (E.D.N.Y. Sept. 10, 2021) ........................................................ 13

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) .............................................................. 14

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*,
   772 F.3d 125 (2d Cir. 2014) ..................................................................................... 25

*In re Bisys Sec. Litig.*,
   2007 WL 2049726 (S.D.N.Y July 16, 2007) ......................................................... 23

*In re Bristol-Myers Squibb Sec. Litig.*,
   361 F. Supp. 2d 229 (S.D.N.Y. 2005) ....................................................................... 8

*In re Colgate-Palmolive Co. ERISA Litig.*,
   36 F. Supp. 3d 344 (S.D.N.Y. July 8, 2014) ............................................... 8, 11, 23

*In re Comverse Tech., Inc. Sec. Litig.*,
   2010 WL 2653354 (E.D.N.Y. June 24, 2010), ................................................. 16, 22

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
   80 F. Supp. 3d 838 (N.D. Ill. 2015) ................................................................. 15, 17

*In re Elan Sec. Litig.*,
   385 F. Supp. 2d 363 (S.D.N.Y. 2005) ..................................................................... 23

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
   2007 WL 2230177 (S.D.N.Y. July 27, 2007) ........................................................... 7

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
   2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) ...................................................... 4, 23

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
   2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ........................................... 16, 17, 21, 24

764329.1

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
   2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018) ...................................................................... 8, 9, 11

*In re Giant Interactive Group, Inc. Sec. Litig.*,
   279 F.R.D. 151 (S.D.N.Y. Nov. 2, 2011) ................................................................................ 16

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................................. 16, 22, 24

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ........................................................................ 22

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000) .............................................................................................. 14

*In re Indep. Energy Holdings PLC Sec. Litig.*,
   302 F. Supp. 2d 180 (S.D.N.Y. 2003) ..................................................................................... 24

*In re Interpublic Sec. Litig.*,
   2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004) ......................................................................... 23

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   2009 WL 5178546 (S.D.N.Y. 2009) ........................................................................................ 25

*In re Patriot National Sec. Litig.*,
   2019 WL 5882171 (S.D.N.Y. Nov. 6, 2019) .......................................................................... 12

*In re Qudian Inc. Sec. Litig.*,
   2021 WL 2328437 (S.D.N.Y. June 8, 2021) ..................................................................... 12, 25

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3d Cir. 2005) ...................................................................................................... 8

*In re Schering-Plough Corp. Enhance Sec. Litig.*,
   2013 WL 5505744 (D.N.J. Oct. 1, 2013) ................................................................................ 18

*In re Signet Jewelers Limited Sec. Litig.*,
   2020 WL 4196468 (S.D.N.Y. July 21, 2020) ......................................................................... 25

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. Sept. 10, 2008) ....................................................................... 4

*In re Veeco Instruments Inc. Sec. Litig.*,
   2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ................................................................... *passim*

764329.1

iv

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005).................................................................................... 7

*In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*,
  364 F. Supp. 2d 980 (D. Minn. 2005)............................................................................... 2, 19

*Johnson v. Brennan*,
  2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011)...................................................................... 8

*La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*,
  2009 WL 4730185 (D.N.J. Dec. 4, 2009) ........................................................................... 14

*Leach v. NBC Universal Media, LLC*,
  2017 WL 10435878 (S.D.N.Y. Aug. 24, 2017)................................................................ 12, 23

*LeBlanc-Sternberg v. Fletcher*,
  143 F.3d 748 (2d Cir. 1998)................................................................................................. 22

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002)............................................................................ *passim*

*Meredith Corp. v. SESAC, LLC*,
  87 F. Supp. 3d 650 (S.D.N.Y. 2015).................................................................................... 18

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970)............................................................................................................... 6

*Missouri v. Jenkins*,
  491 U.S. 274 (1989)............................................................................................................. 22

*Monzon v. 103W77 Partners, LLC*,
  2015 WL 993038 (S.D.N.Y. 2015)........................................................................................ 7

*Savoie v. Merchs. Banks*,
  166 F.3d 456 (2d Cir. 1999)................................................................................................. 13

*Shapiro v. JPMorgan Chase & Co.*,
  2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ..................................................................... 15

*Silverman v. Motorola Sols., Inc.*,
  739 F.3d 956 (7th Cir. 2013) ................................................................................................. 2

*Taft v. Ackermans*,
  2007 WL 414493 (S.D.N.Y. Jan. 31, 2007) .................................................................... 12, 19

764329.1

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
   2004 WL 1087261 (S.D.N.Y. May 14, 2004) ........................................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).................................................................................................. 21

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)............................................................................... 7, 13, 22

*Zeltser v. Merrill Lynch & Co., Inc.*,
   2014 WL 4816134 (S.D.N.Y. Sept. 23, 2014)......................................................... 13

STATUTES

15 U.S.C. § 78u-4 ............................................................................................................ 1

15 U.S.C. § 78u-4(a)(6) ................................................................................................... 7

15 U.S.C. §  78u-4(a)(4)24 ...................................................................................... 24, 25

OTHER AUTHORITIES

Attorneys' Fees in Class Actions: 2009-2013,
   92 N.Y.U. Law Review 937 (2017)............................................................. 10, 11, 23

*Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review*,
   NERA (Jan. 25, 2021)...................................................................................... *passim*

*Securities Class Action Filings: 2020 Year in Review*,
   Cornerstone Research (2021)..................................................................................... 2

Court-appointed Lead Counsel Glancy Prongay & Murray LLP ("GPM"), on behalf of all Plaintiffs' Counsel, respectfully requests that the Court grant its motion for an award of attorneys' fees in the amount of 30% of the $7,500,000 Settlement Amount (*i.e.*, $2,250,000, plus interest at the same rate as the Settlement Fund).[1]  Lead Counsel also seeks: (i) reimbursement of $71,121.58 in out-of-pocket litigation expenses reasonably and necessarily incurred by Plaintiffs' Counsel in prosecuting and resolving the Action; and (ii) an award in the amount of $7,500 for Lead Plaintiff's costs and expenses directly related to her and her family's representation of the Settlement Class, as authorized by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## I.    INTRODUCTION

The proposed Settlement, which provides for a non-reversionary cash payment of $7.5 million in exchange for the resolution of the Action, represents an excellent result for the Settlement Class, particularly when juxtaposed against the significant hurdles that Plaintiffs would have needed to overcome in order to prevail in this complex securities fraud litigation.  In undertaking this litigation, Plaintiffs' Counsel faced numerous challenges to establishing liability, loss causation and damages.  The risk of losing was very real and it was greatly enhanced by the fact that they would be litigating against a corporate defendant represented by highly skilled defense counsel, under the heightened pleading standard and automatic stay of discovery imposed by the PSLRA.  *See* 15 U.S.C. § 78u-4; *see also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009) (O'Connor, J., by designation) ("To be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and

