# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHIVA STEIN, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:19-cv-06873-LGS |
| Plaintiff, | |
| v. | |
| EAGLE BANCORP, INC., SUSAN G. RIEL, RONALD D. PAUL, CHARLES D. LEVINGSTON, JAMES H. LANGMEAD, and LAURENCE E. BENSIGNOR, | |
| Defendants. | |

**DECLARATION OF LEANNE H. SOLISH IN SUPPORT OF: (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 2

II.     PROSECUTION OF THE ACTION ................................................................... 5

        A.      Commencement Of The Action And Appointment Of Lead Plaintiffs And Lead Counsel ................................................................................................. 5

        B.      The Comprehensive Pre-Filing Investigation And The Preparation Of The Complaint .................................................................................................... 6

        C.      Defendants' Motion To Dismiss The Complaint And Plaintiffs' Response ........... 7

        D.      Mediation Efforts, Settlement Negotiations, And The Settlement's Preliminary Approval ................................................................................. 11

III.    THE RISKS OF CONTINUED LITIGATION ................................................. 13

        A.      Risks Faced In Proving Liability ............................................................... 14

        B.      Risks To Proving Loss Causation And Damages ....................................... 15

        C.      Risks Faced In Obtaining And Maintaining Class Action Status .............. 18

        D.      Other Risks ................................................................................................. 19

        E.      The Settlement Is Reasonable In Light Of Potential Recovery In The Action ..... 21

IV.     PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE ...................................... 22

V.      ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ............ 25

VI.     LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES ...................................................................... 28

        A.      The Fee Application ................................................................................... 29

                1.      The Outcome Achieved Is The Result Of The Significant Time And Labor That Plaintiffs' Counsel Devoted To The Action ..................................... 29

                2.      The Significant Risks Borne By Plaintiffs' Counsel ............................... 32

                3.      The Quality Of Representation, Including The Result Obtained, The Experience And Expertise Of Plaintiffs' Counsel, And The Standing And Caliber Of Defendants' Counsel ............................................................... 33

i

4.    The Requested Fee In Relation To The Settlement ................................... 34

5.    Interests Of Public Policy, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Securities Cases ........................................................................................................ 34

6.    The Reaction Of The Settlement Class Supports Lead Counsel's Fee Request .................................................................................................... 35

7.    Plaintiffs Support Lead Counsel's Fee Request ....................................... 35

B.    Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable 36

VII.    CONCLUSION ............................................................................................................ 39

**TABLE OF EXHIBITS TO DECLARATION**

| EX. | TITLE |
|---|---|
| 1 | Declaration Of Lead Plaintiff Danilee Cassinelli, As Trustee Of The Danilee Cassinelli Trust DTD 7-23-93, In Support Of: (1) Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 2 | Declaration Of Kathleen Kiely-Becchetti On Behalf Of Additional Named Plaintiff Norfolk County Retirement System In Support Of: (1) Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 3 | Declaration Of Luiggy Segura Regarding: (A) Mailing Of The Notice Packet; (B) Publication Of The Summary Notice; And (C) Report On Requests For Exclusion Received To Date |
| 4 | Declaration of Leanne H. Solish, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fee And Reimbursement Of Litigation Expenses Filed On Behalf Of Glancy Prongay & Murray LLP |
| 5 | Declaration Of Francis P. McConville, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fee And Reimbursement Of Litigation Expenses Filed On Behalf Of Labaton Sucharow LLP |
| 6 | Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review (NERA Jan. 25, 2021) |
| 7 | Securities Class Action Filings: 2020 Year in Review (Cornerstone Research 2021) |
| 8 | Table of Law Firm Billing Rates |
| 9 | *Ernst v. Dish Network, LLC*, Case No. 1:12-cv-08794-LGS, ECF No. 237 (S.D.N.Y. Nov. 13, 2015) |
| 10 | *In re Ubiquiti Networks, Inc. Sec. Litig.*, No. 18-cv-01620 (VM), ECF No. 49 (S.D.N.Y. March 27, 2020) |
| 11 | *In re L.G. Philips LCD Co. Sec. Litig.*, No. 1:07-cv-00909-RJS, ECF No. 10 (S.D.N.Y. Mar. 17, 2011) |

| 12 | *In re Am. Express Fin. Advisors Sec. Litig.*, No. 04 Civ. 1773 (DAB), ECF No. 170 (S.D.N.Y. July 18, 2007) |
|----|------------------------------------------------------------------------|
| 13 | *In re TeleTech Litig.*, No. 1:08-cv-00913-LTS, ECF No. 82 (S.D.N.Y. June 11, 2010) |

I, Leanne H. Solish, declare the following pursuant to 28 U.S.C. §1746:

1.      I am an attorney duly licensed to practice law before all of the courts of the State of California and I am admitted *pro hac vice* in this action.  I am a partner with the law firm of Glancy Prongay & Murray LLP, Lead Counsel for Lead Plaintiff Danilee Cassinelli, as Trustee of the Danilee Cassinelli Trust DTD 7-23-93 ("Lead Plaintiff") in the above-entitled action (the "Action").[1]

2.      I respectfully submit this declaration, together with the attached exhibits in support of Lead Plaintiff's and additional named plaintiff Norfolk County Retirement System's ("Norfolk" and collectively, "Plaintiffs") Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently-filed memorandum in support thereof ("Final Approval Memorandum").  As set forth in the Final Approval Memorandum, Plaintiffs seek final approval of the $7,500,000 Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

3.      I also respectfully submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently-filed memorandum in support thereof ("Fee Memorandum").[2]  As set forth in the Fee Memorandum, Lead Counsel seeks an award of attorneys' fees in the amount of 30% of the Settlement Fund (which, by definition, includes interest accrued thereon), and reimbursement of

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Stipulation and Agreement of Settlement, dated June 28, 2021 (the "Stipulation").  ECF No. 72-1.

[2] Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses is made on behalf of Lead Counsel and Labaton Sucharow LLP ("Labaton" and collectively, "Plaintiffs' Counsel").

1

Litigation Expenses in the total amount of $78,621.58, which includes Plaintiffs' Counsel's total out-of-pocket litigation costs in the amount of $71,121.58, and $7,500 to Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, for the costs incurred and time and effort expended in connection with representing the Settlement Class.

4.   The Court preliminarily approved the proposed Settlement by Order dated August 16, 2021 (the "Preliminary Approval Order"), and thereby directed notice of the Settlement to be disseminated to the Settlement Class. *See* ECF No. 77.  Pursuant to the Preliminary Approval Order, JND Legal Administration ("JND") the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and by publication.

5.   In total, 35,448 Notice Packets have been mailed to potential Settlement Class Members, and thus far, no requests for exclusion and no objections have been received.

## I.   INTRODUCTION

6.   This is a consolidated securities class action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and Section 20(a) of the Exchange Act.  Plaintiffs asserted claims against defendant Eagle Bancorp, Inc. ("Eagle Bancorp" or the "Company"), Susan G. Riel ("Riel"), Ronald D. Paul ("Paul"), Charles D. Levingston ("Levingston"), James H. Langmead ("Langmead"), and Laurence E. Bensignor ("Bensignor") (together, "Defendants").