---

[1] Unless otherwise defined, all capitalized terms used herein have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated June 28, 2021 (ECF No. 72-1, the "Stipulation") or the concurrently filed Declaration of Leanne H. Solish in Support of: (1) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Solish Declaration" or "Solish Decl."). All citations to "¶ __" and "Ex. __" in this memorandum refer, respectively, to paragraphs in, and Exhibits to, the Solish Declaration.

congressional action.").[2]  Indeed, "[a] review of the current status of securities class action suits filed after 2014 reveals that within each filing year a greater proportion of cases have been dismissed than have been settled.  For cases filed between 2015 and 2017, dismissal rates range from 44% to 49% each year while settlement rates range from 22% to 35%."[3]  *See* Ex. 6 (Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA Jan. 25, 2021 at p. 13 (Fig. 11)) ("NERA Report"); *see also* Ex. 7 (*Securities Class Action Filings: 2020 Year in Review* (Cornerstone Research 2021 at p. 18 (Fig. 17)) ("Recent annual dismissal rate have been closer to 50%.").  There was, therefore, a very strong possibility that the case would yield little or no recovery after many years of costly litigation.  *See In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*, 364 F. Supp. 2d 980, 994 (D. Minn. 2005) ("Precedent is replete with situations in which attorneys representing a class have devoted substantial resources in terms of time and advanced costs yet have lost the case despite their advocacy."); *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (observing that "Defendants prevail outright in many securities suits.").

Despite these risks, Plaintiffs' Counsel collectively worked over 2,164.10 hours on behalf of the Settlement Class, and advanced $71,121.58 in costs and expenses, all on a fully contingent basis.  Among other things, Plaintiffs' Counsel:

- drafted motions on behalf of their respective Plaintiffs to be appointed to serve as lead plaintiff as required by the PSLRA;
- conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) Eagle's filings with the U.S. Securities and Exchange Commission ("SEC"), (ii) public reports, research reports prepared by securities and financial analysts, and news articles concerning Eagle, (iii) Eagle's investor call transcripts, (iv) press releases published by and

---

[2] Unless otherwise noted, all internal citations and quotation marks are omitted and all emphasis is added.

[3] "[T]he word 'dismissed' is used as shorthand for all cases resolved without settlement; it includes cases where a motion to dismiss was granted (and not appealed or appealed unsuccessfully), voluntary dismissals, cases terminated by a successful motion for summary judgment, or an unsuccessful motion for class certification."  NERA Report, at 25 n.7.

764329.1

regarding Eagle; (v) Eagle's codes of business conduct and ethics, and (vi) court filings, deed records, UCC filings, and other publicly available material related to Eagle; (b) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information; (c) interviewing third parties with relevant information; (d) researching the applicable federal banking regulations, SEC regulations and Generally Accepted Accounting Principles ("GAAP") pertaining to related party loans; (e) consulting and working with a banking expert to understand and analyze relevant federal banking regulations; (f) consulting and working with an accounting expert to analyze Eagle's Settlement Class Period financial results, including the reported and revised related party loans; and (g) working with a damages and loss causation expert to analyze Eagle's stock price movements;

- utilized the foregoing comprehensive investigation and additional research to draft and file the comprehensive 126-page Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 37), which included approximately 258 pages of exhibits, and asserted claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Individual Defendants under Section 20(a) of the Exchange Act, and additional scheme liability claims under Rule 10b-5(a) and (c) against Defendants Paul and Bensignor;

- researched and drafted the opposition to Defendants' motion to dismiss and a request for judicial notice of two exhibits (ECF Nos. 50-51);

- drafted papers in support of the substitution of Danilee Cassinelli as the Lead Plaintiff in the Action (ECF Nos. 55-56);

- prepared multiple letters to the Court related to settlement negotiations;

- engaged in a mediation process overseen by a highly experienced third-party mediator, Jed Melnick, Esq., of JAMS, which involved an exchange of written submissions concerning the facts of the case, liability and damages, a full-day formal mediation session, extensive consultation with Plaintiffs' expert on damages and loss causation, and additional follow-up negotiations;

- negotiated a detailed confidential Memorandum of Understanding with Defendants' counsel, which was executed on April 21, 2021;

- negotiated the terms of the Stipulation (including the exhibits thereto) and Supplemental Agreement with Defendants' Counsel;

- worked with a damages expert to craft a plan of allocation that treats Plaintiffs and all other members of the proposed Settlement Class fairly;

- drafted the preliminary approval motion and supporting papers;

- oversaw the implementation of the notice process; and

- drafted the motion for final approval.  ¶81.

764329.1

3

Moreover, the legal work related to the Settlement will not end with the Court's approval of the proposed Settlement. Additional hours and resources will be expended assisting Settlement Class Members with their Claim Forms, responding to Settlement Class Members' inquiries, shepherding the claims process to conclusion and filing a distribution motion. No additional compensation will be sought for this work. *See In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 2015 WL 6971424, at \*10 (S.D.N.Y. Nov. 9, 2015) ("Considering that the work in this matter is not yet concluded for Plaintiffs' counsel who will necessarily need to oversee the claims process, respond to inquiries, and assist Class Members in submitting their Proof of Claims, the time and labor expended by counsel in this matter support a conclusion that a 33% fee award in this matter is reasonable.").

As compensation for Plaintiffs' Counsel's significant efforts and achievements on behalf of the Settlement Class, Lead Counsel respectfully requests a fee award in the amount of 30% of the Settlement Fund. The requested fee is equal to or below the relevant median percentage awards in complex class litigation according to empirical studies. *See infra* at § III.C.1.(a). The reasonableness of the request is further confirmed by a lodestar cross-check. In fact, the requested fee represents a multiplier of 1.47 on Plaintiffs' Counsel's lodestar, which is well within the range of multipliers typically awarded in class actions with substantial contingency risks such as this one (and below the mean multiplier in securities class actions). *See Ernst v. Dish Network, LLC*, Case No. 1:12-cv-08794-LGS, ECF No. 237, slip op. at 6, ¶16 (S.D.N.Y. Nov. 13, 2015) (finding "2.57 multiplier" to be "within the range awarded by courts throughout the country.") (Ex. 9); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 590 (S.D.N.Y. Sept. 10, 2008) ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court."); *see also infra* at III.C.3.

Lead Counsel also seek reimbursement of $71,121.58 in out-of-pocket litigation expenses

764329.1

4

incurred by Plaintiffs' Counsel in prosecuting this Action. *See* ¶¶98-105. The expenses are reasonable in amount, primarily for consultation with experts, and necessarily incurred in the successful prosecution of the Action. Accordingly, they should be approved.

Finally, Lead Plaintiff Danilee Cassinelli, as Trustee of the Danilee Cassinelli Trust DTD 7-23-93 ("Cassinelli"), respectfully requests a PSLRA award in the amount of $7,500 to compensate her for the time and effort she and her family expended on behalf of the Settlement Class.[4] Ex. 1. Lead Plaintiff, *inter alia*, researched the facts of the case, reviewed filings, conferred with Plaintiffs' Counsel about litigation and settlement strategies, and authorized Lead Counsel to settle the case. But for her and her family's "commitment to pursuing these claims, the successful recovery for the [Settlement] Class would not have been possible." *Bell v. Pension Comm. of ATH Holding Co., LLC*, 2019 WL 4193376, at *6 (S.D. Ind. Sept. 4, 2019).