7.   On January 21, 2020, Plaintiffs filed and served their Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"), asserting claims against all Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against the Individual Defendants under Section 20(a) of the Exchange Act, and

additional scheme liability claims under Rule 10b-5(a) and (c) against Defendants Paul and Bensignor. ECF No. 37. The Complaint alleged that Defendants made materially false and misleading statements and/or omissions about: (a) Eagle's related-party loan figures for fiscal years 2014 through 2017; (b) the terms of Eagle's related-party loans and their approval process; (c) Defendants' attestations as to the effectiveness of Eagle's internal controls and certifications in accordance with Sarbanes-Oxley Act ("SOX") of 2002 ("SOX Certifications"); and (d) Defendants' denials of a report issued by Marcus Aurelius Value (the "Aurelius Report") that was critical of Eagle and questioned the Company's material underreporting of its related-party loan figures. The Complaint further alleged that the prices of Eagle publicly-traded securities were artificially inflated as a result of Defendants' allegedly false and misleading statements, and declined when the truth was revealed. ECF No. 37.

8.      The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $7,500,000 (the "Settlement Amount") for the benefit of the Settlement Class. As detailed herein, Plaintiffs and Lead Counsel respectfully submit that the proposed Settlement represents an excellent result for the Settlement Class considering the posture of the Action as well as the significant risks of continued litigation.

9.      The Settlement was reached after two years of contested litigation. Plaintiffs' Counsel's efforts involved, among other things: (a) conducting a detailed and substantive investigation into Eagle, the Individual Defendants, and the facts forming the basis for the claims asserted in the Action, including retaining and working with a private investigator who conducted interviews with former employees and other third parties; (b) consulting with experts in the fields of damages and loss causation, accounting, and banking; (c) based on the foregoing investigation and consultations, filing the Complaint; (d) researching, drafting, and filing an

3

opposition to Defendants' motion to dismiss; and (e) engaging in mediation and further negotiations with a well-respected neutral.

10.     In preparation for the mediation, Plaintiffs' Counsel drafted a detailed mediation statement and thoroughly reviewed and analyzed Defendants' mediation statement. Following the exchange of detailed mediation statements addressing both liability and damages, Lead Counsel prepared for and engaged in full-day mediation session overseen by an experienced mediator of complex cases, Jed Melnick, Esq. of JAMS, which ended without an agreement to settle. However, based on the significant submissions addressing both the factual and legal basis for the Parties' respective positions and the full-day session, which included direct discussions, Mr. Melnick conducted further negotiations. These negotiations culminated in the Parties accepting Mr. Melnick's recommendation to settle the Action for $7,500,000 on or about April 19, 2021.

11.     Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of its members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

12.     In addition, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Plaintiffs' damages consultant. The Plan of Allocation provides for the

distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

13.     Finally, Lead Counsel, on behalf of Plaintiffs' Counsel, seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Fee Memorandum.  As discussed in detail in the accompanying Fee Memorandum, the requested 30% fee is within the range of percentage awards granted by courts in this Circuit in comparable securities class actions.  Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and warranted in light of the extent and quality of the work performed and the substantial result achieved.  Likewise, the requested out-of-pocket litigation costs of $71,121.58 and the requested reimbursements of costs of $7,500 to Lead Plaintiff pursuant to the PSLRA are also fair and reasonable.  Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses be approved.

## II.     PROSECUTION OF THE ACTION

### A.     Commencement Of The Action And Appointment Of Lead Plaintiffs And Lead Counsel

14.     This Action was filed on July 24, 2019 by plaintiff Shiva Stein, in the United States District Court for the Southern District of New York, styled *Stein v. Eagle Bancorp, Inc. et al*, Case No. 1:19-cv-06873-LGS.

15.     On September 23, 2019, Anthony Cassinelli, as Trustee of the Danilee Cassinelli Trust DTD 7-23-93, along with Norfolk and another potential lead plaintiff, filed motions to be appointed lead plaintiff under the PSLRA and for appointment of their selected counsel to serve as lead counsel.  *See* ECF Nos. 7-17.

5

16.     On November 7, 2019, the Court issued an Order: (1) appointing Anthony Cassinelli, as Trustee of the Danilee Cassinelli Trust DTD 7-23-93, Lead Plaintiff in the Action; and (2) approving Lead Plaintiff's selection of Glancy Prongay & Murray LLP as Lead Counsel for the putative class.  ECF. No. 33.[3]

**B.     The Comprehensive Pre-Filing Investigation And The Preparation Of The Complaint**

17.     Lead Counsel conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) Eagle's filings with the U.S. Securities and Exchange Commission ("SEC"), (ii) public reports, blog posts, research reports prepared by securities and financial analysts, and news articles concerning Eagle, (iii) Eagle's investor call transcripts, (iv) press releases published by and regarding Eagle; (v) Eagle's codes of business conduct and ethics, and (vi) court filings, deed records, UCC filings, and other publicly available material related to Eagle; (b) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information; (c) researching the applicable federal banking regulations, SEC regulations and Generally Accepted Accounting Principles ("GAAP") pertaining to related party loans; (d) consulting and working with a banking expert to understand and analyze relevant federal banking regulations; (e) consulting and working with accounting experts to analyze Eagle's Settlement Class Period financial results, including the reported and revised related party loans; and (f) working with a damages and loss causation expert to analyze Eagle's stock price movements .

---

[3] In November 2020, following the death of Anthony Cassinelli, Danilee Cassinelli, as Trustee of the Danilee Cassinelli Trust DTD 7-23-93, was substituted as the Lead Plaintiff.  *See* ECF Nos. 55, 57.

18.    On January 21, 2020, Plaintiffs filed and served their detailed 126-page Complaint, together with approximately 258 pages of exhibits.  ECF No. 37.  The Complaint asserted claims against all Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against the Individual Defendants under Section 20(a) of the Exchange Act, and additional scheme liability claims under Rule 10b-5(a) and (c) against Defendants Paul and Bensignor.

19.    Among other things, the Complaint alleged that Defendants made materially false and misleading statements and omissions concerning: (a) Eagle's related-party loan figures for fiscal years 2014 through 2017; (b) the terms of Eagle's related-party loans and their approval process; (c) Defendants' attestations as to the effectiveness of Eagle's internal controls and the Individual Defendants' SOX Certifications; and (d) Defendants' denials of the Aurelius Report that was critical of Eagle and questioned the Company's material underreporting of its related-party loan figures.

20.    As a result of these materially false and misleading statements, Plaintiffs allege the prices of Eagle publicly-traded securities were artificially inflated and declined when the truth was revealed and the concealed risks materialized through two partial disclosures on December 1, 2017 and July 17, 2019, damaging investors.

**C.    Defendants' Motion To Dismiss The Complaint And Plaintiffs' Response**

21.    On April 2, 2020, Defendants moved to dismiss the Complaint.  ECF Nos. 45-47. Among other things, Defendants argued that Plaintiffs failed to plead: (a) the existence of a materially misleading statement or omission, (b) a strong inference of scienter, (c) loss causation, and (d) a claim for scheme liability.  Specifically, Defendants argued that all of the statements

alleged to be false or misleading[4] were statements of opinions and therefore subject to the heightened pleading standards of *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015) ("*Omnicare*"). Defendants further argued that all of the challenged statements were *true* statements of opinion (*i.e.*, that they were accurate, good faith representations of Defendants' actual beliefs) and not misleading.

22.     Defendants also argued that Plaintiffs failed to plead a strong inference of scienter because there was no cogent reason as to why Defendants would have committed the alleged fraud, and that due to the extensive regulatory scrutiny Eagle's related party loans received, Defendants had every reason to believe that the Company was accurately identifying and disclosing loans, and, moreover, these loans continued to have strong loan performance.