For the reasons set forth herein, and in the Solish Declaration, Lead Counsel respectfully requests that the Court award attorneys' fees equal to 30% of the Settlement Fund, approve reimbursement of $71,121.58 in litigation expenses incurred by Plaintiffs' Counsel, and grant a PSLRA award of $7,500 to Lead Plaintiff Cassinelli.

## II.    FACTUAL AND PROCEDURAL HISTORY

The Solish Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for a discussion of, *inter alia*, the history of the Action (¶¶14-36); nature of the claims asserted (¶¶18-20); negotiations leading to the Settlement (¶¶30-35); risks and uncertainties of continued litigation (¶¶38-54); a summary of the services Plaintiffs' Counsel provided for the Settlement Class's benefit (¶81); and additional information on the factors that support the fee and expense application, including the lodestar cross-check (¶¶87-96).

---

[4] Cassinelli and additional plaintiff Norfolk County Retirement System are collectively referred to herein as "Plaintiffs."

764329.1

## III.   ARGUMENT

### A.   The Common Fund Doctrine Applies To The Settlement

The Supreme Court and the Second Circuit have long recognized that attorneys whose efforts create a "common fund" are entitled to a reasonable attorneys' fee from that fund. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). "The rationale for the doctrine is an equitable one: it prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost." *Id.* at 47; *see also In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *2 (S.D.N.Y. Nov. 7, 2007). Awarding reasonable attorneys' fees from a common fund also serves an important policy goal: it encourages "skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and thus discourages "future misconduct of a similar nature." *Id.*; *see also Hicks v. Morgan Stanley & Co.*, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005).

For the common fund doctrine to apply, "the applicant's efforts must confer a 'substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread costs proportionately among them,' an award of attorneys' fees must operate to shift the costs of litigation to that group." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 393-94 (1970)). All of these elements are present here. Plaintiffs' Counsel's efforts conferred a substantial benefit—$7.5 million in cash—on an ascertainable class. In addition, a fee award from the common fund will equitably shift the costs of litigation to the group benefitting from the Settlement, *i.e.*, the Settlement Class. Accordingly, the Court should award attorneys' fees from the Settlement Fund. *See Maley*, 186 F. Supp. 2d 369.

764329.1

## B.    The Court Should Award A Reasonable Percentage Of The Common Fund

In the Second Circuit, "both the lodestar and the percentage of the fund methods are available to district judges in calculating attorneys' fees." *Goldberger*, 209 F.3d at 50.  However, "[t]he trend in the Second Circuit is to use the percentage of the fund method in common fund cases like this one, as it directly aligns the interests of the class and its counsel, mimics the compensation system actually used by individual clients to compensate their attorneys, provides a powerful incentive for the efficient prosecution and early resolution of litigation, and preserves judicial resources." *Monzon v. 103W77 Partners, LLC*, 2015 WL 993038, at *2 (S.D.N.Y. 2015); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.").  The percentage-of-the-fund method is also supported by the PSLRA, which states that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."  15 U.S.C. § 78u-4(a)(6).[5]  The lodestar method, by contrast, "create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Wal-Mart*, 396 F.3d at 121.

The percentage method does not, however, render the lodestar irrelevant.  Rather, part of the reasonableness inquiry is a comparison of the lodestar to the fee awarded pursuant to the percentage of the fund method "[a]s a 'cross-check.'" *Wal-Mart*, 396 F.3d at 123 (quoting *Goldberger*, 209 F.3d at 50).  "[W]here [the lodestar method is] used as a mere cross-check, the hours documented by

---

[5] *See also In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *16 (S.D.N.Y. July 27, 2007) ("[T]he PSLRA implicitly supports the use of the percentage of the fund method."); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005) ("apply[ing] the percentage method" due, at least in part, to "the PSLRA's express contemplation that the percentage method will be used to calculate attorneys' fees in securities fraud class actions").

764329.1

counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50. "Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case," *id.*, or "[t]he district courts … may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 184 (W.D.N.Y. 2011); *Johnson v. Brennan*, 2011 WL 4357376, at \*14-15 (S.D.N.Y. Sept. 16, 2011).

In sum, the weight of authority suggests that the Court should use the percentage-of-recovery method, with a lodestar cross-check, in determining a reasonable attorneys' fee. *See Bellifemine v. Sanofi-Aventis U.S. LLC*, 2010 WL 3119374, at \*6 (S.D.N.Y. Aug. 6, 2010) ("applying a lodestar 'cross-check'"); *In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 233 (S.D.N.Y. 2005) ("Typically, courts utilize the percentage method and then 'cross-check' the adequacy of the resulting fee by applying the lodestar method."); *Hicks*, 2005 WL 2757792, at \*10.

## C.     The *Goldberger* Factors Confirm The Requested Fee Is Fair And Reasonable

The Second Circuit has set forth the following criteria that courts should consider when reviewing a request for attorneys' fees in a common fund case:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50. In application, this Court has "adopt[ed] the three-step approach set forth in *Colgate-Palmolive*." *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at \*2 (S.D.N.Y. Nov. 8, 2018) ("*Forex*") (citing *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 348 (S.D.N.Y. July 8, 2014)).

First, the Court "determine[s] a baseline reasonable fee by reference to other common fund settlements of a similar size, complexity and subject matter." *Forex*, 2018 WL 5839691, at \*2. "This analysis considers three of the *Goldberger* factors: (1) the requested fee in relation to the

764329.1

settlement, (2) whether to award a lower percentage of a higher settlement amount under a 'sliding scale' approach in order to avoid a windfall to Lead Counsel and (3) the magnitude and complexity of the case." *City of Birmingham Retirement and Relief System v. Credit Suisse Group AG*, 2020 WL 7413926, at \*2 (S.D.N.Y. Dec. 17, 2020).  Next, the Court makes "any necessary adjustments to the baseline fee based on the *Goldberger* factors of risk, quality of representation and other public policy concerns." *Forex*, 2018 WL 5839691, at \*2.  "The final step is to apply the lodestar method as a cross-check, which addresses the final *Goldberger* factor -- the time and labor expended by counsel." *City of Birmingham*, 2020 WL 7413926, at \*2.  Based on this analysis, a reasonable baseline fee in this case is 30%, which requires no further adjustment. *See Maley*, 186 F. Supp. 2d at 370 (finding a one-third fee request of settlement fund valued at $11.5 million "falls comfortably within the range of fees typically awarded in securities class actions").