23.     Defendants also challenged the Complaint's pleading of loss causation. First, Defendants argued that the Aurelius Report could not constitute a corrective disclosure because it was merely a negative characterization of already public information. Second, Defendants argued that Plaintiffs' second alleged corrective disclosure—the July 17, 2019 announcement that Eagle had been paying elevated legal and accounting fees and expenses in responding to various government investigations, concerning, *inter alia*, the Company's related party transactions—did not suffice to plead loss causation because the announcement referred to multiple investigations concerning several different matters. Third, Defendants argued that the absence of a price reaction following the filing of Eagle's 2018 10-K on March 1, 2019, in which Eagle modified its related party analysis and resulted in an increase of Eagle's related party loans

---

[4] These statements included: (a) Eagle's reported related party loan totals, (b) Defendants' statements concerning the terms of the loans and the loan review and approval process, (c) Defendants' attestations as to the effectiveness of Eagle's internal controls and the SOX Certifications, and (d) Defendants' denials of the Aurelius Report.

balance by $238.4 million as of December 31, 2017, undermined Plaintiffs' pleading of loss causation.

24.     Finally, Defendants argued that Plaintiffs failed to state a claim for scheme liability against Defendants Paul and Bensignor.  Defendants asserted that the allegations were unreliable because they were based on unproven and unadjudicated allegations made by third parties in other litigation (including allegations made by Raymond Rahbar in the MakeOffices litigation and allegations made by parties in the Matchbox litigation).[5]  Defendants also argued that the scheme liability claims did not satisfy the nexus requirement because the underlying factual allegations upon which they were based (including Rahbar's allegations that he was coerced into signing a false "no tying" letter in order to mislead banking regulators) did not involve a scheme to defraud "in connection with" the purchase or sale of securities.  Finally, Defendants argued that Plaintiffs failed to raise a strong inference that Defendants Paul and Bensignor engaged in the alleged scheme—in which Defendant Paul allegedly used his relationship with Eagle to secure favorable deals for himself on personal investments in exchange for Eagle loans at terms not otherwise available—with the requisite intent to defraud investors.

25.     On May 15, 2020, Plaintiffs opposed Defendants' motion to dismiss.  ECF Nos. 50-51.  With respect to falsity, Plaintiffs responded to Defendants' arguments by arguing, *inter alia*, that: (a) Eagle's modification of its related party loan totals constituted an admission that its previous totals were materially understated, and this was sufficient to plead falsity; (b) Defendants' misstatements were statements of fact, not opinions; and (c) even if the alleged misstatements were opinions, they were materially false and misleading under *Omnicare*'s

---

[5] *See* ECF No. 46 at 12, 20, 24; ECF No. 50 at 9-10.

standards because the Complaint pleaded particularized facts indicating that the speakers did not honestly hold the "opinions" at the time the statements were made, and the statements omitted material facts whose omission made the statements at issue misleading to a reasonable person reading the statements fairly and in context.

26.    Plaintiffs asserted that the well-pleaded facts in the Complaint also raised a strong inference of scienter as to each of the Individual Defendants.  In particular, Plaintiffs argued that the alleged facts strongly suggested that Defendants Paul and Bensignor engaged in a scheme to deliberately conceal loans related to Paul's investment deals from the market and regulators. Plaintiffs also argued that just because the undisclosed related party loans were still performing, Defendants' fraud is not excused.  Plaintiffs argued that the failure to disclose these related party loans concealed not only heightened credit risks, but also regulatory and reputational risks, and that these risks did come to pass, damaging investors.

27.    Plaintiffs next countered Defendants' scheme liability arguments, explaining that Paul's and Bensignor's conduct in concealing the related party nature of the transactions from regulators and the public constituted deceptive acts and a scheme to defraud, satisfying both the nexus and scienter requirements (as well as the reliance requirement) for a claim under subsections (a) and (c) of Rule 10b-5.[6]

28.    Finally, Plaintiffs responded to Defendants' loss causation arguments, explaining that the Aurelius Report did, in fact, reveal new information to the market, including that Eagle had more than $100 million of undisclosed related party loans, and that the Aurelius Report's

---

[6] Plaintiffs also argued that they were entitled at the pleadings stage to rely on the third party allegations made in other litigation, relying on a substantial body of precedent in this Circuit. *See* ECF No. 50 at 9-10.  Moreover, Plaintiffs pointed out that they were not simply relying on those third party allegations by themselves, but that these allegations were corroborated by multiple emails and other documents obtained by Plaintiffs. *Id.*

conclusions were based on expert analysis of a multitude of documents, including UCC filings and deed records concerning other companies that Eagle had never acknowledged were related parties. Plaintiffs further argued that although these documents were publicly available, the information contained in them was not the type that would be presumed to immediately be impounded into the price of Eagle's stock, even in an efficient market. Plaintiffs explained that Defendants' argument about the absence of a price reaction following Eagle's filing of the 2018 10-K ignored the fact that Eagle's stock price had already partially corrected following the Aurelius Report and that the 2018 10-K did not reveal the full panoply of facts, including that Eagle's amendment of its related party loan totals was made following discussions with regulators who were investigating Eagle's related party disclosures. Lastly, Plaintiffs argued that all of the investigations disclosed in Eagle's July 17, 2019 announcement of elevated legal expenses were potentially connected to related party loan issues and, even if certain of the investigations were not, this is a disaggregation issue not appropriate for resolution on a motion to dismiss.

29.     On June 15, 2020, Defendants filed and served their reply papers in support of their motion to dismiss. ECF No. 52.

### D.     Mediation Efforts, Settlement Negotiations, And The Settlement's Preliminary Approval

30.     On December 23, 2020, the Parties requested that the Court stay all proceedings pending their participation in a mediation session overseen by Mr. Melnick. ECF No. 58. On December 27, 2020, the Court granted the Parties' stipulation and stayed all proceedings, including its decision on the fully briefed motion to dismiss. ECF No. 59.

31.     In advance of the mediation session, Lead Counsel dedicated substantial efforts to preparing a persuasive mediation statement setting forth the facts relevant to the underlying

alleged misrepresentations, and analyzing applicable facts, law, and damages issues.  The Parties then exchanged mediation statements.

32.    On April 13, 2021, Lead Counsel and Defendants' Counsel participated in a full-day, virtual mediation session in conjunction with Mr. Melnick.  During the mediation session, the Parties engaged in full and frank discussions concerning the merits of this Action, including, for example, the facts alleged to support Plaintiffs' claims.  This negotiation process enabled the Parties to meaningfully assess the relative strengths and weaknesses of their respective claims and defenses.  Although the Parties did not reach an agreement to settle the case, Mr. Melnick continued discussions with the Parties over the course of the following week.

33.    On April 15, 2021, counsel for Plaintiffs, with Defendants' Counsel's consent, jointly updated the Court on the results of mediation.  Lead Counsel informed the Court that although the Parties did not reach an agreement to settle during the mediation session, discussions were productive and the Parties agreed to continue their discussions with the assistance of Mr. Melnick.  In light of the Parties' progress, Lead Counsel requested that the proceedings in the Action continue to be stayed for an additional three weeks.  ECF No. 64.  On April 16, 2021, the Court granted the Parties' application and continued the stay of proceedings in this Action and requested an update on the mediation discussions by May 6, 2021.  ECF No. 65.