### 1. Comparison To Court-Approved Fees In Other Class Action Common Fund Settlements

#### (a) The Applicable Baseline Fee Is 30%

According to a report published by NERA Economic Consulting, for securities class action settlements settled between 2011 and 2020 with a gross settlement value ranging from $5 million to $10 million, the median of plaintiffs' attorneys' fees as a percentage of settlement value was 30%. *See* NERA Report at 23 (Fig. 19).  The same was true for securities class actions settled during the 1996-2010 timeframe; the median of plaintiffs' attorneys' fees as a percentage of gross settlement value ranging from $5 million to $10 million was 30%. *Id*.  Thus, fee awards in securities class action cases settling for between $5 million to $10 million—like this one—have remained remarkably consistent since the passage of the PSLRA in 1995.

A study by Professors Theodore Eisenberg, Geoffrey Miller and Roy Germano of 458 reported class action settlements from state and federal courts around the country during the five

764329.1

years from 2009 to 2013 yielded substantially similar results. *See* Theodore Eisenberg, Geoffrey Miller and Roy Germano, Attorneys' Fees in Class Actions: 2009-2013, 92 N.Y.U. Law Review 937 (2017) ("Eisenberg & Miller"). That study finds that the mean fee percentage award for all class actions was 27% of the gross recovery during that five-year period. *Id.* at 947. For 116 settlements from the Second Circuit, the mean fee was 28% and the median fee was 30%. *Id.* at 951, Table 3. For the 78 settlements from the Southern District of New York, the mean fee was 27% and the median fee was 31%. *Id.* at 950, Table 2.

While certain of these figures are lower than the 30% median fee percentage reported by NERA, Lead Counsel respectfully submits that the data reported by NERA is more relevant and appropriate for the purpose of establishing an applicable baseline in this case. Of the 458 settlements in the data set used by Eisenberg & Miller (for the years 2009 through 2013), only 74 involved securities class actions. *Id.* at 940, 951. In contrast, NERA's data set solely includes securities class actions and spans more than three decades.[6] For just the years 2011 through 2020, NERA identified 816 securities class action settlements,[7] more than 10 times the number of securities class action settlements in the data set used by Eisenberg & Miller. Thus, NERA's data set is both more robust and more recent than the data set used by Eisenberg & Miller.[8]

In addition, while Eisenberg & Miller broke down certain of their data by case type and size of settlement, they did not separately break down securities class action settlements by size.[9] This is

---

[6] *See* https://www.nera.com/publications/archive/2021/recent-trends-in-securities-class-action-litigation--2020-full-y.html (last visited December 9, 2021) (noting that NERA relies on a "proprietary database of securities class actions, which spans more than three decades").

[7] *See* NERA Report at 12, Figure 10. Notably, this number does not include settlements that solely involved the resolution of merger objections, which NERA counted separately. *See id.*

[8] For just the years 2011 through 2013, the NERA Report identified 229 securities class action settlements. *See id.* Thus, Eisenberg & Miller's sample of 78 securities class action settlements was materially incomplete, even for the five-year period covered by that study.

[9] For all securities class action settlements in the Eisenberg & Miller study (irrespective of settlement size), the mean fee was 23% and the median fee was 25%. *See* Eisenberg & Miller, 92 N.Y.U. Law Review at 952, Table 4. For all settlements between $6.5 million and $12 million (irrespective of case type), the mean fee percentage was approximately

an important limitation of the Eisenberg & Miller study. As discussed *infra*, securities class actions are riskier and more complex than other types of class actions, a reality that is reflected by the fact that the average lodestar multiplier in securities class action settlements is meaningfully higher than that in almost every other type of class action.[10] Moreover, as this Court has recognized, the size of the settlement matters in establishing an appropriate baseline fee, as there is an inverse relationship between the size of the settlement and fee percentage. *See In re Colgate-Palmolive*, 36 F. Supp. 3d at 349. Thus, in determining an appropriate baseline fee, the most relevant comparables are settlements of the same case type with a similar settlement size. *See Forex*, 2018 WL 5839691, at *2 (court should "determine a baseline reasonable fee by reference to other common fund settlements of a ***similar size, complexity and subject matter***"). Accordingly, the Court should use NERA's median fee percentage for securities class action settlements between $5 million to $10 million—30%—as the baseline fee in this case.[11]

### (b)     The Requested Fee Will Not Result In A Windfall To Plaintiffs' Counsel

As demonstrated above, the requested attorneys' fee of 30% of the Settlement Fund is the same as the median fee percentage awarded in similar-sized securities class actions settled between 1996 and 2010 and between 2011 and 2020 (*see* NERA Report at 23 (Fig. 19)), is consistent with the median 30% fee percentage in the 116 class action settlements from the Second Circuit analyzed by Eisenberg & Miller (*see* Eisenberg & Miller, 92 N.Y.U. Law Review at 951, Table 3), and is below

---

26.4%. *Id.* at 948, Figure 5. Importantly, however, Eisenberg & Miller did not report the mean or median fee for securities class action settlements between $6.5 million and $12 million.

[10] According to Eisenberg & Miller, the mean lodestar multiplier for securities class action settlements is 1.79. *See* Eisenberg & Miller, 92 N.Y.U. Law Review at 963-65, Table 12. The only case types in Eisenberg & Miller's data set with a higher mean multiplier had tiny sample sizes: Health Care cases (mean multiplier of 4.61 based on 2 cases) and Truth in Lending Act cases (mean multiplier of 1.94 based on 2 cases). *See id.*

[11] In addition, Lead Counsel respectfully submits that "[e]xamining median values, which are less sensitive to outliers than the mean," provides a better basis for setting a baseline number. Eisenberg & Miller, 92 N.Y.U. Law Review at 949. The NERA Report presents only median values for fee percentages.

764329.1

the 31% median fee for the 78 class action settlements from the Southern District of New York surveyed by Eisenberg & Miller (*id.* at 950, Table 2). Accordingly, the requested fee will not result in a windfall to Plaintiffs' Counsel.[12] *See Taft v. Ackermans*, 2007 WL 414493, at *10 (S.D.N.Y. Jan. 31, 2007) ("Thirty percent of a larger settlement fund could constitute a windfall; however, a settlement fund of this size does not create such an issue. The requested fee is reasonable in relation to the settlement amount.").

That this case was settled before the Court decided Defendants' pending motion to dismiss does not alter the analysis. Indeed, "Class Counsel should not be penalized by a reduction of their fee request, but rather rewarded for the extent and expediency of the recovery for the Settlement Class[] that they have achieved." *Leach v. NBC Universal Media, LLC*, 2017 WL 10435878 at ¶40 (S.D.N.Y. Aug. 24, 2017). Recognizing the importance of efficient and effective advocacy, courts have repeatedly awarded similar fees where a settlement was reached during the pendency of a motion to dismiss or shortly thereafter, and where no or very limited discovery had been obtained as a result of the PSLRA discovery stay. *See Maley*, 186 F. Supp. 2d at 370 (awarding one-third of $11.5 million settlement, representing a 4.65 multiplier, where motions to dismiss were pending); *In re Ubiquiti Networks, Inc. Sec. Litig.*, No. 18-cv-01620 (VM), ECF No. 49 at 6 (S.D.N.Y. March 27, 2020) (awarding 33.3% of $15 million settlement, where settlement was reached prior to the filing of a motion to dismiss) (Ex. 10).[13]

---

[12] The Notice informed the Settlement Class that Lead Counsel would apply for an attorneys' fee award of up to 33⅓% of the Settlement Fund (which by definition includes accrued interest). Lead Counsel is, however, only seeking an attorneys' fee of 30% of the Settlement Fund.