34.    Following the mediation session, the Parties continued their discussions with Mr. Melnick, which culminated in Mr. Melnick making a mediator's proposal that the Parties settle the matter for $7,500,000 in cash, which both sides accepted.  The Parties thereafter memorialized the settlement in a confidential Memorandum of Understanding (the "MOU") that was executed on April 21, 2021.  The MOU set forth, among other things, the Parties' agreement

12

to settle and release all claims asserted against Defendants in the Action in return for a cash payment by or on behalf of Defendants of $7,500,000 for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers.

35.     The Parties thereafter exchanged multiple drafts of—and ultimately executed—the Stipulation dated June 28, 2021.  That same day, Plaintiffs submitted their Unopposed Motion for: (I) Preliminary Approval of Class Action Settlement; (II) Certification of the Class; and (III) Approval of Notice of the Settlement.  ECF Nos. 70-72.

36.     On August 12, 2021, the Court held a preliminary approval hearing via teleconference, and requested Lead Counsel provide the Court additional information regarding the fee arrangement with JND, a copy of the confidential supplemental agreement between the Parties, and a revised proposed preliminary approval order with relevant attachments.  Following the Parties' exchange of multiple drafts of the revised proposed preliminary approval order, Lead Counsel submitted to the requested additional information to the Court's e-mail inbox on August 16, 2021.

37.     On August 16, 2021, the Court issued its Order Preliminarily Approving Settlement and Providing for Notice.  ECF No. 77.

## III.    THE RISKS OF CONTINUED LITIGATION

38.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $7,500,000.  As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.  Prior to trial and a potentially litigated verdict,

13

the most immediate risk faced by the Settlement Class related to Defendants' pending motion to dismiss.  There was no guarantee that Plaintiffs and the Settlement Class would surmount this hurdle given the heightened pleading standards of the PSLRA and, even if they did, later achieve any recovery, let alone one greater than $7,500,000.

**A.    Risks Faced In Proving Liability**

39.    Plaintiffs and Lead Counsel recognized that this Action presented a number of substantial risks to establishing liability.  At the time the Settlement was reached, the Court had not ruled on the Defendants' motion to dismiss.  While Plaintiffs believe they effectively demonstrated that they had sufficiently pleaded that Eagle made materially false and misleading statements in violation of the Federal Securities Laws, Defendants argued that their statements were not materially false and misleading, but rather were true statements of opinion and that the Complaint did not adequately allege falsity under the heightened pleading standards of *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).

40.    For example, Defendants argued that the determination as to which loans needed to be disclosed pursuant to the framework of Reg. O, Item 404, and GAAP required Eagle to make a host of highly subjective judgment calls, and such that statements have been found to constitute statements of opinion for purposes of the securities laws.  Defendants also argued they believed Eagle's related party loan amounts to be truthful when they were reported.

41.    Additionally, Defendants contend that the alleged false and misleading statements were not made with the requisite state of mind (*i.e.*, scienter) to support the securities fraud claims alleged.  While Lead Counsel believes that the Complaint adequately alleges scienter, Lead Counsel was well aware of the high hurdle they would have to surmount in order to successfully allege (and then prove) that the Defendants acted with the intent to "deceive, manipulate, or defraud" investors under the federal securities laws.

14

42. Here, Defendants maintained that they acted in good faith in reporting the amounts, terms and approval process of Eagle's related-party loans, explaining that, among other things: (a) the related party loan review and approval process was subject to review by outside advisors and examined annually by regulators to ensure Regulation O compliance and that this extensive outside scrutiny gave Defendants reason to believe Eagle was accurately identifying and disclosing its related party loans; and (b) the related party loans were performing well, providing Defendants comfort that the loans were properly vetted, made on arm's-length terms, and involved no more risk than a third party loan. While Plaintiffs and Lead Counsel strongly disagreed with these assertions, there was no guarantee that Plaintiffs would have prevailed on the scienter issue at the pleading stage, or that the trier of fact would have ultimately adopted Plaintiffs' point of view.

### B.    Risks To Proving Loss Causation And Damages

43. Assuming Plaintiffs were able to establish that Defendants made materially false and misleading statements with the requisite state of mind, Plaintiffs also would have confronted considerable challenges in establishing loss causation and class-wide damages (both at the summary judgment stage and at trial).[7] While Plaintiffs would have argued that the declines in the prices of Eagle securities were attributable to the partial corrections of Defendants' false and misleading statements and the materializations of the concealed risks that occurred on December 1, 2017 and July 17, 2019, Defendants argued—and would have continued to argue—that Plaintiffs' losses were not causally connected to the alleged false and misleading statements and omissions.

---

[7] Defendants also challenged the sufficiency of the Complaint's pleading of loss causation in their motion to dismiss. While Lead Counsel strongly believes that the Complaint satisfies the relatively low hurdle for pleading loss causation and that the Court would have denied Defendants' motion to dismiss with respect to loss causation, there is no guarantee that the trier of fact would have adopted Plaintiffs' view on this issue at summary judgment or trial.

15

44.    Plaintiffs allege that on December 1, 2017, the Aurelius Report revealed, among other things, that Eagle failed to disclose roughly $185 million of insider loans used to finance various ventures in which Defendant Paul was an interested party.  Following the release of the Aurelius Report, Eagle's stock price declined $16.20 per share, roughly 24.5%, to close at $49.95 on December 1, 2017.  Defendants argued in their motion to dismiss that the Aurelius Report could not constitute a corrective disclosure because it was merely a "[n]egative characterization of already public information."  ECF No. 46 at 11-13.  In other words, Defendants argued, and likely would have continued to argue, that there was no sufficiently *new* non-public news in the Aurelius Report necessary to establish loss causation.

45.    The second alleged corrective disclosure in this case is Eagle's July 17, 2019, announcement that it had been paying elevated legal and accounting fees and related expenses in responding to various government investigations concerning the Company's related party transactions.  In their motion to dismiss, Defendants argued that this disclosure did not constitute a corrective disclosure, because all of the information concerning Eagle's re-classification of the previously undisclosed related party loans had already been revealed to the market by, at the very latest, March 1, 2019, when Eagle issued its 2018 Form 10-K.  In the Company's 2018 Form 10-K, Eagle disclosed that it had modified its related party analysis, resulting in a significant increase in the Company's related party loan totals, effectively validating the Aurelius Report allegations.  Defendants argued that the absence of a price reaction on March 1, 2019 demonstrated the absence of loss causation in this case.

46.    In addition, Defendants argued in their motion to dismiss, and likely would have continued to argue, that the July 2019 disclosure could not predicate loss causation because Eagle's announcement referred to multiple government investigations concerning several

16

different matters.  Even if this argument were not accepted by the Court at this early stage in the litigation, Defendants likely would have continued to assert that a substantial portion of Eagle's stock price decline following the July 2019 disclosure was due to the disclosure of information unrelated to the alleged fraud.  To the extent that a portion of the price decline following the July 2019 disclosure was due to factors other than the alleged fraud, Plaintiffs would have been required to disaggregate which portion of the stock price decline was due to the alleged fraud and which portion of the price decline was due to other non-fraud related information.