[13] *See also In re Qudian Inc. Sec. Litig.*, 2021 WL 2328437, at *1 (S.D.N.Y. June 8, 2021) (awarding one-third of $8.5 million settlement following decision on motion to dismiss, but prior to formal discovery); *In re L.G. Philips LCD Co. Sec. Litig.*, No. 1:07-cv-00909-RJS, ECF No. 82, slip op. at ¶3 (S.D.N.Y. Mar. 17, 2011) (awarding 30% of $18 million, representing a multiplier of 3.17, where settlement was reached while motion to dismiss was pending) (Ex. 11); *In re Am. Express Fin. Advisors Sec. Litig.*, No. 04 Civ. 1773 (DAB), ECF No. 170, slip op. at ¶16 (S.D.N.Y. July 18, 2007) (awarding 27% of $100 million, where settlement was reached while motion to dismiss was pending) (Ex. 12); *In re TeleTech Litig.*, No. 1:08-cv-00913-LTS, ECF No. 82 (S.D.N.Y. June 11, 2010) (awarding 30% of $11 million settlement reached before motion to dismiss was filed) (Ex. 13); *In re Patriot National Sec. Litig.*, 2019 WL 5882171, at

One of the merits of awarding fees on a percentage basis is that it does not penalize attorneys for achieving a prompt resolution of a case, where, as here, Plaintiffs' Counsel gained sufficient information concerning the case's strengths and weaknesses to make an informed decision about the value of the claims, and further litigation may well have resulted in a recovery far less than the proposed Settlement, or nothing at all.  Under such circumstances, Plaintiffs' Counsel should be rewarded for their efficient and effective advocacy.  *See Zeltser v. Merrill Lynch & Co., Inc.*, 2014 WL 4816134, at *10 (S.D.N.Y. Sept. 23, 2014) (awarding a 33% fee, equating to a 5.1 multiplier, where settlement was reached after consolidated amended complaint was filed and noting that Plaintiff's Counsel should not be "penalize[d] ... for achieving an early settlement, particularly where ... the settlement amount is substantial."); *Wal-Mart Stores*, 396 F.3d at 121 ("The percentage method better aligns the incentives of plaintiffs' counsel with those of the class members because it bases the attorneys' fees on the result they achieve for their clients, rather than on the number of motions they file, documents they review or hours they work.").[14]

The requested 30% fee is, therefore, consistent with awards in other similarly complex cases. *See Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, at *1 and 15 (S.D.N.Y. Dec. 18, 2019) (awarding one-third of $7.5 million settlement, and stating: "[i]n this Circuit, courts routinely award attorneys' fees that run to 30% and even a little more of the amount of the common fund."); *Anwar v. Fairfield Greenwich Ltd.*, 2012 WL 1981505, at *3 (S.D.N.Y. June 1, 2012) (33% fee request of the approximate $7.7 million settlement fund "is well within the percentage range that courts within the Second Circuit have awarded in other complex litigations."); *Edward Lea v. TAL Educ. Grp.*,

---

*1-2 (S.D.N.Y. Nov. 6, 2019) (awarding 33% of $6.5 million settlement where settlement was reached prior to filing of a motion to dismiss); *In re Akazoo S.A. Sec. Litig.*, 2021 WL 4316717, at *1 (E.D.N.Y. Sept. 10, 2021) (awarding one-third of $4.9 million settlement fund where settlement was reached prior to filing of a motion to dismiss).

[14] *See also Savoie v. Merchs. Banks*, 166 F.3d 456, 461 (2d Cir. 1999) ("[T]he percentage-of-the-fund method also removes disincentives to prompt settlement, because plaintiffs' counsel, whose fee does not increase with delay, have no reason to drag their feet.").

764329.1

13

2021 WL 5578665, at *12 (S.D.N.Y. Nov. 30, 2021) (awarding 33⅓% of $7.5 million settlement fund and stating: "[t]he percentage of the fund request[ed] – one-third – is a percent that has been approved as reasonable in this Circuit.").

### (c)     The Magnitude And Complexity Of The Case Support The Requested Fee

Courts have repeatedly recognized the "notorious complexity" of securities class action litigation. *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006); *TAL Educ. Grp.*, 2021 WL 5578665, at *9 ("Class action suits have a well-deserved reputation as being most complex, and securities class actions are notably difficult and notoriously uncertain to litigate."); *La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 2009 WL 4730185, at *8 (D.N.J. Dec. 4, 2009) ("securities class actions are inherently complex"). Moreover, "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA," and other changes in the law. *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000); *see also AOL Time Warner*, 2006 WL 903236, at *9 ("[T]he legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages.").

Here, in addition to facing the heightened pleading standard and automatic discovery stay of the PSLRA—which can be problematic in the best of times as demonstrated by the high dismissal rate of securities class actions referenced *supra*—Plaintiffs also had to deal with the extremely complicated rules and regulations governing the subject matter of the Action. The focal point of the litigation was Eagle's failure to disclose approximately $177 million in related party loans. Disclosure is governed by multiple regulatory frameworks, including: (i) Regulation O (sometimes referred to as "Reg. O")—a Federal Reserve Board rule; (ii) Regulation S-K Item 404—an SEC Rule; and (iii) GAAP. The intersecting frameworks of Reg. O, Item 404, and GAAP is, to put it mildly,

exceedingly complex, and Plaintiffs had to retain experts in accounting and banking law to assist Lead Counsel in crafting the Complaint and understanding the governing standards. Indeed, it was only by immersing themselves in the esoteric world of banking law, developing a working knowledge of the various rules and regulations at issue, and conducting a thorough independent investigation of Eagle and Defendants—again, without the benefit of discovery—that Lead Counsel were able to put together a case strong enough to convince Defendants to engage in mediation and, ultimately, settle the case. Simply put, this was an incredibly complex matter—even by the standards of securities class actions.

The magnitude of this Action was similarly unquestionable: this was a hard-fought, expensive, multi-year litigation, with tens of millions of dollars of damages at stake, and it required considerable skill and resources to litigate. As such, the magnitude and complexity of the litigation support the requested fee. *See City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at \*16 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015) ("[T]he complex and multifaceted subject matter involved in a securities class action such as this supports the fee request.").