47.    There is a strong likelihood that Defendants also would have raised a disaggregation argument with respect to the December 1, 2017 publication of the Aurelius Report.  Defendants asserted in their motion to dismiss that the stock price decline following the issuance of the Aurelius Report was due to the Report's allegations of self-dealing and "sweetheart" deals, rather than the Report's allegations of under-reported related party loan totals. ECF No. 46 at 1-2, 7-8, 12-13; ECF No. 52 at 3.  Lead Counsel believes that the stock price decline following the issuance of the Aurelius Report was due to both sets of allegations and that, in any event, Plaintiffs would have been able to prove the truth of both sets of allegations, which would have made disaggregation unnecessary.  However, Lead Counsel acknowledges that if Plaintiffs were unable to prove both sets of allegations, Plaintiffs would have been required to provide a basis for disaggregating the portion of the stock price decline due to the under-reported related party loan totals as opposed to the portion of the stock price decline due to the undisclosed self-dealing and "sweetheart" deals.

48.    In order to prove their claims, Plaintiffs would have been required to proffer expert testimony demonstrating, among other things: (a) what the "true value" of Eagle securities would have been had there been no alleged material misstatements or omissions; (b) the amount

17

by which the value of Eagle securities were inflated by the alleged material misstatements and omissions; and (c) the amount of artificial inflation removed by the disclosures on December 1, 2017 and July 17, 2019.  Such expert testimony is expensive, time consuming, and subject to rebuttal.

49.    Indeed, Defendants almost certainly would have presented their own damages expert(s), who would have no doubt presented conflicting conclusions and theories for the price declines of Eagle securities on the alleged disclosure dates.  Defendants likely would have challenged Plaintiffs' expert(s) at the class certification stage, summary judgment, and at trial and on appeal.  This "battle of the experts" creates additional litigation risk because the reaction of a trier of fact to such expert testimony is highly unpredictable, creating uncertainty regarding how much weight a judge or jury will accord the analysis of the parties' competing experts.

**C.    Risks Faced In Obtaining And Maintaining Class Action Status**

50.    Had this Action proceeded beyond the pleading stage, Defendants likely would have argued against class certification.  While Lead Counsel researched and analyzed class certification and are confident that all the Rule 23 requirements are satisfied, and that the Court would have certified the proposed class, Plaintiffs bear the burden of proof on class certification, and Defendants would have undoubtedly raised a number of arguments challenging the propriety of class certification.  Among other things, Defendants likely would have argued that the proposed class period should have been significantly shortened, ending on either December 1, 2017, when the Aurelius Report allegedly revealed to the market the existence of the undisclosed related party loans, or on March 1, 2019, when Eagle issued its 2018 10-K and provided to the market its modified related party loan analysis.

51.    In addition, Defendants likely would have raised a challenge to class certification

18

based on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  In *Comcast*, the Supreme Court held that one of the factors in determining whether common questions of law and fact predominate over individual questions is whether "damages are capable of measurement on a classwide basis." *Id.* at 34.  In *Comcast*, an antitrust case, the Court held that certification was inappropriate where the damages model that plaintiffs offered in support of class certification was not tied to their remaining theory of liability.

52.     Based on arguments similar to those raised by Defendants in connection with their loss causation challenges, Defendants would have argued that Plaintiffs' theory of damages is disconnected from their theory of liability, and that Plaintiffs would, therefore, be unable to proffer a damages model that would survive scrutiny under *Comcast*.  While Lead Counsel believes that any *Comcast* challenge would be unlikely to prevent class certification, the prospect of such a challenge certainly presented another element of risk.  Additionally, even if Plaintiffs successfully obtained class certification, Defendant could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery.  Class certification was, by no means, a foregone conclusion.

### D.     Other Risks

53.     In addition to the pending motion to dismiss, Plaintiffs also would have had to prevail at several later stages of the litigation, each of which presents significant risks in complex class actions such as this.  For example, as detailed above, Plaintiffs would have to satisfy the requirements of Rule 23 to prevail on a motion for class certification; they would have to conduct substantial discovery, including comprehensive discovery on numerous relevant third parties, the costs of which were assuredly high and the fruits of which were highly uncertain; Plaintiffs would have to successfully navigate and prevail against Defendants' eventual motion(s)

19

for summary judgment, and at trial.  Each of these several stages of litigation present significant risks in complex class actions such as this one.  Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.  In fact, approximately three years ago, GPM lost a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs.  *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).  Lead Counsel also litigated a securities class action in this District for approximately five years and, after surviving a motion to dismiss, successfully obtaining class certification and undertaking significant discovery efforts, which included depositions throughout the U.S. and in the U.K. and substantial document review, summary judgment was entered for defendants, and the judgment was affirmed on alternative grounds on appeal to the Second Circuit.  *Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 29 (2d Cir. 2019).  Put another way, complex litigation is uncertain, and success in cases like this one is never guaranteed.

54.    Even if Plaintiffs succeeded in proving all elements of their case at trial and obtained a jury verdict, Defendants almost certainly would have appealed.  An appeal not only would have renewed the risks faced by Plaintiffs—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay and further depletion of Eagle's rapidly wasting insurance policies.  Given these significant litigation risks, Plaintiffs and Lead Counsel believe the Settlement represents an excellent result for the Settlement Class.

20

**E.      The Settlement Is Reasonable In Light Of Potential Recovery In The Action**

55.      In addition to the risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. If Plaintiffs had fully prevailed in each of their claims at both summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiffs' damages theory, including proof of loss causation as to the stock price drop dates alleged in this case—*i.e.*, Plaintiffs' best-case scenario—estimated total **maximum** damages are approximately $304 million. Under this scenario, the $7.5 million Settlement represents a recovery of 2.5% of the Settlement Class's maximum estimated damages. In comparison, the median recovery in securities class actions in 2020 was approximately 1.7% of estimated damages. *See* Ex. 6 (Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA Jan. 25, 2021 at p. 20 (Fig. 16)).

56.      However, if Defendants prevailed on any or all of their arguments concerning Plaintiffs' alleged partial corrective disclosures detailed above, the amount of damages could have been substantially reduced or eliminated entirely. For example, Defendants estimate that if the class period were to end after the issuance of the Aurelius Report on December 1, 2017, maximum theoretical damages would be approximately $26 million, and if the class period were to end after the issuance of the 2018 10-K on March 1, 2019, maximum theoretical damages would be approximately $75 million. Under these scenarios, the $7.5 million represents a recovery of 10% to 28.8% of maximum theoretical damages. These estimates do not include any reductions for disaggregation, and Defendants maintain that actual damages in this case are zero, because Defendants believe both that there is no liability (on falsity and scienter grounds) and that there is no loss causation in connection with any of the alleged corrective disclosures.

21

IV. PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

57. Pursuant to the Preliminary Approval Order (ECF No. 77), Lead Counsel and the Court-approved Claims Administrator, JND, implemented a comprehensive notice program whereby notice was given to potential Settlement Class Members by mail and publication.

58. The Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and the Proof of Claim and Release Form (the "Claim Form" and, collectively with the Notice, the "Notice Packet") be disseminated to the Settlement Class. The Preliminary Approval Order also set a deadline of December 30, 2021 (21 calendar days prior to the settlement hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the application for attorneys' fees and Litigation Expenses or to request exclusion from the Settlement Class, and set a settlement hearing date of January 20, 2022 (the "Settlement Hearing").

59. Pursuant to the Preliminary Approval Order, Lead Counsel instructed JND to begin disseminating copies of the Notice Packet and publish the Summary Notice. Contemporaneously with the mailing of the Notice Packet, Lead Counsel instructed JND to post downloadable copies of the Notice and Claim Form online at www.EagleSecuritiesSettlement.com (the "Settlement Website"). The Notice directed Settlement Class Members to the Settlement Website to obtain additional information on the Settlement, including how to file a claim and access to downloadable versions of the Notice Packet.