### 2.    Analysis Of Risk, Result And Policy Considerations

"The next step is to consider three additional *Goldberger* factors—the risk of the litigation, the quality of representation and any remaining policy considerations—and determine whether this case is so exceptional in any of those areas that a departure from awards in similar cases is warranted." *City of Birmingham*, 2020 WL 7413926, at \*3.

### (a)    The Risk Of Litigation Supports The Baseline Fee

"[T]he risk of success [is] perhaps the foremost factor to be considered in determining" a reasonable award of attorneys' fees. *Goldberger*, 209 F.3d at 54; *see also Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at \*21 (S.D.N.Y. Mar. 24, 2014) ("The Second Circuit long ago recognized that courts should consider the risks associated with lawyers undertaking a case on a contingent fee basis."); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 80 F. Supp. 3d 838,

764329.1

847-48 (N.D. Ill. 2015) ("When determining the reasonableness of a fee request, courts put a fair amount of emphasis on the severity of the risk (read: financial risk) that class counsel assumed in undertaking the lawsuit."). This is because "[n]o one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974). In applying this factor, "'litigation risk must be measured as of when the case is filed,' rather than with the hindsight benefit of subsequent events." *Global Crossing*, 225 F.R.D. at 467 (quoting *Goldberger*, 209 F.3d at 55). The many risks that Plaintiffs' Counsel faced in prosecuting this suit more than justify the requested 30% fee. *See, e.g.*, ¶¶39-54.

Numerous courts recognize that "class actions confront even more substantial risks than other forms of litigation[,]" *Comverse*, 2010 WL 2653354, at *5, and "[s]ecurities class actions such as this are notably difficult and notoriously uncertain." *Flag Telecom*, 2010 WL 4537550, at *27.[15] This case was no exception. From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, "plaintiffs' counsel were obligated to assure that sufficient attorney and para-professional resources were dedicated to the prosecution of the Action; counsel also faced the responsibility of advancing litigation and overhead expenses on this case for [approximately two and a half] years." *In re Giant Interactive Group, Inc. Sec. Litig.,* 279 F.R.D. 151, 164 (S.D.N.Y. Nov. 2, 2011). Indeed, "[u]nlike counsel for Defendants, who are paid substantial hourly rates and reimbursed

---

[15] *See also Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004) ("Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation.").

for their expenses on a regular basis, [Plaintiffs' Counsel] have not been compensated for any time or expenses since this case began [approximately two and half] years ago." *Flag Telecom*, 2010 WL 4537550, at *27.  Plaintiffs' Counsel's commitment was substantial (*i.e.*, $1,531,095.00 in lodestar and $71,121.58 in out-of-pocket hard costs), and had they not obtained a recovery, it could have all been lost.  *See Gross v. GFI Group, Inc.*, 784 Fed. App'x. 27, 28 (2d Cir. Sept. 13 2019) (affirming grant of summary judgment against plaintiff in securities fraud class action where GPM served as one of Lead Plaintiff's counsel, resulting in loss of millions of dollars in time and hundreds of thousands of dollars of hard costs); *see also* ¶82 (lodestar), ¶98 (expenses).  To put it bluntly, complex litigation is not risk free, and this case was not a slam dunk.[16]

"One proxy for assessing risk is whether the litigation followed on the heels of some prior criminal or civil proceeding involving the same parties or subject matter."  *Dairy Farmers*, 80 F. Supp. 3d at 848.  "This inquiry provides insight into whether class counsel benefitted from the work of others, which acts a red flag for judges assessing fee petitions."  *Id.*  In the instant case, no civil or criminal charges have been filed by the SEC or DOJ—even as of today.[17]  And, while the so-called "Aurelius Report" by an anonymous short seller did provide some guidance to Plaintiffs, Defendant Paul immediately denied its veracity (describing it as a "bogus, self-serving article" meant to hurt his financial institution and "stock manipulation"), and Defendant Eagle issued a press release claiming it was "filled with demonstrable falsehoods and material omissions."  The report also raised a host of

---

[16] For a discussion of the litigation, and thus contingency fee, risks inherent in this case, the Court is respectfully referred to the concurrently filed Final Approval Memorandum and Solish Declaration.  *See* Final Approval Memorandum § III.A.3.; Solish Decl. ¶¶38-54.  While Lead Counsel believe those risks are important in assessing a reasonable attorneys' fee, for the sake of brevity, and in line with this Court's prior attorneys' fee rulings, this section focuses on what made this Action riskier than other securities class actions.  *See City of Birmingham*, 2020 WL 7413926, at *3 ("[G]reater risks undertaken by counsel who accept a case on a contingent fee basis support a higher settlement percentage.").

[17] There are on-going governmental investigations into Eagle and certain of its executives, however, the government has not released any information concerning those investigations and the information provided to the public by Eagle has been extremely vague.  Additionally, while a Wells Notice was issued to Eagle's CFO in July 2021—after the June 2021 filing of the preliminary approval motion in this case—none of the investigations have resulted in indictments or criminal or civil penalties.

764329.1

issues with respect to pleading a securities fraud case—most notably with respect to loss causation, as Defendants argued in their motion to dismiss papers. *See* ECF Nos. 46 at 11-13 & 52 at 3-4. Plaintiffs could not, therefore, simply rely on the allegations of the Aurelius Report and call it a day. Rather, they had to conduct their own independent investigation, consult with a variety of experts, and then draft an amended complaint that would not only comply with the rigorous pleading standards of the PSLRA, but also allow them to credibly contest a motion to dismiss drafted by one of the country's foremost law firms. Put simply, a short seller's report is far different from a government indictment, and "Plaintiffs' counsel (and their teams and experts) were truly the authors of the favorable outcome for the class." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 670 (S.D.N.Y. 2015).

Another indicia of risk is whether there has been a restatement. When companies restate their financials, they are admitting a material misstatement of their financial reporting. A case predicated on a restatement is, therefore, less risky because the misstatement and materiality elements of a securities fraud claim are already met. *See In re Schering-Plough Corp. Enhance Sec. Litig.*, 2013 WL 5505744 at *30 (D.N.J. Oct. 1, 2013) (granting fee request where the case was the antithesis of cases where liability is virtually certain due to a financial restatement). While Eagle did modify certain aspects of its related party loan analysis, it did not restate its financials, as Defendants noted in their motion to dismiss, and hammered home four times in their reply. *See* ECF No. 46 at 9 ("The Company did not restate any prior financials, but it did disclose additional loans made to parties affiliated with Mr. Paul and other directors that the Company, in good faith, had previously believed fell outside its disclosure obligations."); ECF No. 52 at 1 ("Importantly, Eagle never restated prior balances …."); 8 ("Yet none of these changes over time ever required a restatement of prior related party loan balances …."); 10 ("Moreover, *no prior financials were restated* in March

764329.1

2020, and no additional loans were reclassified." (emphasis in the original)); and 13 (material weakness of internal controls were "not significant enough to require restatement of any financials").