60. The Court-approved Notice disclosed, among other things, the following

22

information to Settlement Class Members: (a) the $7.5 million Settlement Amount; (b) the proposed Plan of Allocation; (c) that Lead Counsel would apply for an award of attorneys' fees on behalf of Plaintiffs' Counsel in an amount not to exceed 33⅓% of the Settlement Fund (*i.e.*, the Settlement Amount, plus interest), and Litigation Expenses in an amount not to exceed $105,000, which could include an application for reimbursement to Plaintiffs for their costs and expenses; (d) that any Settlement Class Member could object to the requested attorneys' fees and Litigation Expenses; (e) a detailed explanation of the reasons for the Settlement; (f) that requests for exclusion from the Settlement had to be filed by no later than December 30, 2021; (g) that objections to the Settlement, the Plan of Allocation, and/or the fee and expense application had to be filed by no later than December 30, 2021; and (h) that the deadline for filing Proof of Claims is January 12, 2022.

61.    Pursuant to the Court-approved notice program, on September 14, 2021, JND mailed, by first-class mail, 5,742 copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members.  Ex. 3 (Segura Decl.) at ¶7 (the "Initial Mailing").

62.    The Initial Mailing included potential Settlement Class Members identified on transfer records provided by Eagle, additional potential Settlement Class Members identified by JND through its review of SEC filings, and mailing to JND's Broker Database, a proprietary database maintained by JND containing names and addresses of the largest and most common banks, brokers, and other nominees that often hold securities in "street name" on behalf of clients. Ex. 3 (Segura Decl.) at ¶¶3-5.

63.    JND made additional efforts to identify and reach potential Settlement Class Members, including posting the Notice for brokers and nominees on the DTC Legal Notice

23

System ("LENS"), following up by telephone with 50 of the largest broker/nominee firms, and sending reminder postcards to nominees in the Broker Database who did not respond to the Initial Mailing. Ex. 3 (Segura Decl.) at ¶¶8-10. As a result of these efforts, JND received an additional 14,743 unique names and addresses of potential Settlement Class Members to whom JND mailed Notice Packets, as well as requests from brokers and other nominees for 14,963 copies of the Notice Packet that the nominees would forward to their customers. *Id.* at ¶11.

64. As of December 2, 2021, JND had sent a total of 35,448 Notice Packets to potential Settlement Class Members or their nominees. Ex. 3 (Segura Decl.) at ¶12.

65. Among other things, the Notice directed Settlement Class Members to the Settlement Website in order to obtain additional information on the Settlement and how to file a claim. Ex. 3 (Segura Decl.) at ¶15. JND posted the Notice and Claim Form, along with other important case-related documents, including the Stipulation of Settlement and the Preliminary Approval Order, on the Settlement Website, which became operational on or about September 14, 2021. *Id.* All documents are downloadable, and Settlement Class Members have the option of submitting Claim Forms online. *Id.*

66. JND also caused the Summary Notice to be published once in *Investor's Business Daily* and transmitted once over the *PR Newswire* on September 27, 2021. Ex. 3 (Segura Decl.) at ¶13.

67. Beginning on or about September 14, 2021, a case-specific toll-free telephone number, 1-833-677-1091 was established with an interactive voice response system and live operators. Ex. 3 (Segura Decl.) at ¶14. The automated attendant answers the calls and presents callers with a series of choices to respond to basic questions. Callers requiring further help have the option to be transferred to a live operator during business hours. As of December 2, 2021,

24

JND had received approximately 257 calls to the telephone helpline. *Id.* JND will continue to maintain the telephone helpline and update the interactive voice response system as necessary through the administration of the Settlement. *Id.*

68.     The Notice informed potential Settlement Class Members that the deadline to file objections to the Settlement, proposed Plan of Allocation and/or the Fee Motion and Memorandum, or to request exclusion from the Settlement Class is December 30, 2021. Ex. 3-A (Notice Packet). As of December 2, 2021 (the date of execution of the Segura Declaration), no requests for exclusion had been received. *See* Ex. 3 (Segura Decl.) at ¶19. Additionally, to date, no objections to the Settlement, the Plan of Allocation or the maximum amounts listed in the Notice that Lead Counsel would seek for an award of attorneys' fees and reimbursement of Litigation Expenses have been entered on this Court's docket or have otherwise been received by Lead Counsel. Lead Counsel will file reply papers on January 13, 2022 to address any requests for exclusion and objections that may be received.

## V.     ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

69.     Pursuant to the Preliminary Approval Order (ECF No. 77), and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $7,500,000 Settlement Amount plus any and all interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information submitted online or postmarked no later than January 12, 2022. The Net Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, as subject to approval by the Court. *See* Ex. 3-A (Notice) at ¶59; ECF No. 72-1 (Stipulation at ¶20). As set forth in the Notice, the Net Settlement Fund will

be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

70.     The proposed Plan of Allocation is detailed in the Notice.  *See* Ex. 3-A (Notice, pp. 12-20).  The Notice was sent to Settlement Class Members, and a downloadable version is available online at www.eaglesecuritiessettlement.com.  If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Authorized Claimants.  The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a result of the alleged fraud as opposed to losses caused by market- or industry-wide factors or Company-specific factors unrelated to the alleged fraud and takes into consideration when each Authorized Claimant purchased and/or sold Eagle Securities (defined as Eagle Common Stock, Call Options, and Put Options).  *See id.*  As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.  *Id.* at ¶49.

71.     The Plan of Allocation, developed by one of Plaintiffs' economic expert consultants working in conjunction with Lead Counsel, is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action.  More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the price of Eagle's Common Stock and Call Options was

26

artificially inflated and the price of Eagle's Put Options was artificially deflated during the Settlement Class Period due to Defendants' alleged materially false and misleading statements and omissions.  The Plan of Allocation is based on the premise that the decreases in the prices of Eagle common stock that followed the alleged corrective disclosures that occurred on December 1, 2017 and July 17, 2019 (the "Corrective Disclosure Dates") may be used to measure the alleged artificial inflation in the price of Eagle common stock prior to these disclosures.  *See id.* at ¶51.

72.     Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund.  Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.  *Id.* at ¶59.

73.     An individual Claimant's recovery under the Plan of Allocation will depend on a number of factors, including when the Claimant purchased, acquired, or sold Eagle Securities during the Settlement Class Period, in what amounts, and if any securities were sold, when they were sold and in what amounts, as well as the number of valid claims filed by other Claimants. *Id.* at ¶51.

74.     If a Claimant has an overall market gain with respect to his, her, or its overall transactions in Eagle Securities during the Settlement Class Period, the Claimant's recovery under the Plan of Allocation will be zero.  *Id.* at ¶65.

75.     If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant.  *Id.* at ¶56.  Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized

Claimants whose prorated payments are $10.00 or greater. In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost prohibitive.[8]

76.     In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund fairly among Settlement Class Members based on the losses they suffered on transactions in Eagle Securities that were attributable to the conduct alleged in the Complaint. Plaintiffs and Lead Counsel believe that the proposed Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members.