In short, this case lacked several strong factors that often support liability, large settlement valuations, and provide a roadmap for proving fraud, such as a corporate restatement or a companion SEC or DOJ action. The contingency fee risk was high and, consequently, this factor militates in favor of the requested fee. *See Xcel Energy*, 364 F. Supp. 2d at 995 (noting that attorney fee request was supported by fact that the "case did not benefit from meaningful governmental investigations" and that it did not involve a "a restatement of financials").

<strong>(b)      The Quality Of Representation Supports The Baseline Fee</strong>

"To determine the 'quality of the representation,' courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *Taft v. Ackermans*, 2007 WL 414493, at *10 (S.D.N.Y. Jan. 31, 2007); *see also Veeco*, 2007 WL 4115808, at *7. Both of these factors point to the same conclusion, a 30% fee award is reasonable under circumstances.

The proposed Settlement is an excellent result in light of the significant risks of continued litigation. Plaintiffs' damages expert estimates that if Plaintiffs had fully prevailed on all their claims at summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' best case scenario—the total ***maximum*** damages potentially available in this Action would be approximately $304 million. Under these assumptions, the Settlement equates to approximately 2.5% of maximum potential damages. Defendants had, however, raised significant arguments concerning Plaintiffs' alleged partial corrective disclosures on December 1, 2017 and July 17, 2019 and would likely have raised additional arguments concerning the length of the class period if Plaintiffs prevailed on the motion to dismiss. If any of Defendants' arguments were accepted by the Court or a jury, the Settlement Class's potential maximum damages could have been reduced to

764329.1

anywhere from $26 million to $75 million (and even further if disaggregation principles were applied).  *See* ¶¶55-56; Final Approval Memorandum § III.A.3.(d).  Thus, the $7.5 million Settlement represents a recovery of 2.5% to 28.8% (assuming $26 million in damages), a range that falls well above the median recovery of 1.7% of estimated damages in securities class actions in 2020.  *See* Solish Decl., Ex. 6 (NERA Report, at p. 20 (Fig. 16)).

Additionally, the quality of Plaintiffs' Counsel's efforts and commitment to providing the Settlement Class with the best possible representation, together with their substantial experience in securities class actions, provided leverage necessary to negotiate the Settlement.  *See* ¶90; *see also* Exs. 3-C and 4-C (GPM and Labaton firm resumes).  Indeed, "[n]ot only did Plaintiffs' Counsel's skill and expertise contribute to the favorable settlement for the class, it contributed to the overall efficiency of the case."  *Veeco*, 2007 WL 4115808, at *7.

Finally, courts have recognized that the quality of the opposition faced by Plaintiffs' Counsel should be taken into consideration in assessing the quality of the counsel's performance.  ¶91; *see, e.g.*, *Veeco*, 2007 WL 4115808, at *7 (among factors supporting 30% award of attorneys' fees was that defendants were represented by "one of the country's largest law firms"); *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by formidable opposing counsel from some of the best defense firms in the country also evidences the high quality of lead counsels' work."), *aff'd*, 272 Fed. Appx. 9 (2d Cir. 2008).  Here, Defendants were represented by Baker & Hostetler LLP, a prestigious and well-respect law firm with a substantial securities class action litigation practice, whose lawyers tenaciously represented the interests of their clients throughout this Action.  ¶91.  Notwithstanding this formidable opposition, Plaintiffs' Counsel's thorough investigation, ability to present a strong case, and demonstrated willingness to vigorously prosecute

764329.1

the Action, ultimately resulted in the favorable Settlement. *Id.* Consequently, this factor militates in favor of the requested fee. *See Veeco*, 2007 WL 4115808, at *7 ("That Plaintiffs' Counsel was able to obtain a substantial settlement from these Defendants confirms the quality of Plaintiffs' Counsel's representation … and is a factor in determining the reasonableness of the fee request.").

### (c)   Policy Considerations Support The Baseline Fee

"In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered." *Del Global*, 186 F. Supp. 2d at 373. This is because private actions such as this one serve to further the objective of the federal securities laws to protect investors. "[The Supreme] Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the [SEC]." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). If the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook." *Flag Telecom*, 2010 WL 4537550, at *29. "[A]s a practical matter, lawsuits such as this one can only be maintained if competent counsel can be retained to prosecute them. This will occur if courts award reasonable and adequate compensation for such services where successful results are achieved." *City of Providence*, 2014 WL 1883494, at *18.

Here, Plaintiffs' Counsel invested substantial amounts of time and money vigorously pursuing allegedly serious wrongdoing by a public enterprise, and they did so on a fully contingent basis. Had Plaintiffs' Counsel not done so, the Settlement Class would have received no compensation whatsoever. Accordingly, public policy considerations favor Lead Counsel's attorneys' fee request. *See City of Birmingham*, 2020 WL 7413926, at *2 ("Protecting investors from fraudulent or misleading investments serves the public interest, and Lead Counsel's fees should

764329.1

21

reflect the important goal of 'serv[ing] as an inducement for lawyers to make similar efforts in the future.'") (quoting *Wal-Mart*, 396 F.3d at 96) (alteration in the original).

### 3. The Lodestar "Cross-Check" Strongly Supports The Reasonableness Of The Requested Fee

A lodestar "cross-check" confirms the reasonableness of the requested fee award. *See Goldberger*, 209 F.3d at 50. The "lodestar" is calculated by multiplying the number of hours expended on the litigation by each particular attorney or paralegal by their current reasonable and customary hourly rate, and totaling the amounts for all time-keepers.[18] Additionally, "[u]nder the lodestar method of fee computation, a multiplier is typically applied to the lodestar." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004). "The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010) ("Where ... counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar.").

Here, Plaintiffs' Counsel (including attorneys, paralegals, and professional support staff) collectively devoted a total of 2,164.10 hours to the prosecution of the Action, resulting in a lodestar of $1,531,095.00. ¶82.[19] Based on a 30% fee (equal to $2,250,000), Plaintiffs' Counsel's lodestar of $1,531,095.00 yields a multiplier of 1.47. This multiplier is well within the range of multipliers commonly awarded in securities class actions and other complex litigation. *See Wal-Mart*, 396 F.3d at 123 (upholding multiplier of 3.5 as reasonable on appeal); *Maley*, 186 F. Supp. 2d at 369

---

[18] "[T]he use of current rates to calculate the lodestar figure has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *15 (S.D.N.Y. Dec. 19, 2014); *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) ("[C]urrent rates, rather than historical rates, should be applied in order to compensate for the delay in payment.").

[19] Lead Counsel's rates range from $700 to $975 for partners, and $425 to $625 for associates (¶83), and "are comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude." *TAL Educ. Grp.*, 2021 WL 5578665, at *12 (approving GPM's rates of $600 to $995 for partners, and $500 to $750 for associates); *see also* Ex. 8 (chart of rates charged by peer plaintiff and defense counsel in complex litigation).