77.     As noted above, as of December 2, 2021, a total of 35,448 copies of the Notice Packet have been disseminated to potential Settlement Class Members, which provides the Plan of Allocation therein, directs Settlement Class Members to the Settlement Website containing the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation. *See* Ex. 3 (Segura Decl.) at ¶12; Ex. 3-A (Notice). To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

## VI.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

78.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying for a fee award of 30% of the Settlement Fund (or $2,250,000, plus interest earned at the same rate as the Settlement Fund). Lead Counsel also request reimbursement of Litigation Expenses in the amount of $78,621.58, which includes $71,121.58 in out-of-pocket expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action from the Settlement Fund, and $7,500 to Lead Plaintiff for the reasonable costs

---

[8] If any funds remain after an initial distribution to Authorized Claimants, as a result of uncashed or returned checks or other reasons, subsequent distributions will be conducted as long as they are cost effective. Ex. 3-A (Notice) at ¶67. At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance shall be contributed to non-sectarian, not-for-profit organization(s), to be recommended by Lead Counsel and approved by the Court.

directly incurred in connection with representing the Settlement Class.  The total Litigation Expenses amount of $78,621.58 is below the maximum expense amount of $105,000 set forth in the Notice.  The legal authorities supporting a 30% fee award are set forth in the accompanying Fee Memorandum, which is being filed contemporaneously herewith.  The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A.      The Fee Application

79.      Lead Counsel are applying for a percentage-of-the-common-fund fee award to compensate them for the services they rendered on behalf of the Settlement Class.  As set forth in the accompanying Fee Memorandum, the percentage method is the best method for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery.  The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances.  This paradigm minimizes unnecessary drain on the Court's resources.  Notably, the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and the Second Circuit for cases of this nature.  Furthermore, as set forth below, though not required in the Second Circuit, Lead Counsel respectfully submits that the requested fee is fully supported by a "lodestar multiplier cross-check."

80.      As discussed in the Fee Memorandum, empirical research demonstrates that a 30% fee award is well within the range of percentages awarded in securities class actions with comparable settlements, and it is also supported by the *Goldberger* factors.

### 1.      The Outcome Achieved Is The Result Of The Significant Time And Labor That Plaintiffs' Counsel Devoted To The Action

81.      Plaintiffs' Counsel spent considerable time prosecuting this Action on behalf of the Settlement Class.  As previously summarized above, among other things:

- drafted motions on behalf of their respective Plaintiffs to be appointed to serve as lead plaintiff as required by the PSLRA;

- conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) Eagle's filings with the SEC, (ii) public reports, research reports prepared by securities and financial analysts, and news articles concerning Eagle, (iii) Eagle's investor call transcripts, (iv) press releases published by and regarding Eagle; (v) Eagle's codes of business conduct and ethics, and (vi) court filings, deed records, UCC filings, and other publicly available material related to Eagle; (b) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information; (c) interviewing third parties with relevant information; (d) researching the applicable federal banking regulations, SEC regulations and GAAP pertaining to related party loans; (e) consulting and working with a banking expert to understand and analyze relevant federal banking regulations; (f) consulting and working with accounting experts to analyze Eagle's Settlement Class Period financial results, including the reported and revised related party loans; and (g) working with a damages and loss causation expert to analyze Eagle's stock price movements;

- utilized the foregoing comprehensive investigation and additional research to draft and file the comprehensive 126-page Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 37), which included approximately 258 pages of exhibits, and asserted claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Individual Defendants under Section 20(a) of the Exchange Act, and additional scheme liability claims under Rule 10b-5(a) and (c) against Defendants Paul and Bensignor;

- researched and drafted the opposition to Defendants' motion to dismiss and a request for judicial notice of two exhibits (ECF Nos. 50-51);

- drafted papers in support of the substitution of Danilee Cassinelli as the Lead Plaintiff in the Action (ECF Nos. 55-56);

- prepared multiple letters to the Court related to settlement negotiations;

- engaged in a mediation process overseen by a highly experienced third-party mediator, Jed Melnick, Esq., of JAMS, which involved an exchange of written submissions concerning the facts of the case, liability and damages, a full-day formal mediation session, extensive consultation with Plaintiffs' expert on damages and loss causation, and additional follow-up negotiations;

- negotiated a detailed confidential MOU with Defendants' counsel, which was executed on April 21, 2021;

- negotiated the terms of the Stipulation (including the exhibits thereto) and Supplemental Agreement with Defendant's Counsel;

- worked with a damages expert to craft a plan of allocation that treats Plaintiffs

30

and all other members of the proposed Settlement Class fairly;

- drafted the preliminary approval motion and supporting papers;
- oversaw the implementation of the notice process; and
- drafted the motion for final approval. *See also* ¶¶15-37, 57-67, *supra*.

82.    Attached hereto as Exhibits 4 and 5 are declarations from Plaintiffs' Counsel in support of an award of attorneys' fees and reimbursement of Litigation Expenses. Included within each supporting declaration is a schedule summarizing the hours and lodestar of each firm from the inception of the case through December 14, 2021, a summary of expenses by category, and a firm resume.[9] The following is a chart of lodestar amounts for Plaintiffs' Counsel:

| LAW FIRM: | LODESTAR |
|---|---|
| Glancy Prongay & Murray LLP | $1,398,385.00 |
| Labaton Sucharow LLP | $132,710.00 |
| TOTAL LODESTAR | $1,531,095.00 |

83.    The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation in this District. Additionally, the rates billed by Plaintiffs' Counsel attorneys (ranging from $425-$800 per hour for non-partners and $700-$1,150 per hour for partners) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude. *See* Ex. 8 attached hereto (table of peer law firm billing rates). The majority of the lodestar in this case, 91.33%, was accrued by Lead Counsel, whose billable rates for attorneys range from $425-$625 per hour for non-partners, and $700-$975 per hour for partners.

84.    As set forth above and in greater detail in Exhibits 4 and 5, Plaintiffs' Counsel have collectively expended a total of 2,164.1 hours in the investigation, prosecution, and

---

[9] Time expended in preparing the application for fees and reimbursement of Litigation Expenses has not been included.

settlement of the Action through and including December 14, 2021.  The resulting total lodestar is $1,531,095.00.   The requested fee amount of 30% of the Settlement Fund equals $2,250,000.00 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a 1.47 multiplier of Plaintiffs' Counsel's lodestar.

85.    Moreover, Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval.  Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member claims, will respond to shareholder inquiries, will draft and file a motion for distribution, and will oversee the distribution process.  No additional compensation will be sought for this work.

86.    Plaintiffs' Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

### 2.    The Significant Risks Borne By Plaintiffs' Counsel

87.    This prosecution was undertaken by Plaintiffs' Counsel on an entirely contingent-fee basis.  From the outset, this Action was an especially difficult and highly uncertain securities case.   There was no guarantee that Plaintiffs' Counsel would ever be compensated for the substantial investment of time and money the case would require.   In undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a case like this one were covered. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.

Indeed, Plaintiffs' Counsel received no compensation during the course of the Action and incurred $71,121.58 in out-of-pocket litigation-related expenses in prosecuting the Action.

88.     Additionally, Plaintiffs and Plaintiffs' Counsel developed and then alleged the Exchange Act claims without information gained through subpoena power, hindered by the PSLRA's automatic discovery stay.

89.     Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. Plaintiffs' Counsel know from experience that the commencement of a class action does not guarantee a settlement. *See supra*, ¶53. On the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

> **3.      The Quality Of Representation, Including The Result Obtained, The Experience And Expertise Of Plaintiffs' Counsel, And The Standing And Caliber Of Defendants' Counsel**

90.     As demonstrated by the excerpted firm resumes, attached hereto as Exhibits 4-C and 5-C, Plaintiffs' Counsel are highly experienced and skilled laws firms that focus their practices on securities class action litigation. Indeed, Plaintiffs' Counsel have substantial experience in litigating securities fraud class actions and have negotiated scores of other class settlements, which have been approved by courts throughout the country. Lead Counsel and Labaton enjoy well-deserved reputations for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters. I believe Plaintiffs' Counsel's experience added valuable leverage in the settlement negotiations.