764329.1

(awarding fee equal to a 4.65 multiplier, which was "well within the range awarded by courts in this Circuit and courts throughout the country"); *Burns v. Falconstor Software, Inc.*, 2014 WL 12917621, at \*10 (E.D.N.Y. Apr. 10, 2014) (finding fee award of 33.3% "reasonable" based on cross-check multiplier of 4.75); *In re Bisys Sec. Litig.*, 2007 WL 2049726, at \*3 (S.D.N.Y July 16, 2007) (finding a 2.99 multiplier "falls well within the parameters set in this district and elsewhere"); *Davis*, 827 F. Supp. 2d at 185 (awarding fee representing a multiplier of 5.3, which was "not atypical" in similar cases); *In re Elan Sec. Litig.,* 385 F. Supp. 2d 363, 376 (S.D.N.Y. 2005) (awarding multiplier of 3.47 in light of an early settlement).[20]  Moreover, "[t]he fact that Class Counsel's fee award will not only compensate them for time and effort already expended, but for the time that they will be required to spend administering the settlement going forward, also supports their fee request." *Leach*, 2017 WL 10435878 at ¶49; *see also Facebook,* 2015 WL 6971424, at \*10.

Additionally, the 1.47 multiplier in this case is almost 18% lower than the 1.79 mean multiplier for securities class actions identified by Eisenberg & Miller.  *See* Eisenberg & Miller, 92 N.Y.U. Law Review at 965, Table 12.  Thus, if anything, the lodestar cross-check in this case could warrant "a modest upward adjustment in the fee percentage," *City of Birmingham*, 2020 WL 7413926, at \*4, but Lead Counsel only requests the baseline fee of 30%.

In sum, Lead Counsel's requested fee award is well within the range of what courts in this Circuit regularly award in class actions such as this one, whether calculated as a percentage of the fund or in relation to Plaintiffs' Counsel's lodestar.

---

[20] *See also Colgate-Palmolive*, 36 F. Supp. 3d at 353 (awarding fee representing a multiplier of 5.2, which was "large, but not unreasonable."); *Athale v. Sinotech Energy Ltd.*, 2013 WL 11310686, at \*8 (S.D.N.Y. Sept. 4, 2013) (stating that courts routinely award lodestar multipliers of "between four and five"); *Guevoura*, 2019 WL 6889901, at \*18 ("multipliers of between three and four times … have been routinely awarded in this Circuit."); *In re Interpublic Sec. Litig.*, 2004 WL 2397190, at \*12 (S.D.N.Y. Oct. 26, 2004) ("In recent years multipliers of between 3 and 4.5 have been common in federal securities cases."); *Asare v. Change Group of New York, Inc.*, 2013 WL 6144764, at \*19 (S.D.N.Y. Nov. 18, 2013) ("Typically, courts use multipliers of 2 to 6 times the lodestar.").

764329.1

23

**D.    Plaintiffs' Counsel's Expenses Are Reasonable And Were Necessarily Incurred To Achieve The Benefit Obtained**

Plaintiffs' Counsel also request reimbursement of $71,121.58 in expenses incurred while prosecuting the Action.  In support of this request, Plaintiffs' Counsel are submitting separate declarations attesting to the accuracy of these expenses, which are properly recovered by counsel. *See Flag Telecom*, 2010 WL 4537550, at *30 ("It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class"); *In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation' of those clients."). A significant portion of the expenses were incurred for professional services rendered by Plaintiffs' experts, the investigator, and the mediator, and the remaining expenses are attributable to the legal and factual research, travel, service of process, and other expenses incurred in the course of the litigation.  ¶¶101-04.  These expenses were critical to Plaintiffs' success in achieving the proposed Settlement, are reasonable in amount, and are customary and necessary expenses for a complex securities action.  As such, they should be reimbursed.  *See Flag Telecom*, 2010 WL 4537550, at *30; *Global Crossing*, 225 F.R.D. at 468 ("The expenses incurred – which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review – are the type for which 'the paying, arms' length market' reimburses attorneys.  For this reason, they are properly chargeable to the Settlement fund.").

**E.    Lead Plaintiff Should Be Awarded Her Reasonable Costs And Expenses Under 15 U.S.C. §  78u-4(a)(4)**

In connection with their request for reimbursement of Litigation Expenses, Lead Counsel also respectfully requests a PSLRA award of $7,500 for Cassinelli to compensate her for the time and effort she and her family expended on behalf of the Settlement Class.  Ex. 1.  The PSLRA

764329.1

24

specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4).

Here, Lead Plaintiff took an active role in the litigation by, among other things: (a) regularly communicating with her attorneys regarding the posture and progress of the case, as well as strategy; (b) producing documents to her attorneys; (c) reviewing all significant pleadings and memoranda; (d) consulting with her attorneys regarding the settlement negotiations; and (e) evaluating and approving the proposed Settlement. Ex. 1, ¶¶3-6, 12-13; *see also* ¶106 (discussing work of Lead Plaintiff and her family on behalf of the Settlement Class). These are "precisely the types of activities that support awarding reimbursement of expenses to class representatives." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *21 (S.D.N.Y. 2009).

Consequently, Lead Counsel respectfully requests that the Court grant Lead Plaintiff's request for reimbursement of her "reasonable costs and expenses incurred in managing this litigation and representing the Class." *Id.* at *21 (approving $215,000 total award to two lead plaintiffs); *In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, 772 F.3d 125, 132 (2d Cir. 2014) (affirming award of approximately $453,000 to representative plaintiffs); *In re Qudian Inc. Sec. Litig.*, 2021 WL 2328437, at *2 (awarding lead plaintiff $25,000, and class representative $12,500, for "reasonable costs and expenses directly related to [their] representation of the Class").[21]

## IV.   CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests that the Court grant the motion.

---

[21] *See also In re Signet Jewelers Limited Sec. Litig.*, 2020 WL 4196468, at *24 (S.D.N.Y. July 21, 2020) (collecting cases and awarding $25,410 to lead plaintiff); *Lea*, 2021 WL 5578665, at *13 (awarding $7,500 to each of the two lead plaintiffs); *Veeco*, 2007 WL 4115808, at *12 (awarding lead plaintiff approximately $15,900 of $5.5 million settlement for time spent supervising litigation, and characterizing such awards as "routine" in this Circuit).

764329.1

Dated: December 16, 2021

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Leanne H. Solish*
Robert V. Prongay (*pro hac vice*)
Joseph D. Cohen (*pro hac vice*)
Jason L. Krajcer (*pro hac vice*)
Leanne H. Solish (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
    jcohen@glancylaw.com
    jkrajcer@glancylaw.com
    lsolish@glancylaw.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Proposed Settlement Class*

**LABATION SUCHAROW LLP**
Francis P. McConville
140 Broadway, 34th Floor
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: fmcconville@labaton.com

*Counsel for Norfolk County Retirement System*

764329.1

26

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed with the Clerk of

Court via the CM/ECF system, which will send Notice of such filing to all counsel of record.


Dated: December 16, 2021    */s/ Leanne H. Solish*
             Leanne H. Solish

764329.1