91.     Additionally, the quality of the work performed by Plaintiffs' Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Baker & Hostetler LLP, a well-known national law firm that

vigorously represented the interests of its clients throughout this Action. In the face of this experienced and formidable opposition, Plaintiffs' Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendant to settle the case on terms that were highly favorable to the Settlement Class.

### 4.    The Requested Fee In Relation To The Settlement

92.    The amount of the fee requested (30%) in relation to the Settlement Amount ($7.5 million) is fair and reasonable. As empirical evidence demonstrates, Courts routinely award fees of 30% in securities class action settlements of a similar size. *See* Fee Memorandum § III.C.1(a).

### 5.    Interests Of Public Policy, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Securities Cases

93.    Courts consistently recognize that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly large investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a particular securities class action. Relatedly, it is long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements.

34

**6.    The Reaction Of The Settlement Class Supports Lead Counsel's Fee Request**

94.    As noted above, as of December 2, 2021, a total of 35,448 Notice Packets were mailed advising Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund.  Segura Decl. ¶12; Ex. 3-A (Notice).  In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*.    Segura Decl. at ¶13; Ex. 3-B (confirmations of Summary Notice publication).  To date, no objection to the maximum potential attorneys' fees request set forth in the Notice has been received or entered on this Court's docket. Any objection received after the date of this filing will be addressed in Lead Counsel's reply papers, which are to be filed by January 13, 2022.

**7.    Plaintiffs Support Lead Counsel's Fee Request**

95.    As set forth in the declarations submitted by Lead Plaintiff Danilee Cassinelli, as Trustee of the Danilee Cassinelli Trust DTD 7-23-93 and additional plaintiff Norfolk County Retirement System, Plaintiffs have concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action.  *See* Ex. 1 ("Cassinelli Decl.") ¶¶9-10; Ex. 2 ("Norfolk Decl.") ¶¶9-10.  Ms. Cassinelli and her family and Norfolk have been intimately involved in this case, and her and Norfolk's endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

96.    In sum, Plaintiffs' Counsel accepted this case on a fully contingent basis, committed significant resources to it, and prosecuted the Action without any compensation or guarantee of success.  Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submit

that a fee award of 30%, resulting in a modest multiplier of 1.47, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

**B.      Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable**

97.      Lead Counsel seeks a total of $78,621.58 in Litigation Expenses to be paid from the Settlement Fund.  This amount includes: $71,121.58 in out-of-pocket expenses reasonably and necessarily incurred by Plaintiffs' Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; as well as $7,500 to Lead Plaintiff pursuant to 15 U.S.C. § 78u-4(a)(4) for the reasonable costs directly incurred, including the time and effort expended by Ms. Cassinelli and her family, in connection with representing the Settlement Class. *See* Cassinelli Decl., ¶13.

98.      Lead Counsel is seeking reimbursement of a total of $71,121.58 in out-of-pocket costs and expenses.  The following is a combined breakdown by category of all expenses incurred by Plaintiffs' Counsel:

| CATEGORY OF EXPENSE | AMOUNT |
|---|---|
| COURIER AND SPECIAL POSTAGE | 58.42 |
| COURT FILING FEES | 1,000.00 |
| EXPERTS | 33,164.00 |
| INVESTIGATIONS | 14,745.00 |
| MEDIATORS | 11,135.47 |
| ONLINE RESEARCH | 7,410.29 |
| PHOTOIMAGING | 257.00 |
| PRESS RELEASES | 120.00 |
| SERVICE OF PROCESS | 382.55 |
| TRAVEL AIRFARE | 1,793.20 |
| TRAVEL AUTO | 129.37 |
| TRAVEL HOTEL | 567.57 |
| TRAVEL MEALS | 358.71 |
| GRAND TOTAL | 71,121.58 |

99.    The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $105,000. The total amount requested by Lead Counsel and Plaintiffs, $78,621.58, falls well below the $105,000 that Settlement Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.  If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in its reply papers.

100.    From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover their out-of-pocket expenses.  Plaintiffs' Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute this Action.  Accordingly, Plaintiffs' Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

101.    The largest component of expenses, $33,164.00, or approximately 46.63% of the total expenses, was expended on the retention of experts—two in the field of accounting and reporting related party transactions, one in the field of banking and banking regulations, and two in the field of damages and loss causation.  These experts were consulted at different points throughout the litigation, including on matters related to the preparation of the Complaint, on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.

102.    Another large component of expenses, $14,745.00, or approximately 20.73% of the total expenses, was expended on the retention of a private investigator, who conducted

37

numerous fact interviews with former Eagle employees and other relevant third parties in connection with Lead Counsel's investigation.

103.    Additionally, Lead Counsel paid $11,135.47 in mediation fees, which is approximately 15.66% of the total expenses incurred.

104.    A total of $2,848.85, or approximately 4% of the total expenses, was expended on work-related transportation, lodging, and meal costs.  Air travel was at economy or premium economy rates (*i.e.*, not business or first class).

105.    The other litigation expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These litigation expenses included, among other things, the use of online research vehicles to research many of the factual allegations alleged in the Complaint and to research and support Plaintiffs' legal arguments, court fees, service of process costs, photocopying, and postage and delivery expenses.

106.    Finally, as stated above, Lead Counsel respectfully requests a PSLRA award of $7,500 for Cassinelli to compensate her for the time and effort she and her family expended on behalf of the Settlement Class.  *See* Ex. 1 (Cassinelli Decl.) at ¶¶12-13.[10]  The efforts devoted to this Action by Lead Plaintiff, her deceased husband, and her adult children—who worked with Lead Counsel to get Ms. Cassinelli up-to-speed on the litigation are detailed in her accompanying declaration.  Ex. 1.  Based on the substantial work done by Lead Plaintiff and her family for the benefit of the Settlement Class, Lead Counsel respectfully requests that the Court grant the request in full.

---

[10] The original Court-appointed Lead Plaintiff was Anthony Cassinelli, as Trustee of the Danilee Cassinelli Trust DTD 7-23-93.  ECF No. 33.  Following Mr. Cassinelli's death, the Court substituted Danilee Cassinelli as the Lead Plaintiff in the Action.  ECF No. 57.

107.    To date, no objections to the Litigation Expenses has been filed on the Court's docket.  In my opinion, the Litigation Expenses incurred by Plaintiffs' Counsel and Lead Plaintiff were reasonable and necessary to represent the Settlement Class and achieve the Settlement.  Accordingly, Lead Counsel respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII.    CONCLUSION

108.    In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, I respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and the proposed Plan of Allocation should be approved as fair and reasonable.  I further submit that the requested fee in the amount of 30% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of $78,621.58 in Litigation Expenses, including PSLRA reimbursement for costs in the amounts of $7,500 for Lead Plaintiff Danilee Cassinelli, as Trustee of the Danilee Cassinelli Trust DTD 7-23-93, should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 16th day of December, 2021, in Los Angeles, California.

*/s/ Leanne H. Solish*
Leanne H. Solish

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of December 2021, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/  Leanne H. Solish*
Leanne H. Solish
